UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KENT J. RODRIGUEZ, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | <u>CLASS ACTION COMPLAINT</u> |
| v. | <u>JURY TRIAL DEMANDED</u> |
| DRAFTKINGS INC. f/k/a DIAMOND EAGLE ACQUISITION CORP., JASON D. ROBINS, JASON K. PARK, JEFF SAGANSKY, and ELI BAKER, | |
| Defendants. | |

Plaintiff Kent J. Rodriguez ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding DraftKings Inc. f/k/a Diamond Eagle Acquisition Corp. ("DEAC", "DraftKings", or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired DraftKings securities between December 23, 2019 and June 15, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      DraftKings operates as a digital sports entertainment and gaming company in the U.S.  It operates through two segments, Business-to-Consumer and Business-to-Business. The Company provides users with daily sports, sports betting, and iGaming opportunities.  It is also involved in the design, development, and licensing of sports betting and casino gaming platform software for online and retail sportsbook, and casino gaming products.  The Company distributes its product offerings through various channels, including traditional websites, direct app downloads, and direct-to-consumer digital platforms.

3.      DraftKings was incorporated in Nevada as DEAC NV Merger Corp., a wholly owned subsidiary of its legal predecessor, DEAC, a special purpose acquisition company, or SPAC.  On April 23, 2020, DEAC consummated transactions contemplated by a Business Combination Agreement (the "Business Combination") dated December 22, 2019, as amended on April 7, 2020, and, in connection therewith, (i) DEAC merged with and into the Company, whereby the Company survived the merger and became the successor issuer to DEAC, (ii) the Company changed its name to "DraftKings Inc.," (iii) the Company acquired DraftKings Inc., a Delaware corporation ("Old DK"), by way of a merger, and (iv) the Company acquired all of the issued and outstanding share capital of SBTech (Global) Limited ("SBTech").  Upon

consummation of the preceding transactions, Old DK and SBTech became wholly owned subsidiaries of the Company.

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) SBTech had a history of unlawful operations; (ii) accordingly, DraftKings' merger with SBTech exposed the Company to dealings in black-market gaming; (iii) the foregoing increased the Company's regulatory and criminal risks with respect to these transactions; (iv) as a result of all the foregoing, the Company's revenues were, in part, derived from unlawful conduct and thus unsustainable; (v) accordingly, the benefits of the Business Combination were overstated; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.      On June 15, 2021, Hindenburg Research ("Hindenburg") published a report addressing DraftKings, alleging that the Company's merger with SBTech exposed DraftKings to dealings in black-market gaming.  Citing "conversations with multiple former employees, a review of SEC and international filings, and inspection of back-end infrastructure at illicit international gaming websites," Hindenburg alleged that "SBTech has a long and ongoing record of operating in black markets," estimating that 50% of SBTech's revenue is from markets where gambling is banned."

6.      Following publication of the Hindenburg report, DraftKings' stock price fell $2.11 per share, or 4.17%, to close at $48.51 per share on June 15, 2021.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

8.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

10.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements entered and the subsequent damages took place in this Judicial District.  Pursuant to DraftKings's most recent Quarterly Report, as of May 5, 2021, there were 400,980,887 shares of the Company's Class A common stock and 393,013,951 shares of the Company's Class B common stock outstanding. DraftKings's securities trade on the Nasdaq Global Select market ("NASDAQ").  Accordingly, there are presumably hundreds, if not thousands, of investors in DraftKings securities, some of whom undoubtedly reside in this Judicial District.

11.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

12.      Plaintiff, as set forth in the attached Certification, acquired DraftKings securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant DraftKings is a Nevada corporation with principal executive offices located at 222 Berkeley Street, 5th Floor, Boston, Massachusetts 02116.  The Company's common stock trades in an efficient market on the NASDAQ under the ticker symbol "DKNG".

14.     Defendant Jason D. Robins ("Robins") has served as DraftKings' Chief Executive Officer ("CEO") and Chairman of the Board since the consummation of the Business Combination.

15.     Defendant Jason K. Park ("Park") has served as DraftKings' Chief Financial Officer ("CFO") since the consummation of the Business Combination.

16.     Defendant Jeff Sagansky ("Sagansky") served as DEAC's CEO and Chairman until the consummation of the Business Combination.

17.     Defendant Eli Baker ("Baker") served as DEAC's CFO and President until the consummation of the Business Combination.

18.     Defendants Robins, Park, Sagansky, and Baker are sometimes referred to herein as the "Individual Defendants."

19.     The Individual Defendants possessed the power and authority to control the contents of DraftKings' SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of DraftKings' SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with DraftKings, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were

then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

20.     DraftKings and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21.     DraftKings operates as a digital sports entertainment and gaming company in the U.S.  It operates through two segments, Business-to-Consumer and Business-to-Business. The Company provides users with daily sports, sports betting, and iGaming opportunities.  It is also involved in the design, development, and licensing of sports betting and casino gaming platform software for online and retail sportsbook, and casino gaming products.  The Company distributes its product offerings through various channels, including traditional websites, direct app downloads, and direct-to-consumer digital platforms.

22.     DraftKings was incorporated in Nevada as DEAC NV Merger Corp., a wholly owned subsidiary of its legal predecessor, DEAC, a special purpose acquisition company, or SPAC.  On April 23, 2020, DEAC consummated transactions contemplated by a Business Combination Agreement dated December 22, 2019, as amended on April 7, 2020, and, in connection therewith, (i) DEAC merged with and into the Company, whereby the Company survived the merger and became the successor issuer to DEAC, (ii) the Company changed its name to "DraftKings Inc.," (iii) the Company acquired Old DK, by way of a merger, and (iv) the Company acquired all of the issued and outstanding share capital of SBTech.  Upon consummation of the preceding transactions, Old DK and SBTech became wholly owned subsidiaries of the Company.

**Materially False and Misleading Statements Issued During the Class Period**

23.     The Class Period begins on December 23, 2019, when DraftKings issued a press release, filed by DEAC on a Current Report on Form 8-K with the SEC that same day, announcing the Business Combination.   That press release made the following representations regarding SBTech:

**SBTech Highlights**

- SBTech is a premier global full-service B2B turnkey technology provider with omni-channel sports betting solutions, trading services, and marketing and bonus tools powering some of the world's most popular sports betting and online gaming brands.
- 50+ partners in 20+ regulated markets and jurisdictions including Czech Republic, Denmark, Ireland, Italy, Mexico, Portugal, Spain, Sweden, and U.K. and Arkansas, Indiana, Mississippi, New Jersey, Oregon and Pennsylvania in United States.
- Awarded exclusive contract offering mobile and retail sports betting for the Oregon state lottery with their Oregon Lottery Scoreboard brand.

"The combination of DraftKings and SBTech brings together two tech-native companies with the customer at their cores," said Gavin Isaacs, SBTech's Chairman. "SBTech will maintain its core business and continue its B2B focus. We are excited about the opportunity to join a company with a similar innovation DNA and create a unique and differentiated player in global sports betting and online gaming."

24.     That same day, DEAC filed a Current Report on Form 8-K with the SEC, appended to which as an exhibit was the transcript of an investor call to discuss the Business Combination. During the call, Defendant Robins touted SBTech, stating, in relevant part:

Number three, the combination with SBTech, who is the leading B2B innovator in sports technology, powering some of the world's most popular sports betting and online gaming brands, creates a unique, vertically integrated, customer focused U.S. market opportunity.

\*\*\*

Layering in SBTech, the industry leader in B2B sport's technology, strengthens us and creates a unique, vertically integrated company in the category. SBTech is one of the fastest growing tech firms within sports betting, featuring an omnichannel

solution. They have a proven track record of outperformance versus industry peers on both growth and margin. The company has a global footprint with material new opportunities emerging in the U.S., Europe, Africa, Latin America, and Asia.

25.     On January 13, 2020, DEAC filed a Current Report on Form 8-K with the SEC, appended to which as exhibit was an investor presentation (the "January 2020 Investor Presentation").  The January 2020 Investor Presentation described DraftKings and SBTech as a "fully integrated platform that enables DraftKings' mission," and touted SBTech as a "leader in online gaming technology" that is "[p]ositioned as one of the fastest growing tech firms within sports betting, with an **omni-channel solution**," and has a "**[p]roven track record of outperformance** vs. industry peers on growth and margin" and a "**[g]rowing global footprint** with material new opportunities emerging in Europe, U.S., Africa, Latin America, and Asia." (Emphasis in original.)

26.     On March 5, 2020, DEAC filed a Current Report on Form 8-K with the SEC, appended to which as an exhibit was the transcript of an interview given by Defendant Robins on March 3, 2020 at the Morgan Stanley Technology, Media & Telecom Conference.  During the interview, Defendant Robins stated, in relevant part:

> I think for us there were really three objectives that we were trying to solve for. And the way we approach anything at the company, including something like how do we capitalize the business, what's the best financing route, is we start with what are we trying to accomplish and then what is the most effective way to accomplish that.  Seems simple enough.
>
> So the three things we were trying to accomplish were we had identified this company, SBTech, which we felt was a really important part of the full product that we needed to build out and we thought this was a great opportunity to really add the one piece we thought we were missing on the technology and product side.

27.     On March 12, 2020, DraftKings issued a press release announcing the Company's full year 2019 results.  The press release stated, in relevant part:

"This was a transformative year for DraftKings. We further established ourselves as a leader in the rapidly evolving digital sports and gaming industry, launched products in six new states and announced a business combination with Diamond Eagle and SBTech to become a public company," said Jason Robins, co-founder and Chief Executive Officer of DraftKings. "I am excited to have closed out 2019, having achieved net revenue of $323M for the full year, a 43% increase over 2018."

                                                    ***

Upon close of the business combination, DraftKings will become the only vertically-integrated pure-play sports betting and online gaming company based in the United States. Through the business combination, DraftKings expects to realize synergies by transitioning its risk and trading sports betting platform to SBTech's, instead of relying on a third-party platform. In addition to reducing costs, DraftKings will control its backend system and product roadmap, differentiating the company from other U.S. operators and giving it the ability to tailor its sports betting product to U.S. sports and users.

28.    On April 23, 2020, DraftKings issued a press release entitled, "DraftKings Closes Business Combination and Will Begin Trading on the Nasdaq Stock Exchange." The press release stated, in relevant part:

"Today marks another milestone for DraftKings and the future of digital sports entertainment and gaming in America," said Jason Robins, co-founder and CEO of DraftKings. "By bringing together our leading consumer brand, data science expertise and industry-leading products with SBTech's proven technology platform, we will accelerate our innovation, growth and scale. I am confident that the new DraftKings will progress our goal of offering the best, most innovative sports and gaming products to our customers."

29.    On April 27, 2020, DraftKings filed a Prospectus on Form 424B3 with the SEC (the "April 27, 2020 Prospectus"). The April 27, 2020 Prospectus stated, in relevant part:

Following the consummation of the Business Combination with SBTech, we also plan to expand our offerings to begin serving other operators within our industry. We will begin by migrating DraftKings' own consumer offering onto SBTech's proprietary sports betting platform over time, allowing us to become a fully vertically integrated sports betting operator. We will also leverage the combined entity's shared infrastructure to service adjacent branded operators in both the United States and internationally at greater scale. This could include online sportsbooks, retail sportsbooks, iGaming operators, as well as governments or lotteries seeking to manage their own sportsbook or iGaming offerings. SBTech offers one of the industry's most robust platform solutions to satisfy its customers'

sports betting technology needs, ranging from trading and risk management to platform services to support reporting, customer management and regulatory reporting requirements. SBTech competes with a variety of other sports betting technology providers and differentiates itself through this full suite platform offering. In addition, SBTech offers a leading iGaming solution via its proprietary platform with integrations to third-party iGaming suppliers.

30.     Further, the April 27, 2020 Prospectus listed as one of the Company's "Core

Operating Principles":

> ***Act responsibly***. We are committed to industry-leading responsible gaming practices and seek to provide our users with the resources and services they need to play responsibly. We have invested in processes that identify and protect vulnerable users. Specifically, we created an internal, independent "Game Integrity and Ethics Team" that actively monitors for any indication of activities that may violate current regulations governing us, our own terms of use or our "Community Guidelines." This team oversees a framework for our user community to follow in determining when a user may need assistance. With our focus on fair and responsible gaming along with user protection and data security, users have come to know and trust our gaming platform.

31.     Finally, with respect to compliance, the April 27, 2020 Prospectus stated, in

relevant part:

> Underpinning our regulatory access is our DraftKings platform that allows us to efficiently and safely scale our product offerings into multiple jurisdictions. We have developed our DraftKings platform from the ground up to meet the needs of the unique regulatory environment that the United States offers, while maintaining ease of use for our users. We provide a single experience for login, verification and wallet.
>
> SBTech's platform has been built from the ground up to meet the needs of differing regulatory regimes, including configurable regulatory and responsible gaming controls such as responsible gaming tests, operator alerts on player behavior, deposit limits, betting limits, loss limits, timeout facilities, session limits, reality checks, balance thresholds and intended gaming amounts. These features allow the operators' customers full control of their gaming to allow them to play responsibly.

32.     On May 13, 2020, DraftKings filed a Prospectus on Form 424B3 with the SEC (the

"May 13, 2020 Prospectus").   The May 13, 2020 Prospectus contained substantively similar

statements as those included in the April 27, 2020 Prospectus, referenced, *supra*, in ¶¶ 29-31.

33.     On May 15, 2020, DraftKings issued a press release announcing the Company's Q1 2020 results.  The press release stated, in relevant part:

> Through its recent business combination, DraftKings has created the only vertically integrated sports betting company based in the United States.
>
> "We are uniquely positioned at the intersection of digital sports entertainment and gaming in a rapidly growing industry," said Jason Robins, DraftKings co-founder, CEO and Chairman of the Board. "DraftKings recorded standalone Q1 year-over-year revenue growth of 30% despite the effects of COVID-19.  Additionally, the engagement we continue to see from our customers validates the connection they have with our content, their passion for our products and most importantly their loyalty to our brand."

34.     That same day, DraftKings hosted an earnings call with investors and analysts to discuss the Company's Q1 2020 results (the "Q1 2020 Earnings Call").  During the scripted portion of the Q1 2020 Earnings Call, Defendant Robins stated, in relevant part, "[t]hrough the acquisition of SBTech, we have created the only vertically integrated sports betting company in the U.S., enabling us to be the product innovation leader for American sports, with a clear focus on the American sports fan."  Also during the scripted portion of the Q1 2020 Earnings Call, Defendant Park stated, in relevant part:

> Starting with Old DraftKings, despite COVID we generated $89 million of net revenue in the quarter, which is an increase of 30% versus prior year. Notably pre-COVID prior to March 11, our revenue was up 60% versus prior year. These results are due to our strategy of launching in new states, as well as growing revenue in existing states. In this quarter, we were live in five new states for online sports betting, versus the first quarter of 2019, Indiana, Iowa, New Hampshire, Pennsylvania, and West Virginia.
>
> ***
>
> Now turning to SBTech. Old SBTech revenue generated €22.6 million, an increase of 3% versus Q1 2019. Notably, pre-COVID, prior to March 11, our revenue was up 19% versus prior year.
>
> Adjusted EBITDA was negative €851,000 versus prior year of positive €4.3 million. SBTech was well on track to achieve positive EBITDA for the quarter,

until COVID hit. And we anticipate to return to profitability once the major sports resume.

35.     On June 22, 2020, DraftKings filed a Prospectus on Form 424B4 with the SEC (the "June 22, 2020 Prospectus").   The June 22, 2020 Prospectus contained substantively similar statements as those included in the April 27, 2020 Prospectus, referenced, *supra*, in ¶¶ 29-31.

36.     On August 14, 2020, DraftKings issued a press release entitled, "DraftKings Reports Strong Q2 Revenue Despite Limited Sports Calendar."   The press release stated, in relevant part:

> DraftKings [. . .] today reported financial results for the second quarter of 2020. For the three months ended June 30, 2020, DraftKings reported GAAP revenue of $71 million compared to $57 million during the same period in 2019. On a pro forma basis, including the effect of the Company's business combination with SBTech (Global) Limited and Diamond Eagle Acquisition Corp. as if it had been completed on January 1, 2019, revenue would have been $75 million in the second quarter of 2020, compared to $83 million during the same period in 2019. DraftKings ended the second quarter of 2020 with over $1.2 billion in cash and no debt on its balance sheet.
>
> "We believe that the best product will ultimately win with the American consumer," said Jason Robins, DraftKings Co-Founder, CEO and Chairman of the Board. "As a technology first organization, we will continue to focus on bringing new and innovative products to market that strengthen our engagement with customers and maintain our competitive differentiation."

37.     That same day, DraftKings hosted an earnings call with investors and analysts to discuss the Company's Q2 2020 results (the "Q2 2020 Earnings Call").   During the scripted portion of the Q2 2020 Earnings Call, Defendant Robins stated, in relevant part:

> We had a strong second quarter given the limited sports calendar with second quarter pro forma revenue of $75 million. As sports have started to return, we saw revenue improve sequentially each month in the quarter, with June revenue increasing 20% year-over-year on a pro forma basis. This strong overall results and improvement are due to our product innovation, our entry into new jurisdiction, and pent-up demand for sports betting as Live Sports like Golf, European Soccer, NASCAR and UFC started to return.

38.     On October 8, 2020, DraftKings filed a Prospectus on Form 424B4 with the SEC

(the "October 8, 2020 Prospectus").  The October 8, 2020 Prospectus contained substantively

similar statements as those included in the April 27, 2020 Prospectus, referenced, *supra*, in ¶¶ 29-

31.

39.     On November 13, 2020, DraftKings issued a press release reporting the Company's

Q3 2020 results and raising its 2020 revenue guidance.  The press release stated, in relevant part:

> DraftKings [. . .] today reported its financial results for the third quarter of 2020.
> For the three months ended September 30, 2020, DraftKings reported revenue of
> $133 million, an increase of 98% compared to $67 million during the same period
> in 2019. After giving pro forma effect to the business combination with SBTech
> (Global) Limited and Diamond Eagle Acquisition Corp., as if it had occurred on
> January 1, 2019, revenue grew 42% compared to the three months ended September
> 30, 2019.
>
> "The resumption of major sports such as the NBA, MLB and the NHL in the third
> quarter, as well as the start of the NFL season, generated tremendous customer
> engagement," said Jason Robins, DraftKings' co-founder, CEO and Chairman of
> the Board. "In addition to our year-over-year pro forma revenue growth of 42%,
> DraftKings recorded an increase in monthly unique payers of 64% to over 1 million,
> demonstrating the effectiveness of our data-driven sales and marketing approach.
> Our product offerings and scalable platform provide a distinctive and personalized
> experience for customers across the ten states where we operate mobile sports
> betting today, and we look forward to entering additional jurisdictions at the earliest
> opportunity."

40.     That same day, DraftKings hosted an earnings call with investors and analysts to

discuss the Company's Q3 2020 results (the "Q3 2020 Earnings Call").  During the scripted portion

of the Q3 2020 Earnings Call, Defendant Robins stated, in relevant part:

> DraftKings had a very productive third quarter on a number of different fronts.
> First, our Q3 performance confirms what we foreshadowed on our previous
> earnings call. The return on major sports has generated tremendous customer
> engagement. Third quarter revenue of $133 million was at the high end of the range
> we outlined in our recent S-1 and grew 42% year-over-year. In Q3, we also had
> more than 1 million monthly unique payers, which means the average for the month
> of July, August and September was greater than 1 million.

***

13

We continue to be very excited with the products and technology investments we're making as well as with our progress on the technology migration and business integration of SBTech.

*** 

As a reminder, with the acquisition of SBTech, we now have almost 1,100 engineers worldwide dedicated to creating best-in-class technology and games and experiences for our users.

41.     On February 26, 2021, DraftKings filed an Annual Report on Form 10-K with the

SEC, reporting the Company's financial and operating results for the quarter and year ended

December 31, 2020 (the "2020 10-K"). The 2020 10-K also touted SBTech's business, stating,

*inter alia*:

> **B2B Business Marketing** - Our core B2B marketing strategy is centered around attending and exhibiting at major trade shows around the world. SBTech's trade show marketing is supplemented with digital and offline marketing campaigns in leading industry publications, websites, regular media pieces and participation on industry panels. SBTech's reputation and customer testimonials also assist in its marketing and business efforts.

(Emphasis in original).

42.     Further, the 2020 10-K touted the Company's compliance program, stating, in

relevant part:

> We have developed and implemented an internal compliance program to help ensure that we comply with legal and regulatory requirements imposed on us in connection with our DFS, Sportsbook and iGaming activities. Our compliance program focuses on, among other things, reducing and managing problematic gaming and providing tools to assist users in making educated choices related to gaming activities.
>
> SBTech offerings have been built from the ground up to meet the needs of differing regulatory regimes, including configurable regulatory and responsible gaming controls such as responsible gaming tests, operator alerts on player behavior, deposit limits, betting limits, loss limits, timeout facilities, session limits, reality checks, balance thresholds and intended gaming amounts. These features allow the operators' customers full control of their gaming to allow them to play responsibly.

43.     Appended to the 2020 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Robins and Park, attesting that "[t]he information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

44.     Corresponding with the 2020 10-K, DraftKings issued a press release announcing the Company's fourth quarter and full year 2020 results and raising its 2021 revenue guidance. The press release stated, in relevant part:

> For the three months ended December 31, 2020, DraftKings reported revenue of $322 million, an increase of 146% compared to $131 million during the same period in 2019. After giving pro forma effect to the business combination with SBTech (Global) Limited ("SBTech") and Diamond Eagle Acquisition Corp. which was completed on April 23, 2020, as if it had occurred on January 1, 2019, revenue grew 98% compared to the three months ended December 31, 2019.
>
> "With a favorable fourth quarter sports calendar and strong marketing execution, DraftKings was able to generate tremendous customer acquisition and engagement that propelled us to $322 million in fourth quarter revenue, a 98% year over year increase," said Jason Robins, DraftKings' co-founder, CEO and Chairman of the Board. "In the fourth quarter of 2020, we saw MUPs increase 44% to 1.5 million and ARPMUP increase 55% to $65. We are raising our revenue outlook for 2021 due to our expectation for continued growth, the outperformance of our core business and newly launched states that were not included in our previous guidance."

45.     That same day, DraftKings hosted an earnings call with investors and analysts to discuss the Company's Q4 2020 results (the "Q4 2020 Earnings Call"). During the scripted portion of the Q4 2020 Earnings Call, Defendant Robins stated, in relevant part:

> Our list of accomplishments in 2020 is impressive. We completed the business combination with SBTech and became a publicly traded company in April. We are well on our way to completing the integration of the two companies from a team organization and business standpoint, and are progressing with the migration to our own in-house sports betting engine, which we expect will be complete by the end of the third quarter in 2021.

***

We exceeded our expectations in 2020. Pro forma revenue grew nearly 50% to $644 million versus $432 million last year. Both MUPs and ARPMUP grew 29% in 2020. We had a strong close to the year with Q4 revenue growing almost 100% year-over-year, and MUPs and ARPMUP growing 44% and 55%, respectively, in the quarter.

Revenue for the year was almost $95 million higher than the midpoint of our guidance. These results were due to overperformance in our core business as well as multiple assumptions on external factors that broke our way, such as the sports calendar, the extension of mobile registration, Illinois and better-than-expected whole percentage in online sports book.

46.     On May 7, 2021, DraftKings issued a press release announcing the Company's Q1

2021 results and raising its 2021 revenue guidance.  The press release stated, in relevant part:

For the three months ended March 31, 2021, DraftKings reported revenue of $312 million, an increase of 253% compared to $89 million during the same period in 2020. After giving pro forma effect to the business combination with SBTech (Global) Limited ("SBTech") and Diamond Eagle Acquisition Corp. which was completed on April 23, 2020, as if it had occurred on January 1, 2019, revenue grew 175% compared to the three months ended March 31, 2020.

"DraftKings is off to an outstanding start in 2021," said Jason Robins, DraftKings' co-founder, CEO and Chairman of the Board. "We continued to make progress and remain on track with the migration to our own in-house proprietary sports betting engine, strengthened our content and technology capabilities with the acquisitions of VSiN and BlueRibbon Software, and invested in further differentiating our product offering with the upcoming rollout of social functionality in our DFS and mobile Sportsbook apps."

Jason Park, DraftKings' Chief Financial Officer, added, "Our $312 million in first quarter revenue, 114% increase in MUPs and 48% growth in ARPMUP reflect solid customer acquisition and retention as well as successful launches of mobile sports betting and iGaming in new states. We are raising our revenue outlook for 2021 due to the outperformance of our core business in the first quarter and our expectation for continued healthy growth."

47.     That same day, DraftKings hosted an earnings call with investors and analysts to

discuss the Company's Q1 2021 results (the "Q1 2021 Earnings Call").  During the scripted portion

of the Q1 2021 Earnings Call, Defendant Robins stated, in relevant part:

DraftKings is off to an outstanding start in 2021. Revenue for the first quarter increased 175% year-over-year to 312 million on a pro forma basis. MUPs grew

114% and ARPMUP grew 48%. These results reflect continued over performance of our core business due to strong customer acquisition and retention as well as the successful launches of mobile sports betting and iGaming in Michigan and mobile sports betting in Virginia.

48.     The statements referenced in ¶¶ 23-47 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) SBTech had a history of unlawful operations; (ii) accordingly, DraftKings' merger with SBTech exposed the Company to dealings in black-market gaming; (iii) the foregoing increased the Company's regulatory and criminal risks with respect to these transactions; (iv) as a result of all the foregoing, the Company's revenues were derived, in part, from unlawful conduct and thus unsustainable; (v) accordingly, the benefits of the Business Combination were overstated; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

49.     On June 15, 2021, Hindenburg published a report entitled, "DraftKings: A $21 Billion SPAC Betting It Can Hide Its Black Market Operations."  The report alleged that the Company's merger with SBTech exposed DraftKings to dealings in black-market gaming.  Specifically, the report stated, in relevant part:

- SBTech accounted for ~25% of total revenue at the SPAC consummation and was the only positive contributor to operating income, providing both financial stability and technology to the deal.

- Unbeknownst to investors, DraftKings' merger with SBTech also brings exposure to extensive dealings in black-market gaming, money laundering and organized crime.

- Based on conversations with multiple former employees, a review of SEC & international filings, and inspection of back-end infrastructure at illicit

international gaming websites, we show that SBTech has a long and ongoing record of operating in black markets.

- We estimate that roughly 50% of SBTech's revenue continues to come from markets where gambling is banned, based on an analysis of DraftKings' SEC filings, conversations with former employees, and supporting documents.

\*\*\*

- We identified numerous black market clients of DraftKings' "front" entity, through searches on social media and back-end web infrastructure.

\*\*\*

- DraftKings trades at a ~26x last twelve months (LTM) sales multiple and a ~20x estimated 2021 sales multiple despite (i) no expectation of earnings for years, (ii) intense competition, and (iii) regulatory risk. The company posted net losses of $844 million in 2020 and $346 million last quarter.

- Insiders have dumped over $1.4 billion in stock since the company went public a little over a year ago, with SBTech's founder leading the pack, having personally sold ~$568 million in shares.

\*\*\*

- We think DraftKings has systematically skirted the law and taken elaborate steps to obfuscate its black market operations. These violations appear to be continuing to this day, all while insiders aggressively cash out amidst the market froth.

50.     The Hindenburg report explained that SBTech entered into Asian black markets in

2014.  Indeed, the report stated, in relevant part:

According to former employees, SBTech's offering struggled to compete against competitors like Kambi, which had a robust team dedicated to analyzing and setting "in-game" betting odds and had more powerful technology. The competition pushed SBTech to seek business in markets where others were unwilling to operate, we were told.

Despite the illegality of sports gambling in major Asian markets, SBTech's own marketing materials suggest it had an expansive Asia-facing business at least as far back as 2014. SBTech's website at the time advertised a "powerful turnkey Asian system" that accepted payment in currencies where gambling was clearly illegal.

***

Specifically, according to the graphic on its website, SBTech accepted Vietnamese Dong and Indonesian Rupees – both currencies based in black market sports gambling jurisdictions.

51.     The Hindenburg report continued to explain that the owner of SBTech spun out certain of his gambling operations to set up a front entity to mask SBTech's involvement in black and unregulated markets.  The report stated:

> According to a former business partner of SBTech, the prospect of doing business in the U.S. was the trigger for SBTech owner Shalom Meckenzie to spin out certain of his gambling operations to at least two separate entities. The entities were placed under the control of relatives or trusted confidantes and run by many of the same staff.

> Shortly after the Supreme Court hearing, on March 19, 2018, SBTech announced that Tom Light, the SVP of business development, was leaving to create a "new blockchain and gambling venture".

***

> The venture was unnamed in the press release, but Maltese and Bulgarian corporate records show that Light began creating an entity called BTi days later. [1,2,3] It was later renamed CoreTech.

> One former employee who served in a product development role told us BTi/CoreTech was a "front" for SBTech's illegal or unregulated markets:

>> "*Before SBTech joined with DraftKings, they split the grey market/unregulated…they [Bti] are a separate company marketing their white label solution to Middle East, South America, mostly China and Malaysia. Their technology provider is SBTech. Because SBTech is now on NASDAQ they don't want Asia or the grey market to give it a bad influence. They want to be clean*."

> The same former employee told us that BTi/CoreTech acted as a customer of SBTech, which invoiced BTi/CoreTech, in an apparent effort to put a layer of legal separation between SBTech and its black market end customers.

> A second former employee, who worked as a data specialist at SBTech for several years, described BTi/CoreTech similarly. When asked how much of BTi/CoreTech's revenue comes from black or grey markets he said:

"I would say almost all of it. Well over 90%"

Despite the small legal market in Asia, DraftKings states in its SEC filings that **an unnamed customer** focused on Asian markets accounted for 46% of SBTech's 2019 revenue and 52% of SBTech's 2020 revenue, but failed to disclose the name of the customer.[1] [Pg. 39, Pg. 40]

When asked about this, the former employee speculated "…**if it's Asia it will have to be (BTi)…it must be through BTi**". To be clear, SBTech has several Asia-facing customers and "resellers" such as 10Bet, W88, and Gameplay, as we detail further. The opacity of DraftKings' customer relationship disclosures has thus far masked the names of its top customers.

The implication either way is that black and unregulated market revenue and profitability, which includes BTi/CoreTech, represented and still represents a major portion of SBTech's financials since DraftKings went public.

The former employee added that the new focus on adding blockchain to the gambling offering was because operators in black markets had requested cryptocurrency options to make moving money easier. Crypto has emerged as the medium of choice for illicit money transfers, given the lack of oversight.

BTi/CoreTech was set up across town from SBTech's office in Sofia, Bulgaria, 4.5 miles (7.2 km) away, per Bulgarian corporate records.

(Emphasis in original.)

52.     Further, the Hindenburg report explained that, despite SBTech's claims it was separate from BTi/CoreTech, multiple employees and customers described BTi/CoreTech as either an affiliate or subsidiary of SBTech, or used the name BTi interchangeably with SBTech.  For example, the Hindenburg report stated:

Despite the ostensible separation, many employees seemed to be under the impression that they worked for SBTech.

This includes **BTi/CoreTech's current CEO**, Amir Vaknin (who, according to his LinkedIn, never worked for SBTech). Nonetheless, he announced he was searching to **hire employees for SBTech** around the time that BTi/CoreTech was formed.

(Emphasis in original.)

53.     The Hindenburg report indicated that Hindenburg was able to corroborate accounts by former employees who claimed that "the renaming and re-branding of parts of SBTech to BTi to CoreTech – was an effort to separate the entity's 'behind the scenes' black market operations to pave the way for a U.S. deal partner like DraftKings', with its polished and clean exterior." Specifically, the Hindenburg report provided a number of corroborating examples:

Example 1: BTi's Sportsbook Is Advertised Through a Site Linked To A Recent Raid on An Alleged Illegal Operator in Thailand

\*\*\*

Example 2: 12Bet, A Site Tied To Triads And At The Center Of A Swiss Money Laundering Investigation, Advertises Its Use of BTi's Technology

\*\*\*

Example 3: Gaming Site Fun88, Linked To An Illegal Gaming Raid In Vietnam, Also Advertises Its Use of BTi's Platform

\*\*\*

Example 4: SBTech Claimed to Oregon Regulators That Its Customer 10Bet Did Not Derive Revenue From China (A Major Black Market) Using SBTech's Software

We Found Multiple Chinese-Facing 10Bet Sites Where Backend Web Infrastructure Demonstrates SBTech's Involvement

\*\*\*

Example 4 (Cont'd): 10bet, A Sports Betting Firm With Apparent Ongoing Operations in China, Was Launched By SBTech Founder Shalom Meckenzie

In Mid-2018, Meckenzie Stepped Down From 10Bet And Transferred His Shares to His Brother To (Once Again) Obfuscate The Connection

DraftKings Continues to Do Business With the Entity, Per Its SEC Filings

\*\*\*

Example 5: SBTech Operated in Iran For Years, According to Multiple Former Employees, Contrary to Its Representations to Oregon State Regulators

54.     In its conclusion, the Hindenburg report further elaborated on SBTech's unlawful

activity, stating, in relevant part:

> One issue with partnering with black market betting operators is that such businesses are not just engaged in illegal betting. These operators almost by definition are engaged in money laundering, and often additional lines of underground business activity.
>
> As one former employee told us succinctly, SBTech founder Meckenzie and his affiliate entities have "sold to plenty of mobs".
>
> The same former employee explained that DraftKings and its SPAC sponsors must have either known the issues with SBTech's black market operations or were grossly negligent in their diligence:
>
>> "*I would be really, really, really surprised if they didn't know. In fact, it would be really, really amateur of them if they didn't investigate that. Presumably they knew and...helped facilitate hiding it or turned a blind eye to it... but they must have known*."
>
> DraftKings has never identified the nature of its BTi/CoreTech relationship in any of its SEC filings – not as an affiliate or subsidiary of SBTech or in any other way as relevant to DraftKings' SPAC combination with SBTech. It also has not provided transparency regarding the markets SBTech and its other "resellers" and affiliates operate in, and their respective contributions to the public company.
>
> Given the importance of SBTech to DraftKings' top and bottom-line, it is virtually impossible to fathom that DraftKings was and continues to remain unaware of its ongoing relationship with BTi/CoreTech and its illicit operators.
>
> Yet rather than disclose anything about these relationships, the company instead appears to have created a complex web of misinformation to conceal them.

(Emphasis in original.)

55.     Following publication of the Hindenburg report, DraftKings' stock price fell $2.11

per share, or 4.17%, to close at $48.51 per share on June 15, 2021.

56.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline

in the market value of the Company's securities, Plaintiff and other Class members have suffered

significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired DraftKings securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

58.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, DraftKings securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by DraftKings or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

59.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

60.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

61.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of DraftKings;

- whether the Individual Defendants caused DraftKings to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of DraftKings securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

62.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

63.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- DraftKings securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold DraftKings securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

64.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

65.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

66.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

67.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

68.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of DraftKings securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire DraftKings securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

69.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for DraftKings securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about DraftKings' finances and business prospects.

70.    By virtue of their positions at DraftKings, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant

26

knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

71.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of DraftKings, the Individual Defendants had knowledge of the details of DraftKings' internal affairs.

72.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of DraftKings.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to DraftKings' businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of DraftKings securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning DraftKings' business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired DraftKings securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

73.     During the Class Period, DraftKings securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares

of DraftKings securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of DraftKings securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of DraftKings securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

74.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

76.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

77.     During the Class Period, the Individual Defendants participated in the operation and management of DraftKings, and conducted and participated, directly and indirectly, in the conduct of DraftKings' business affairs. Because of their senior positions, they knew the adverse

non-public information about DraftKings' misstatement of income and expenses and false financial statements.

78.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to DraftKings' financial condition and results of operations, and to correct promptly any public statements issued by DraftKings which had become materially false or misleading.

79.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which DraftKings disseminated in the marketplace during the Class Period concerning DraftKings' results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause DraftKings to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of DraftKings within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of DraftKings securities.

80.    Each of the Individual Defendants, therefore, acted as a controlling person of DraftKings.  By reason of their senior management positions and/or being directors of DraftKings, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, DraftKings to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of DraftKings and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

81.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by DraftKings.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  July 2, 2021                              Respectfully submitted,

                                                  POMERANTZ LLP

                                                  */s/ Jeremy A. Lieberman*
                                                  Jeremy A. Lieberman
                                                  J. Alexander Hood II
                                                  Thomas H. Przybylowski
                                                  600 Third Avenue
                                                  New York, New York 10016
                                                  Telephone: (212) 661-1100
                                                  Facsimile: (212) 661-8665
                                                  jalieberman@pomlaw.com
                                                  ahood@pomlaw.com
                                                  tprzybylowski@pomlaw.com

                                                  *Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, _Kent Jamison Rodryai_, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against DraftKings Inc. f/k/a Diamond Eagle Acquisition Corp. ("DEAC", "DraftKings", or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire DraftKings securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired DraftKings securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in DraftKings securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.


Executed   6-25-21
                (Date)


_____
(Signature)


_____
(Type or Print Name)

**DraftKings Inc. (DKNG)**                                                              **Rodriguez, Kent J.**

**List of Purchases and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 4/12/2021 | 100 | $58.1700 |
| Purchase | 4/13/2021 | 50 | $58.9100 |
| Purchase | 4/13/2021 | 50 | $58.8500 |
| Purchase | 4/13/2021 | 50 | $58.8300 |
| Purchase | 4/13/2021 | 50 | $58.9400 |
| Purchase | 4/13/2021 | 50 | $59.0500 |
| Purchase | 4/13/2021 | 100 | $58.8800 |
| Purchase | 4/14/2021 | 50 | $60.4200 |
| Purchase | 4/14/2021 | 50 | $60.2100 |
| Purchase | 4/14/2021 | 50 | $59.6700 |
| Purchase | 4/14/2021 | 50 | $59.6500 |
| Purchase | 4/14/2021 | 100 | $59.7500 |
| Purchase | 4/14/2021 | 100 | $60.0500 |
| Purchase | 4/14/2021 | 100 | $59.9493 |
| Purchase | 4/16/2021 | 50 | $58.0600 |
| Purchase | 4/16/2021 | 50 | $58.1500 |
| Purchase | 4/16/2021 | 50 | $58.0999 |
| Purchase | 4/16/2021 | 50 | $57.9799 |
| Purchase | 4/16/2021 | 50 | $57.9700 |
| Purchase | 4/16/2021 | 50 | $57.9897 |
| Purchase | 4/16/2021 | 50 | $58.1500 |
| Purchase | 4/16/2021 | 50 | $58.1500 |
| Purchase | 4/16/2021 | 50 | $58.1200 |
| Purchase | 4/16/2021 | 100 | $58.3500 |
| Purchase | 4/16/2021 | 100 | $58.2900 |
| Purchase | 4/19/2021 | 50 | $56.0500 |
| Purchase | 4/19/2021 | 50 | $56.2500 |
| Purchase | 4/19/2021 | 50 | $56.4800 |
| Purchase | 4/19/2021 | 50 | $56.5600 |
| Purchase | 4/19/2021 | 100 | $56.0390 |
| Purchase | 4/19/2021 | 100 | $55.7630 |
| Purchase | 4/19/2021 | 100 | $55.9800 |
| Purchase | 4/20/2021 | 100 | $55.6800 |
| Purchase | 4/21/2021 | 50 | $55.3900 |
| Purchase | 4/22/2021 | 6 | $57.2450 |
| Purchase | 4/22/2021 | 44 | $57.2500 |
| Purchase | 4/23/2021 | 50 | $57.9800 |
| Purchase | 4/23/2021 | 50 | $57.7799 |
| Purchase | 4/23/2021 | 50 | $57.9799 |
| Purchase | 4/23/2021 | 50 | $57.9000 |
| Purchase | 4/23/2021 | 50 | $57.9999 |
| Purchase | 4/23/2021 | 100 | $57.8879 |
| Purchase | 4/28/2021 | 100 | $58.5300 |
| Purchase | 4/29/2021 | 50 | $58.5499 |
| Purchase | 4/29/2021 | 50 | $56.8699 |
| Purchase | 5/3/2021 | 50 | $57.4499 |
| Purchase | 5/3/2021 | 50 | $57.2100 |
| Purchase | 5/3/2021 | 25 | $57.4500 |
| Purchase | 5/3/2021 | 25 | $57.2600 |
| Purchase | 5/3/2021 | 25 | $56.8500 |
| Purchase | 5/6/2021 | 25 | $54.7300 |

**DraftKings Inc. (DKNG)**                                                    **Rodriguez, Kent J.**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 5/6/2021 | 50 | $52.6900 |
| Purchase | 6/9/2021 | 50 | $54.9000 |
| Purchase | 6/9/2021 | 50 | $55.2000 |
| Purchase | 6/10/2021 | 50 | $54.6500 |
| Sale | 4/13/2021 | (100) | $58.6600 |
| Sale | 4/13/2021 | (100) | $59.0659 |
| Sale | 4/13/2021 | (50) | $59.1700 |
| Sale | 4/13/2021 | (50) | $58.9600 |
| Sale | 4/13/2021 | (50) | $58.8867 |
| Sale | 4/13/2021 | (50) | $59.0601 |
| Sale | 4/14/2021 | (100) | $60.0001 |
| Sale | 4/14/2021 | (100) | $60.2601 |
| Sale | 4/14/2021 | (100) | $60.0701 |
| Sale | 4/14/2021 | (50) | $59.9900 |
| Sale | 4/14/2021 | (50) | $60.4600 |
| Sale | 4/14/2021 | (50) | $59.8200 |
| Sale | 4/15/2021 | (100) | $60.2000 |
| Sale | 4/16/2021 | (100) | $58.6930 |
| Sale | 4/16/2021 | (100) | $58.3901 |
| Sale | 4/16/2021 | (50) | $58.1390 |
| Sale | 4/16/2021 | (50) | $58.2750 |
| Sale | 4/16/2021 | (50) | $58.1401 |
| Sale | 4/16/2021 | (50) | $58.0601 |
| Sale | 4/16/2021 | (50) | $58.0100 |
| Sale | 4/16/2021 | (50) | $58.1216 |
| Sale | 4/16/2021 | (50) | $58.2250 |
| Sale | 4/16/2021 | (50) | $58.1850 |
| Sale | 4/19/2021 | (100) | $56.1001 |
| Sale | 4/19/2021 | (100) | $55.9166 |
| Sale | 4/19/2021 | (100) | $56.0121 |
| Sale | 4/19/2021 | (50) | $58.2810 |
| Sale | 4/19/2021 | (50) | $56.1650 |
| Sale | 4/19/2021 | (50) | $56.3315 |
| Sale | 4/19/2021 | (50) | $56.5750 |
| Sale | 4/20/2021 | (100) | $55.7001 |
| Sale | 4/20/2021 | (50) | $56.8400 |
| Sale | 4/21/2021 | (50) | $55.4411 |
| Sale | 4/22/2021 | (50) | $57.3500 |
| Sale | 4/23/2021 | (100) | $58.1201 |
| Sale | 4/23/2021 | (50) | $58.1691 |
| Sale | 4/23/2021 | (50) | $58.0167 |
| Sale | 4/23/2021 | (50) | $58.0901 |
| Sale | 4/23/2021 | (50) | $58.0710 |
| Sale | 4/23/2021 | (50) | $58.0501 |
| Sale | 4/28/2021 | (100) | $58.6500 |
| Sale | 5/3/2021 | (50) | $57.5500 |
| Sale | 5/3/2021 | (50) | $57.3500 |
| Sale | 5/3/2021 | (100) | $57.8450 |
| Sale | 6/9/2021 | (50) | $55.0400 |
| Sale | 6/9/2021 | (50) | $55.3300 |
| Sale | 6/15/2021 | (50) | $46.9400 |