UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KENT J. RODRIGUEZ, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> DRAFTKINGS INC. f/k/a DIAMOND EAGLE ACQUISITION CORP., JASON D. ROBINS, JASON K. PARK, JEFF SAGANSKY, and ELI BAKER, <br><br> Defendants. | Case No.  1:21-cv-05739-PAE <br><br> MEMORANDUM OF LAW: (1) IN FURTHER SUPPORT OF MOTION OF ROBERT DOWNS FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF LEAD COUNSEL; and (2) IN OPPOSITION TO COMPETING MOTIONS |
| MICHIEL TEN HOORN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> DRAFTKINGS INC. f/k/a DIAMOND EAGLE ACQUISITION CORP., JASON D. ROBINS, JASON K. PARK, JEFF SAGANSKY, and ELI BAKER, <br><br> Defendants. | Case No.  1:21-cv-06497-PAE |

Case 1:21-cv-05739-PAE    Document 32    Filed 09/15/21    Page 2 of 25

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT........................................................................................................................ 5

I.      Downs Should Be Appointed Lead Plaintiff .................................................... 5

        A.      Downs Has The Largest Financial Interest In The Relief Sought By The Class Of
                Any Eligible Movant.................................................................................. 6

        B.      Downs Satisfies the Requirements Of Rule 23........................................... 6

II.     Kaintz Is Atypical, Inadequate and Subject to Unique Defenses ..................... 7

        A.      Kaintz's Unorthodox Trading Makes Him an Atypical and Inadequate Class
                Representative........................................................................................... 8

        B.      Kaintz's Unorthodox Trading Subjects Him to Disqualifying Unique Defenses. 13

        C.      Kaintz's Demonstrably False Certification Proves His Inadequacy to Serve as
                Lead Plaintiff .......................................................................................... 16

CONCLUSION.................................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrada v. Atherogenics, Inc.*, No. 05 Civ. 00061,
2005 U.S. Dist. LEXIS 6777 (S.D.N.Y. Apr. 19, 2005).........................................................12

*Aude v. Kobe Steel, Ltd.*, 17-CV-10085,
2018 U.S. Dist. LEXIS 57591 (S.D.N.Y. Apr. 4, 2018)....................................................2, 5, 6

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988)..............................................................................................4, 14, 15, 16

*Beck v. Maximus, Inc.*,
457 F.3d 291 (3d Cir. 2006)..................................................................................................14

*Bensley v. FalconStor Software, Inc.*,
277 F.R.D. 231 (E.D.N.Y. 2011) ........................................................................................3, 8

*Camp v. Qualcomm Inc.*, No. 18-CV-1208-AJB-BLM,
2019 U.S. Dist. LEXIS 10269 (S.D. Cal. Jan. 22, 2019)..................................................17, 18

*Chahal v. Credit Suisse Grp. AG*, 18-CV-02268 (AT)(SN),
2018 U.S. Dist. LEXIS 104185 (S.D.N.Y. June 21, 2018)......................................................6

*Cook v. Allergan PLC*, 18 Civ. 12089 (CM),
2019 U.S. Dist. LEXIS 51962 (S.D.N.Y. Mar. 21, 2019) ..................................................3, 12

*Di Scala v. ProShares Ultra Bloomberg Crude Oil*, 20 Civ. 5865,
2020 U.S. Dist. LEXIS 242969 (S.D.N.Y. Dec. 28, 2020) ................................................3, 12

*Dookeran v. Xunlei Ltd.*, 18-cv-467 (RJS) *et al.*,
2018 U.S. Dist. LEXIS 62575 (S.D.N.Y. Apr. 12, 2018)...................................................2, 7

*Eichenholtz v. Verifone Holdings, Inc.*, No. C 07-06140 MHP,
2008 U.S. Dist. LEXIS 64633 (N.D. Cal. Aug. 22, 2008).......................................................9

*Foley v. Transocean Ltd.*,
272 F.R.D. 126 (S.D.N.Y. 2011) .......................................................................................6, 7

*Galmi v. Teva Pharms. Indus.*,
302 F. Supp. 3d 485 (D. Conn. 2017)....................................................................................8

*Gross v. AT&T Inc.*, 19-CV-2892 (VEC),
2019 U.S. Dist. LEXIS 128615 (S.D.N.Y. July 31, 2019) ....................................................13

*Howard v. Liquidity Servs.*,
    322 F.R.D. 103 (D.D.C. 2017)...............................................................................................15

*Hurst v. Enphase Energy*, No. 20-cv-04036-BLF,
    2020 U.S. Dist. LEXIS 223696 (N.D. Cal. Nov. 30, 2020)...............................................9, 10

*In re Bally Total Fitness Sec. Litig.*, Nos. 04 C 3530 *et al.*,
    2005 U.S. Dist. LEXIS 6243 (N.D. Ill. Mar. 15, 2005)...........................................................13

*In re Boeing Co. Aircraft Sec. Litig.*, No. 19-cv-02394,
    2020 U.S. Dist. LEXIS 15012 (N.D. Ill. Jan. 28, 2020) ......................................................5, 17

*In re Critical Path*,
    156 F. Supp. 2d 1102 (N.D. Cal. 2001) ..............................................................................3, 10

*In re Elan Corp. Sec. Litig.*, No. 08 Civ. 08761 (AKH),
    2009 U.S. Dist. LEXIS 39859 (S.D.N.Y. May 11, 2009).........................................................12

*In re Hebron Tech. Co. Sec. Litig.*, 20 Civ. 4420 (PAE),
    2020 U.S. Dist. LEXIS 169480 (S.D.N.Y. Sept. 16, 2020)................................................15, 16

*In re Netflix, Inc., Sec. Litig.*, Nos. 12-0225 SC *et al.*,
    2012 U.S. Dist. LEXIS 59465 (N.D .Cal. Apr. 26 2012) .........................................................14

*In re Orion Secs. Litig.*, 08 Civ. 1328 (RJS),
    2008 U.S. Dist. LEXIS 55368 (S.D.N.Y. July 7, 2008) .............................................................7

*In re Vonage Initial Pub. Offering Secs. Litig.*, No. 07-177 (FLW),
    2007 U.S. Dist. LEXIS 66258 (D.N.J. Sept. 6, 2007) .........................................................5, 17

*Isaacs v. Musk*, Nos. 18-cv-04865-EMC *et al.*,
    2018 U.S. Dist. LEXIS 200717 (N.D. Cal. Nov. 27, 2018)................................................3, 10

*Jurkowski v. MolyCorp, Inc.*, No. 13 Civ. 5697 (PAC),
    2014 U.S. Dist. LEXIS 200771 (S.D.N.Y. Apr. 2, 2014)........................................................12

*Kaplan v. Gelfond*,
    240 F.R.D. 88 (S.D.N.Y. 2007) ..........................................................................................5, 6

*Marcus v. J.C. Penney Co.*, No. 6:13-CV-736,
    2014 U.S. Dist. LEXIS 197529 (E.D. Tex. Feb. 28, 2014) .....................................................11

*Micholle v. Ophthotech Corp.*, 17-CV-210 (VSB),
    2018 U.S. Dist. LEXIS 41120 (S.D.N.Y. Mar. 13, 2018) ...................................................4, 12

*Nurlybaev v. ZTO Express (Cayman) Inc.*, 17-CV-06130 (LTS)(SN),
    2017 U.S. Dist. LEXIS 187238 (Nov. 13, 2017)......................................................................6

*Porzio v. Overseas Shipholding Group*, 12 Civ. 7948,
   2013 U.S. Dist. LEXIS 14463 (S.D.N.Y. Feb. 1, 2013)............................................................8

*Rocco v. Nam Tai Elects., Inc.*,
   245 F.R.D. 131 (S.D.N.Y. 2007) ...........................................................................................16

*Shaffer v. Horizon Pharma PLC*, No. 16-CV-1763,
   2016 U.S. Dist. LEXIS 83175 (S.D.N.Y. June 27, 2016)........................................................14

*Steamfitters Local 449 Pension Fund v. Cent. European Distrib. Corp.*, Nos. 11-6247,
   2012 U.S. Dist. LEXIS 118693 (D.N.J. Aug. 22, 2012)..........................................................14

*Tomaszewski v. Trevena, Inc.*,
   383 F. Supp. 3d 409 (E.D. Pa. 2019) .....................................................................................16

*Topping v. Deloitte Touche Tohmatsu CPA, Ltd.*,
   95 F. Supp. 3d 607 (S.D.N.Y. 2015)......................................................................................3, 8

*Weisz v. Calpine Corp.*, No. C 02-1200 SBA,
   2002 U.S. Dist. LEXIS 27831 (N.D. Cal. Aug. 15, 2002).....................................................3, 10

## Statutes

15 U.S.C. § 78u-4 ....................................................................................................... *passim*

Private Securities Litigation Reform Act of 1995 ................................................................ *passim*

## Rules

Fed. R. Civ. P. 23........................................................................................................ *passim*

Movant Downs[1] respectfully submits this Memorandum of Law in further support of his motion for consolidation of the Related Actions, appointment as Lead Plaintiff and approval of his selection of Pomerantz as Lead Counsel (Dkt. No. 18); and in opposition to the competing motions of: (i) Tim Kaintz ("Kaintz") (Dkt. No. 17); (ii) Walter Marino ("Marino") (Dkt. No. 24); (iii) Stephen Goering ("Goering") (Dkt. No. 15); (iv) Robert Mendoza ("Mendoza") (Dkt. No. 9); and (v) Mario E. Ernst ("Ernst") (Dkt. No. 12).

## PRELIMINARY STATEMENT

The Related Actions are putative class action securities fraud lawsuits on behalf of investors in DraftKings securities. As with all federal class action securities fraud lawsuits, a lead plaintiff must be appointed. The PSLRA governs that process and, pursuant to the PSLRA, the Court must appoint as Lead Plaintiff the movant with the greatest financial interest in the outcome of the action; ***and*** who satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

Here, that movant is Downs, having suffered approximately $424,946 in losses in connection with his Class Period purchases of DraftKings securities as a result of the Defendants' alleged fraud. *See* Dkt. No. 22-1. The table below sets forth the losses of Downs compared to the competing movants:

| Movant | Loss |
|--------|------|
| Downs | $424,946 |
| Marino | $217,456 |
| Goering | $154,878 |
| Mendoza | $33,561 |
| Ernst | $20,927 |
| ~~Kaintz~~ | ~~$2,242,155~~ |

---

[1] All capitalized terms herein are defined in Downs' moving brief, unless otherwise indicated. *See* Dkt. No. 20.

1

As the table reflects, Downs' loss of $424,946 is the largest among the eligible competing movants and is indeed larger than the losses of the next three movants—Marino, Goering, and Mendoza—***combined***.  Although one competing movant, Kaintz, has alleged a larger loss than Downs, Kaintz is ineligible for appointment as Lead Plaintiff in this litigation for a litany of reasons related to his atypicality and inadequacy within the meaning of Rule 23, as discussed in detail below.  Accordingly, Downs possesses the largest financial interest of any eligible movant within the meaning of the PSLRA.

In addition to his significant financial interest, Downs also satisfies the adequacy and typicality requirements of Rule 23.  Downs is aware of no conflict between his interests and those of the Class, his losses incurred as a result of the alleged fraud give him a sufficient stake in the outcome of this action to ensure vigorous advocacy, and in Pomerantz, Downs has retained qualified and experienced counsel.  *Dookeran v. Xunlei Ltd.*, 18-cv-467 (RJS) *et al.*, 2018 U.S. Dist. LEXIS 62575, at *6 (S.D.N.Y. Apr. 12, 2018).  Downs, like all members of the Class, purchased DraftKings securities at prices artificially inflated by Defendants' misrepresentations or omissions and was damaged upon disclosure of those misrepresentations or omissions.  *Aude v. Kobe Steel, Ltd.*, 17-CV-10085, 2018 U.S. Dist. LEXIS 57591, at *8 (S.D.N.Y. Apr. 4, 2018).

In stark contrast, Kaintz, the only competing movant alleging a larger loss than Downs, is atypical, inadequate, and/or subject to unique defenses for multiple reasons related to his trading patterns, and as such is ineligible for appointment as Lead Plaintiff irrespective of his financial interest in this litigation.

First, Kaintz is a serial "in-and-out" trader, meaning that he repeatedly purchased and sold DraftKings securities multiple times throughout the Class Period.  Courts routinely decline to

appoint in-and-out traders as lead plaintiffs in PSLRA actions, finding them to be inadequate and/or atypical class representatives.  *See*, *e.g.*, *Bensley v. FalconStor Software, Inc.*, 277 F.R.D. 231, 241 (E.D.N.Y. 2011); *Topping v. Deloitte Touche Tohmatsu CPA, Ltd.*, 95 F. Supp. 3d 607, 633 n.16 (S.D.N.Y. 2015).  Here, Kaintz was in and out of his common stock position—that is, he purchased DraftKings stock and shortly thereafter sold all of those shares—a total of *64* times during the Class Period, a highly unusual trading pattern that may raise questions as to the recoverability of his investment losses at a later stage of this litigation.

Second, Kaintz repeatedly sold short DraftKings stock during the Class Period, meaning that he traded in the expectation that DraftKings shares would decline, rather than appreciate, in value.  Courts understandably decline to appoint short sellers as class representatives in PSLRA actions, finding that their bets against the Company generally render them atypical of the classes that they seek to represent.  *In re Critical Path*, 156 F. Supp. 2d 1102, 1110 (N.D. Cal. 2001); *Isaacs v. Musk*, Nos. 18-cv-04865-EMC *et al.*, 2018 U.S. Dist. LEXIS 200717, at *12-*13 (N.D. Cal. Nov. 27, 2018); *Weisz v. Calpine Corp.*, No. C 02-1200 SBA, 2002 U.S. Dist. LEXIS 27831, at *28 (N.D. Cal. Aug. 15, 2002).  Here, Kaintz's transaction history reflects 57 transactions that were denoted as either short sales or cover purchases—*i.e.*, purchases made solely in connection with short sales—and Kaintz held short positions for three of the seven months during which he traded DraftKings stock.

Third, Kaintz is further atypical because of his frequent transactions in DraftKings options during the Class Period.  Courts generally decline to appoint options investors as lead plaintiffs in PSLRA actions, finding them to be atypical class representatives.  *See*, *e.g.*, *Di Scala v. ProShares Ultra Bloomberg Crude Oil*, 20 Civ. 5865, 2020 U.S. Dist. LEXIS 242969, at *10-11 (S.D.N.Y. Dec. 28, 2020); *Cook v. Allergan PLC*, 18 Civ. 12089 (CM), 2019 U.S. Dist. LEXIS 51962, at *7

3

(S.D.N.Y. Mar. 21, 2019); *Micholle v. Ophthotech Corp.*, 17-CV-210 (VSB), 2018 U.S. Dist. LEXIS 41120, at *23-24 (S.D.N.Y. Mar. 13, 2018).  Here, Kaintz traded options during all but seven weeks of the seven-month period in which he traded DraftKings securities.

Fourth, the foregoing issues related to Kaintz's trading are further disqualifying because they give to rise to unique defenses that would threaten to become the focus of this litigation if the Court were to appoint Kaintz as Lead Plaintiff.  The PSLRA prohibits the appointment of a lead plaintiff who is ""subject to unique defenses that render [him] incapable of representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb).  Here, if Kaintz were appointed Lead Plaintiff, the Defendants are almost certain to capitalize on his unorthodox trading patterns—which, again, include in-and-out trading, short sales, and options transactions—in an effort to demonstrate that Kaintz did not purchase DraftKings securities in reliance on the integrity of the market, in an effort to deprive him of the presumption of reliance established in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.  Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action." *Basic*, 485 U.S. at 247.  Here, in the best-case scenario, Kaintz would be forced to devote considerable time and energy to litigating issues specific to his own trading history only, at the expense of the Class's claims.  There is no reason to saddle the Class with such a representative.

Fifth, Kaintz is inadequate because he submitted a false Certification replete with material errors along with his motion papers.  The transaction history appended to Kaintz's Certification (Dkt. No. 21-1 at *3-17) does not reflect a single options transaction, yet Kaintz's damages analysis reflects that Kaintz gained approximately $1,145,908 from trading options during the Class Period.

In addition, there are inconsistencies between the transaction history appended to Kaintz's Certification (Dkt. No. 21-1 at *3-17) and the transaction history set forth in his damages analysis (Dkt. No. 21-2). Specifically, on each of three separate dates, Kaintz's Certification lists two identical sales, whereas the damages analysis lists one of these same two sales as a purchase in each corresponding instance. The dollar amount of the transactions at issue in the foregoing omissions and discrepancies is significant, totaling **$6,689,508**. Courts routinely deny lead plaintiff motions on the basis of such errors, as they raise questions regarding the movant's fitness to supervise a complex securities class action. *See*, *e.g.*, *In re Vonage Initial Pub. Offering Secs. Litig.*, No. 07-177 (FLW), 2007 U.S. Dist. LEXIS 66258, at *23, *28 n.8 (D.N.J. Sept. 6, 2007); *In re Boeing Co. Aircraft Sec. Litig.*, No. 19-cv-02394, 2020 U.S. Dist. LEXIS 15012, at *16-*17 (N.D. Ill. Jan. 28, 2020).

For the reasons set forth herein, Downs respectfully requests that the Court grant his motion in its entirety and deny the competing motions.

**ARGUMENT**

**I.      Downs Should Be Appointed Lead Plaintiff**

The PSLRA creates a strong presumption that the Lead Plaintiff is the "person or group of persons" that "has the largest financial interest in the relief sought by the class" and "otherwise satisfies the requirements of Rule 23." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The movant that has the largest financial interest must "make a *prima facie* showing that they meet [the requirements] of Rule 23." *Aude*, 2018 U.S. Dist. LEXIS 57591, at *8; *see also Kaplan v. Gelfond*, 240 F.R.D. 88, 94 (S.D.N.Y. 2007). Once this presumption is triggered, it may be rebutted upon proof that the presumptive Lead Plaintiff will not fairly represent the interests of the Class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Here, the most adequate plaintiff is Downs.

5

**A.    Downs Has The Largest Financial Interest In The Relief Sought By The Class Of Any Eligible Movant**

The PSLRA requires a court to adopt a rebuttable presumption that "the most adequate plaintiff . . . is the person or group of persons that . . . has the largest financial interest in the relief sought by the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii).  While the PSLRA itself does not provide any guidance concerning the method of calculating which plaintiff has the "largest financial interest," courts recognize that the amount of financial loss is the most significant factor to be considered.  *See*, *e.g.*, *Foley v. Transocean Ltd.*, 272 F.R.D. 126, 128 (S.D.N.Y. 2011) ("[W]e, as have other courts, shall place the most emphasis on . . . the approximate loss suffered by the movant"); *Chahal v. Credit Suisse Grp. AG*, 18-CV-02268 (AT)(SN), 2018 U.S. Dist. LEXIS 104185, at *12 (S.D.N.Y. June 21, 2018) (equating financial interest with economic loss); *Nurlybaev v. ZTO Express (Cayman) Inc.*, 17-CV-06130 (LTS)(SN), 2017 U.S. Dist. LEXIS 187238, at *3 (Nov. 13, 2017) (same).

Under the foregoing analysis, no movant eligible for appointment as Lead Plaintiff in the Action has a larger financial interest in the litigation than Downs.  As the chart at p. 1 reflects, Downs' loss of $424,946 is larger than that of any eligible competing movant—and, moreover, is larger than the losses of the next three movants ***combined***.  Although one other movant, Kaintz, has alleged a larger loss than Downs, Kaintz is atypical and inadequate within the meaning of Rule 23 as well as subject to unique defenses and is thus disqualified from consideration, as discussed *infra* at Section II.

**B.    Downs Satisfies the Requirements Of Rule 23**

Downs has also made the requisite *prima facie* showing that he satisfies the typicality and adequacy requirements of Rule 23.  *See Aude*, 2018 U.S. Dist. LEXIS 57591, at *8; *Kaplan*, 240 F.R.D. at 94.  First, Downs' claims satisfy the typicality requirement of Rule 23(a)(3) because his

claims against DraftKings and the other Defendants are based on the same legal theory and arise from the same events and course of conduct as the Class's claims. *See*, *e.g.*, *In re Orion Secs. Litig.*, 08 Civ. 1328 (RJS), 2008 U.S. Dist. LEXIS 55368, at *12 (S.D.N.Y. July 7, 2008). Second, Downs satisfies the adequacy requirement of Rule 23(a)(4) because "(1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) there is no conflict between the proposed lead plaintiff and the members of the class; and (3) the proposed lead plaintiff has a sufficient interest in the outcome of the case to ensure vigorous advocacy." *Foley*, 272 F.R.D. at 131; *see also Dookeran*, 2018 U.S. Dist. LEXIS 62575, at *6.

To overcome the strong presumption entitling Downs to appointment as Lead Plaintiff, the PSLRA requires "***proof***" that the presumptive Lead Plaintiff is inadequate. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (emphasis added). No such proof exists in this case and any speculative arguments to the contrary should be flatly rejected.

Because Downs has the largest financial interest of any eligible Lead Plaintiff candidate in the relief sought by the Class and otherwise satisfies the requirements of Rule 23, he is the presumptive "most adequate plaintiff" of the Class within the meaning of the PSLRA.

## II.    Kaintz Is Atypical, Inadequate and Subject to Unique Defenses

Although Kaintz has alleged a loss of approximately $2.4 million incurred as a result of DraftKings's alleged fraud, Kaintz cannot trigger the "most adequate plaintiff" presumption because he fails to satisfy the adequacy and typicality requirements of Rule 23. Specifically, as set forth below, Kaintz's Class Period transactions in DraftKings securities reflect unorthodox trading strategies that render him both atypical and inadequate as a Class representative. These same issues also subject Kaintz to unique defenses that further disqualify Kaintz from appointment as Lead Plaintiff. Finally, Kaintz is further inadequate because the numerous glaring errors in his

7

Certification and motion papers demonstrate his inability to serve as a responsible and diligent fiduciary on behalf of the Class.

### A. Kaintz's Unorthodox Trading Makes Him an Atypical and Inadequate Class Representative

Kaintz is atypical and inadequate within the meaning of Rule 23 because Kaintz, unlike most members of the putative Class that he seeks to represent, engaged in unorthodox trading strategies—specifically, in-and-out transactions, short-selling, and options transactions—during the Class Period.

*First*, Kaintz is atypical under Rule 23 because he was a serial in-and-out trader of DraftKings common stock during the Class Period. An in-and-out trader is an investor who repeatedly buys a security and then sells the entirety of their investment position. Courts generally decline to appoint such investors as lead plaintiffs in PSLRA actions because they "may be unable to demonstrate loss causation" and as such are atypical and inadequate class representatives. *FalconStor Software*, 277 F.R.D. at 241 (denying in-and-out trader's motion because "there remains the risk that the Fund will no be able to prove loss causation."); *Topping*, 95 F. Supp. 3d at 633 n.16 ("observ[ing] that [movant's] status as an in-and-out trader would render it an inappropriate lead plaintiff" for failing to "satisf[y] the requirements of Rule 23"); *Porzio v. Overseas Shipholding Group*, 12 Civ. 7948, 2013 U.S. Dist. LEXIS 14463, at *14-15 (S.D.N.Y. Feb. 1, 2013) (same).

Not only was Kaintz an in-and-out trader, he was also a day trader—that is, he purchased and sold DraftKings stock repeatedly even on single trading days, and as such was clearly trading based on daily market volatility rather than in reliance upon the Defendants' alleged misrepresentations. *See*, *e.g.*, *Galmi v. Teva Pharms. Indus.*, 302 F. Supp. 3d 485, 504 n.10 (D. Conn. 2017) (finding day trader to "be subject to unique defense that make him an inappropriate

lead plaintiff"); *Eichenholtz v. Verifone Holdings, Inc.*, No. C 07-06140 MHP, 2008 U.S. Dist. LEXIS 64633, at *36 (N.D. Cal. Aug. 22, 2008) (finding that a "day-trader would not be typical of the class because the class's damages stem from reliance upon the company's financial statements, not upon daily market volatility. Specifically, it may be subject to a unique defense regarding its reliance upon publicly available information."); *Hurst v. Enphase Energy*, No. 20-cv-04036-BLF, 2020 U.S. Dist. LEXIS 223696, at *22-24 (N.D. Cal. Nov. 30, 2020) (same).

Here, Kaintz was "in and out" of his DraftKings stock position—that is, he purchased shares and then sold all of his holdings—a total of **64** times during the approximately seven-month period in which Kaintz traded DraftKings common stock. Excerpted below and illustrating the extent of Kaintz's in-and-out trading activity is just a single page of his 14-page transaction history, representing fewer than six full days worth of activity, during which time Kaintz purchased DraftKings stock 21 times and sold it 18 times.

| | | | |
|---|---|---|---|
| 3/2/2021 | Bought | 10,000 | $67.83 |
| 3/2/2021 | Bought | 10,000 | $67.56 |
| 3/2/2021 | Sold | 10,000 | $57.76 |
| 3/2/2021 | Sold | 10,000 | $67.99 |
| 3/2/2021 | Bought | 20,000 | $67.90 |
| 3/2/2021 | Bought | 20,000 | $67.72 |
| 3/2/2021 | Sold | 40,000 | $68.00 |
| 3/2/2021 | Sold | 350 | $68.91 |
| 3/2/2021 | Sold | 400 | $68.89 |
| 3/2/2021 | Sold | 436 | $68.88 |
| 3/2/2021 | Sold | 300 | $68.87 |
| 3/2/2021 | Sold | 1,908 | $68.86 |
| 3/2/2021 | Bought | 3,394 | $68.58 |
| 3/2/2021 | Bought | 20,000 | $68.25 |
| 3/2/2021 | Sold | 20,000 | $68.30 |
| 3/3/2021 | Bought | 10,000 | $67.50 |
| 3/3/2021 | Bought | 124 | $66.70 |
| 3/3/2021 | Bought | 17,600 | $66.80 |
| 3/3/2021 | Bought | 2,276 | $66.78 |
| 3/4/2021 | Bought | 10,000 | $61.24 |
| 3/5/2021 | Bought | 10,000 | $59.60 |
| 3/5/2021 | Sold | 10,000 | $60.50 |
| 3/5/2021 | Bought | 9,756 | $60.22 |
| 3/5/2021 | Bought | 244 | $60.18 |
| 3/5/2021 | Bought | 6,400 | $59.65 |
| 3/5/2021 | Bought | 3,600 | $59.64 |
| 3/9/2021 | Bought | 10,000 | $63.00 |
| 3/9/2021 | Sold | 10,000 | $63.09 |
| 3/9/2021 | Bought | 10,000 | $63.03 |
| 3/9/2021 | Sold | 10,000 | $63.24 |
| 3/9/2021 | Bought | 10,000 | $63.05 |
| 3/9/2021 | Sold | 887 | $63.205 |
| 3/9/2021 | Sold | 9,113 | $63.20 |
| 3/9/2021 | Bought | 7,013 | $62.94 |
| 3/9/2021 | Bought | 2,987 | $62.93 |
| 3/9/2021 | Sold | 3,500 | $63.06 |
| 3/9/2021 | Sold | 6,500 | $63.05 |
| 3/11/2021 | Sold | 66 | $70.795 |
| 3/11/2021 | Sold | 200 | $70.78 |

Dkt. No. 21-1 at *11.

In total, Kaintz both purchased *and* sold DraftKings stock on *47* of the 62 days on which he traded shares.  Given the frequency with which Kaintz exited his entire investment position, there were many days of the Class Period on which Kaintz did not hold *any* shares of DraftKings stock whatsoever.  Accordingly, if or when an Amended Complaint filed in this litigation alleges different corrective disclosures, there is a non-speculative risk that Kaintz will not have held DraftKings stock on the dates of any corrective disclosures, meaning that "there is a strong likelihood that [his] entire claimed losses will be unrecoverable[.]" *Id.* at *15.  Conversely, as a Class representative, Kaintz's unusual in-and-out trading pattern might incentivize him to pursue an unconventional theory of the fraud merely to ensure that he maintains standing and/or to maximize his own recoverable losses.

*Second*, Kaintz is further atypical because he repeatedly sold short DraftKings stock.  A short seller is an investor who sells a security with the intention of repurchasing it later at a lower price.  Whereas a typical investor purchases a security with the expectation that its value will go up, a short seller thus trades in the expectation that a security's value will go down—in effect, betting *against* the company.  Thus, for obvious reasons, courts routinely decline to appoint short sellers as lead plaintiffs in PSLRA actions for failure to satisfy the typicality requirement of Rule 23, because "[s]hort sales raise the question of whether the seller was actually relying on the market price, and the class is not served by its representative coming under such scrutiny." *Critical Path*, 156 F. Supp. 2d at 1110; *Isaacs*, 2018 U.S. Dist. LEXIS 200717, at *12-*13 ("[T]he Court has concerns regarding the adequacy or typicality of [movant] because it is a short seller[.]"); *Weisz*, 2002 U.S. Dist. LEXIS 27831, at *28 (finding movant to be "disqualified from serving as a lead plaintiff by virtue of the fact that he admittedly sold Calpine stock 'short' during the Class

10

Period."); *Marcus v. J.C. Penney Co.*, No. 6:13-CV-736, 2014 U.S. Dist. LEXIS 197529, at \*20-\*21 (E.D. Tex. Feb. 28, 2014) (finding short selling to be an "atypical trading practice" and holding short seller to be "subject to unique defenses and flaws that render him inadequate to serve as lead plaintiff").

Here, Kaintz's submissions reflect **57** transactions that were either short sales or "cover purchases"—that is, purchases of stock made solely in connection with short sales. For example, of the 42 transactions excerpted below from a single page of Kaintz's damages analysis, reflecting fewer than two days of trading activity, a total of **17** transactions are either short sales or cover purchases:

| Ln. | Transaction Type | Trade Date |
|---|---|---|
| 43 | Bought to Cover 49264 DKNG @ 44.71 | 11/17/2020 |
| 44 | Bought 736 DKNG @ 44.71 | 11/17/2020 |
| 45 | Sold Short 800 DKNG @ 44.92 | 11/17/2020 |
| 46 | Sold Short 502 DKNG @ 44.91 | 11/17/2020 |
| 47 | Sold Short 200 DKNG @ 44.9 | 11/17/2020 |
| 48 | Sold Short 700 DKNG @ 44.89 | 11/17/2020 |
| 49 | Sold Short 700 DKNG @ 44.88 | 11/17/2020 |
| 50 | Sold Short 5105 DKNG @ 44.87 | 11/17/2020 |
| 51 | Sold 736 DKNG @ 44.87 | 11/17/2020 |
| 52 | Sold Short 41557 DKNG @ 44.86 | 11/17/2020 |
| 53 | Sold Short 20000 DKNG @ 44.99 | 11/17/2020 |
| 54 | Bought to Cover 1000 DKNG @ 47.52 | 11/18/2020 |
| 55 | Bought to Cover 10000 DKNG @ 47.57 | 11/18/2020 |
| 56 | Bought to Cover 10000 DKNG @ 47.5 | 11/18/2020 |
| 57 | Bought to Cover 10000 DKNG @ 47.5 | 11/18/2020 |
| 58 | Bought to Cover 10000 DKNG @ 47.5 | 11/18/2020 |
| 59 | Bought to Cover 5000 DKNG @ 47.45 | 11/18/2020 |
| 60 | Bought to Cover 10000 DKNG @ 47.4 | 11/18/2020 |
| 61 | Bought to Cover 13564 DKNG @ 47.3 | 11/18/2020 |
| 62 | Bought 10000 DKNG @ 47.2 | 11/18/2020 |
| 63 | Bought 10000 DKNG @ 47.11 | 11/18/2020 |
| 64 | Sold 20000 DKNG @ 47.58 | 11/18/2020 |
| 65 | Bought 20000 DKNG @ 47.22 | 11/18/2020 |
| 66 | Sold 100 DKNG @ 47.67 | 11/18/2020 |
| 67 | Sold 1300 DKNG @ 47.66 | 11/18/2020 |
| 68 | Sold 9 DKNG @ 47.65 | 11/18/2020 |
| 69 | Sold 85 DKNG @ 47.61 | 11/18/2020 |
| 70 | Sold 1311 DKNG @ 47.6 | 11/18/2020 |
| 71 | Sold 235 DKNG @ 47.59 | 11/18/2020 |
| 72 | Sold 100 DKNG @ 47.58 | 11/18/2020 |
| 73 | Sold 16860 DKNG @ 47.55 | 11/18/2020 |
| 74 | Bought 20000 DKNG @ 47.26 | 11/18/2020 |
| 75 | Sold 1 DKNG @ 47.39 | 11/18/2020 |
| 76 | Sold 1 DKNG @ 47.37 | 11/18/2020 |
| 77 | Sold 535 DKNG @ 47.35 | 11/18/2020 |
| 78 | Sold 2000 DKNG @ 47.3402 | 11/18/2020 |
| 79 | Sold 9000 DKNG @ 47.34 | 11/18/2020 |
| 80 | Sold 8463 DKNG @ 47.33 | 11/18/2020 |
| 81 | Bought 30000 DKNG @ 47.12 | 11/18/2020 |
| 82 | Sold 30000 DKNG @ 47.15 | 11/18/2020 |
| 83 | Bought 20000 DKNG @ 48.63 | 11/18/2020 |
| 84 | Sold 20000 DKNG @ 48.71 | 11/18/2020 |

Dkt. No. 21-2 at *5.

This quantum of short sales—conspicuously high, considering that Kaintz only traded DraftKings securities during a seven-month period—illustrates that Kaintz was frequently betting *against* the Company during the Class Period, by investing in the expectation that its stock price would fall.  By contrast, the Class members who Kaintz seeks to represent invested in DraftKings, in reliance upon the Defendants' positive statements about the Company's operations, in the simple expectation that the Company's stock price would increase, to their benefit.  Kaintz's short sales thus clearly make him an atypical Class member.

*Third* and finally, Kaintz's high volume of options purchases renders him further atypical of the Class in this litigation.  Courts generally decline to appoint options investors as lead plaintiffs in PSLRA actions.  *See*, *e.g.*, *Di Scala*, 2020 U.S. Dist. LEXIS 242969, at *10-11 (denying motion by options investor, finding that "factual issues unique to [the movant] 'would likely threaten to become the focus of the litigation'") (quoting *Andrada v. Atherogenics, Inc.*, No. 05 Civ. 00061, 2005 U.S. Dist. LEXIS 6777, at *14 (S.D.N.Y. Apr. 19, 2005)); *Allergan*, 2019 U.S. Dist. LEXIS 51962, at *7 ("[t]he appointment of [an options investor] as lead plaintiff very likely 'would introduce factual issues irrelevant to stockholder class members, like strike price, duration, maturity, volatility, and interest rates, and he could subject the class to unique defenses, causing unnecessary conflict.'") (quoting *In re Elan Corp. Sec. Litig.*, No. 08 Civ. 08761 (AKH), 2009 U.S. Dist. LEXIS 39859, at *6 (S.D.N.Y. May 11, 2009)); *Ophthotech*, 2018 U.S. Dist. LEXIS 41120, at *23-24 (same); *Jurkowski v. MolyCorp, Inc.*, No. 13 Civ. 5697 (PAC), 2014 U.S. Dist. LEXIS 200771, at *8 (S.D.N.Y. Apr. 2, 2014) (same).

Here, Kaintz sold call options nearly every week during the seven-month period during which he traded DraftKings securities.  Specifically, Kaintz employed a "covered call option"

12

strategy, pursuant to which he effectively wagered on only minor increases in DraftKings' stock price over relatively short periods of time. This strategy indicates that Kaintz was trading based on technical stock information, analyzing DraftKings' stock chart in an effort to anticipate its future price actions while largely disregarding the underlying business and operations of the Company itself. This strategy further distinguished Kaintz from a typical Class member—who, by contrast, would have invested in DraftKings securities based upon their expectations regarding, *inter alia*, the Company's business and operations, as informed by the Defendants' alleged false and misleading statements.

Any one of the foregoing trading strategies independently would mandate denial of Kaintz's motion. Considered together, they underscore the extent to which Kaintz is highly atypical of the Class of investors that he seeks to represent in this litigation and illustrate why the PSLRA requires denial of his motion.

### B.    Kaintz's Unorthodox Trading Subjects Him to Disqualifying Unique Defenses

Not only do Kaintz's unorthodox trading strategies render him inadequate and atypical of the Class he seeks to represent, they also subject him to unique defenses that further mandate denial of his motion. The PSLRA precludes the appointment of a lead plaintiff who is "subject to unique defenses that render [him] incapable of representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb). "The PSLRA . . . provides that we ask simply whether [a movant] is likely to be 'subject to' the unique defense . . . ; we do not have to determine that the defense is likely to succeed." *In re Bally Total Fitness Sec. Litig.*, Nos. 04 C 3530 *et al.*, 2005 U.S. Dist. LEXIS 6243, at \*19 (N.D. Ill. Mar. 15, 2005). *See also Gross v. AT&T Inc.*, 19-CV-2892 (VEC), 2019 U.S. Dist. LEXIS 128615, at \*6 (S.D.N.Y. July 31, 2019) ("Before disqualifying a potential lead plaintiff [as subject to a unique defense], the Court need not conclude that the defense is likely to

or will succeed. Rather, 'many courts have rejected appointments of lead plaintiffs based on *potential* risks.'") (quoting *Shaffer v. Horizon Pharma PLC*, No. 16-CV-1763, 2016 U.S. Dist. LEXIS 83175, at *10 (S.D.N.Y. June 27, 2016) (emphasis in original)); *In re Netflix, Inc., Sec. Litig.*, Nos. 12-0225 SC *et al.*, 2012 U.S. Dist. LEXIS 59465, at *17 (N.D .Cal. Apr. 26 2012) ("There is no requirement at this early stage to prove a defense, only to show a degree of likelihood that a unique defense might play a significant role at trial. The point of this requirement is not to adjudicate the case before it has even begun, but rather to protect the absent class members from the expense of litigating defenses applicable to lead plaintiffs but not to the class as a whole.") (internal citations omitted); *Steamfitters Local 449 Pension Fund v. Cent. European Distrib. Corp.*, Nos. 11-6247 (JBS/KMW), 2012 U.S. Dist. LEXIS 118693, at *39 (D.N.J. Aug. 22, 2012) (denying motion by lead plaintiff movants subject to unique defense, "declin[ing] to decide [the issue] at this time," because "[t]o decide the lead plaintiff motions, the Court need only decide whether the issue of standing is a unique defense that is *likely* to become a major focus at litigation.") (emphasis added); *Beck v. Maximus, Inc.*, 457 F.3d 291, 297 (3d Cir. 2006) ("A proposed class representative is neither typical nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation.").

Here, as discussed *supra*, Kaintz employed several unusual trading strategies with respect to his Class Period investments in DraftKings securities. If the Court were to appoint Kaintz as Lead Plaintiff, then these strategies—which included Kaintz wholly exiting his investment position 64 times in seven months, as well as engaging in dozens of short sales and options transactions during the same period—will give the Defendants ample ammunition at the class certification stage of this litigation, when they will, inevitably, argue that Kaintz plainly cannot be entitled to rely on the *Basic* presumption of reliance premised upon "fraud-on-the-market."

14

> [T]he *Basic* Court established a rebuttable presumption of reliance, predicated on the notion that '[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action." To invoke Basic's presumption of reliance, "a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed."

*Howard v. Liquidity Servs.*, 322 F.R.D. 103, 116 (D.D.C. 2017) (citations omitted).

The *Basic* court held that "*[a]ny* showing that severs the link between the alleged misrepresentation and . . . [plaintiff's] decision to trade at a fair market price[] will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248 (emphasis added). In that case, which involved news of a corporate merger, the court stated, for example, that a plaintiff who was aware of the truth of the merger discussions "but sold his shares nevertheless because of unrelated concerns . . . *could not be said to have relied upon the integrity of the price he knew had been manipulated*." *Id.* at 249. Here, on *Basic's* rationale, Kaintz's many short sales would undercut his reliance on the Defendants' alleged misstatements in this litigation because they demonstrate that Kaintz was betting on DraftKings' stock price declining *despite the Defendants' positive statements*.

This Court's own recent decision in the PSLRA action *In re Hebron Tech. Co. Sec. Litig.*, 20 Civ. 4420 (PAE), 2020 U.S. Dist. LEXIS 169480 (S.D.N.Y. Sept. 16, 2020), is instructive. There, the Court denied a lead plaintiff motion by one Michael Clynes ("Clynes"), finding that the unusual timing of Clynes's purchases raised a serious, non-speculative risk that "the cottage industry of issues surrounding Clynes's purchase of Hebron shares would saddle, or *at least potentially saddle*, his claims with unique defenses" that "could well 'divert attention from the substance of the basic claim' and needlessly imperil the claims of the class." *Id.* at *20-21

15

(emphasis added) (quoting *Rocco v. Nam Tai Elects., Inc.*, 245 F.R.D. 131, 135 (S.D.N.Y. 2007)). In *Hebron*, the Court found that a competing movant had "adduced proof—*i.e.*, non-speculative evidence—that Clynes was subject to this arguable [unique] defense". *Id.* at *18. "As the debate [regarding the timing of Clynes's purchases] aptly illustrates, ***there is a real risk that the idiosyncrasies of Clynes's purchases would become just such a distraction at trial***, were Clynes appointed lead plaintiff, with his trading serving as a proxy for the class." *Id.* at *17-18 (emphasis added).

Like Clynes in *Hebron*, Kaintz's transactions in DraftKings securities are at best idiosyncratic. If Kaintz is appointed as Lead Plaintiff, Defendants will foreseeably attempt to rebut the *Basic* presumption by demonstrating that Kaintz's unorthodox investment decisions were ***not*** made in reliance upon the Defendants' alleged misrepresentations. In the worst-case scenario, the Defendants will succeed in doing so, to the obvious prejudice of the Class. Even in the best-case scenario, Kaintz will be forced to devote considerable time and energy to litigating issues that are unique to his own Class Period investment strategy, at the expense of prosecuting the Class's fraud claims. There is no reason to saddle the Class in this litigation with a Lead Plaintiff subject to these unique defenses.

### C.      Kaintz's Demonstrably False Certification Proves His Inadequacy to Serve as Lead Plaintiff

Finally, Kaintz is further inadequate because he submitted a sworn Certification to the Court which is riddled with numerous material errors. Courts routinely disqualify movants from appointment as lead plaintiff on the basis of errors and inaccuracies in their motion papers. *See*, *e.g.*, *Tomaszewski v. Trevena, Inc.*, 383 F. Supp. 3d 409, 414-15 (E.D. Pa. 2019) (denying lead plaintiff motion where errors in loss charts "speak to level of carelessness" that raise doubt that applicant possesses "the necessary adequacy and sophistication to be lead plaintiff"); *Vonage IPO*,

16

2007 U.S. Dist. LEXIS 66258, at *23, *28 n.8 (denying motion by movant whose certification "contained incorrect trading data and loss calculations," finding it to be "plagued with misinformation"); *Boeing*, 2020 U.S. Dist. LEXIS 15012, at *16-*17 (denying motion by movants where errors in loss calculations demonstrated that movants either knowingly submitted incorrect information or failed to review their submissions before filing); *Camp v. Qualcomm Inc.*, No. 18-CV-1208-AJB-BLM, 2019 U.S. Dist. LEXIS 10269, at *9-*10 (S.D. Cal. Jan. 22, 2019) (denying motion where "significant errors" in movant's submissions raised questions as to "the reliability of [movant's] misrepresentations.").

Kaintz's Certification is demonstrably false because it omits to disclose significant options transactions by Kaintz during the Class Period. In Kaintz's Certification, he attests, "under penalty of perjury", that "[t]he attached sheet . . . lists all of my transactions in DraftKings securities during the Class Period, as specified in the Complaint." Dkt. No. 21-1 at *2. The appended schedule of transactions does not list a single purchase or sale of DraftKings options. However, his damages analysis reflects that Kaintz was in fact a prolific options trader between November 2020 and June 2021. *See id.* at *18-20. The excerpt from his damages analysis below provides a snapshot of his options trading activity during less than three months of the Class Period—***none*** of which transactions are reflected in Kaintz's Certification:

17

| Date | SYMBOL | Transaction Type |
|---|---|---|
| 11/13/2020 | DKNG Nov 20 2020 44.0 Call | Sold 197 DKNG Nov 20 2020 44.0 Call @ 1.4 |
| 11/23/2020 | DKNG Nov 27 2020 48.0 Call | Sold 5 DKNG Nov 27 2020 48.0 Call @ 1 |
| 11/23/2020 | DKNG Nov 27 2020 48.0 Call | Sold 96 DKNG Nov 27 2020 48.0 Call @ 0.9 |
| 11/23/2020 | DKNG Nov 27 2020 48.0 Call | Sold 165 DKNG Nov 27 2020 48.0 Call @ 0.88 |
| 11/23/2020 | DKNG Nov 27 2020 48.0 Call | Sold 34 DKNG Nov 27 2020 48.0 Call @ 0.85 |
| 11/23/2020 | DKNG Nov 27 2020 48.0 Call | Sold 200 DKNG Nov 27 2020 48.0 Call @ 1.4 |
| 11/23/2020 | | REMOVAL OF OPTION DUE TO ASSIGNMENT (0DKNG.KK00044000) |
| 11/24/2020 | DKNG Nov 27 2020 48.5 Call | Sold 100 DKNG Nov 27 2020 48.5 Call @ 0.96 |
| 11/30/2020 | DKNG Dec 4 2020 52.0 Call | Sold 100 DKNG Dec 4 2020 52.0 Call @ 1.75 |
| 11/30/2020 | | REMOVAL OF OPTION DUE TO ASSIGNMENT (0DKNG.KR00048000) |
| 11/30/2020 | | REMOVAL OF OPTION DUE TO ASSIGNMENT (0DKNG.KR00048500) |
| 11/30/2020 | | REMOVAL OF OPTION DUE TO EXPIRATION (0DKNG.KR00048000) |
| 12/1/2020 | DKNG Dec 4 2020 52.0 Call | Sold 200 DKNG Dec 4 2020 52.0 Call @ 1.1 |
| 12/7/2020 | DKNG Dec 11 2020 52.0 Call | Sold 396 DKNG Dec 11 2020 52.0 Call @ 0.45 |
| 12/7/2020 | | REMOVAL OF OPTION DUE TO EXPIRATION (0DKNG.L400052000) |
| 12/11/2020 | DKNG Dec 18 2020 52.0 Call | Sold 396 DKNG Dec 18 2020 52.0 Call @ 1.57 |
| 12/14/2020 | | REMOVAL OF OPTION DUE TO EXPIRATION (0DKNG.LB00052000) |
| 12/21/2020 | DKNG Dec 24 2020 53.0 Call | Sold 100 DKNG Dec 24 2020 53.0 Call @ 1.45 |
| 12/21/2020 | | REMOVAL OF OPTION DUE TO ASSIGNMENT (0DKNG.LI00052000) |
| 12/22/2020 | DKNG Dec 24 2020 53.0 Call | Sold 100 DKNG Dec 24 2020 53.0 Call @ 0.82 |
| 12/24/2020 | DKNG Dec 24 2020 53.0 Call | Bought 200 DKNG Dec 24 2020 53.0 Call @ 0.05 |
| 12/24/2020 | DKNG Dec 31 2020 52.5 Call | Sold 100 DKNG Dec 31 2020 52.5 Call @ 1.5 |
| 1/4/2021 | DKNG Jan 8 2021 50.0 Call | Sold 500 DKNG Jan 8 2021 50.0 Call @ 0.36 |
| 1/4/2021 | | REMOVAL OF OPTION DUE TO EXPIRATION (0DKNG.LV00052500) |
| 1/11/2021 | | REMOVAL OF OPTION DUE TO ASSIGNMENT (0DKNG.A810050000) |
| 1/14/2021 | DKNG Jan 15 2021 55.5 Call | Sold 200 DKNG Jan 15 2021 55.5 Call @ 0.59 |
| 1/19/2021 | DKNG Jan 22 2021 52.0 Call | Sold 180 DKNG Jan 22 2021 52.0 Call @ 1.31 |
| 1/19/2021 | DKNG Jan 22 2021 52.0 Call | Sold 20 DKNG Jan 22 2021 52.0 Call @ 1.3 |
| 1/19/2021 | DKNG Jan 22 2021 52.5 Call | Sold 200 DKNG Jan 22 2021 52.5 Call @ 0.98 |
| 1/19/2021 | | REMOVAL OF OPTION DUE TO EXPIRATION (0DKNG.AF10055500) |
| 1/25/2021 | DKNG Jan 29 2021 53.5 Call | Sold 40 DKNG Jan 29 2021 53.5 Call @ 1.6 |
| 1/25/2021 | | REMOVAL OF OPTION DUE TO ASSIGNMENT (0DKNG.AM10052000) |
| 1/25/2021 | | REMOVAL OF OPTION DUE TO ASSIGNMENT (0DKNG.AM10052500) |
| 1/25/2021 | | REMOVAL OF OPTION DUE TO EXPIRATION (0DKNG.AM10052500) |
| 1/26/2021 | DKNG Jan 29 2021 55.5 Call | Sold 12 DKNG Jan 29 2021 55.5 Call @ 1.6 |
| 1/26/2021 | DKNG Jan 29 2021 55.5 Call | Sold 4 DKNG Jan 29 2021 55.5 Call @ 1.59 |
| 1/26/2021 | DKNG Jan 29 2021 55.5 Call | Sold 6 DKNG Jan 29 2021 55.5 Call @ 1.57 |
| 1/26/2021 | DKNG Jan 29 2021 55.5 Call | Sold 138 DKNG Jan 29 2021 55.5 Call @ 1.55 |
| 1/29/2021 | DKNG Feb 5 2021 54.0 Call | Sold 160 DKNG Feb 5 2021 54.0 Call @ 2.5 |
| 2/1/2021 | | REMOVAL OF OPTION DUE TO ASSIGNMENT (0DKNG.AT10053500) |
| 2/1/2021 | | REMOVAL OF OPTION DUE TO EXPIRATION (0DKNG.AT10055500) |
| 2/2/2021 | DKNG Feb 5 2021 59.5 Call | Sold 100 DKNG Feb 5 2021 59.5 Call @ 1.69 |
| 2/2/2021 | DKNG Feb 5 2021 60.0 Call | Bought 100 DKNG Feb 5 2021 60.0 Call @ 1.59 |
| 2/2/2021 | DKNG Feb 5 2021 60.0 Call | Sold 100 DKNG Feb 5 2021 60.0 Call @ 1.59 |
| 2/8/2021 | DKNG Feb 12 2021 62.0 Call | Sold 200 DKNG Feb 12 2021 62.0 Call @ 1.35 |
| 2/8/2021 | | REMOVAL OF OPTION DUE TO ASSIGNMENT (0DKNG.B510054000) |
| 2/8/2021 | | REMOVAL OF OPTION DUE TO ASSIGNMENT (0DKNG.B510059500) |

*Id.* at \*18.  Considering that Kaintz's damages analysis states that he made approximately $1,142,908 from these options investments, Kaintz's omission of these transactions from his Certification is far from minor.

Moreover, there is an obvious inconsistency between the transaction history appended to Kaintz's Certification (Dkt. No. 21-1) and that set forth in his damages analysis (Dkt. No. 21-2). On each of three separate dates, Kaintz's Certification lists several sales of DraftKings stock in the same quantity and at the same price—that is, identical in all respects.  In his Certification, Kaintz attests, under penalty of perjury, to selling 19,700 shares at $44.00 per share multiple times on November 23, 2020; to selling 10,000 shares at $48.50 per share multiple times on November 30, 2020; and to selling 20,000 shares at $71.00 per share multiple times on March 22, 2021.  *See* Dkt. No. 21-1 at \*5, \*7, \*14.  On the corresponding dates in his damages analysis, however, Kaintz instead lists one instance of each transaction as a ***purchase*** rather than a ***sale***—*i.e.*, the damages

18

analysis states that Kaintz both sold *and* purchased 19,700 shares at $44.00 per share on November 23, 2020, 10,000 shares at $48.50 per share on November 30, 2020, and 20,000 shares at $71.00 per share on March 22, 2021. *See* Dkt. No. 21-2 at *5, *8, *14.

| Transactions reflected in Exhibit A - Certification (Dkt. No. 21-1) | | | | | Transactions reflected in damages analysis (Dkt. No. 21-2) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Trade Date | Transaction | Quantity | Price | Amount | Trade Date | Transaction | Quantity | Price | Amount |
| 11/23/2020 | Sale | 19,700 | $44.0000 | $866,800 | 11/23/2020 | Sale | 19,700 | $44.0000 | $866,800 |
| 11/23/2020 | Sale | 19,700 | $44.0000 | $866,800 | 11/23/2020 | Sale (treated as purchase) | (19,700) | $44.0000 | ($866,800) |
| 11/23/2020 | Sale | 19,700 | $44.0000 | $866,800 | 11/23/2020 | Sale (short sale) | 19,700 | $44.0000 | $866,800 |
| | Total Sales | 59,100 | Total Proceeds | $2,600,400 | | Total Sales | 19,700 | Total Proceeds | $866,800 |
| 11/30/2020 | Sale | 10,000 | $48.5000 | $485,000 | 11/30/2020 | Sale | 10,000 | $48.5000 | $485,000 |
| 11/30/2020 | Sale | 10,000 | $48.5000 | $485,000 | 11/30/2020 | Sale (treated as purchase) | (10,000) | $48.5000 | ($485,000) |
| 11/30/2020 | Sale | 300 | $48.5000 | $14,550 | 11/30/2020 | Sale | 300 | $48.5000 | $14,550 |
| 11/30/2020 | Sale | 9,700 | $48.5000 | $470,450 | 11/30/2020 | Sale (short sale) | 9,700 | $48.5000 | $470,450 |
| | Total Sales | 30,000 | Total Proceeds | $1,455,000 | | Total Sales | 10,000 | Total Proceeds | $485,000 |
| 3/22/2021 | Sale | 20,000 | $71.0000 | $1,420,000 | 3/22/2021 | Sale | 20,000 | $71.0000 | $1,420,000 |
| 3/22/2021 | Sale | 20,000 | $71.0000 | $1,420,000 | 3/22/2021 | Sale (treated as purchase) | (20,000) | $71.0000 | ($1,420,000) |
| 3/22/2021 | Sale | 10,000 | $71.0000 | $710,000 | 3/22/2021 | Sale | 10,000 | $71.0000 | $710,000 |
| 3/22/2021 | Sale | 10,000 | $71.0000 | $710,000 | 3/22/2021 | Sale (short sale) | 10,000 | $71.0000 | $710,000 |
| | Total Sales | 60,000 | Total Proceeds | $4,260,000 | | Total Sales | 20,000 | Total Proceeds | $1,420,000 |
| | Total Proceeds from Identified Sales | | | $8,315,400 | | Total Proceeds from Identified Sales reflected in Exhibit B | | | $2,771,800 |

In total, the foregoing errors—that is, the options transactions omitted from Kaintz's Certification and the conflicting statements regarding Kaintz's transactions in November 2020 and March 2021—implicate roughly *$6,689,508* worth of transactions in DraftKings securities. Downs respectfully submits that the magnitude of Kaintz's errors demonstrate that he is not a suitable candidate to serve as a Class fiduciary and that the Court should therefore deny his motion.

19

## CONCLUSION

For the foregoing reasons and the reasons set forth in his motion brief (Dkt. No. 20), Downs respectfully requests that the Court issue an Order granting his motion in all respects and denying the competing motions.

Dated:  September 15, 2021                    Respectfully submitted,

                                             POMERANTZ LLP

                                             */s/ Jeremy A. Lieberman*
                                             Jeremy A. Lieberman
                                             J. Alexander Hood II
                                             Thomas H. Przybylowski
                                             600 Third Avenue, 20th Floor
                                             New York, NY 10016
                                             Telephone: (212) 661-1100
                                             Facsimile: (212) 661-8665
                                             jalieberman@pomlaw.com
                                             ahood@pomlaw.com
                                             tprzybylowski@pomlaw.com

                                             *Counsel for Lead Plaintiff Movant Robert Downs*
                                             *and Proposed Lead Counsel for the Class*