UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KENT J. RODRIGUEZ, *Individually and On Behalf of All Others Similarly Situated,*

Plaintiff,

-v-

DRAFTKINGS INC. f/k/a DIAMOND EAGLE ACQUISITION CORP., JASON D. ROBINS, JASON K. PARK, JEFF SAGANSKY, and ELI BAKER,

Defendants.

OPINION & ORDER

21 Civ. 5739 (PAE)

---

MICHIEL TEN HOORN, *Individually and on Behalf of All Others Similarly Situated,*

Plaintiff,

-v-

DRAFTKINGS INC. f/k/a DIAMOND EAGLE ACQUISITION CORP., JASON D. ROBINS, JASON K. PARK, JEFF SAGANSKY, and ELI BAKER,

Defendants.

21 Civ. 6497 (PAE)

---

PAUL A. ENGELMAYER, District Judge:

In July 2021, the above two putative class actions were filed on behalf of purchasers of certain securities of DraftKings, Inc. f/k/a Diamond Eagle Acquisition Corp. ("DraftKings") between December 23, 2019, and June 15, 2021, inclusive (the "Class Period"). Plaintiffs in each case allege that DraftKings and the individual defendants (each a DraftKings officer) made false and misleading statements about, and/or failed to disclose, that a company with which DraftKings had merged, SB Tech (Global) Limited ("SBTech"), had a history of unlawful operations. Plaintiffs allege that SBTech's transgressions left DraftKings exposed to dealings in

1

black-market gaming, which exposed DraftKings to regulatory and criminal risks and meant that some of its revenues derived from unlawful conduct. As a result, plaintiffs allege, various public statements by DraftKings were materially false and misleading, causing its shares to trade at artificially inflated prices during the Class Period. However, plaintiffs allege, on June 15, 2021, Hindenburg Research ("Hindenburg") published a report exposing SBTech's history and alleging that the merger with SBTech exposed DraftKings to black-market gaming. After the report, DraftKings shares fell 4.17%.

Pending before the Court are two sets of motions. One, unopposed, is to consolidate the actions. The other consists of motions from six individual investors, each seeking appointment as lead plaintiff and appointment of their respective attorneys as lead counsel. These movants are: (1) Tim Kaintz ("Kaintz"); (2) Robert Downs ("Downs"); (3) Walter Marino ("Marino"); (4) Stephen Goering ("Goering"); (5) Robert Mendoza ("Mendoza"); and (6) Mario E. Ernst ("Ernst"). Goering, Mendoza, and Ernst have since conceded that they lack the largest financial interest in this litigation, and have filed notices of non-opposition. Dkts. 29, 30, 31.[1] The Court's choice is, therefore, between Kaintz, Downs, and Marino (collectively, "movants").

For the reasons that follow, the Court (1) consolidates the two actions; (2) appoints Marino lead plaintiff; and (3) appoints as lead counsel Marino's counsel, Robbins Geller Rudman & Dowd LLP.

---

[1] Citations to the docket refer to the docket of 21 Civ. 5739.

## I.     Background

### A.     Factual Background[2]

DraftKings was incorporated in Nevada as a wholly owned subsidiary of a special

purpose acquisition company, Diamond Eagle Acquisition Corporation ("DEAC"). DraftKings

is a U.S.-based digital sports entertainment and gaming company. It provides users daily sports,

sports betting, and gaming opportunities; it is also involved in the design, development, and

licensing of sports betting and casino gaming platform software for online and retail sportsbook

and casino gaming products. Dkt. 1 ("Rodriguez Compl.") ¶ 2. DraftKings's common stock

trades on the NASDAQ under the ticker "DKNG." *Id.*

On April 23, 2020, DEAC executed transactions as contemplated by a Business

Combination Agreement ("Business Combination") dated December 22, 2019, as amended April

7, 2020. *Id.* ¶ 3. Pursuant to the Business Combination, in relevant part, (1) DEAC merged with

and into DraftKings, such that DraftKings survived the merger and became the successor issuer

to DEAC; (2) DraftKings acquired DraftKings Inc., a Delaware corporation ("Old DK"), by way

of merger; and (3) DraftKings acquired all issued and outstanding share capital of SBTech.

After the transactions, Old DK and SBTech became wholly owned subsidiaries of DraftKings.

*Id.* ¶¶ 3, 13.

Plaintiffs allege that, throughout the Class Period, in press releases, SEC filings, and

investor calls, DEAC, DraftKings, and/or the individual defendants touted DraftKings's strong

earnings and the valued added by SBTech. *See id.* ¶¶ 23–47. For example, on April 23, 2020,

DraftKings allegedly issued a press release stating, "By bringing together our leading consumer

---

[2] The following facts are drawn from Kent J. Rodriguez's ("Rodriguez") Complaint, Dkt.1,
("Rodriguez Compl."), and the parties' submissions on the pending motions. The Court accepts
these facts as true solely for the purposes of resolving these motions.

brand, data science expertise and industry-leading products with SBTech's proven technology platform, we will accelerate our innovation, growth and scale." *Id.* ¶ 28.  On November 13, 2020, DraftKings allegedly hosted an earnings call during which defendant Jason D. Robins, the company's chief executive officer, stated, "We continue to be very excited with the products and technology investments we're making as well as with our progress on the technology migration and business integration of SBTech," and "remind[ing]" participants on the call that, "with the acquisition of SBTech, we now have almost 1,100 engineers worldwide dedicated to creating best-in-class technology and games and experiences for our users." *Id.* ¶ 40.  And on May 7, 2021, DraftKings allegedly issued a press release stating, in part, "After giving pro forma effect to the business combination with SBTech (Global) Limited ('SBTech') and Diamond Eagle Acquisition Corp., . . . revenue grew 175%." *Id.* ¶ 46.

On June 15, 2021, Hindenburg published a report entitled, "DraftKings: A $21 Billion SPAC Betting It Can Hide Its Black Market Operations." *Id.* ¶ 49.  The report alleged, in relevant part, that SBTech accounted for a substantial portion of DraftKings's operating income, but that roughly 50% of SBTech's revenue was derived from markets where gambling is banned—a fact which SBTech had attempted to cover up—and that this exposed DraftKings to substantial risks of civil and criminal liability. *Id.* ¶¶ 49–54.  On June 15, 2021, following publication of the Hindenburg report, DraftKings's stock price fell $2.11 per share, or 4.17%. *Id.* ¶ 55.

### B.    Procedural Background

On July 2, 2021, Rodriguez filed a complaint, and his counsel, Pomerantz LLP (who now represents Downs) published a notice of this action on *Globe Newswire*, *see* Dkt. 22-2 ("Notice"), a "widely circulated national business-oriented publication or wire service," 15

U.S.C. § 78u-4(a)(3)(A)(i); *see Li Hong Cheng v. Canada Goose Holdings Inc.*, 19 Civ. 8204 (VSB), 2019 WL 6617981, at *4 (S.D.N.Y. Dec. 5, 2019).  On July 30, 2021, Michiel Ten Hoorn filed a complaint.  Both plaintiffs allege that, throughout the Class Period, DraftKings and the individual defendants made false and misleading statements and failed to disclose material adverse facts about SBTech's business, causing DraftKings's securities, at all relevant times, to be overvalued.  Plaintiffs each allege violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* ("Exchange Act"), and Rule 10b-5.

On August 31, 2021, Kaintz, Downs, Marino, Goering, Mendoza, and Ernst each moved to consolidate the two cases and for appointment as lead plaintiff in the consolidated action. Dkts. 9, 12, 15, 17, 18, 24.  On September 1, 2021, the Court ordered responses to the motions by September 15, 2021.  Dkt. 28.  On September 15, 2021, Goering, Mendoza, and Ernst filed statements of non-opposition, Dkts. 29, 30, 31, and Kaintz, Downs, and Marino filed briefs opposing one another's motions for appointment, Dkts. 32, 33, 35.  On September 18, 2021, Kaintz filed a "corrected" Private Securities Litigation Reform Act certification fixing mistakes on the one he had submitted with his initial motion.  Dkt. 36.  That same day, Kaintz filed an uninvited reply brief responding to Downs's and Marino's opposition.  Dkt. 37.  On September 20, 2021, Downs and Marino filed letters responding to Kaintz's reply.  Dkts. 38, 39.

## II.    Consolidation

### A. Legal Standard

Federal Rule of Civil Procedure 42(a) provides that, "[i]f actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay."

Rule 42(a) "empowers a trial judge to consolidate actions for trial when there are common questions of law or fact," and where consolidation will avoid needless costs or delay. *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284 (2d Cir. 1990); *see also Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999). "Typically, considerations of judicial economy favor consolidation, but 'the benefits of efficiency can never be purchased at the cost of fairness.'" *M & T Mortg. Corp. v. White*, No. 04 Civ. 4775 (WFK) (VVP), 2012 WL 715896, at *1 (E.D.N.Y. Feb. 14, 2012) (quoting *Malcolm v. Nat'l Gypsum Co.*, 995 F.2d 346, 350 (2d Cir. 1993)), *report and recommendation adopted*, 2012 WL 954651 (E.D.N.Y. Mar. 5, 2012). Before a Court orders consolidation, it must consider several factors and determine, *inter alia*, whether the gains in efficiency and economy are outweighed by the risks of prejudice and possible confusion. *Johnson*, 899 F.2d at 1284.

The Exchange Act provides that consolidation should occur where multiple actions under securities laws assert "substantially the same claim." 15 U.S.C. § 78u-4(a)(3)(B)(ii).

**B. Discussion**

Each movant seeks consolidation, and consolidation is clearly merited. Both actions sue DraftKings and its officers under the Exchange Act on behalf of all persons and entities that "purchased or otherwise acquired DraftKings securities between December 23, 2019 and June 15, 2021," inclusive. *See* Rodriguez Compl. ¶ 1; No. 21 Civ. 6497, Dkt. 1 ("Hoorn Compl.") ¶ 1. Both center on the same allegations: that DraftKings and its officers unlawfully failed to disclose SBTech's black-market dealings; that these violations led to artificially inflated share prices, and that, after the truth was revealed, these collapsed to the financial detriment of the proposed class. Rodriguez Compl. ¶¶ 4–6. In fact, the majority of each complaint contains the identical allegations, largely verbatim. The defendants in the two suits are also identical: They

include DraftKings and four officers, Jason D. Robins, Jason K. Park, Jeff Sagansky, and Eli Baker. The lawsuits, therefore, are overwhelmingly similar.

Courts routinely consolidate securities class actions arising from the same allegedly actionable statements. *See, e.g.*, *In re Braskem S.A. Sec. Litig.*, No. 15 Civ. 5132 (PAE), 2015 WL 5244735, at *3 (S.D.N.Y. Sept. 8, 2015); *Simmons v. Spencer*, No. 13 Civ. 8216 (RWS), 2014 WL 1678987, at *2 (S.D.N.Y. Apr. 25, 2014); *In re Tronox, Inc. Sec. Litig.*, 262 F.R.D. 338, 344 (S.D.N.Y. 2009); *Blackmoss Invs., Inc. v. ACA Cap. Holdings, Inc.*, 252 F.R.D. 188, 190 (S.D.N.Y. 2008). All relevant factors support consolidation here. Accordingly, the Court consolidates these actions.

## III.    Selecting the Lead Plaintiff

### A.    Legal Standard

Motions for appointment of lead plaintiff and approval of lead counsel in putative class actions brought under the securities laws are governed by the Private Securities Litigation Reform Act ("PSLRA"). *In re Millennial Media, Inc. Sec. Litig.*, 87 F. Supp. 3d 563, 569 (S.D.N.Y. 2015); *Bo Young Cha v. Kinross Gold Corp.*, No. 12 Civ. 1203 (PAE), 2012 WL 2025850, at *2 (S.D.N.Y. May 31, 2012). The PSLRA directs the Court to appoint as lead plaintiff the party or parties "most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i). Under the PSLRA, there is a rebuttable presumption that the most adequate plaintiff is the person or group of persons that: (1) has either "filed a complaint or made a motion in response to a notice"; (2) in the determination of the Court, has the "largest financial interest in the relief sought by the class"; and (3) "satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure," which governs class actions. *Id.* § 78u-4(a)(3)(B)(iii)(I)(aa)–(cc).

### B. Application

#### 1.    Timely Motion

All movants satisfy the first requirement, as each has timely submitted a motion in response to a notice. *Id.* § 78u-4(a)(3)(B)(iii)(I)(aa); *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, 269 F.R.D. 291, 293 (S.D.N.Y. 2010).

#### 2.    Financial Interest

In determining who has the largest financial stake in the litigation, courts in this Circuit have traditionally applied a four-factor test, first set forth in *Lax v. First Merchants Acceptance Corp.*, No. 97 Civ. 2715 (DHC), 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997). These "*Lax*" factors include:

> (1) the total number of shares purchased during the class period;
> (2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period);
> (3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and
> (4) the approximate losses suffered.

*City of Monroe*, 269 F.R.D. at 293.

Of these factors, courts have consistently held that the fourth, the magnitude of the loss suffered, is most significant. *See, e.g., Kaplan v. Gelfond*, 240 F.R.D. 88, 93 (S.D.N.Y. 2007) ("Although courts have differed on how much weight to assign to each of the *Lax* factors, we, as have other courts, shall place the most emphasis on the last of the four factors: the approximate loss suffered by the movant."), *reconsidered on other grounds*, *In re IMAX Sec. Litig.*, No. 06 Civ. 6128 (NRB), 2009 WL 1905033 (S.D.N.Y. June 29, 2009); *Bo Young Cha*, 2012 WL 2025850, at *2; *Reimer v. Ambac Fin. Grp., Inc.*, No. 08 Civ. 411 (NRB), 2008 WL 2073931, at *3 (S.D.N.Y. May 9, 2008); *Bhojwani v. Pistiolis*, No. 06 Civ. 13761 (CM) (KNF),

2007 WL 2197836, at *6 (S.D.N.Y. June 26, 2007); *Strougo v. Brantley Cap. Corp.*, 243 F.R.D.

100, 104 (S.D.N.Y. 2007); *see also Foley v. Transocean Ltd.*, 272 F.R.D. 126, 128 (S.D.N.Y.

2011) ("[I]n determining the largest financial interest, most courts simply determine which

potential lead plaintiff has suffered the greatest total losses." (citation omitted)).

### a.  Loss Calculation Methodology

To calculate the approximate losses sustained by a proposed lead plaintiff in

a securities class action, courts, including in this District, typically employ one of two

methodologies: First–In–First–Out ("FIFO") or Last–In–First–Out ("LIFO"). Under FIFO,

stocks acquired first are assumed to have been sold first in the calculation of losses; under LIFO,

stocks acquired most recently are assumed to have been the first sold. *See Vladimir v.

Bioenvision, Inc.*, No. 07 Civ. 6416 (SHS) (AJP), 2007 WL 4526532, at *5 (S.D.N.Y. Dec. 21,

2007). These methodologies can yield significantly different results where, as of the start of the

class period, the plaintiff held stocks in the issuer which it had purchased earlier.

The overwhelming trend both in this District and nationwide has been to use LIFO to

calculate such losses. *See, e.g., City of Monroe*, 269 F.R.D. at 295 ("[C]ourts in this district and

others have stated a preference for LIFO over FIFO in assessing loss for purposes of the

appointment of lead plaintiff."); *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 101 (S.D.N.Y.

2005) ("[M]ore recently, courts have preferred LIFO and have 'generally rejected FIFO as an

appropriate means of calculating losses in securities fraud cases.'") (quoting *In re Cable &

Wireless, PLC, Sec. Litig.*, 217 F.R.D. 372, 378–79 (E.D. Va. 2003)); *see also Beckman v.

Ener1, Inc.*, No. 11 Civ. 5794 (PAC), 2012 WL 512651, at *3 (S.D.N.Y. Feb. 15,

2012); *Pipefitters Local No. 636 Defined Ben. Plan v. Bank of Am. Corp.*, 275 F.R.D. 187, 190

(S.D.N.Y. 2011); *Bhojwani*, 2007 WL 2197836 at *7. And, of the courts that have used FIFO,

some have often done so reluctantly, solely because the parties had not supplied sufficient data on which to conduct a LIFO analysis. *See, e.g.*, *Kaplan*, 240 F.R.D. at 94; *In re Cardinal Health, Inc. Sec. Litig*, 226 F.R.D. 298, 304 (S.D. Ohio 2005) (criticizing FIFO but using it grudgingly where data did not permit a LIFO calculation).

Critically here, the LIFO methodology excludes "in-and-out" trades. Those trades occur when one purchases and sells all of their holdings during the class period, *i.e.*, after the stock price was fraudulently inflated and before it dropped due to a corrective disclosure. *See Bo Young Cha*, 2012 WL 2025850, at *4 (quoting *Vladimir*, 2007 WL 4526532, at *5 n.11 (citing cases)). The problem with "in and out" transactions is that "[a]ny gain or loss due to [them] is reasonably read to reflect price fluctuations attributable to factors other than the fraud." *Id.* And as the Supreme Court explained in *Dura Pharm., Inc. v. Broudo*, plaintiffs in securities fraud cases can recover only losses actually caused by the fraud. 544 U.S. 336, 344 (2005). "In-and-out" transactions "thus should be excluded from the PSLRA loss calculus." *Bo Young Cha*, 2012 WL 2025850, at *4.

Consistent with this principle, "[c]ourts consider only recoverable losses when calculating financial loss for the purpose of selecting lead plaintiff." *Micholle v. Ophthotech Corp.*, No. 17 Civ. 210 (VSB), 2018 WL 1307285, at *5 (S.D.N.Y. Mar. 13, 2018) (collecting cases); *see also Kniffin v. Micron Tech., Inc.*, 379 F. Supp. 3d 259, 264 (S.D.N.Y. 2019) ("[T]he recent trend in this district is for movants to adjust their LIFO calculations to remove any losses arising from securities that were bought and sold before a defendant's corrective disclosure."); *Sallustro v. CannaVest Corp.*, 93 F. Supp. 3d 265, 273 (S.D.N.Y. 2015) ("[T]he court would be abdicating its responsibility under the PSLRA if it were to ignore [the issue of loss causation at the lead plaintiff] stage," as "[r]elying on losses that, under *Dura*, are clearly not recoverable is

irreconcilable with this Court's duty to ascertain which plaintiff has the greatest financial interest in this litigation."); *City of Sunrise Firefighter's Pension Fund v. Citigroup Inc.*, No. 20 Civ. 9132 (AJN), 2021 WL 396343 (S.D.N.Y. Feb. 4, 2021).

The parties do not dispute that LIFO is the proper methodology to apply here.

### b. The Movants' Financial Stakes

Kaintz appears to have the largest financial stake here. Kaintz alleges a $2,242,155 loss, which, if true, would unquestionably be the highest of any movant. Dkt. 17 ("Kaintz Mot.") at 2.

Downs argues that Kaintz's cognizable losses are considerably lower than what Kaintz submits. Downs describes Kaintz as a serial "in-and-out" trader, trading in and out 64 times during the seven-month period in which Kaintz traded DraftKings common stock. Dkt. 32 ("Downs Opp'n") at 8–9. And as explained above, losses on such trades should be excluded from the loss calculation. *See Bo Young Cha*, 2012 WL 2025850, at *4 (quoting *Vladimir*, 2007 WL 4526532, at *5 n.11 (citing cases)). Notably, though, Downs does not calculate and submit his view of what Kaintz's *Dura*-adjusted loss is. Kaintz, on the other hand, does: Kaintz submits that his *Dura*-adjusted loss was $1,918,875. Dkt. 35 ("Kaintz Opp'n") at 4; *see also* Dkt. 21-2, Schedule A (Kaintz loss chart).

Marino argues that inconsistencies between the PSLRA certification and loss chart Kaintz submitted in this case, as well as omissions in his PSLRA certification, leave it impossible to tell precisely how much Kaintz has lost. Marino explains that Kaintz's PSLRA certification overstates and clouds his losses by omitting (1) profits from options transactions, (2) millions of dollars' worth of DraftKings common stock trades, and (3) short selling activity. Dkt. 33 ("Marino Opp'n") at 4–6. Moreover, Marino claims, Kaintz's loss chart inadvertently treats certain sales as purchases, *id.* at 6, and that Kaintz's PSLRA certification and loss chart are

inconsistent in the number of shares purchased, obfuscating Kaintz's actual trading activity. *Id.*
at 7. On September 18, 2021, having been alerted to these issues, Kaintz submitted a "corrected"
PSLRA certification bringing it in line with his loss chart, the accuracy of which Kaintz has
maintained. *See* Dkt. 36.

The slovenliness of Kaintz's submissions is undoubtedly relevant and concerning, and
plays an important role in the Court's assessment of his adequacy as a putative class
representative. *See infra* Section III.B.3.b. For purposes of determining his financial stake,
however, the Court has no reason to believe that Kaintz's cognizable losses as reflected in his
loss chart are inaccurate—or at least *so* inaccurate that Kaintz's financial stake is lower than any
other movant's. The Court credits that Kaintz has suffered a *Dura*-adjusted loss of $1,918,875.

Downs alleges a $424,946 loss. Dkt. 20 ("Downs Mot.") at 7; *see also* Dkt. 22-1 (Downs
loss chart). But as Marino and Kaintz point out, the vast majority of shares Downs sold (93%, to
be exact) occurred *before*—and therefore the losses on such trades cannot be attributed to—the
corrective disclosure (the Hindenburg report). *See* Marino Opp'n at 10–11 & n.6; Kaintz Opp'n
at 4. Marino and Kaintz are right about that. *See supra* Section III.B.2.a.

It is undisputed that Downs retained only 6,500 DraftKings securities through the
corrective disclosure. Downs does not specify what his losses on just those shares, *i.e.*, the
cognizable ones, are. Marino and Kaintz, however, calculate Downs's loss on those shares as
$99,501 and $47,254, respectively. *See* Marino Opp'n at 12; Kaintz Opp'n at 4. Despite some
difference of view as to what *exactly* Downs's *Dura*-adjusted loss is, it is clearly lower than both
Kaintz's ($1,918,875) and, as shown below, Marino's (at least $217,456).

Marino alleges a $217,456 loss. Dkt. 25 ("Marino Mot.") at 4. Downs does not
challenge that figure. And Kaintz calculates Marino's *Dura*-adjusted loss as $513,288, which is

curiously *higher* than what Marino himself claims to have lost.[3]  Kaintz Opp'n at 4.  Based on

the materials before the Court, it appears that Marino's cognizable loss is $217,456, $513,288, or

somewhere in between.  Where along that spectrum Marino's losses truly fall, however, is

immaterial to the movants' comparative financial stakes, as Marino's *Dura*-adjusted loss is

plainly lower than Kaintz's and higher than Downs's.

In sum, considering the *Lax* factors in light of *Dura*, the Court concludes that the

movants, listed in order of highest to lowest losses, are: (1) Kaintz; (2) Marino; and (3) Downs.

### 3.    Rule 23 Requirements

The PSLRA's final requirement is that the proposed lead plaintiff satisfy Rule 23's

requirements for class certification: numerosity, commonality, typicality, and adequacy.  At this

early stage of litigation, however, "only the last two factors—typicality and adequacy—are

pertinent."  *Bo Young Cha*, 2012 WL 2025850, at *6 (quoting *Constance Sczesny Tr. v. KPMG

LLP*, 223 F.R.D. 319, 324 (S.D.N.Y. 2004)).  "When moving for appointment as lead plaintiff,

'the moving plaintiff must only make a preliminary showing that the adequacy and typicality

requirements have been met.'"  *Kux-Kardos v. VimpelCom, Ltd.*, 151 F. Supp. 3d 471, 477

(S.D.N.Y. 2016) (quoting *Janbay v. Canadian Solar, Inc.*, 272 F.R.D. 112, 120 (S.D.N.Y.

2010)).

#### a.    Typicality Challenges

Lead plaintiffs' claims are typical where "each class member's claim arises from the

same course of events, and each class member makes similar legal arguments to prove the

defendant's liability."  *Sgalambo v. McKenzie*, 268 F.R.D. 170, 173–74 (S.D.N.Y. 2010)

---

[3] It is unclear to the Court how adjusting for *Dura*—which would seemingly have the effect of *decreasing* a movant's cognizable losses by excluding a category of loss—could result in a higher loss.  The Court need not probe this curiosity deeper, however, as it is non-dispositive.

(citation omitted); *see also In re Oxford Health Plans, Inc., Sec. Litig.*, 182 F.R.D. 42, 49–50 (S.D.N.Y. 1998) ("The claims of [a plaintiff] are typical of the class [when] their claims and injuries arise from the same conduct from which the other class members' claims and injuries arise.").

Here, each movant's claims arise from the same alleged conduct by defendants, and they make identical legal arguments regarding defendants' liability. Each purchased their DraftKings shares during the Class Period; each then sold them at a loss. *See* Dkts. 21-2 (Kaintz loss chart), 22-1 (Downs loss chart), 26-3 (Marino loss chart). That "is all that is required to demonstrate typicality at this stage." *In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 624 (S.D.N.Y. 2015). And no movant disputes that Downs or Marino are typical. The Court finds them so.

That said, Downs contends that Kaintz is atypical for four reasons. *See* Downs Opp'n at 13–16.

First, Downs criticizes Kaintz as atypical because he was "a serial in-and-out trader of DraftKings stock during the Class Period." *Id.* at 8. Downs explains that, as an "in-and-out" trader, Kaintz might not unable to prove loss causation and therefore should not serve as a putative class representative. *See Bensley v. FalconStor Software, Inc.*, 277 F.R.D. 231, 241 (E.D.N.Y. 2011). Downs is correct that some courts that have taken such risks into their considerations of movants' typicality. Here, however, this Court has already done so, in its assessing Kaintz's cognizable losses to be less than claimed on account of the "in-and-out" transactions. *See supra* Section III.B.2.b.

Even as adjusted, however, Kaintz's cognizable loss remains the highest loss of any movant. That is unlike the situation in the cases Downs cites, in which removal of "in-and-out"

trading has resulted in movants' complete inability to show loss causation. *See FalconStor*, 277 F.R.D. at 241; *Topping v. Deloitte Touche Tohmatsu CPA*, 95 F. Supp. 3d 607, 622 & n.16 (S.D.N.Y. 2015); *Porzio v. Overseas Shipholding Grp.*, Nos. 12 Civ. 7948, 12 Civ. 8547, 12 Civ. 9363 (SAS), 2013 WL 407678, at *3 (S.D.N.Y. Feb. 1, 2013).

Second, Downs alleges that Kaintz was a day trader—one who bought and sold DraftKings stock repeatedly even on single trading days. Downs Opp'n at 8–9. Per Downs, the concern with such trading is that it could indicate that Kaintz traded based on daily market volatility rather than reliance on defendants' alleged misrepresentations. And that possibility, Downs asserts, exposes Kaintz's claims to unique defenses that, win or lose, would distract from the litigation and sap his effectiveness on behalf of the class. *See Galmi v. Teva Pharms. Indus.*, 302 F. Supp. 3d 485, 504 n.10 (D. Conn. 2017) ("[G]iven his status as a potential 'day trader,' he may be subject to unique defenses that make him an inappropriate lead plaintiff."); *see also Stoopler v. Direxion Shares ETF Tr.*, Nos. 09 Civ. 8011, 09 Civ. 8375, 09 Civ. 8459, 10 Civ. 271, 10 Civ. 1273 (RJH), 2010 WL 3199679, at *4 (S.D.N.Y. Aug. 12, 2010), *as corrected* (Aug. 16, 2010) (day traders potentially subject to unique defenses). Such unique defenses, however "are considered more appropriately as rebutting [a movant's] status as presumptive lead plaintiff," not in preliminarily assessing the Rule 23 factors. *Batter v. Hecla Mining Co.*, No. 19 Civ. 4883 (ALC), 2020 WL 1444934, at *4 (S.D.N.Y. Mar. 25, 2020). Accordingly, the Court addresses this concern below. *See infra* Section III.B.4.

Downs's third typicality attack on Kaintz is that he was a short seller—an investor who sells with the intention of repurchasing at a later date and lower price, effectively betting against the company. One court has explained as follows the rationale for finding short-sellers atypical class representatives: The fraud-on-the-market theory, central in securities litigation, is premised

on the idea that the market price accurately reflects publicly available information; but short selling is an investment strategy premised on the view that the stock price will fall. Thus, short selling "raise[s] the question of whether the seller was actually relying on the market price, and the class is not served by its representative coming under such scrutiny." *In Re Critical Path, Inc. Sec. Litig.*, 156 F. Supp. 2d 1102, 1110 (N.D. Cal. 2001); *see also Marcus v. J.C. PenneyPenny Co., Inc.*, No. 13 Civ. 736 (KNM), 2014 WL 11394911, at *7 n.47 (E.D. Tex. Feb. 28, 2014) ("It seems counter intuitive to assume the typical member of the proposed class would purchase shares of JCP stock with the hopes that stock would decrease."). Downs points to a "conspicuously high" quantum of short sales or "cover purchases" (purchased in connection with short sales) executed by Kaintz. Kaintz's loss chart details such transactions as having been executed throughout the class period. *See* Dkt. 21-3.

Courts have indeed declined to appoint short sellers as class representatives (albeit not always on typicality grounds). *See Critical Path*, 156 F. Supp. 2d 1102; *Marcus*, 2014 WL 11394911; *Isaacs v. Musk*, No. 18 Civ. 4865 (EMC), 2018 WL 6182753, at *2 (N.D. Cal. Nov. 27, 2018); *Weisz v. Calpine Corp.*, No. 2 Civ. 1200 (SBA), 2002 WL 32818827, at *8 (N.D. Cal. Aug. 19, 2002). On the other hand, courts have rejected "short-seller" challenges to typicality where short sales were executed as part of a sophisticated investment strategy that undermines the idea that the short-seller failed to rely on the integrity of the market price. *See, e.g., Chauhan v. Intercept Pharms.*, 21 Civ. 36 (LJL), 2021 WL 235890, at *6 (S.D.N.Y. Jan. 25, 2021).

Defending his bid, Kaintz counters that "[h]e has sworn, unequivocally, that his purchases of DraftKings securities were 'based on [his] analysis of the stock.'" Kaintz Opp'n at 11 (citing Dkt. 21-3 ¶ 2). "Therefore," Kaintz claims, "there is no evidence that he traded based on some idea or plan divorced from Defendants' fraud." *Id.* But, unlike in *Chauhan*, Kaintz's

self-serving statements do not explain whether, or if so how, his short selling was part of a strategy that relied on the market price. Nonetheless, Downs has not articulated why Kaintz's short selling bespeaks a lack of reliance on the market price. Accordingly, on the present record, the Court cannot find that Kaintz's short selling would make him an atypical class representative.

Fourth, Downs alleges that Kaintz would be an atypical class representative because he engaged in a high volume of options purchases. *See, e.g.*, *Di Scala v. ProShares Ultra Bloomberg Crude Oil*, No. 20 Civ. 5865 (NRB), 2020 WL 7698321, at *4 (S.D.N.Y. Dec. 28, 2020) (declining to appoint movant whose losses "overwhelmingly reflect his sale of put options, raising issues of his typicality and adequacy"); *Andrada v. Atherogenics, Inc.*, No. 05 Civ. 61 (RJH), 2005 WL 912359, at *5 (S.D.N.Y. Apr. 19, 2005) (same where movant purchased only call options); *Cook v. Allergan PLC*, No. 18 Civ. 12089 (CM), 2019 WL 1510894 (S.D.N.Y. Mar. 21, 2019) (same where more than 6% of movant's losses arose from options trading). Unlike many movants in the cases Downs cites, however, for Kaintz, "the overwhelming majority of [his] trading activity is in common stock (99.98%)." Kaintz Opp'n at 12. And as Kaintz points out, courts in this District have appointed as lead plaintiff movants who have engaged in an insignificant amount of options trades and do not claim any losses therefrom. *See Chauhan*, 2021 WL 235890, at *6; *see also Goldstein v. Puda Coal, Inc.*, 827 F. Supp. 2d 348, 355 (S.D.N.Y. 2011). The Court will not hold it against Kaintz that a miniscule fraction of his trading activity was in options.

In sum, the Court finds Downs, Marino, and Kaintz typical.

### b.   *Adequacy Challenges*

A lead plaintiff is adequate where he or she "does not have interests that are antagonistic to the class that he [or she] seeks to represent and has retained counsel that is capable and

qualified to vigorously represent the interests of the class that he [or she] seeks to represent." *Glauser v. EVCI Ctr. Colls. Holding Corp.*, 236 F.R.D. 184, 189 (S.D.N.Y. 2006).

Here, no movant has interests "antagonistic" to the class. *Id.* Each has a "sufficient interest in the outcome to ensure vigorous advocacy on behalf of the class." *Petrobras*, 104 F. Supp. 3d at 624 (citation omitted); *see Kux-Kardos*, 151 F. Supp. 3d at 478. And each has retained experienced and qualified proposed lead counsel. Roche Freedman LLP (counsel for Kaintz), Pomerantz LLP (counsel for Downs), and Robbins Geller Rudman & Dowd LLP (counsel for Marino) each have extensive experience as lead counsel in securities class actions. *See* Dkts. 21-4 (Roche Freedman LLP Firm Resume); 22-5 (Pomerantz LLP Firm Resume); Marino Mot. at 6–8.

Although no movant has questioned Downs's or Marino's adequacy as a class representative, Downs and Marino question Kaintz's. The concerns stem from the significant errors and inconsistencies in Kaintz's submissions to the Court, as described above. *See* Marino Opp'n at 8–9; Downs Opp'n at 16–19. On September 18, 2021—three days after Downs and Marino filed their objections highlighting the problems—Kaintz submitted his "corrected" PSLRA certification fixing errors in the initial certification. Dkt. 36. Kaintz also submitted an uninvited reply memorandum and affidavit from the accountant who prepared his loss chart, describing what went wrong. Dkt. 37-1. Kaintz seeks to minimize the issue as a "clerical error made when transcribing" certain trades from the loss chart to the PSLRA certification. He claims that he "missed these errors due to the volume of transactions involved," which he fixed "[a]fter being alerted to the error." Dkt. 37.

The Court is not buying. Had Kaintz been serious about his responsibilities as a budding class representative, he should not have had to have been alerted to these basic errors in the first

place. Minor or not—and the Court by no means finds the numerous and varied errors minor—the errors "nonetheless speak[] to a level of carelessness" that rightly calls into doubt Kaintz's adequacy to be lead plaintiff. *Plaut v. Goldman Sachs Grp., Inc.*, No. 18 Civ. 12084 (VSB), 2019 WL 4512774, at \*5 (S.D.N.Y. Sept. 19, 2019) (quoting *Romaszewski v. Trevena, Inc.*, 383 F. Supp. 3d 409, 415 (E.D. Pa. 2019)). As have other courts in this District presented with similar sloppiness, this Court finds that Kaintz's careless errors weigh heavily against his appointment as lead plaintiff. *See id.*; *Karp v. Diebold Nixdorf, Inc.*, No. 19 Civ. 6180 (LAP), 2019 WL 5587148, at \*6 (S.D.N.Y. Oct. 30, 2019) (rejecting movant with comparatively higher financial stake, in part due to errors in submissions to court); *Li Hong Cheng*, 2019 WL 6617981, at \*6 n.7 (same); *Micholle*, 2018 WL 1307285, at \*9 (same); *Bhojwani*, 2007 WL 9228588, at \*3 (same).

Thus, the Court finds, Downs and Marino satisfy the PSLRA's preliminary assessment of Rule 23's adequacy requirement, but Kaintz does not.

In any event, even were Kaintz not dogged by these self-inflicted wounds affecting his submissions, his presumptive lead plaintiff status on account of his financial interest, *see* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I), would be rebuttable, *id.* § 78u-4(a)(3)(B)(iii)(II)(bb). And for the reasons that follow, Downs convincingly contends that the timing and species of Kaintz's purchases expose him to unique defenses that would effectively so rebut. *See* Downs Opp'n at 13–16.

### 2. Rebuttal

"[T]o rebut the presumption in favor of the movant with the greatest financial loss, there must be 'proof' of a non-speculative risk that the movant" is subject to unique defenses that render them incapable of adequately representing the class. *Schaffer v. Horizon Pharma Plc*, No.

16 Civ. 1763 (JMF), 2016 WL 3566238, at *2 (S.D.N.Y. June 27, 2016); *see* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb).  Courts in this District have recognized that the meaning of the PSLRA's term "proof" is "not firmly established," and have treated it as roughly "synonymous with 'evidence.'"  *Schaffer*, 2016 WL 3566238, at *2 (quoting *Gelfond*, 240 F.R.D. at 94).  And, because the PSLRA requires proof that the movant is merely "subject to" unique defenses, "many courts have rejected appointments of lead plaintiffs based on *potential* risks."  *Id.* at *3 (emphasis in original) (collecting cases).  Thus, "[b]efore disqualifying a potential lead plaintiff on [the basis that he is subject to a unique defense], the Court need not conclude that the defense is likely to or will succeed."  *Gross v. AT&T Inc.*, No. 19 Civ. 2892 (VEC), 2019 WL 3500496, at *2 (S.D.N.Y. July 31, 2019).  Rather, it must find only "at least a potential that the presumptively most adequate lead plaintiff will be subject to unique defenses."  *Batter*, 2020 WL 1444934, at *7 (quoting *In re Surebeam Corp. Sec. Litig.*, No. 03 Civ. 1721 (JM), 2004 WL 5159061, at *7 (S.D. Cal. Jan. 5, 2004)).

This approach protects members of the putative class, because even ultimately unsuccessful unique defenses may "divert attention from the substance of the basic claim," and class members are "entitled to be represented by someone unhindered by" such distractions. *Rocco*, 245 F.R.D. at 135 (quoting *Kline v. Wolff*, 88 F.R.D. 696, 699–701 (S.D.N.Y. 1981)).  As the debate between Downs, Marino, and Kaintz well illustrates, there is a real risk that the idiosyncrasies of Kaintz's purchases would become just such a distraction at trial, were Kaintz appointed lead plaintiff, with his trading history inhibiting his ability to serve as an untarnished proxy for the class.  *Cf. In re Hebron Tech. Co., Ltd. Sec. Litig.*, No. 20 Civ. 4420 (PAE), 2020 WL 5548856, at *7 (S.D.N.Y. Sept. 16, 2020).

Specifically, Downs argues that Kaintz's short-selling and day trading leaves him vulnerable to attacks that he did not rely on the market price in trading DraftKings, which could "sever[] the link between the alleged misrepresentation and . . . [Kaintz's] decision to trade at a fair market price." *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988). Downs is right that the specter of such attacks on Kaintz would loom large were he to be a proxy for the class. And courts have declined to appoint movants subject to them. *See, e.g.*, *Galmi*, 302 F. Supp. 3d at 504 n.10; *Eichenholtz v. Verifone Holdings, Inc.*, No. 07 Civ. 6140 (MHP), 2008 WL 3925289, at *11 (N.D. Cal. Aug. 22, 2008); *Critical Path*, 156 F. Supp. 2d at 1110; *see also Stoopler* 2010 WL 3199679, at *4 (recognizing that day-trader could be subject to unique defenses).

Kaintz defends his bid for lead status by pointing to the numerous courts in this District that have appointed as lead plaintiffs, or certified classes represented by, litigants who have engaged in short-selling and/or day trading. *See, e.g.*, *Prefontaine v. Rsch. in Motion Ltd.*, No. 11 Civ. 4068 (RJS), 2012 WL 104770, at *4 (S.D.N.Y. Jan. 5, 2012); *Pearlstein v. BlackBerry Ltd.*, No. 13 Civ. 7060 (CM), 2021 WL 253453 (S.D.N.Y. Jan. 26, 2021); *Perez v. HEXO Corp.*, No. 19 Civ. 10965 (NRB), 2020 WL 905753, at *4 (S.D.N.Y. Feb. 25, 2020). But while Kaintz might ultimately succeed in persuading the Court that his idiosyncrasies ought not defeat class certification or harm his claims' prospects on the merits, the interests of the class disfavor exposing it to the risk that his history will dog him. The question whether Kaintz's trading practice compromise his claims and his adequacy as a class representative is sure to arise in the litigation. That potential to distract militates against his appointment. *See Batter*, 2020 WL 1444934, at *7. As the court in *Galmi* aptly put the point: "The question is whether the appointment of a particular lead plaintiff would lead to the defendant raising unique defenses against that lead plaintiff that would unnecessarily complicate and/or stall the litigation." 302 F.

Supp. 3d at 504 n.10 (citing *George v. China Auto. Sys., Inc.*, No. 11 Civ. 7533 (KBF), 2013 WL 3357170, at *7 (S.D.N.Y. July 3, 2013)).

Downs further notes that, were an amended complaint to allege a different corrective disclosure, Kaintz might prove to have held *no* DraftKings stock on the dates at issue, given Kaintz's frequent trading. Downs Opp'n at 10. That point is less compelling than the earlier, because were Kaintz chosen as lead plaintiff, he likely would not amend the complaint to allege a corrective disclosure on a date on which he did not hold any DraftKings stock. And while a decision by Kaintz not to so amend would be unfaithful to the putative class he proposed to lead were it driven by his unique trading history, Downs has not identified a specific such corrective disclosure that an unconflicted class plaintiff here ought to have pled. The Court thus regards the various instances on which Kaintz fully exited his DraftKings position during the class period as revealing a degree of potential that Kaintz may be subject to unique defenses, *see Schaffer*, 2016 WL 3566238, at *3, but, unlike his sloppy court submissions and short selling and day trading, not as alone dispositive of his inadequacy.

In sum, even had Kaintz merited presumptive status as lead plaintiff, that status would have been effectively rebutted. *See id.* (collecting cases rejecting presumptive lead plaintiffs faced with unique defenses); *City Pension Fund for Firefighters & Police Officers in the City of Mia. Beach v. Aracruz Cellulose S.A.*, No. 08 Civ. 23317, 2009 WL 10664427, at *5 (S.D. Fla. Aug. 7, 2009) (same where presumptive lead plaintiff bought shares "after a potential corrective disclosure, affecting issues of reliance and causation"); *see also, e.g.*, *Gross*, 2019 WL 3500496, at *2; *Petrobras*, 104 F. Supp. at 623–24 & n.4 (presumption rebutted where "statements would provide fodder" for class-certification challenge); *In re Bally Total Fitness Sec. Litig.*, No. 04 Civ. 3530, 2005 WL 627960, at *6 (N.D. Ill. Mar. 15, 2005); *Surebeam*, 2004 WL 5159061, at

*7 (same where there is "at least a potential that [movant] will be subject to unique defenses and will not fairly and adequately protect the interests of the class").

The Court finds Kaintz's unique trading patterns and slapdash submissions to the Court to militate strongly against finding him the best suited putative class representative here. Considering all of these reasons, the Court declines to appoint Kaintz as lead plaintiff.

The candidate for lead plaintiff with the next-highest financial stake in the litigation is Marino, whom the Court has already found to satisfy the Rule 23 factors for purposes of the PSLRA analysis. *See supra* Section III.B.3.  As such, Marino is the "most adequate plaintiff." 15 U.S.C. § 78u-4(a)(3)(B)(i).  No movant, even Kaintz, has put forth any reason that Marino would be ill-suited to adequately represent the putative class here.

The Court therefore appoints Marino as lead plaintiff.

## IV.    Appointing Lead Counsel

The most adequate plaintiff may retain counsel to represent the class, subject to the Court's approval. *Id.* § 78u–(4)(a)(3)(B)(v).  Marino has selected the law firm of Robins Geller Rudman & Downs LLP ("Robins Geller") as lead counsel.  Having reviewed the firm's submissions as to its pertinent background and experience, including its experience litigating securities class actions, the Court finds the firm qualified to serve as lead counsel.  Accordingly, the Court appoints Robins Geller as lead counsel.

## CONCLUSION

For the reasons set out above, the Court grants Marino's motion for appointment as lead plaintiff, and appoints Robins Geller as lead counsel.

The Clerk of the Court is respectfully directed to terminate the motions pending at docket entries 9, 12, 15, 17, 18, and 24.

The Court directs the parties to meet and confer and, by November 19, 2021, to file a joint letter setting out an efficient proposed schedule for next steps in this case, including proposed dates for the filing of (1) a consolidated amended complaint and (2) defendants' response.  If defendants anticipate that their response will take the form of a motion to dismiss, the parties shall include proposed dates for the opposition and reply briefs as well.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: November 12, 2021
       New York, New York