**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE DRAFTKINGS INC. SECURITIES LITIGATION | )<br>)<br>)<br>)  No. 1:21-cv-05739 (PAE)<br>)<br>)<br>)<br>)  ***ORAL ARGUMENT REQUESTED*** |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE AMENDED COMPLAINT

Brian T. Frawley
Timothy J. Weinstein
Charles H. Sullivan
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
frawleyb@sullcrom.com
weinsteint@sullcrom.com
sullivanc@sullcrom.com
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Attorneys for Defendants DraftKings Inc.,
Jason D. Robins, Jason K. Park, Jeff
Sagansky, Eli Baker and Shalom Meckenzie*

February 22, 2022

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................1

ALLEGATIONS OF THE AMENDED COMPLAINT.......................................2

    A.    The Parties ...........................................................................2

    B.    The Business Combination ...........................................................3

    C.    Plaintiff's Regurgitation of the Hindenburg Editorial ...................................5

ARGUMENT .......................................................................................8

I.    Plaintiff Does Not Plead With Particularity Any
Actionable Misstatement or Omission.....................................................9

    A.    The Complaint Fails to Comply with the PSLRA and Rule 9(b). .................9

    B.    Plaintiff in All Events Comes Nowhere Close to Pleading
Any Material Misstatement or Omission.......................................10

    C.    Plaintiff Pleads No Violation of Items 303 or 105. ........................17

II.    Plaintiff Fails to Allege a Cogent and Compelling Inference of Fraud. ..................18

    A.    Plaintiff Has Not Alleged Any Cognizable Motive to Defraud....................19

    B.    Plaintiff Fails to Plead Strong Circumstantial Evidence of Fraud. ...............21

    C.    Fraud Is Not Remotely the More
Compelling Inference on the Facts Alleged....................................23

III.    The Complaint Fails to Plead a Viable Claim Against Each Defendant. .................24

IV.    The Complaint Fails to Allege Loss Causation. ........................................25

CONCLUSION.....................................................................................25

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*In re Advanced Battery Techs., Inc.,*
781 F.3d 638 (2d Cir. 2015)...............................................................................23

*AK Laborer Emp'rs Ret. Fund* v. *Scholastic Corp.,*
2010 WL 3910211 (S.D.N.Y. Sept. 30, 2010).......................................................21

*Anschutz Corp.* v. *Merrill Lynch & Co.,*
690 F.3d 98 (2d Cir. 2012)....................................................................................8

*Ashcroft* v. *Iqbal,*
556 U.S. 662 (2009)...............................................................................................8

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.,*
493 F.3d 87 (2d Cir. 2007)..............................................................................1, 24

*In re Axis Cap. Holdings Ltd. Sec. Litig.,*
456 F. Supp. 2d 576 (S.D.N.Y. 2006)..................................................................14

*In re Bank of Amer. Corp. Secs., Derivative, and ERISA Litig.,*
757 F. Supp. 2d 260 (S.D.N.Y. 2010)..................................................................11

*Basic Inc.* v. *Levinson,*
485 U.S. 224 (1988).............................................................................................10

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash,*
506 F. App'x. 32 (2d Cir. 2012) ..................................................................... 15-17

*In re Braskem S.A. Sec. Litig.,*
246 F. Supp. 3d 731 (S.D.N.Y. 2017)..................................................................24

*In re Citigroup, Inc. Sec. Litig.,*
330 F. Supp. 2d 367 (S.D.N.Y. 2004)..................................................................17

*City of Austin Police Ret. Sys.* v. *Kinross Gold Corp.,*
957 F. Supp. 2d 277 (S.D.N.Y. 2013)..................................................................23

*City of Coral Springs* v. *Farfetch Ltd.,*
2021 WL 4481119 (S.D.N.Y. Sept. 30, 2021)................................................20, 24

*City of Omaha Police & Fire Ret. Sys.* v. *Evoqua Water Techs. Corp.,*
450 F. Supp. 3d 379 (S.D.N.Y. 2020)......................................................... 19-20, 23

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG,*
752 F.3d 173 (2d Cir. 2014)................................................................................17

*Cortina* v. *Anavex Life Scis. Corp.*,
    2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) ........................................................................23

*Dalberth* v. *Xerox Corp.*,
    766 F.3d 172 (2d Cir. 2014)........................................................................................................10

*In re Coty Inc. Sec. Litig.*,
    2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ........................................................................17

*DoubleLine Capital LP* v. *Odebrecht Fin., Ltd.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2018)........................................................................................15

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)........................................................................................................18

*In re FBR Sec. Litig.*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008)........................................................................................17

*Gagnon* v. *Alkermes PLC*,
    368 F. Supp. 3d 750 (S.D.N.Y. 2019)..................................................................................3, 19

*Gamm* v. *Sanderson Farms, Inc.*,
    944 F.3d 455 (2d Cir. 2019)........................................................................................................12

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ......................................................................................19

*In re Gildan Activewear, Inc. Sec. Litig.*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009)................................................................................. 19-20

*Glaser* v. *The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)........................................................................................22

*Gray* v. *Alpha & Omega Semiconductor Ltd.*,
    2021 WL 4429499 (S.D.N.Y. Sept. 27, 2021)........................................................... 12-13, 22

*In re Hardinge, Inc. Sec. Litig.*,
    696 F. Supp. 2d 309 (W.D.N.Y. 2010) ....................................................................................24

*In re Hebron Tech. Co. Ltd. Secs. Litig.*,
    2021 WL 4341500 (S.D.N.Y. Sept. 22, 2021)...................................................... 9, 13, 22-23

*Hutchinson* v. *Deutsche Bank Sec. Inc.*,
    647 F.3d 479 (2d Cir. 2011)........................................................................................................18

*Ind. Pub. Ret. Sys.* v. *SAIC, Iinc.*,
    818 F.3d 85 (2d Cir. 2016).................................................................................................17, 21

*Janus Capital Grp., Inc.* v. *First Derivative Traders*,
564 U.S. 135 (2011)..................................................................................24

*Jaroslawicz* v. *M&T Bank Corp.*,
2017 WL 1197716 (D. Del. Mar. 30, 2017) ..........................................11

*Kalnit* v. *Eichler*,
264 F.3d 131 (2d Cir. 2001)................................................................19, 21

*Lehman* v. *Ohr Pharm., Inc.*,
2021 WL 5986761 (2d Cir. Dec. 16, 2021) ...........................................22

*Lipow* v. *Net1 UEPS Techs.*,
131 F. Supp. 3d 144 (S.D.N.Y. 2015)....................................................22

*Long Miao* v. *Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020).....................................................9

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014).......................................................20

*In re Marsh & Mclennan Cos. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006).....................................................15

*Martin* v. *Quartermain*,
732 F. App'x 37 (2d Cir. 2018) ..............................................................16

*Matrixx Initiatives, Inc.* v. *Siracusano*,
563 U.S. 27 (2011) ..................................................................................10

*Menaldi* v. *Och-Ziff Cap. Mgmt. Grp. LLC*,
164 F. Supp. 3d 568 (S.D.N.Y. 2016).....................................................12

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010)....................................................................10

*Novak* v. *Kasaks*,
216 F.3d 300 (2d Cir. 2000)................................................................9, 22

*In re Omnicom Group, Inc.*,
541 F. Supp. 2d 546 (S.D.N.Y. 2008).....................................................25

*Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank A/S*,
11 F.4th 90 (2d Cir. 2021) .............................................13, 15, 17, 24

*In re PXRE Grp., Ltd., Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009).....................................................21

*Rothstein* v. *UBS AG*,
   708 F.3d 82 (2d Cir. 2013).......................................................................8

*S. Cherry St., LLC* v. *Hennessee Grp.*,
   573 F.3d 98 (2d Cir. 2009)......................................................................21

*Shetty* v. *Trivago N.V.*,
   796 F. App'x 31 (2d Cir. 2019) ..............................................................18

*Shields* v. *Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994)....................................................................21

*Singh* v. *Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019)........................................................................8

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)......................................................2, 8, 18, 23

*Town of Davie Police Officers Ret. Sys.* v. *Nat. Gen. Hldgs. Corp.*,
   2021 WL 5142702 (2d Cir. Nov. 5, 2021) ..............................................23

*Tyler* v. *Liz Claiborne, Inc.*,
   814 F. Supp. 2d 323 (S.D.N.Y. 2011).....................................................20

*In re VEON Ltd. Sec. Litig.*,
   2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017).........................................15

*Warren Police & Fire Ret. Sys.* v. *Foot Locker, Inc.*,
   412 F. Supp. 3d 206 (E.D.N.Y. 2019) .....................................................20

*In re Yukos Oil Co. Secs. Litig.*,
   2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ..........................................13

**STATUTES AND RULES**

Federal Rules of Civil Procedure 9(b) and 12(b)................................ *passim*

Securities Exchange Act of 1934, Sections 10(b) and 20(a),
   15 U.S.C. §§ 78j(b) & 78t(a) ............................................... *passim*

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ................. *passim*

Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105 ......................................18

Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303 ......................................17

**OTHER AUTHORITIES**

I. Nelson Rose, *Gambling and the Law: The International Law of Remote Wagering*, 40 J. MARSHALL L. REV. 1159, 1169 (2007)..........................................................13

W. Woon, *Regulation of the Securities Industry in Singapore*, 4 PAC. RIM L. & POL'Y J. 731, 754 (1995) ......................................................................................................13

Defendants DraftKings Inc. ("DraftKings") and Messrs. Robins, Park, Sagansky, Baker and Meckenzie (collectively, the "Individual Defendants") respectfully submit this memorandum in support of their motion to dismiss the Amended Complaint (Dkt. No. 52) pursuant to Rules 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act (the "PSLRA").

## PRELIMINARY STATEMENT

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc*. v. *Shaar Fund, Ltd*., 493 F.3d 87, 99 (2d Cir. 2007). Rather than set out detailed and particularized facts as the PSLRA requires, the Complaint here does nothing more than repackage the contents of an internet posting from a short-seller, Hindenburg Research, that the author concedes reflects biased opinions based on publicly-available information (the "Hindenburg Editorial"). Plaintiff admittedly did nothing to verify those allegations, and he offers nothing else in support of his claims. But, no matter the source of plaintiff's allegations, the conjecture and misdirection in the Complaint fail to state any claim in compliance with the PSLRA for at least four reasons.

*First*, plaintiff does not plead any actionable misstatement or omission. His principal misstatement theory is that a putative acquisition target, SBTech (Global) Limited ("SBTech")—an entity DraftKings acquired through a December 23, 2019 Business Combination Agreement (the "BCA")—represented *to* DraftKings in the BCA that SBTech was in compliance with certain laws, and that representation allegedly was inaccurate or incomplete. Plaintiff cites no basis for him to predicate fraud claims on representations to DraftKings by a contractual counterparty, and his assertions that SBTech was at any time in violation of U.S. sanctions or foreign gaming laws through unspecified conduct at unspecified times are supported by nothing. Beyond that, plaintiff mischaracterizes the scope of the representation, and his contention that

DraftKings was obligated to volunteer judgments about the lawfulness of any SBTech conduct—none of which *ever* has been challenged—is illogical and contrary to well-settled law.

*Second*, the Complaint is bereft of particularized allegations supporting a strong inference of scienter, which the Supreme Court has held must include facts demonstrating a "cogent" and "compelling" inference of fraud. *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007). Plaintiff nowhere alleges any specific facts known to any defendant that conflicted with an alleged statement at the time it was made. The Complaint does not contend that defendants—or anyone else (besides Hindenburg)—agrees with the legal judgments about various foreign laws alleged in the Complaint. Instead, plaintiff concedes U.S. gaming regulators have rejected his claim those nations are so-called "black markets."

*Finally*, the Complaint does not plead (i) each element of his claims, for each challenged statement as to each defendant, or (ii) loss causation, as required by the PSLRA and settled law.

## ALLEGATIONS OF THE AMENDED COMPLAINT

### A. The Parties

DraftKings is a "digital sports entertainment and gaming company." (AC ¶ 2.) Through its Business-to-Consumer ("B2C") segment, DraftKings provides users with daily fantasy sports, sports betting and online casino opportunities. (*Id*.) Through its Business-to-Business ("B2B") segment, DraftKings designs, develops, and licenses sports betting and casino gaming software for online and retail sportsbook and casino gaming products. (*Id*.) Jason Robins is a founder of DraftKings, serves as its CEO and Chairman of the Board, and is DraftKings' largest stockholder and controls about 90% of DraftKings' voting power. (AC ¶ 17; Ex. 1 (FY 2020 10-K) at 43.) Jason Park is DraftKings' CFO. (AC ¶ 18.)

Jeff Sagansky and Eli Baker are former executives of DraftKings' legal predecessor, Diamond Eagle Acquisition Corp. ("DEAC"), which merged with DraftKings in April 2020.

(AC ¶¶ 3, 20-21.)  Shalom Meckenzie is the founder of SBTech, and he has served as a director of DraftKings since the Business Combination.  (AC ¶ 19.)

## B.    The Business Combination

DraftKings was founded in 2011 and, for several years, operated as a private company primarily in the B2C segment with its famous fantasy sports business.  (AC ¶ 38.)  In 2018, DraftKings expanded into the rapidly growing sports betting and online casino businesses.  As a result, DraftKings' annual revenues grew from $225 million in 2018 to over $323 million the following year.  (Ex. 2 (Proxy) at 40, 188-92.)[1]

On December 23, 2019, DraftKings announced a three-way Business Combination with SBTech and DEAC, a publicly-traded special purpose acquisition company.  (Ex. 3 (Press Release).)  In the Business Combination, DraftKings would become a public company through a merger with DEAC and simultaneously acquire SBTech, a privately-held corporation incorporated and headquartered in the Isle of Man, whose "principal business activities involve the design and development of sports betting and casino gaming platform software for online and retail sportsbook and casino gaming products."  (AC ¶ 39; Ex. 2 (Proxy) at 21.)  The combined company would retain the DraftKings name and become a "vertically-integrated powerhouse for sports betting."  (AC ¶ 44.)

On April 15, 2020, DraftKings filed its 324-page Proxy Statement ("Proxy," Ex. 2) containing detailed discussions of, among other things, the BCA, DraftKings' and SBTech's businesses, both companies' historical financial results, and risk factors affecting the combined company.  As the Proxy explained in detail, by acquiring SBTech's established technology

---

[1]        On this motion, the Court may consider, in addition to well-pleaded allegations of the Amended Complaint ("AC" or "Complaint"), documents referenced in, or integral to the Complaint, or any other document "upon which [plaintiff] relied in bringing the suit."  *Gagnon* v. *Alkermes PLC*, 368 F. Supp. 3d 750, 762 (S.D.N.Y. 2019).  Defendants include as Exhibits ("Ex.") to the accompanying Declaration of Brian T. Frawley certain public statements and public filings relied upon in the Complaint that the Court may consider on this motion.

platform and infrastructure, DraftKings would no longer need to rely, as it had historically, on a third party to license and operate DraftKings' core sportsbook offering that was the foundation of its future business plans.  (*Id*. at 77, 204.)

Prior to the BCA, SBTech was a software and technology provider to third-party operators and resellers; it neither accepted wagers nor operated a casino or sportsbook. "SBTech's proprietary platform *allows leading mobile sportsbook and casino gaming operators to deliver products under their own brands*, powered by SBTech's leading industry platform engine."  (Proxy at 243 (emphasis added).)  DraftKings disclosed repeatedly that SBTech is "a business-to-business software service provider," and it "generates revenue by offering its services and software to customers throughout Europe, Asia, and the United States."  (*Id*. at 28, 103, 245.)  "[T]he SBTech business generates revenue from operators by providing sports betting and iGaming content directly to operators in exchange for a share of operators' revenues, as well as through fixed fee contracts with resellers."  (*Id.* at 200.)  "SBT[ech] offers their services directly to operators in Europe and uses a reseller model in Asia."  (*Id*. at 75.)  Hence, in Europe, SBTech's gaming engine is incorporated into its customers' applications and "distributed online . . . by operators that have licensed such products and services directly from SBTech."  (*Id*. at 204.)  By contrast, SBTech "licenses its products and services to [Asian] resellers (through a fixed-fee model) who sublicense to operators."[2]  (*Id.* at 204.)

Every document referenced in the Complaint disclosed repeatedly that SBTech derived significant revenues from business conducted by its B2B customers in Asia.  The Proxy, for example, disclosed that SBTech's B2B customer base was concentrated "primarily in international jurisdictions," and that, in 2019, "approximately 37% and 63% of SBTech's

---

[2]     Substantially similar disclosures to those in the Proxy Statement were contained in additional SEC filings including a registration statement filed on April 23, 2020 and each of the prospectuses referenced in the Complaint. (*See, e.g.*, Ex. 4 (April 27, 2020 Prospectus) at 11, 27-29, 39, 41, 81, 84, 91, 122, 124-25.)

revenue . . . was derived from customers in Europe and other regions (primarily Asia),"
respectively. (*Id*. at 75, 245; *see id.* at 246 ("Organic revenue growth [in 2019] reflected mainly
additions of new customers in Asia.").) DraftKings further disclosed that SBTech "relies
primarily on one reseller for its Asia revenue" and that "[t]his reseller accounted for
approximately 46% of SBT's revenue in the year ended December 31, 2019." (*Id*. at 75.)

Over several pages of the Proxy, DraftKings warned that its business was subject to "a
variety of U.S. and foreign laws, many of which are unsettled and still developing, and which
could subject [DraftKings] to claims or otherwise harm our business." (*Id*. at 63-65.)
DraftKings noted that there could "be no assurance that legally enforceable legislation" may not
be enacted in jurisdictions relevant to its business "to prohibit, legislate or regulate various
aspects" of its business, or that "existing laws in those jurisdictions will not be interpreted
negatively." (*Id*. at 64.) Thus, while DraftKings believed it was "in compliance in all material
respects with all applicable . . . sports betting and iGaming laws . . . [it] cannot assure that [its]
activities or the activities of [its] users will not become the subject of any regulatory or law
enforcement, investigation, proceeding or other governmental action." (*Id.* at 211.)

On April 23, 2020, DEAC, DraftKings, and SBTech consummated the series of
transactions contemplated by the BCA. As a result, SBTech became a subsidiary of DraftKings,
and DEAC merged into DraftKings, which retained the "DraftKings" name. (AC ¶ 3.)

### C. Plaintiff's Regurgitation of the Hindenburg Editorial

Every single substantive allegation in the Complaint is borrowed wholesale from a self-
serving internet posting by Hindenburg Research, a short seller that "stands to realize significant
gains in the event that [DraftKings] stock declines." (AC, Ex. A at 43.) Plaintiff attributes his
entire Complaint *exclusively* to the Hindenburg Editorial, but admittedly he has *no clue* of the
truth or falsity of his own accusations: His "counsel attempted to confirm the statements" in the

Editorial with Hindenburg Research, but Hindenburg *declined*. (AC ¶ 50 n.13.) Plaintiff nevertheless adopts the entirety of the Hindenburg Editorial as fact, even though Hindenburg itself does not—the Editorial says that it reflects the publisher's "opinion" based upon information "obtained from public sources." (AC, Ex. A at 43-44.)

On its face, the Hindenburg Editorial says nothing relevant. Indeed, its entire thesis is that—***years*** before the Business Combination—SBTech reorganized to jettison more risky business lines in anticipation of gambling markets opening in the United States in 2018. (*Id*. at 10-13, 17-18.) The foundation for this thesis is Hindenburg's assertion that certain Asian markets—primarily China—***could be*** "grey or black" in terms of the permissiveness of domestic gambling, while begrudgingly burying the lede in a footnote: "At the time, China was classified as a 'grey' market by the [U.S.] regulator," meaning U.S. casino operators may operate in that market. (*Id*. at 12 n.1.) Beyond this, the Hindenburg Editorial relied primarily on purported "conversations" with unnamed "former [SBTech] employees" (*id*. at 1), not one of whom is identified by name or title, or even job responsibility or time period of employment. Following publication of the Hindenburg Editorial, DraftKings' stock price fell a modest 4.2% (AC ¶¶ 9, 132), but very quickly recovered and remained above that level for many months.

Still, this lawsuit promptly followed. Plaintiff haphazardly embraces the Hindenburg Editorial as supposed facts, and then proceeds to attempt to transform that speculation and guesswork into securities law claims under Sections 10(b) and 20(a) of the Exchange Act. Plaintiff offers three, equally implausible, misstatement theories that lack any support.

*First*, plaintiff illogically seeks to transform highly conditional representations *by SBTech* in the BCA regarding its historical compliance with certain laws into statements *by DraftKings*, and then proceeds to declare those contractual representations inaccurate by reference to assertions in the Hindenburg Editorial that say nothing of the sort. This is nonsense. Even if

SBTech's contractual representations are challengeable—and they are not—plaintiff's contention that an SBTech sub-licensee accepted wagers from in Iran in 2018 (AC ¶ 84) does not remotely plead any violation of law or breach of contractual representations *by SBTech*. And, plaintiff's assertion that SBTech misrepresented its compliance with gaming laws "*[e]xcept for operations conducted . . . in any jurisdiction that is a Grey Market*" is entirely circular. (AC ¶ 96 (emphasis added).) Plaintiff nowhere establishes any "black market" in which SBTech operated.

*Second*, plaintiff alleges that every mention of SBTech or report of DraftKings' financial results were misleading because they did not at the same time (i) volunteer "that the Asian markets in which the unnamed reseller operated were black and/or grey markets for gaming; and (ii) identify that the unnamed reseller was BTi/CoreTech and disclose that BTi/CoreTech was affiliated with SBTech at that time." (AC ¶¶ 91-92, 98-07, 114-15, 118-21, 125-28.) Plaintiff challenges these statements even though the very same documents disclosed repeatedly that the majority of SBTech revenues came from grey markets in Asia, and that it "relied primarily on one reseller for its Asia revenue," which generated 46% of SBTech's 2019 revenues and 52% of its 2020 revenues. (AC ¶¶ 48, 83, 102, 125.) Worse still, plaintiff itself pleads that BTi/CoreTech "is not a part of SBT[ech]" after a "full separation," but it was simply "an agent or distributor for SBT[ech]." (AC ¶ 72.)

*Third*, plaintiff adds a throwaway allegation that every statement in 40 paragraphs of the Complaint was misleading because each supposedly failed to disclose (a) SBTech's "record of operating . . . in black markets," (b) SBTech's "attempts to distance itself" from those markets "were illusory," (c) the Business Combination exposed DraftKings to "black and/or grey market gambling," and (d) DraftKings' revenues "were derived, in part, from unlawful conduct." (AC ¶ 131.) This tactic cannot plead a securities law claim.

Beyond citing some unremarkable stock transactions by certain individuals, plaintiff offers no allegations or theory of scienter, but simply alleges that each company performed due diligence "that made them privy to confidential proprietary information." (AC ¶¶ 156-62.)

## ARGUMENT

"To avoid dismissal under Section 10(b) and Rule 10b-5, a complaint must plausibly allege: (1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation." *Singh* v. *Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) (internal quotation marks omitted). While well-pled factual allegations are accepted as true, this Court is "not required to credit conclusory allegations or legal conclusions couched as factual . . . allegations." *Rothstein* v. *UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678, (2009).

Plaintiffs' fraud allegations are subject to heightened pleading standards. Rule 9(b) requires Plaintiffs to specify the time, place and contents of each misrepresentation, and "explain why the statements were fraudulent." *Anschutz Corp.* v. *Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012). The PSLRA likewise requires plaintiffs to allege with particularity "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), and these particularized facts must "giv[e] rise to a strong inference that the defendant acted with the required state of mind," *id.* § 78u-4(b)(2)(A). The PSLRA thus "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 313. Plaintiff alleges neither, and "the PSLRA

requires courts to dismiss complaints that fail to meet the pleading requirements" in the statute. *Novak* v. *Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).

## I.      Plaintiff Does Not Plead With Particularity Any Actionable Misstatement or Omission.

### A.      The Complaint Fails to Comply with the PSLRA and Rule 9(b).

"The case law reflects a particular need for close scrutiny where a short-seller report relied upon by a securities plaintiff itself relies on 'confidential' or anonymous sources, without corroboration." *Long Miao* v. *Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020). Although there is no categorical prohibition against reliance on short-seller reports to plead fraud, *see In re Hebron Tech. Co. Ltd. Secs. Litig.*, 2021 WL 4341500, at *13 (S.D.N.Y. Sept. 22, 2021), the Complaint here "does not contain any 'independent [well-pled] factual allegations'" that support or *in any way* corroborate the Hindenburg Editorial. *Long*, 442 F. Supp. 2d at 803. Instead, as in *Long*, plaintiff's exclusive reliance upon the Hindenburg Editorial cannot plead fraud with particularity because, among other things, (1) the "positions and job responsibilities" of the anonymous sources "are not described at a sufficient level of particularity," (2) "the anonymous interviewees' statements are . . . entirely unmoored in time" and, if anything, confirm that their statements relate to the irrelevant past, (3) the assertions that SBTech—a licensor of software that did *not* operate any gaming business—"operated" at all in "grey or black" (*i.e.*, permissible *or* impermissible) markets, are "insufficiently particular," (4) "plaintiff's counsel in this case appear to have done nothing whatsoever to confirm the identities or statements of the confidential sources cited" by Hindenburg,[3] and (5) the Hindenburg Editorial "contain[s] significant factual errors," not the least of which is that SBTech does not "operate" in Asia or take wagers from anywhere. *Id.* at 803-04.

---

[3]      Plaintiff claims to have reviewed "information readily obtainable on the Internet" and other public documents (AC at 1), but offers none of that to corroborate the Hindenburg Editorial's anonymous witnesses.

### B.    Plaintiff in All Events Comes Nowhere Close to Pleading Any Material Misstatement or Omission.

"Silence, absent a duty to disclose, is not misleading." *Basic Inc.* v. *Levinson*, 485 U.S. 224, 239 n.17 (1988). There is no duty to disclose information simply because it is material, or of potential interest. *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 44-45 (2011); *see Dalberth* v. *Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014). A duty to disclose arises under the federal securities laws only when particular information is subject to an "affirmative legal disclosure obligation," or when necessary "to prevent existing disclosures from being misleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360-66 (2d Cir. 2010). Nothing of the sort has been alleged here.

### 1.    SBTech's Contractual Representations Are Neither Actionable Fact Statements Nor Shown to Have Been Inaccurate.

Plaintiff alleges that highly qualified representations in the BCA *to* DraftKings *by* SBTech regarding SBTech's compliance with certain laws were misleading because DraftKings failed to disclose that SBTech (i) operated or had clients located in jurisdictions "where gambling was illegal," and (ii) conducted business with a resident of Iran, "a country that is subject to" OFAC sanctions. (AC ¶¶ 94-97.) This theory is hopelessly flawed.

*First*, plaintiff nowhere explains how or why a representation *by SBTech* in a contract somehow qualifies as a statement of fact *by DraftKings* to its investors. More importantly, DraftKings told investors that those contractual representations were ***not*** statements of fact nor should be relied upon as such:

> The representations, warranties and covenants made in the BCA by DEAC, DraftKings, SBT and the SBT Sellers were qualified and subject to important limitations . . . [and] were negotiated with the principal purpose of establishing circumstances in which a party to the BCA may have the right not to consummate the Business Combination if the representations and warranties of the other party were to be untrue due to a change in circumstance or otherwise, and allocating risk between the parties to the BCA, rather than establishing or attempting to set forth matters as facts. . . . Moreover, information concerning the subject matter of

the representations and warranties, *which do not purport to be accurate as of the date of this proxy statement/prospectus*, may have changed since the date of the BCA. For the foregoing reasons, the representations and warranties or any descriptions of those provisions *should not be read alone or relied upon as presenting the actual state of facts or condition of DEAC, DraftKings, SBT and the SBT Sellers, or any of their respective subsidiaries or affiliates*.

(Ex. 2 (Proxy) at 112 (emphasis added).) Indeed, SBTech agreed that the representations cited in the Complaint would be "true and correct" at signing and at closing *only* insofar as any deviations would not have a Material Adverse Effect on SBTech's overall business (Ex. 5 (BCA) § 11.2(a)), which is nowhere alleged to be the case here.[4]

*Second*, plaintiff nowhere even alleges that SBTech violated any law cited in the Complaint. Plaintiff first references various bribery and money-laundering laws, but does not contend that they were violated. (AC ¶ 94 n.16.) Plaintiff next references U.S. sanctions laws, but does not even argue that those laws then applied to SBTech, a company incorporated and based in the Isle of Man, or the SBTech sub-licensee that accepted wagers from Iran, or even the customer in Iran that placed the wager. (*Id*. at 94 n.17.) Plaintiff finally references certain gaming laws, but ignores that SBTech's agreement excluded *entirely* any representation about the business or operations of SBTech or its customers or end users in "Grey Markets" (AC ¶ 96) (quoting Ex. 5 (BCA) §§ 4.6(l), (v)), and the Complaint fails to establish that *any one* of the foreign jurisdictions mentioned in the Complaint was not a "Grey Market."

*Third*, where, as here, "a complaint claims that statements were rendered false or misleading through the non-disclosure of illegal activity, the facts of the underlying illegal acts must also be pleaded with particularity, in accordance with the heightened pleading

---

[4]     Even if an issuer's unqualified contractual representation about *its own* business might be actionable, *see In re Bank of Amer. Corp. Secs., Derivative, and ERISA Litig.*, 757 F. Supp. 2d 260, 299 (S.D.N.Y. 2010), no court has held an issuer responsible for a counterparty's representations, much less one with the qualifications present here. *See Jaroslawicz* v. *M&T Bank Corp.*, 2017 WL 1197716, at *5 (D. Del. Mar. 30, 2017) (representations accompanied by warning that they were for parties' benefit alone not actionable).

requirement[s] of Rule 9(b) and the PSLRA." *Gamm* v. *Sanderson Farms, Inc*., 944 F.3d 455, 465 (2d Cir. 2019). Plaintiff's allegation that the acceptance of wagers originating in Iran by a sub-licensee of SBTech violated some law or rule is supported by nothing. Plaintiff does not identify the participants in these transactions, the dates of occurrence, the laws violated, or how and why U.S. sanctions laws applied to entirely foreign transactions, or to SBTech, which was not a party to the transactions and then had *no connection with the U.S.* (AC ¶ 85 (sub-licensee "accepted wagers from one of the said distributor's end use operators in Iran")); *see Menaldi* v. *Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016) (rejecting sanctions violation where plaintiffs "have not explained how [the conduct] violated the Executive Orders they invoke"). Indeed, plaintiff baldy asserts that Iran "has regularly been subject to U.S. sanctions" (AC ¶ 53), but does not specify any law or rule, or when, how or to whom or what it applied. *See Gray* v. *Alpha & Omega Semiconductor Ltd.*, 2021 WL 4429499, at *7-9 (S.D.N.Y. Sept. 27, 2021) (plaintiff must "adequately plead that the misconduct did, in fact, occur").

Plaintiff's allegations regarding SBTech's compliance with gaming laws is equally conclusory and even more divorced from his pleading. SBTech's contractual representation concerned only jurisdictions and laws that ***were not*** "Grey Markets." (AC ¶ 96 (quoting Ex. 5 (BCA) §§ 4.6(l), (v).) Plaintiff contends that SBTech's representation was untrue with respect to unspecified activities by unidentified persons in China, Indonesia, Iran, Malaysia and Thailand, which plaintiff alleges were "grey markets" ***or*** "black markets," whenever one or the other labels suits his needs. As the Complaint alleges, a "black market" is one where the relevant activities are ***both*** facially prohibited and "government authorities have taken affirmative, concrete actions to actively enforce laws that prohibit online gaming." (AC ¶¶ 45-47.) Plaintiff alleges neither.

Plaintiff concedes that U.S. gaming regulators view China as a "grey" market. (AC ¶ 83.) Plaintiff's citation to vague and conclusory internet postings as to the law in China or other

jurisdictions pleads no facts.  *See Hebron Tech*, 2021 WL 4341500, at *14.  Further, the

unsupported snippets plaintiff extracts from those sources do not at all establish that any specific

alleged conduct is flatly proscribed.[5]  *In re Yukos Oil Co. Secs. Litig.*, 2006 WL 3026024, at *14

(S.D.N.Y.Oct. 25, 2006) (rejecting claim unsupported by "sufficient facts demonstrating that

[the] tax strategy violated" the Russian law alleged).  Nor does plaintiff allege that any of these

legal concepts apply at all to persons or entities, such as SBTech, absent entirely from the

jurisdiction,[6] or that the laws specifically apply to internet gaming.[7]  Plaintiffs must plead "more

than a generality with surface appeal."  *Plumber & Steamfitters Loc. 773 Pension Fund* v.

*Danske Bank A/S*, 11 F.4th 90, 100 (2d Cir. 2021).

Fatal to his claims, the internet postings plaintiff relies upon do not remotely suggest that

*SBTech's* activities are even addressed, much less prohibited, by any law or concept referenced

in the Complaint.  SBTech is a provider of software and related services.  (*See* AC ¶¶ 39, 42,

100, 102.)  It has no operations in any of the referenced countries, and it operates no gaming

business at all.  Plaintiff **nowhere even argues** that a licensor of software is within reach of any

referenced gaming laws, any more than a manufacturer of playing cards or dice.  *See Gray*, 2021

---

[5]     *See* AC ¶¶ 145 (Vietnam: "citizens . . . rely on technology to access the wealth of foreign-based gambling sites"; "foreign tourists can use the country's opulent casino resorts"); 148 (Indonesia: government "would be looking at the issue from a technological standpoint, aiming to block Indonesian citizens from accessing online gambling"); 149 (Malaysia:  "Some forms of gambling," including "casino games . . . are legal"); 150 (Thailand: does not allow "the vast majority of gambling activities," and gambling debts are "not enforceable").

[6]     *See* I. Nelson Rose, *Gambling and the Law: The International Law of Remote Wagering*, 40 J. Marshall L. Rev. 1159, 1169 (2007) (Because "there is often a strong presumption that lawmakers have not reached out beyond their jurisdictions' borders in enacting a statute . . . any prohibition on gambling which does expressly state that it applies to cross-border wagers will be presumed to include only activities taking place within the borders of that particular government entity."); W. Woon, *Regulation of the Securities Industry in Singapore*, 4 Pac. Rim L. & Pol'y J. 731, 754 (1995) ("Malaysian courts would lack the jurisdiction to try the case, since the offense would *ex hypothesi* have been committed outside Malaysia.").

[7]     Notably, the BCA defined "Grey Market" to mean a jursidiction whose laws (a) "do not specifically prohibit or permit *internet* gaming and/or *internet* sports betting," or (b) "do specifically prohibit *internet* gaming and/or *internet* sports betting, but Governmental Authorities in that jurisdiction have not . . . (1) taken affirmative concrete action to actively enforce those Laws . . . or (2) issued unequivocal official pronouncements that *internet* gaming and/or *internet* sports betting is not legal in that jurisdiction."  (Ex. 5 (BCA) at 105 (emphasis added).)

WL 4429499, at *9 (rejecting allegation that "indirect" sales by defendant to a sanctioned entity through a distributor were "necessarily illegal," absent analysis in the complaint as to why *indirect* sales were covered). Where, as here, "the complaint fails to allege facts which would establish such an illegal scheme," then claims premised on its nondisclosure are "fatally flawed." *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006).

Finally, the Complaint defeats rather than supports the notion that prosecutors in any referenced jurisdiction "have taken affirmative, concrete actions to actively enforce" any gaming laws (AC ¶ 45), much less as might be applied to a software provider such as SBTech. Plaintiff points to no such actions in Iran, Indonesia or Malaysia. (AC ¶¶ 139, 148-49.) And, his references to enforcement activities in other jurisdictions all concern only the enforcement of local laws against local citizens. Plaintiff not once cites any law in any jurisdiction threatened or enforced against a foreign, online gaming operator, much less a foreign provider of software, like SBTech. Of course, plaintiff nowhere suggests SBTech ever once was the subject of any threatened or actual assertions of unlawful gambling in any of the referenced jurisdictions. Plaintiff thus does not remotely establish that the representation in the BCA is at issue.

### 2. Defendants' Truthful Disclosures Did Not Give Rise to Any Duty to Disclose Any Additional Details Regarding SBTech's Customers.

Plaintiff next claims that truthful statements noting that SBTech's revenues were derived from "customers in Europe and other regions (primarily Asia)" and that SBTech "relies primarily on one reseller for its Asia revenue" somehow were misleading by not identifying the reseller (and its illusory historical ties to SBTech) and volunteering that it operated in "numerous black and/or grey markets for gambling in Asia." (AC ¶¶ 92, 101, 103-4, 119, 126, 128.) Similarly, plaintiff contends that truthful statements regarding SBTech's licenses were misleading by not also disclosing that it "operated" in "black and/or grey markets for gambling in Asia." (AC ¶ 92; *see id.* ¶¶ 101, 107-8, 111, 115, 121.) Not so.

"'[A] violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data.'" *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 38-39 (2d Cir. 2012). Plaintiff does not allege SBTech lacked the referenced licenses or did not earn the disclosed revenues, which alone sinks this theory.

Further, DraftKings had no duty to comment on SBTech's revenues or operations because it did not "put the sources" of SBTech's revenue at issue through "statements falsely attributing the company's success to factors other than the [allegedly] improper conduct." *In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006). Even if plaintiff established some gaming law violations by SBTech's licensees or the licensees' customers—and he has not—this Court has held routinely that "accurately reported income that is obtained from an unlawful source may not be actionable only on the grounds that the unlawful source is not disclosed." *DoubleLine Capital LP* v. *Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 442 (S.D.N.Y. 2018); *see Danske Bank*, 11 F.4th at 99 ("no obligation to self-report" revenue derived from unlawful activity); *Marsh*, 501 F. Supp. 2d at 470 (same). DraftKings' "narrative restatement of accurate financial reporting" by SBTech cannot support any securities law claim. *In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at *6 (S.D.N.Y. Sept. 19, 2017) ("references to sales and subscriber numbers in Uzbekistan" did not require comment about lawfulness of activities).

Moreover, plaintiff does not remotely establish the truthfulness of the supposedly omitted "facts." Plaintiff has not pled that SBTech or any of its customers operated in black markets, or that the revenues, if any, from proscribed markets were material. (*See supra* at 10-11); *DoubleLine*, 323 F. Supp. 3d at 447 (no misstatement where plaintiffs "fail[ed] to identify which, if any, revenue derived" from unlawful activity). Nor has plaintiff plausibly alleged that BTi/CoreTech was the unnamed Asian reseller, or that BTi/CoreTech "was affiliated with SBTech" or why such affiliation is relevant to DraftKings. Instead, plaintiff says only that an

unnamed "*former employee speculated*" that "it will have to be" BTi/CoreTech (AC ¶ 59 (emphasis added)), and plaintiff concedes repeatedly that, to the extent there ever was any affiliation between BTi/CoreTech and SBTech, it ended in 2018, two years before the Business Combination.  (AC ¶¶ 59, 65, 72.)  The statements re-published in the Complaint say that BTi/CoreTech is a "separate company" to which SBTech is a "technology provider."[8]  And, DraftKings could not have any duty to disclose "SBTech operated in" Asian "black markets" because plaintiff has not established that any such markets were "black" or that SBTech in any way "operated in" them.  (*See supra* at 12-14.)

Nevertheless, the Complaint makes clear that DraftKings affirmatively disclosed that SBTech derived significant revenues from "grey markets" in Asia.  *See Martin* v. *Quartermain*, 732 F. App'x 37, 41-42 (2d Cir. 2018) (a court "must consider the statements at issue 'in light of all [] surrounding text, including hedges [and] disclaimers'").  The contractual representations plaintiff cites refer to "operations conducted by" SBTech in "jurisdiction[s] that [are] Grey Market[s]."  (AC ¶ 96.)  And, DraftKings disclosed repeatedly that SBTech's revenues derived from Asia (*see* AC ¶¶ 99, 100, 102, 118, 125, 127), which according to the Complaint were "black and/or grey markets."  (*E.g.*, ¶ 101.)  Nothing was omitted.

### 3.    Plaintiff's Catch-All Misstatement Theory Is Meritless.

Confirming his lack of any particularized misstatement theory, plaintiff next declares that *every* DraftKings statement is misleading because each failed to disclose in one form or another actual or potential legal risks incident to "black and/or grey markets."  (AC ¶ 131.)  This tactic "does not comport with [the Second Circuit's] exhortation that plaintiffs 'must demonstrate with specificity why and how' each statement is materially false or misleading."  *Bahash*, 506 F.

---

[8]      AC ¶ 59; *see also id.* ("[T]he same former employee told us that BTI/CoreTech acted as a customer of SBTech"); *see* ¶ 72 ("One BTi/CoreTech manager told us: '(BTi) CoreTech is not a part of SBT group.  We are competitors currently operating on different markets.'")

App'x at 38 (quoting *Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004)).

In any event, this theory is nothing more than a claim that DraftKings was obligated to speculate about nonexistent future assertions of illegality, or volunteer subjective legal judgments about its or SBTech's conduct. No duty exists. *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004). A securities filing "is not a rite of confession," and "companies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'" *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014). "As a corollary of that rule, accurately reported financial statements do not automatically become misleading by virtue of the company's nondisclosure of suspected misconduct that may have contributed to the financial results." *Danske Bank*, 11 F.4th at 98-99; *see In re FBR Sec. Litig.*, 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2008). The Second Circuit "easily rejected" a similar claim that a company's "literally true" earnings statements were actionable for not "acknowledg[ing] the long-term unsustainability of its business model." *Bahash*, 506 F. App'x at 38.

### C. Plaintiff Pleads No Violation of Items 303 or 105.

Item 303 and 105 are of no help to plaintiff. (AC ¶¶ 151-55.) Item 303 of SEC Regulation S-K requires an issuer to "[d]escribe any known trends or uncertainties" that the company "reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(ii). Plaintiff's assertion that "potential liabilities" arising out of "SBTech's operations in black and/or grey markets" had to be disclosed under Item 303 (AC ¶ 154) is meaningless. Plaintiff does not establish SBTech's "operations" in any such market, or that any "potential liabilities" existed, much less were "known" to DraftKings at the time of any statement. *See In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *7 (S.D.N.Y. Mar. 29, 2016); *Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) (Item 303 "requires the registrant's actual knowledge of the relevant

trend or uncertainty.").  Moreover, plaintiff fails even to guess what those "liabilities" might be, or why or how any *historical* SBTech events would be material to DraftKings' "continuing operations."  *See Shetty* v. *Trivago N.V.*, 796 F. App'x 31, 33-34 (2d Cir. 2019).

Plaintiff's reference to Item 105, which requires disclosure of "the most significant factors that make an investment in the registrant or offering speculative or risky," 17 C.F.R. § 229.105, is even further afield.  Far from "boilerplate" (AC ¶ 155), the Proxy contained ***39 single-spaced*** pages of "Risk Factors" (Proxy, 47-86), including specific warnings about gaming laws that may be subject to varied interpretations and applications (*see supra* at 3-5).  And this theory fails along with plaintiff's Item 103 theory.  *See Hutchinson* v. *Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 n.4 (2d Cir. 2011) (alleged omission did not violate (what is now) Item 105 for the same reasons that it was not reasonably likely to be material under Item 303).

## II.      Plaintiff Fails to Allege a Cogent and Compelling Inference of Fraud.

Under the PSLRA, plaintiff must, "with respect to each act or omission alleged to violate [the Exchange Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  To allege scienter, Plaintiff must plead "facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009)*.*  For an inference of scienter to be "strong," the Supreme Court has ruled that "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  Further, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id*. at 323.  Where, as here, a "plausible nonculpable explanation[]" is more likely than fraud, plaintiff has failed to establish scienter.  *Id.* at 324.

## A. Plaintiff Has Not Alleged Any Cognizable Motive to Defraud.

To plead motive, the Second Circuit requires particularized allegations of a "concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Here, plaintiff attempts to establish "motive" by asserting that just three of the five Individual Defendants (Meckenzie, Park, and Robins) sold DraftKings stock. (*See* AC ¶ 162.) But "[t]he mere fact that insider stock sales occurred does not suffice." *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009). Plaintiff must demonstrate that the sales are "unusual." *Id.* Plaintiff fails to do so here for several reasons.

*First*, with regard to the three Individual Defendants, plaintiff identifies 15 transactions spread across the 18-month class period—listing the date of the transaction, the number of shares sold, and the gross proceeds—but does not allege *a single other fact* that would support a finding that the sales were "unusual."[9] Plaintiff does not (and cannot) allege, for example, that the sales "closely coincide[d]" with the purported mistatements or corrective disclosure. *Fishbaum* v. *Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999). The trades all occurred at a price no higher than $52.66 per share (AC ¶ 163), well below the class period high of $71.98. *See City of Omaha Police & Fire Ret. Sys.* v. *Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 419-20 (S.D.N.Y. 2020) (sales not "made at a time . . . that suggests that the seller is maximizing personal benefit"). Plaintiff also does not allege the Individual Defendants' net profits, *see In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 381 (E.D.N.Y. 2013) ("allegations of reaped 'proceeds' are insufficient, as the complaint does not identify net profits"), or assert any deviation from normal

---

[9]     Courts in the Second Circuit typically consider a number of facts to determine whether sales are unusual or suspicious, including: "(1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to have known were misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans." *Gagnon*, 368 F. Supp. 3d at 772-73.

trading patterns, *see Gildan*, 636 F. Supp. 2d at 270 ("Insider stock sales are unusual where the trading was in amounts dramatically out of line with prior trading practices").

*Second*, plaintiff omits mentioning that 10 of the 15 stock sales by Individual Defendants were made pursuant to non-discretionary 10b5-1 trading plans, which "do not give rise to a strong inference of scienter." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014) (no inference of scienter where no facts were plead suggesting that 10b5-1 plan was entered into "'strategically' so as to capitalize on insider knowledge"); *City of Warren Police & Fire Ret. Sys.* v. *Foot Locker, Inc.*, 412 F. Supp. 3d 206, 225-27 (E.D.N.Y. 2019) ("plaintiffs have not alleged any facts that suggest there was strategic trading and manipulative intent involved in the trading plan."). Moreover, plaintiff ignores that four of the five trades not made pursuant to 10b5-1 plans (representing 34.6% of all shares sold by the Individual Defendants) were made in June 2020 through an underwritten DraftKings public offering, initiated upon the expiration of a "lock-up" agreed to incident to the BCA that prohibited insiders' sales of stock for six months (Ex. 5 (BCA, Ex. E) § 3.01), which further "cuts against an inference of scienter." *Evoqua Water*, 450 F. Supp. 3d at 420; *City of Coral Springs* v. *Farfetch Ltd.*, 2021 WL 4481119, at *5 (S.D.N.Y. Sept. 30, 2021) (shares sold upon lock-up expiration).[10]

*Third*, plaintiff says nothing about the Individual Defendants' holdings at the end of the class period or the percentage change in their holdings. That pleading deficiency alone is enough to defeat scienter. *See Tyler* v. *Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 335 (S.D.N.Y. 2011) (plaintiff "must allege not only the insider defendants' selling activity," but also the "overall percentage changes in defendants' holdings"). And here, each of the Individual Defendants

---

[10]     The SEC Forms 4 detailing the Individual Defendants' stock transactions are included as Exhibits 6-8. For the Court's convenience, a summary of those Forms 4 is included as Exhibit 10. The summary provides information that was omitted in the Amended Complaint, including the shares of stock that Individual Defendants acquired during the class period, which stock sales by Individual Defendants were made pursuant to 10b5-1 plans or sold through an underwritten public offering, and the number of shares that Individual Defendants still held following their respective sales.

owned significantly more stock at the end of the class period than they sold during it.[11]

Finally, plaintiff cannot establish scienter by pointing to the trades of 10 *non-defendants*, none of whom are alleged to have known if the disclosures were false or misleading.  *See AK Laborer Emp'rs Ret. Fund* v. *Scholastic Corp.*, 2010 WL 3910211, at *7 (S.D.N.Y. Sept. 30, 2010) (where a complaint "alleges no statements or conduct attributable to the non-defendant[s]," their sales "may not be used to prove [ ] scienter").  And like sales by the Individual Defendants, plaintiff has not alleged that these trades were "unusual."

### B.    Plaintiff Fails to Plead Strong Circumstantial Evidence of Fraud.

"Where motive is not apparent . . . [a plaintiff must] plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit*, 264 F.3d at 142 (2d Cir. 2001).  At a minimum, the requisite state of mind is "conscious recklessness."  *S. Cherry St., LLC* v. *Hennessee Grp.*, 573 F.3d 98, 109 (2d Cir. 2009).  Here, however, plaintiff challenges opinions about compliance with laws and Regulation S-K that, by their terms, apply only to "known" circumstances, all of which only "can be actionable under the securities laws if the speaker knows the statement to be false."  *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1131 (2d Cir. 1994) (opinions); *Ind. Pub. Ret. Sys.*, 818 F.3d at 95 (Item 303).

Under either standard, plaintiff must set forth detailed "allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements."  *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009).  "Plaintiffs 'must *specifically identify* the reports or statements that are contradictory to

---

[11]    Following the last stock "sale" identified by plaintiff (AC ¶ 162), Messrs. Meckenzie, Park and Robins still owned, respectively, (a) 21,068,204, (b) 288,542, and (c) 5,213,063 shares of DraftKings stock, in each case more than double the number each individual sold during the class period.  Moreover, *more than half* of the shares "sold" by Mr. Park and Mr. Robins were not stock sales at all but shares surrendered to cover "exercise price or tax liability using portion of securities received from the company."  (*See* Ex. 10 (chart summarizing Form 4s.)

the statements made,' or must 'provide specific instances in which Defendants received information that was contrary to their public declarations.'" *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011); *see Novak*, 216 F.3d at 309.

Here, plaintiff does not reference a single contemporaneous internal report or communication that conveyed information that contradicted DraftKings' public statements. He could not possibly reference any such contradictory information, because plaintiff nowhere even suggests that anyone at DraftKings or SBTech (or even U.S. gaming regulators) shares his view about "grey markets or black markets" in Asia. SBTech made clear that it viewed Asian markets from which it derived revenues to be "grey markets," and plaintiff "present[s] no reason to doubt the reasonableness of [d]efendants' view." *Lehman* v. *Ohr Pharm., Inc.*, 2021 WL 5986761, at *2 (2d Cir. Dec. 16, 2021). Indeed, *even if* plaintiff had shown (a) that online gambling was prohibited in markets from which SBTech derived revenues, *and* (b) that SBTech actually knew so—and he has not—that still would fall miles short of alleging scienter. Plaintiff would still need to establish each defendant's knowledge that SBTech's alleged "indirect sales" in those regions "necessarily means that [SBTech] violated the law," and that such a violation contradicts the alleged mistatements. *Gray*, 2021 WL 4429499, at *11. Nothing remotely of this sort is alleged. *Hebron Tech.*, 2021 WL 4341500, *22 (no "blatant" violation of rules).

Beyond this, plaintiff relies only on scienter theories that are untethered to the facts or to his misstatement theories. Plaintiff may not rely on the Individual Defendants' "associations" with DraftKings or conclusory pronouncements that they must have been "privy to confidential proprietary information." (AC ¶ 157.) "Courts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Lipow* v. *Net1 UEPS Techs.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015); *see Hebron Tech.*, 2021 WL 4341500, at *22. Plaintiff's attempt to avoid his scienter pleading burden by referencing

assurances by SBTech to undertake "appropriate due diligence" on clients (AC ¶ 158), or noting

that DraftKings engaged in transaction-related due diligence (AC ¶¶ 160-61), fares no better.

The Second Circuit has squarely rejected attempts to infer scienter from "pre-acquisition due

diligence," *Town of Davie Police Officers Ret. Sys.* v. *Nat. Gen. Hldgs. Corp.*, 2021 WL

5142702, at *2 (2d Cir. Nov. 5, 2021), or by claims about what a defendant "would have

learned" had it "performed the 'due diligence' it promised." *In re Advanced Battery Techs., Inc.*,

781 F.3d 638, 646 (2d Cir. 2015); *see Evoqua Water*, 450 F. Supp. 3d at 425.

Finally, plaintiff's "core operations" theory (AC ¶ 157) is of no help at all to him.

Plaintiff's complaint concerns only an unspecified subset of SBTech's Asia revenues, which in

no sense constitutes "all or even most of [DraftKing's] business," as required to invoke this

theory. *Hebron Tech.*, 2021 WL 4341500, at *24. And, this concept is at best a "supplementary

but not independently sufficient" means to plead scienter. *Cortina* v. *Anavex Life Scis. Corp.*,

2016 WL 7480415, at *7 (S.D.N.Y. Dec. 29, 2016); *Hebron Tech.*, 2021 WL 4341500, at *22.

### C. Fraud Is Not Remotely the More Compelling Inference on the Facts Alleged.

"A complaint will survive . . . only if a reasonable person would deem the inference of

scienter cogent and at least as compelling as any opposing inference one could draw from the

facts alleged." *Tellabs*, 551 U.S. at 324. That is not the case here.

*First*, plaintiff's allegations about the state of gaming laws and enforcement in Asia

asserts, at most, a difference in opinions, and U.S. gaming regulators do not share his views.

"However, differences of opinion . . . do not reveal scienter." *City of Austin Police Ret. Sys.* v.

*Kinross Gold Corp.*, 957 F. Supp. 2d 277, 299 (S.D.N.Y. 2013). In fact, plaintiff does not even

speculate that SBTech is or ever was at risk of *any legal challenge* in any jurisdiction.

*Second*, DraftKings made extensive disclosures about the uncertain state of gaming laws,

particularly in unregulated jurisdictions outside the U.S. "[A] defendant's decision to make

significant disclosures about the exact risk he or she is purportedly trying to hide is 'inconsistent' with" scienter. *Farfetch*, 2021 WL 4481119, at *7.

*Third*, plaintiff's scienter theory contradicts his misstatement theory. Plaintiff asserts that SBTech made contractual representations about the legality of its business, but then nowhere explains why DraftKings—the beneficiary of those representations—could not rely upon them.

*Finally*, as DraftKings made clear, the primary objective of the SBTech acquisition was to acquire technology, not to develop SBTech's Asia reseller model, which modest revenues plaintiff nowhere contends are relevant or material to DraftKings or its overall business prospects. "[T]he most likely inference from the facts alleged is that defendants did not make certain disclosures . . . because they believed that they were under no obligation to do so, and that, from a business standpoint, there was no good reason to disclose the omitted information." *In re Hardinge, Inc. Sec. Litig.*, 696 F. Supp. 2d 309, 332 (W.D.N.Y. 2010).

## III. The Complaint Fails to Plead a Viable Claim Against Each Defendant.

Plaintiff's conclusory allegations are deficient for a host of other reasons. *First*, despite alleging undifferentiated claims against an entity (DraftKings) that occupied very different roles during the class period, and five Individual Defendants who were affiliated with *three different* entities, plaintiff pleads no facts establishing that any defendant was the speaker of the statement, *see Janus Capital Grp., Inc.* v. *First Derivative Traders*, 564 U.S. 135, 142 (2011), or that each defendant had knowledge of the supposed falsity of each statement, *see In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 762-63 (S.D.N.Y. 2017). *Second*, plaintiff's invocation of the word "scheme" (AC ¶¶ 180-81) cannot plead a so-called "scheme" claim under Rule 10b-5. *Danske Bank*, 11 F.4th at 105. *Third*, plaintiff's derivative control person claims under Section 20(a) fail along with his underlying claims, *see ATSI*, 493 F.3d at 108, and because he pleads no "culpable participation" by any defendant. *Braskem*, 246 F. Supp. 3d at 771.

**IV.      The Complaint Fails to Allege Loss Causation.**

Loss causation, a required element of plaintiff's claim, 15 U.S.C. § 78u-4(b)(4), is not

alleged.  Plaintiff relies only on the Hindenburg Editorial as a corrective disclosure (AC ¶¶ 9,

132, 164), but that publication commented on historical SBTech activities not at issue in any

DraftKings disclosure, and opines that SBTech operated in "grey or black markets," which did

not "correct" any DraftKings statement.  *In re Omnicom Group, Inc.*, 541 F. Supp. 2d 546, 552

(S.D.N.Y. 2008).  The Hindenburg Editorial at most reflected its own, biased views of the

conclusion to be drawn from facts that the document itself says were all public.

## <u>CONCLUSION</u>

For the foregoing reasons, DraftKings respectfully requests that this Court dismiss this

action in its entirety, with prejudice.

Dated:  February 22, 2022

Respectfully submitted,

*/s/  Brian T. Frawley*
Brian T. Frawley
Timothy J. Weinstein
Charles H. Sullivan
SULLIVAN & CROMWELL LLP

*Attorneys for Defendants DraftKings Inc.,*
*Jason D. Robins, Jason K. Park, Jeff Sagansky,*
*Eli Baker and Shalom Meckenzie*