UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

In re DRAFTKINGS INC. SECURITIES     :     Civil Action No. 1:21-cv-05739-PAE
LITIGATION                           :
                                     :     CLASS ACTION
———————————————————————              :
                                     :
This Document Relates To:            :
                                     :
        ALL ACTIONS.                 :
———————————————————————— x

**SECOND AMENDED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiff Walter Marino ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined herein), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding DraftKings Inc. f/k/a Diamond Eagle Acquisition Corp. ("DEAC," "DraftKings," or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired DraftKings securities between December 23, 2019 and June 15, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its executives and directors.

2.      DraftKings operates as a digital sports entertainment and gaming company in the U.S.  It operates through two segments, Business-to-Consumer ("B2C") and Business-to-Business ("B2B").  The Company provides users with daily sports, sports betting, and iGaming

---

[1]    All emphasis herein is added unless otherwise noted.

opportunities.  It is also involved in the design, development, and licensing of sports betting and casino gaming platform software for online and retail sportsbook,[2] and casino gaming products. The Company distributes its product offerings through various channels, including traditional websites, direct app downloads, and direct-to-consumer digital platforms.

3.    The Company was incorporated in Nevada as DEAC NV Merger Corp., a wholly owned subsidiary of its legal predecessor, DEAC, a special purpose acquisition company ("SPAC") or "blank check" company.  The Company began publicly trading on the Nasdaq Stock Market LLC on July 25, 2019.  On April 23, 2020, DEAC consummated transactions contemplated by a Business Combination Agreement ("BCA") dated December 22, 2019, as amended on April 7, 2020 (the "Business Combination"), and, in connection therewith: (i) DEAC merged with and into the Company, whereby the Company survived the merger and became the successor issuer to DEAC; (ii) the Company changed its name to "DraftKings Inc."; (iii) the Company acquired DraftKings Inc., a Delaware corporation ("Old DraftKings" or "Old DK"), by way of a merger; and (iv) the Company acquired all of the issued and outstanding share capital of SBTech (Global) Limited ("SBTech" or "SBT").  Upon consummation of the preceding transactions, Old DK and SBTech became wholly owned subsidiaries of the Company.

4.    On June 15, 2021, Hindenburg Research ("Hindenburg") published a comprehensive report concerning DraftKings (the "Hindenburg Report" or the "Report"),[3] alleging that the Company's merger with SBTech exposed DraftKings to dealings in black-market gaming.  Citing "conversations with multiple former employees, a review of SEC & international filings, and

---

[2]    A sportsbook is an establishment that takes bets on sporting events and pays out winnings.

[3]    The Hindenburg Report is attached hereto as Exhibit A, and is electronically available at https://hindenburgresearch.com/draftkings/.  Hindenburg disclosed a short position in shares of DraftKings. *See* Report at 2.

inspection of back-end infrastructure at illicit international gaming websites," Hindenburg alleged that "SBTech has a long and ongoing record of operating in black markets," estimating that "roughly 50% of SBTech's revenue continues to come from markets where gambling is banned[.]"

5.      According to the Report, after the U.S. Supreme Court overturned the federal law banning sports gambling in 2018, SBTech sought to conceal its activity in Asian countries where gambling is illegal so that this activity would not harm its potential entry into the U.S. market.  To achieve that end, SBTech transferred this activity to a "front" company called BTi, which later changed its name to CoreTech ("BTi/CoreTech"), and which represented a majority of SBTech's 2020 revenue.  BTi/CoreTech was set up by the person described in the Report as the "right hand man" of SBTech's owner, Defendant Shalom Meckenzie ("Meckenzie").

6.      Despite this attempt to distance SBTech from black-market gambling operations, the separation was one of form, not substance.  The relationship between SBTech and BTi/CoreTech was so close that many BTi/CoreTech employees seemed to be under the impression that they worked for SBTech.  This includes ***BTi/CoreTech's CEO***, who announced on LinkedIn that he was looking to hire employees for ***SBTech*** around the time that BTi/CoreTech was formed.  Moreover, former employees acknowledged that an overwhelming majority of BTi/CoreTech's operations occurred in black or grey markets, where online gambling was illegal or restricted.  Thus, despite attempts to distance SBTech from its black-market operations, the creation of BTi/CoreTech merely allowed SBTech, and later the Company after the Business Combination, to continue operating in the same markets.

7.      Meanwhile, DraftKings insiders sold approximately $1.5 billion in stock during the Class Period, with Meckenzie leading the way – having personally sold approximately $568 million in shares.

8.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and financial condition.  Specifically, Defendants failed to disclose that: (i) SBTech has a long and ongoing record of operating in black markets where online gambling is illegal; (ii) SBTech's attempts to distance itself from such illicit operations were illusory, as SBTech continued to transact with a "front" entity and other resellers operating in black markets; (iii) DraftKings' merger with SBTech exposed the Company to dealings in black market gambling; (iv) the Company's revenues were derived, in part, from operations in black markets and thus unsustainable; and (v) the foregoing increased the Company's regulatory and criminal risks with respect to these transactions.  As explained herein, Defendants knew, or recklessly disregarded, these undisclosed facts.

9.      Following publication of the Hindenburg Report, DraftKings' stock price fell 4.2% on June 15, 2021.

10.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b), as the alleged misstatements entered, and the subsequent damages took place, in this District.  Pursuant to DraftKings' Quarterly Report dated May 7, 2021,

as of May 5, 2021, there were 400,980,887 shares of the Company's Class A common stock and 393,013,951 shares of the Company's Class B common stock outstanding. DraftKings' securities trade on the Nasdaq Global Select market ("Nasdaq"). Accordingly, there are presumably hundreds, if not thousands, of investors in DraftKings securities, some of whom undoubtedly reside in this District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

15.     Plaintiff, as set forth in the Certification previously filed with the Court and incorporated herein by reference, purchased DraftKings securities at artificially inflated prices during the Class Period and was damaged thereby.

16.     Defendant DraftKings is a Nevada corporation with principal executive offices located at 222 Berkeley Street, 5th Floor, Boston, Massachusetts 02116. The Company's common stock trades in an efficient market on the Nasdaq under the ticker symbol "DKNG."

17.     Defendant Jason D. Robins ("Robins") has served as DraftKings' Chief Executive Officer ("CEO") and Chairman of the Board since the consummation of the Business Combination through the present. Robins signed the BCA dated December 23, 2019, DraftKings' Annual Report on Form 10-K for the fiscal year ended December 31, 2020, and filed with the SEC on February 26, 2021 (the "2020 10-K"), the Post-Effective Amendment for Registration Statement filed with the SEC on February 26, 2021 (the "February 26, 2021 POS AM"), as well as Amendment No. 1 to the 2020 10-K filed with the SEC on May 3, 2021 (the "2020 10-K/A"). Robins signed the Company's Schedule 14A filed with the SEC on April 15, 2020 (the "April 2020 Proxy Statement" or the "Proxy

Statement"). Robins also signed Form S-1 Registration Statements filed on May 6, 2020, June 16, 2020, and October 5, 2020.

18.    Defendant Jason K. Park ("Park") has served as DraftKings' Chief Financial Officer ("CFO") since the consummation of the Business Combination through the present. Park signed the 2020 10-K, the 2020 10-K/A and the February 26, 2021 POS AM. Park also signed Form S-1 Registration Statements filed on May 6, 2020, June 16, 2020, and October 5, 2020.

19.    Defendant Shalom Meckenzie has served as a Director of the Company since the consummation of the Business Combination through the present. Meckenzie founded SBTech in July 2007 and served as director of SBTech until May 2014. From June 2003 until January 2018, Meckenzie served as a member of the board of directors of Gaming Tech Ltd., which is a subsidiary of SBTech that provides general and administration, marketing support and research and development services. Meckenzie also served as a director of Old DK from December 2013 until April 2020. Meckenzie signed the BCA, the 2020 10-K, the February 26, 2021 POS AM, the 2020 10-K/A and the April 2020 Proxy Statement. Meckenzie also signed Form S-1 Registration Statements filed on May 6, 2020, June 16, 2020, and October 5, 2020.

20.    Defendant Jeff Sagansky ("Sagansky") served as DEAC's CEO and Chairman from March 2019 until the consummation of the Business Combination. Sagansky signed the BCA, the Form S-4 filed with the SEC on January 6, 2020 ("Form S-4") and the April 2020 Proxy Statement. Sagansky also signed the Form S-1 Registration Statement filed on April 15, 2020.

21.    Defendant Eli Baker ("Baker") served as DEAC's CFO and President from March 2019 until the consummation of the Business Combination. Baker signed the Form 8-K filed with the SEC on December 23, 2019, the BCA, the Form S-4 and the April 2020 Proxy Statement. Baker also signed the Form S-1 Registration Statement filed on April 15, 2020.

22.    Defendants Robins, Park, Meckenzie, Sagansky, and Baker are sometimes referred to herein as the "Individual Defendants."

23.    The Individual Defendants possessed the power and authority to control the contents of DraftKings' SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of DraftKings' SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with DraftKings, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

24.    DraftKings and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of SPACs

25.    A "blank check" company is a company that has no specific established business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company, entity, or person.

26.    One type of blank check company is a "special purpose acquisition company," or "SPAC."  A SPAC is a publicly traded company created specifically to pool funds through an initial public offering ("IPO") for the purpose of completing an acquisition or other business combination with an existing company.  Generally, SPACs are founded by public companies or private asset managers.

27.     Since 2014, there has been a resurgent interest in SPAC IPOs.  Through the end of November 2021, there had been 181 SPAC go-public deals in 2021 collectively worth approximately $370 billion – compared with 26 such transactions in 2019, and approximately $10 billion in total funds raised towards SPACs in 2017.

28.     In order to create a SPAC, founders must invest the initial capital to recruit an investment bank to structure capital-raising terms, prepare and file IPO documentation, and pre-market the investment offering to interested investors.  A target company cannot be identified before the SPAC IPO is completed.  Once capital is raised through the IPO, at least 90% of the proceeds must be deposited into a trust account, and any interest is paid to the investors.  An appointed management team (typically the SPAC's founders) then has a specified time period, typically between 18 and 24 months, in which to identify an appropriate target to complete the merger or acquisition.  Nasdaq rules dictate the initial business combination must be with one or more target businesses that together have a fair market value equal to 80% of the balance in the SPAC trust account.  Although the only purpose of a SPAC is to acquire a target company, SPACs generally have corporate governance structures like other operating companies.

29.     Typically, common shareholders of the SPAC are granted voting rights to approve or reject the business combination proposed by the management team. Thus, when the management team identifies a target, a merger proxy statement must be distributed to all SPAC shareholders, which includes the target company's complete audited financials and the terms of the proposed business combination.  To this end, shareholders in SPACs depend on management to honestly provide accurate information about any contemplated transactions.  In anticipation of the shareholder vote, each SPAC shareholder has three options; they can: (i) approve the transaction by voting in

favor of it; (ii) elect to sell their shares in the open market; or (iii) vote against the transaction and redeem their shares for a pro-rata share of the trust account.

30.    If a merger or acquisition is successfully made within the allocated time frame, shareholders and management of the SPAC can profit through their ownership of the common stock and any related securities (it is common for SPAC IPOs to include "units" consisting of both stock and out-of-the-money warrants).  However, if an acquisition is not completed within the time period specified when the SPAC is organized, then the SPAC is automatically dissolved, and the money held in trust is returned back to investors.  No salaries, finder's fees, or other cash compensation are paid to the founders and/or management team if they fail to consummate a successful business combination.  Accordingly, the founders and management team of a SPAC, who typically own approximately 20% of the company through founders' shares and invest significant resources in the formation of the company and identifying acquisition targets, are highly incentivized to get a qualifying transaction approved within the operating deadline.

31.    Indeed, leaders in the finance industry have opined that SPAC management teams have an incentive to spend the money they have raised no matter what so they can collect fees and pay themselves in salary and stock options at the company they purchase.  For example, Ben Dell, managing partner of investment firm Kimmeridge Energy, recently stated that "SPACs are the most egregious example in the industry of executive misalignment with investors."[4]  In addition to the reward of paying themselves a handsome salary, SPAC management teams are incentivized to not waste the significant time and financial resources they expended upfront on legal and financial advisors to set up the investment vehicle.

---

[4]    Christopher M. Matthews, *Investors Handed an Oilman a 'Blank Check' Company. Here's How It Turned Out.*, THE WALL STREET JOURNAL (Apr. 15, 2019), https://www.wsj.com/articles/investors-handed-an-oilman-a-blank-check-company-heres-how-it-turned-out-11555328147.

32.     SEC Chairman Gary Gensler recently expressed concern over the disclosure, marketing practices, and liability issues surrounding SPACs and said he has asked his staff to prepare associated recommendations.  In a speech given on or about December 9, 2021, Gensler said he wants to address the differences in protections for investors between traditional IPOs and the two-step process for SPACs.  Media outlet Law360 reported on Gensler's speech as follows:[5]

> "Currently, I believe the investing public may not be getting like protections between traditional IPOs and SPACs," Gensler said, according to a copy of his speech posted on the SEC's website.

> "Thus, to reduce the potential for such information asymmetries, conflicts and fraud, I've asked staff for proposals for the commission's consideration around how to better align the legal treatment of SPACs and their participants with the investor protections provided in other IPOs, with respect to disclosure, marketing practices and gatekeeper obligations," he continued.

> *           *           *

> Gensler said that currently, there's "inconsistent and differential disclosure" for the parties involved in a SPAC's IPO and eventual merger with a company, specifically highlighting the outsized benefit participants in a private investment in public equity, or PIPE, component of a deal get over that of retail investors.

> "What's more, retail investors may not be getting adequate information about how their shares can be diluted throughout the various stages of a SPAC," Gensler said.

> Gensler also said some SPAC merger announcements are made without full disclosures or proxy statements and with slide decks and celebrity endorsements.

> "SPAC sponsors may be priming the market without providing robust disclosures to the public to back up their claims. Investors may be making decisions based on incomplete information or just plain old hype," he said.

> *           *           *

> "Functionally, the SPAC target IPO is akin to a traditional IPO. Thus, investors deserve the protections they receive from traditional IPOs, with respect to information asymmetries, fraud and conflicts and when it comes to disclosure, marketing practices and gatekeepers," Gensler said.

---

[5]   McCord Pagan, *SEC's Chair Expresses Concern Over SPAC Deals*, LAW360 (Dec. 9, 2021), https://www.law360.com/articles/1447310/sec-s-chair-expresses-concern-over-spac-deals.

## Background of the Company

33.    DEAC is a blank check company incorporated in Delaware on March 27, 2019 and formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses. According to the Proxy Statement, DEAC's intention was to capitalize on the substantial deal sourcing, investing and operating expertise of its management team to identify and combine with one or more businesses with high growth potential.

34.    On May 14, 2019, DEAC consummated its IPO, of 40,000,000 units, with each unit consisting of one share of Class A common stock and one-third of one warrant, generating total gross proceeds of $400,000,000. Prior to the consummation of its IPO, Eagle Equity Partners, LLC (the "Sponsor") and Harry Evans Sloan ("Sloan," and together, the "DEAC Founders") purchased 10,000,000 founder shares (after various adjustments) for an aggregate purchase price of $25,000, or approximately $0.0025 per share. Simultaneously with the consummation of the IPO, DEAC consummated the private sale of 6,333,334 private placement warrants to the DEAC Founders at a price of $1.50 per warrant, generating gross proceeds of approximately $9,500,000. DEAC began publicly trading on the Nasdaq Stock Market LLC on July 25, 2019. Units, consisting of one share of Class A common stock and one third of one redeemable warrant, were traded under the ticker symbol "DEACU." Class A common stock was traded under the ticker symbol "DEAC." Warrants were traded under the ticker symbol "DEACW."

35.    Defendant Sagansky served as DEAC's CEO and Chairman, and Defendant Baker served as President, CFO, and Secretary. On May 10, 2019, Joshua Kazam and Fredric Rosen were named directors of DEAC and placed on the Board's Compensation Committee with Rosen serving as chair. Kazam, Rosen, and Sagansky were placed on the Board's Audit Committee, with Rosen serving as chair.

- 11 -

36.     According to the Proxy Statement, prior to the consummation of its IPO, neither DEAC, nor anyone on its behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with DEAC.  After its IPO, DEAC's officers and directors commenced an active search for prospective businesses or assets to acquire in its initial business combination.

37.     During this search process, DEAC reviewed several business combination opportunities and entered into substantive discussions with two potential target businesses other than Old DraftKings and SBTech.   In June 2019, Sloan contacted Defendant Robins, the CEO of DraftKings, and informed him that both he and the Sponsor had formed DEAC and inquired as to whether Old DraftKings might be interested in pursuing a business combination.

38.     Old DraftKings was founded in 2011 by Robins, Paul Liberman, and Matthew Kalish as a daily fantasy sports ("DFS") operator.  Robins has served as CEO since its inception; he became Chairman of the Board in April 2020.  Kalish was Chief Revenue Officer from 2014 through 2019; he also served as a director of Old DK from December 2011 and was appointed President of DraftKings North America in December 2019.  Liberman served as a director and Chief Technology Officer from 2011 through 2013 and Chief Marketing Officer; he became President of Global Technology and Product in December 2019, and served as Chief Operations Officer from 2015 through December 2019.  Defendant Park became CFO in June of 2019.

39.     SBTech was incorporated on July 24, 2007, under the laws of Gibraltar.  It was originally named Jamtech Limited, subsequently renamed Networkpot Limited, and thereafter renamed SBTech (Global) Limited on August 16, 2010.  SBTech is headquartered in the Isle of Man.  Its principal business activities involve the design and development of sports betting and

casino gaming platform software for online and retail sportsbook and casino gaming products. Prior to the Business Combination, Meckenzie was the principal owner of SBTech.

40.     Additional parties involved in the Business Combination are described as follows. DEAC NV Merger Corp. was a wholly owned subsidiary of DEAC formed to effect the business combination and incorporated under Nevada law.  DEAC NV Merger Corp. had no material assets and did not operate a business.  DEAC merged into DEAC NV Merger Corp. with the latter company surviving the merger.  DEAC NV Merger Corp. became DraftKings Inc. after the Business Combination was completed.

41.     On April 23, 2020, DEAC held a special meeting of shareholders to vote on whether to approve the proposed Business Combination.  DEAC's shareholders voted in favor, and in connection therewith: (i) DEAC merged with and into the Company, whereby the Company survived the merger and became the successor issuer to DEAC; (ii) the Company changed its name to "DraftKings Inc."; (iii) the Company acquired Old DK, by way of a merger; and (iv) the Company acquired all of the issued and outstanding share capital of SBTech.  Upon consummation of the preceding transactions, Old DK and SBTech became wholly owned subsidiaries of the Company.

42.     SBTech played a crucial role in the Company's deal to go public, serving as the technological and financial backbone.  SBTech accounted for approximately 25% of the Company's revenue and was the only positive contributor of operating income, helping stabilize the financial offering for the market.  Total consideration paid for SBTech was $975 million, representing approximately 21% of the total merger consideration.

43.     In 2015, SBTech signed a deal with e-gaming software provider Gameplay Interactive "to provide a powerful sportsbook localized for the Asian market," according to an

SBTech press release.[6]  "Gameplay Interactive powers some of the region's leading brands, including w88.com, all of whom will benefit from the seamless integration of SBTech's powerful sportsbook that has been tailored specifically for the unique Asian sports betting market."  The press release quoted SBTech's then-CEO Itai Zak: "Our latest deal with Gameplay Interactive is a fantastic step forward as it will see us penetrate further into the Asian market through a number of key gaming brands operating in the region.  Almost three quarters of Asia's interactive/online gaming revenues come from sports betting and we're confident our localised sportsbook will prove popular."

44.     The SPAC consummation created, in DraftKings' words, "a vertically-integrated powerhouse" for sports betting.[7]

### Black and Grey Markets for Gambling

45.     In a 2016 bulletin, the Director of the New Jersey Division of Gaming Enforcement ("DGE") defined black markets as follows:

> Black markets are defined as jurisdictions where government authorities have taken affirmative, concrete actions to actively enforce laws that prohibit online gaming, or have issued unequivocal official pronouncements that online gaming is not legal in the jurisdiction.[8]

---

[6]     *SBTech Signs Deal With Gameplay Interactive to Provide Asian Market Sports Betting Solutions Ahead of G2E Asia*, PR NEWSWIRE (May 5, 2015), https://www.prnewswire.com/news-releases/sbtech-signs-deal-with-gameplay-interactive-to-provide-asian-market-sports-betting-solutions-ahead-of-g2e-asia-502562991.html.

[7]     *DraftKings to Become Public Company, Creating the Only Vertically-Integrated U.S.-based Sports Betting and Online Gaming Company*, BUSINESSWIRE (Dec. 23, 2019), https://www.businesswire.com/news/home/20191223005130/en/DraftKings-to-Become-Public-Company-Creating-the-Only-Vertically-Integrated-U.S.-based-Sports-Betting-and-Online-Gaming-Company.

[8]     *Director's Advisory Bulletin: 2016-01*, State of New Jersey, Office of the Attorney General, Department of Law and Public Safety, Division of Gaming Enforcement, https://www.nj.gov/lps/ge/docs/Bulletins/GreyMarkets.pdf.

46.    Former Nevada Gaming Control Board Chairman A.G. Burnett explained that even if a U.S. state does not expressly prohibit online gambling, "there's a high likelihood an offshore sportsbook is violating a state's gambling laws." Most states have general laws that require some level of licensure/taxation/compliance, or else the activity falls into the illegal gambling bucket. "At a minimum, these companies are operating an unlicensed business, and in violation of the jurisdiction's general laws," Burnett said.[9]

47.    With respect to grey markets, the DGE stated: "Where a jurisdiction has refrained from taking any affirmative, concrete action to prevent an Internet gaming market from developing within its borders, the Division will consider such a jurisdiction a grey market for purposes of assessing suitability under the Act."[10]

48.    In the BCA, SBTech defined a grey market as follows:

"Grey Market" means a jurisdiction whose (a) Laws do not specifically prohibit or permit internet gaming and/or internet sports betting, or (b) Laws do specifically prohibit internet gaming and/or internet sports betting, but Governmental Authorities in that jurisdiction have not, or had not at the relevant time, (1) taken affirmative concrete action to actively enforce those Laws (including, but not limited to, instituting criminal or civil actions or proceedings against operators in that jurisdiction, issuing formal cease and desist letters to an internet gaming and/or internet sports betting operator, or affirmatively notifying any Governmental Authority outside that jurisdiction that internet gaming and/or sports betting is specifically prohibited), or (2) issued unequivocal official pronouncements that internet gaming and/or internet sports betting is not legal in that jurisdiction; but for the avoidance of doubt, excludes jurisdictions whose Laws specifically permit internet gaming and/or internet sports betting, but with respect to which all required regulatory approvals were not, or had not been at the relevant time, secured by the relevant person or entity.

49.    SBTech's own definition of a grey market requires that governmental authorities in a foreign country that outlaws internet gambling must not have instituted criminal actions against

---

[9]    Steve Ruddok, *The Differences Between Black and Gray Gambling Markets*, PLAYUSA (Apr. 17, 2019), https://www.playusa.com/illegal-sports-betting-markets/.

[10]    *Director's Advisory Bulletin: 2016-01, supra* n.8.

operators in that country.  Grey-market jurisdictions could not have informed governments of other nations that internet gambling was illegal, nor issued unequivocal official pronouncements that internet gambling was illegal.  In jurisdictions where some forms of internet gambling are legal, all regulatory approvals had to have been secured to make the gambling legal.  Failure to secure approvals does not make that jurisdiction a grey market.

### SBTech Derived a Significant Portion of Its Revenues from Black Markets

50.    On June 15, 2021, Hindenburg published a report entitled, "DraftKings: A $21 Billion SPAC Betting It Can Hide Its Black Market Operations."[11]  The Report alleged that the Company's merger with SBTech exposed DraftKings to dealings in black-market gaming. Specifically, the Report stated, in relevant part:

- SBTech accounted for ~25% of total revenue at the SPAC consummation and was the only positive contributor to operating income, providing both financial stability and technology to the deal.

- Unbeknownst to investors, DraftKings' merger with SBTech also brings exposure to extensive dealings in black-market gaming, money laundering and organized crime.

---

[11]   Hindenburg has written other credible short-selling reports on companies such as Nikola and Lordstown Motors that have been substantiated by federal authorities.  *See* Matthew Goldstein and Kate Kelly, *A Skeptical Stock Analyst Wins Big by Seeking Out Frauds*, THE NEW YORK TIMES (Aug. 16, 2021), https://www.nytimes.com/2021/08/16/business/short-seller-wall-street-scams-hindenburg.html.  According to *The New York Times*, in July 2021, "federal authorities charged the founder of the electric vehicle manufacturer Nikola, which had gone public in the summer of 2020, with defrauding investors.  They were led there partly by the work of a little-known Wall Streeter named Nathan Anderson . . . and his upstart firm, Hindenburg Research."  *Id.*  Nikola ultimately paid $125 million to the SEC to resolve fraud charges.  *See Nikola Corporation to Pay $125 Million to Resolve Fraud Charges*, U.S. SECURITIES & EXCHANGE COMMISSION (Dec. 21, 2021), https://www.sec.gov/news/press-release/2021-267.  Federal authorities are also investigating fraud claims raised by Hindenburg against Lordstown.  *See* Goldstein & Kelly, *supra*.  In addition, Hindenburg recently uncovered a Ponzi scheme that led to FBI involvement.  *See* Ben Foldy, *An Alleged Fraud Uncovered by a Short Seller Ends in Gunfire*, THE WALL STREET JOURNAL (Mar. 23, 2022), https://www.wsj.com/articles/an-alleged-fraud-uncovered-by-a-short-seller-ends-in-gunfire-11648051215.

- Based on conversations with multiple former employees, a review of SEC & international filings, and inspection of back-end infrastructure at illicit international gaming websites, we show that SBTech has a long and ongoing record of operating in black markets.

- We estimate that roughly 50% of SBTech's revenue continues to come from markets where gambling is banned, based on an analysis of DraftKings' SEC filings, conversations with former employees, and supporting documents.

*    *    *

- Prior to the SPAC merger, SBTech seems to have made a concerted effort to distance itself from its black-market dealings. Illicit customer relationships were shuffled into a newly formed "distributor" entity called BTi/CoreTech, with ~50 SBTech employees shifted across town to the new entity.

- The CEO selected to run BTi/CoreTech was formerly an executive of a 'binary options' gambling firm raided by the FBI and subsequently charged by the SEC for deceiving U.S. investors out of over $100 million.

*    *    *

- We identified numerous black market clients of DraftKings' "front" entity, through searches on social media and back-end web infrastructure. For example, an Asia-focused site tied to a triad[12] kingpin at the center of a Swiss money laundering investigation advertises its use of BTi/CoreTech technology.

- In 2019, Vietnamese authorities arrested 22 individuals involved in a "massive illegal online sports betting ring" linked to BTi/CoreTech's platform.

- Contrary to representations made to Oregon's state lottery, a former employee told us SBTech had extensive operations in Iran, violating local laws in a market subject to heavy U.S. sanctions. We were told SBTech knowingly operated there for 4-5 years with the founder directly overseeing the operation.

- Around the time of the DraftKings deal, SBTech's founder spun off another gaming brand that also operated in markets where gambling was banned, transferring it to his brother. The brand was behind a "massive Chinese operation", according to a former employee, contrary to representations made to Oregon's state lottery.

---

[12]  A triad is a Chinese transnational organized crime syndicate based in Greater China and has outposts in various countries with significant overseas Chinese populations.

- The brand continues to operate in China despite the strict local rules prohibiting online gambling, according to our review of web infrastructure for multiple China-facing gambling sites. DraftKings continues to transact with the entity, according to SEC filings.

- DraftKings trades at a ~26x last twelve months (LTM) sales multiple and a ~20x estimated 2021 sales multiple despite (i) no expectation of earnings for years, (ii) intense competition, and (iii) regulatory risk. The company posted net losses of $844 million in 2020 and $346 million last quarter.

- Insiders have dumped over $1.4 billion in stock since the company went public a little over a year ago, with SBTech's founder leading the pack, having personally sold ~$568 million in shares.

*       *       *

- We think DraftKings has systematically skirted the law and taken elaborate steps to obfuscate its black market operations. These violations appear to be continuing to this day, all while insiders aggressively cash out amidst the market froth.

Hindenburg Report at 1-2.

51.    Hindenburg estimated that roughly half of SBTech's 2020 revenue came from black or unregulated markets, based on its review of SEC filings and discussions with former employees.[13]

52.    Unlike many software businesses that just charge flat or per-user fees, gaming businesses like SBTech partner with their client base through revenue share arrangements. SBTech collected between 10-30% of revenue, depending on the jurisdiction and nature of the services, according to multiple former employees Hindenburg spoke with. Overall, black market operators were charged a higher fee, the former employees said, due in part to the elevated risks involved in operating in such jurisdictions.

---

[13]   Plaintiff relies herein on the statements of former employees included in the Hindenburg Report to the extent they are corroborated by other facts. Plaintiff's counsel attempted to confirm the statements of these former employees by reaching out to Hindenburg's founder Nathan Anderson, but was unable to speak with him.

53.     The Hindenburg Report explained that SBTech entered into Asian black markets in

2014.  The Report stated, in relevant part:

> SBTech was founded in 2007 by Shalom Meckenzie as a sports betting technology
> provider.
>
> According to former employees, SBTech's offering struggled to compete against
> competitors like Kambi, which had a robust team dedicated to analyzing and setting
> "in-game" betting odds and had more powerful technology.  The competition pushed
> SBTech to seek business in markets where others were unwilling to operate, we were
> told.
>
> Despite the illegality of sports gambling in major Asian markets, SBTech's own
> marketing materials suggest it had an expansive Asia-facing business at least as far
> back as 2014. SBTech's website at the time advertised a "powerful turnkey Asian
> system" that accepted payment in currencies where gambling was clearly illegal.
>
> *        *        *
>
> Specifically, according to the graphic on its website, SBTech accepted Vietnamese
> Dong and Indonesian Rupees – both currencies based in black market sports
> gambling jurisdictions.

*Id.* at 7-8.

54.     As explained further below, Hindenburg also spoke with former employees who said

that SBTech operated in Vietnam, Thailand, and Malaysia – countries where online gambling is

illegal.  Hindenburg found evidence of SBTech's involvement with multiple operators that were

specifically linked to illegal gaming-ring raids in Vietnam and Thailand.  Moreover, Hindenburg

found evidence of SBTech's involvement with operators in countries like Iran, a black market that

has regularly been subject to U.S. sanctions.  *See Iran Sanctions*, U.S. DEPARTMENT OF STATE,

https://www.state.gov/iran-sanctions/ (last visited Apr 5, 2022).

55.     SBTech's Asia-facing business was being run by its head of international business

development, Tom Light (also known as Tom John Or-Paz).  According to the Report, a former

SBTech employee described Light as SBTech founder Shalom Meckenzie's "right hand man."  The

former employee said that Light was "4 out of 5 reasons" why Meckenzie is who he is, noting Light's ability to network with black and grey market operators to grow SBTech's business.

56.    Light can be seen in a YouTube video promoting SBTech's Asian platform at a 2015 conference, stating that SBTech has a "full Asian facing product" and is "very rooted in Asia" with "dozens if not hundreds" of other sports betting clients in Asia.  *See* Hindenburg Report at 10 (citing YouTube URL).

### In 2017, SBTech Removed Its Asian Business from Its Website as the Prospect of Loosening Gambling Restrictions in the U.S. Emerged

57.    In June 2017, the U.S. Supreme Court agreed to review the Professional and Amateur Sports Protection Act ("PASPA"), which Congress passed in 1992 outlawing betting on amateur or professional sports except in four states that already had operations, giving hope that the largest economy in the world would finally open up to the industry.

58.    SBTech's website removed its advertisement for Asian solutions sometime in 2017, according to internet archives.  *See id*. at 9-10 (citing internet archive Wayback Machine).

### In March 2018, Meckenzie's Right Hand Man Left SBTech to Start a Front Entity Set Up to Mask SBTech's Involvement in Black Markets

59.    In December 2017, the Supreme Court heard oral arguments on PASPA.  Most legal experts observing the arguments agreed that the law prohibiting U.S. sports betting would likely be repealed.  *See id*. at 10-11.

60.    The Hindenburg Report explained that, shortly after the Supreme Court hearing, Meckenzie spun out certain of his gambling operations to set up a front entity to mask SBTech's involvement in black and unregulated markets.  The Report stated:

> According to a former business partner of SBTech, the prospect of doing business in the U.S. was the trigger for SBTech owner Shalom Meckenzie to spin out certain of his gambling operations to at least two separate entities. The entities were placed under the control of relatives or trusted confidantes and run by many of the same staff.

Shortly after the Supreme Court hearing, on March 19, 2018, SBTech announced that Tom Light, the SVP of business development, was leaving to create a "new blockchain and gambling venture."

\*       \*       \*

The venture was unnamed in the press release, but Maltese and Bulgarian corporate records show that Light began creating an entity called BTi days later. It was later renamed CoreTech.

One former employee who served in a product development role told us BTi/CoreTech was a "front" for SBTech's illegal or unregulated markets:

> "*Before SBTech joined with DraftKings, they split the grey market/unregulated…they [Bti] are a separate company marketing their white label solution[14] to Middle East, South America, mostly China and Malaysia. Their technology provider is SBTech. Because SBTech is now on NASDAQ they don't want Asia or the grey market to give it a bad influence. They want to be clean.*"

The same former employee told us that BTi/CoreTech acted as a customer of SBTech, which invoiced BTi/CoreTech, in an apparent effort to put a layer of legal separation between SBTech and its black market end customers.

A second former employee, who worked as a data specialist at SBTech for several years, described BTi/CoreTech similarly. When asked how much of BTi/CoreTech's revenue comes from black or grey markets he said:

> "I would say almost all of it. Well over 90%"

Despite the small legal market in Asia, DraftKings states in its SEC filings that **an unnamed customer** focused on Asian markets accounted for 46% of SBTech's 2019 revenue and 52% of SBTech's 2020 revenue, but failed to disclose the name of the customer.

When asked about this, the former employee speculated "…**if it's Asia it will have to be (BTi)…it must be through BTi**." To be clear, SBTech has several Asia-facing customers and "resellers" such as 10Bet, W88, and Gameplay, as we detail further. The opacity of DraftKings' customer relationship disclosures has thus far masked the names of its top customers.

The implication either way is that black and unregulated market revenue and profitability, which includes BTi/CoreTech, represented and still represents a major portion of SBTech's financials since DraftKings went public.

---

[14]   A white-label product is a product or service produced by one company that other companies rebrand to make it appear as if they had made it.

The former employee added that the new focus on adding blockchain to the gambling offering was because operators in black markets had requested cryptocurrency options to make moving money easier. Crypto has emerged as the medium of choice for illicit money transfers, given the lack of oversight.

BTi/CoreTech was set up across town from SBTech's office in Sofia, Bulgaria, 4.5 miles (7.2 km) away, per Bulgarian corporate records.

*Id*. at 11-13 (emphasis in original).

### The CEO Selected to Run BTi/CoreTech Was Formerly an Executive of a "Binary Options" Gambling Firm Raided by the FBI and Charged by the SEC for Deceiving Investors Out of More than $100 Million

61.     According to Hindenburg, with SBTech's "front" created, the right leadership needed to be put in place to manage its illicit clientele. The CEO leading BTi/CoreTech since its inception is Amir Vaknin, according to his LinkedIn profile and Bulgarian corporate filings.

62.     Immediately prior to BTi/CoreTech, Vaknin served as Chief Technology Officer, and later claimed to be CEO, of disgraced binary options[15] gambling platform SpotOption between 2011 to December 2017 – a company subsequently charged by the SEC with defrauding U.S. investors out of at least $100 million. *See id*. at 14.

63.     SpotOption was raided by the FBI in 2017 as part of investigations into overseas binary option scams. The company was alleged to have provided the backend software for such scams, which included using the software to increase the likelihood that its high-roller clients lost money on their bets. Vaknin previously included SpotOption on his LinkedIn profile. Notably, fellow BTi/CoreTech director and senior employee Maxim Slavutsky also worked with Vaknin at SpotOption. *See id*. at 14-17.

---

[15]   "Binary options are contracts where an investor is speculating on one of two outcomes: a payoff or nothing at all…binary options are structured just like a $100 bet on a football game: [y]ou buy the team you like, or you sell the team you don't like. A binary is just a simple 'yes or no' trade." Randall Liss, *Common Misconceptions About Binary Options*, INVESTOPEDIA (Feb. 9, 2022), https://www.investopedia.com/articles/active-trading/052014/common-misconceptions-about-binary-options.asp.

64.     BTi/CoreTech's founder, Tom Light, worked as a consultant to the binary options industry, which Israeli media has referred to as "a fraudulent industry." Israel's parliament voted to ban overseas trading in binary options. *Id*. at 16.

65.     Hindenburg wrote: "With its leadership plucked from the 'fraudulent' binary options industry, BTi/CoreTech was ready to begin absorbing SBTech's illicit operations." *Id*. at 17.

### Following the Supreme Court's Repeal of PASPA, SBTech Employees Started Shifting to "Front" Entity BTi/CoreTech in Advance of a U.S. Deal

66.     On May 14, 2018, PASPA was formally repealed by the Supreme Court, paving the way for state-sanctioned sports betting. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018). Following the repeal, SBTech's transfer of operations to the four-month-old BTi/CoreTech entity was in full force.

67.     Bulgarian employment records show that in July 2018, SBTech reported a reduction in employee headcount by 47. That month, BTi/CoreTech reported its first employee headcount at 50. These employee transfers are corroborated by multiple LinkedIn profiles showing employees transitioning from SBTech to BTi/CoreTech in mid-2018. *See* Report at 17-18.

### BTi/CoreTech Is an Undisclosed Affiliate or Subsidiary of SBTech

68.     The first meeting to discuss a combination of DraftKings and SBTech happened in Israel between SPAC sponsor Harry Sloan, DraftKings CEO Robins, and SBTech owner Meckenzie on June 15, 2019, according to the Proxy Statement. Two days later, on June 17, 2019, BTi changed its name to CoreTech. *See id*. at 18.

69.     According to Hindenburg, despite the ostensible separation between SBTech and BTi/CoreTech, many BTi/CoreTech employees seemed to be under the impression that they worked for SBTech. "This includes **BTi/CoreTech's current CEO**, Amir Vaknin (who, according to his LinkedIn profile, never worked for SBTech). Nonetheless, he announced on LinkedIn that he was

searching to **hire employees for SBTech** around the time that BTi/CoreTech was formed." *Id*. at 18-19 (emphasis in original).

70.    Other employees were under the impression that BTi/CoreTech was a direct affiliate or subsidiary of SBTech. A former BTi/CoreTech developer, for example, stated in his online resume that BTi is an SBTech company. Another online resume shows a senior employee working concurrently as Head of Bulgaria operations at SBTech *and* Finance Director at BTi. Yet another LinkedIn resume shows an employee who claims to have worked at both companies concurrently from July to November 2018. *See id*. at 20. One online resume shows a Web Content Manager working at both companies simultaneously from 2018 through the present. *See* Ivan Vlahov, LINKEDIN, https://bg.linkedin.com/in/ivan-vlahov-a610b3124 (last visited Apr. 5, 2022). And the online resume of CoreTech Bulgaria's Chief Operations Officer shows that he worked as the "Head of Delivery R and D" (Research and Development) at CoreTech Bulgaria and the "Delivery Manager R and D" at SBTech. *See* Yasen Uzunov, ROCKETREACH, https://rocketreach.co/yasen-uzunov-email_135708399 (last visited Apr. 5, 2022).

71.    According to Hindenburg, the muddled relationship is visible through customer communications as well. After BTi/CoreTech launched, it was advertised in Asian markets as being SBTech. An Asian white label provider called GamingSoft described BTi as being founded in 2007 (which was actually the year SBTech was founded) and simply ran the SBTech commercial to describe BTi's services. Another betting review site used BTi/CoreTech and SBTech interchangeably. *See* Hindenburg Report at 20.

72.    Further, Hindenburg reported: "In a somewhat odd instance, we identified a site operated under a different domain that claimed to be BTi/CoreTech and identified the company as being part of SBTech Group[.] We reached out to BTi/CoreTech to ask about the site and were told

it was 'an old copy of ours' and a 'fake' that they had nothing to do with.  We asked how it could be both a copy and a fake. Within roughly an hour of our inquiry to BTi/CoreTech, the site was completely deleted. . . ."  *Id*. at 21-22.

73.     Hindenburg spoke to former employees who had worked at both SBTech and BTi/CoreTech about the relationship between the two entities, writing as follows:

> Despite clear evidence of a tight connection, former employees who had worked at both SBTech and BTi/CoreTech, were generally defensive, guarded, and evasive when asked about the relationship between the two companies.
>
> One BTi/CoreTech manager told us:
>
>> "*(BTi) CoreTech is not a part of SBT group. We are competitors currently operating on different markets.  Regarding the colleagues, we all do search for good opportunities and some people find SBT attractive, some find CoreTech more attractive.*"
>
> But a different former colleague we spoke with acknowledged SBTech had in fact set up BTi/CoreTech:
>
>> "*Till full separation of few months, SBTech supported BTi, but the split was handled in less than 3 months.*"
>
> Finally, yet another employee **who has worked for both** SBTech and BTi/CoreTech, offered more specifics after initially saying they could not speak because such information was "classified".  They told us:
>
>> "*BTi/CoreTech acts as an agent or distributor for SBT while the two companies are very financially close.  The core system is developed by SBT and BTi/CoreTech is its distributor in Asia...It´s mostly sportsbooks… China and SEA (south-east Asia) are the two biggest markets (for BTi/CoreTech). Especially SEA where football is a big scene there.*"
>
> They said that BTi/CoreTech neither sold nor distributed any other products except the platform supplied by SBTech:
>
>> "***All CoreTech business comes from SBT***."

*Id*. at 22-23 (emphasis in original).

**SBTech/BTi/CoreTech Has Extensive Ties to
Black Market Operators and Suspected Organized Crime**

74.     According to Hindenburg, as indicated by multiple former employees, the reason for all of the administrative shuffling – the renaming and rebranding of parts of SBTech to BTi to CoreTech – was an effort to separate the entity's "behind the scenes" black market operations to pave the way for a U.S. deal partner like DraftKings, with its polished and clean exterior.

75.     Hindenburg has been able to corroborate many of these claims through documents and web sources detailing BTi's involvement with operators that were specifically linked to illegal gaming ring raids in Vietnam and Thailand.  Specifically, the Hindenburg Report provided a number of corroborating examples.

76.     Example 1: BTi's sportsbook is advertised through a site linked to a recent raid on an alleged illegal operator in Thailand.  Hindenburg found BTi's sportsbook running on a Betway-branded gaming site targeting Thai and Chinese players.  The Betway site offers a sportsbook in Thai, Mandarin, and English.  However, online sports betting is banned in Thailand and China.  *See infra* at ¶¶154-162, 172-173.  The Thailand-facing Betway-branded operator displays BTi's logo on its website, advertising the relationship.  The site's backend web infrastructure also makes multiple references to BTi.  A search of the site's network shows multiple URL requests targeting "BTI."  In February 2021, Thai authorities in the Chanthaburi province raided an alleged illegal gambling operation run out of four converted shipping containers.  The operators administered four websites facilitating Thai gambling, including a site called "betway88."  Authorities arrested 34 people in connection with the raid.  *See id*. at 24.

77.     Example 2: SBTech and BTi are also tied to an Asian operator called 12Bet – a site tied to a triad gang kingpin, at the center of a Swiss money-laundering investigation, and recently linked to a police raid in Vietnam.  BTi's sportsbook appears advertised by 12Bet on multiple Asian

facing websites.  For instance, the Hindenburg Report depicts a 12Bet mirror site that clearly advertises BTi's sportsbook and displayed open communications with BTi's site, as shown in the developer tools depicted in the Report.[16]  In 2015, Vietnam authorities shut down an illegal gaming ring tied to 12Bet.  Gambling for Vietnamese citizens is almost entirely banned, with prison sentences for operators and fines for gamblers common punishment.  *See infra* at ¶¶163-167.  The only exception is a state-owned lottery.  In addition to apparent black-market bookmaking, 12Bet is or was owned by Paul Phua, according to an investigation commissioned by the Swiss IHAG Bank.  The U.S. Department of Justice has alleged that Phua is a senior member of the 14K Triads, one of the most dangerous criminal syndicates in the world, known for heroin smuggling and contract murder, among other activities.  Links to Phua landed 12Bet at the center of a Swiss money-laundering investigation related to the Triad member's various laundering entities.  *See* Report at 25.

78.    <u>Example 3</u>: Gaming site Fun88, linked to an illegal gaming raid in Vietnam, also advertises its use of BTi's platform.  In early 2019, Vietnamese authorities arrested 22 individuals in what was described as a "massive illegal online sports betting ring linked to the Fun88 brand."  Authorities said $1.28 billion in wagers were processed by the ring, flowing through the Vietnamese intermediary tied to Fun88.  Around four months before the raid, a former BTi/CoreTech employee posted a photo on Twitter showing a holiday gift basket sent from Fun88 to BTi.  Other links between the two entities include Fun88 advertising BTi on a Vietnamese facing site.  *See id*. at 28-29.

79.    <u>Example 4</u>: SBTech claimed to Oregon regulators that its customer 10Bet did not derive revenue from China (a major black market) using SBTech's software, but Hindenburg found multiple Chinese-facing 10Bet sites where backend web infrastructure demonstrates SBTech's

---

[16]    A mirror site is essentially a replica site that is often set up internationally to either skirt local restrictions, or as a backup in case one site gets shut down by regulators.

involvement.  Online gambling in China has been illegal for years, and has faced recent harsh crackdowns.  *See infra* at ¶¶154-162.  For example, China arrested more than 11,500 people on suspicion of cross border gambling in a series of raids since February 2020.  *See* Report at 30.  In fact, China has been cracking down on gambling, especially online gaming, on its Mainland since at least 2004 and it stepped up its crackdowns even more in 2019.  *See infra* at ¶¶159-160.  SBTech's first major contract in the U.S. was providing its sportsbook to Oregon's Lottery Commission in 2019.  During the vetting process, the Oregon State Lottery wanted to know more about a company SBTech had a relationship with called "10Bet" that seemed to operate in China, based on documents Hindenburg received through a public records request.  *See id.*

80.    In the Oregon State Lottery report, excerpts were included from a letter from Richard Carter, SBTech's then-CEO.  Carter wrote that 10Bet was an independent brand that "does not derive revenues from China using SBTech's software."  The statement is followed by a paragraph explaining that a different operator has the right to use 10Bet's brand in Asia, and that operator is a sublicensee of one of SBTech's distributors.  *See id.*  A former SBTech employee familiar with the Oregon contract, however, told Hindenburg that SBTech in fact had a massive China operation, contrary to representations made to the state of Oregon:

> "Call it what it is, they were running a massive Chinese operation and BTi was the holding corp. that they had it in, and yes Shalom [Meckenzie] is still taking money out of it, and yes that's the risk."

*Id.* at 31.

81.    Supporting this statement, Hindenburg found multiple 10Bet China-facing sites that currently contain source code indicating that they are running SBTech software.  This suggests that SBTech's representations to Oregon regulators were false.  It also suggests that DraftKings continues to collect revenue through 10Bet's black market operations.  The Report cites one of five instances where source code that appears tied to SBTech's BTi/CoreTech is pulled from Chinese

betting sites. *See id.* at 31-32  The Report also depicts source code elements that indicate SBTech and BTi/CoreTech's involvement in five other apparent Chinese mirror sites. *See id.*

82.    Yet, despite all of this evidence, SBTech told the Oregon State Lottery:

> You have specifically cited 10Bet.  10Bet is a brand operated primarily in a variety of European markets and which is licensed by the UK and Maltese gambling authorities.  ***10bet does not derive revenues from China using SBTech's software***.

*Id.* at 32.

83.    Hindenburg further explained that 10Bet was actually founded and run by SBTech founder Shalom Meckenzie:

> SBTech's disclosure to the Oregon state lottery described 10bet simply as "a brand" that operated primarily in Europe, suggesting it was like any other independent company.

> The full picture is less clear cut. ***Rather than merely being an independent brand, 10Bet was actually founded and run by SBTech founder Shalom Meckenzie since its inception, according to UK corporate records.***

> ***Meckenzie then stepped down as a director in 2018, per the same records, and later transferred "the rights and everything related to the 10Bet brand" to an entity owned by Water Tree Limited, whose sole owner is Meckenzie's brother, Roy Meckenzie, per a former employee and DraftKings' SEC filings***. [Pg. 176]

> ***The relationship appears to be ongoing.  DraftKings discloses related-party business with Roy Meckenzie and Water Tree in its filings (without ever actually naming the 10Bet brand or the apparent illegality of some of its ongoing Asian-facing operations)***. [Pg. 308]

> A former employee explained to us that the transfer was yet another legal fig leaf meant to separate SBTech from some of its prior operations in order to enter U.S. markets, while still keeping control of the entity in the family:

>> "For SBTech to pass their due diligence with DraftKings, one of the points was they were told they could not operate a B2C brand and not hold data of white label other brands because it was competition, and so there was conflict of interest.  And so in order to resolve that, SBTech needed to separate 10bet the brand out of SBTech one way or another."

*Id.* at 32-33.

84.    Hindenburg added, in a footnote to the Report, as follows:

- 29 -

> Note that in a report by the Oregon state lottery that we received through a public records request, two SBTech reseller entities were named: BTi and W88. Per the report, the resellers collectively "account for over 99% of the revenue which SBTech derives from gambling services being provided to end users in China." At the time, China was classified as a "grey" market by the regulator, which it defined as a jurisdiction where gambling was illegal but where the laws were not actively being enforced. Oregon chose to permit the behavior. ***Since then, China has arrested over 11,500 people for gaming offenses***. [Pg. 11]

*Id*. at 44 (citing Philip Conneller, *China Online Gambling Crackdown: Over 11,500 Arrests Since February*, Casino.org (June 23, 2020), https://www.casino.org/news/china-online-gambling-crackdown-over-11500-arrests-since-february/); *see also* Zhang Yuzhe and Denise Jia, *How illegal online gambling launders $150bn from China*, Nikkei Asia (Dec. 22, 2020), https://asia.nikkei.com/Spotlight/Caixin/How-illegal-online-gambling-launders-150bn-from-China ("In the first nine months of 2020, police cracked down on 1,700 online gambling platforms and 1,400 underground banks involving more than 1 trillion yuan ($153 billion) of illegal transactions, data from the Ministry of Public Security showed.").

85.    <u>Example 5</u>: SBTech operated in Iran for years, according to multiple former employees, contrary to its representations to Oregon state regulators. Hindenburg wrote, in pertinent part, as follows:

> Around the time of SBTech's deal with Oregon, a 2019 media report highlighted some of SBTech's suspected black-market operations. Per the article:
>
>> "*Online records and company gaming profiles show that businesses that use SBTech technology reach out to online customers in Iran and Turkey, where gaming is restricted or illegal yet have unregulated black market activity.*"
>
> SBTech publicly denied the claim:
>
>> "*SBTech told reporters that it categorically denied operating in Iran, and thoroughly vets customers who rely on its technology.*"
>
> Many investors likely found solace in the fact that Oregon appeared to vet SBTech, even flying investigators to Bulgaria to interview multiple employees at SBTech offices, before eventually approving the deal.

*Id*. at 33-34.

86.    Yet despite SBTech's public denials, the company admitted privately to the Oregon Lottery that it did have business in Iran.  Per a report Hindenburg received through a public records request, during the Oregon investigation, SBTech claimed it "became aware" of one of its distributors operating in Iran, then "caused" the distributor to terminate the Iranian relationship:

> In early Late March 2019 [sic], it was brought to the attention of the Oregon State Lottery that SBTech may have conducted business in Iran, a country considered to be a black-market jurisdiction. ***Further investigation revealed that in early Spring of 2018, SBTech became aware of one of SBTech's contracted B2B distributors accepted wagers from one of the said distributor's end use operators in Iran***. When SBTech learned of the end use operator's violations SBTech took immediate action and caused the distributor to terminate business with the end use operator.

*Id*. at 34.

87.    According to Hindenburg, "former employees described the scenario much differently," stating as follows:

> Iran had been a lucrative market, operated with the full knowledge of SBTech founder Shalom Meckenzie.  Meckenzie chose to abandon the market in search of bigger business opportunities in the U.S., we were told.

> The reason Iran was so lucrative, according to the former employee, was due to there being few technology options given that it was a black market and regularly subject to international sanctions:

>> "*You want to go to take rev share off a guy in Iran, you can charge him 30% and he doesn't really have another choice*"

> **The former employee estimated that SBTech had done business in Iran for 4-5 years, but later dispensed with the business around early 2019 when facing scrutiny around the deal with the Oregon state lottery**, given that Iran was a U.S. sanctioned country[.]

> Note that the same Oregon lottery report describing the Iran dealings also revealed BTi as one of two key distributors, despite neither the Iranian dealings nor its relationship with BTi/CoreTech appearing anywhere in DraftKings' public filings. [Pg. 10]

*Id*. at 34-35 (emphasis in original).

88.     In addition, SBTech suspiciously deactivated one of its websites in April 2019 after the Oregon *Statesman Journal* inquired about SBTech's link to sports leagues, including Turkish teams, listed by JokerBet.  JokerBet, a separate company that used to be associated with SBTech, operates in multiple countries, including Turkey, according to its online profile.

89.     Further, Hindenburg explained that in the course of its investigation, it "found subdomains for sports betting sites linked to over 25 operators who appear to be targeting black market clientele, based on the languages supported.  Jurisdictions where gambling is illegal include China, Vietnam, Thailand, Indonesia and Korea." *See id.* at 41 (citing links to media articles).  Most sites had BTi branding, along with source code that shared the same labeling system as SBTech's.  Hindenburg accessed each subdomain using a VPN through jurisdictions like Thailand, China, and Vietnam.  *See id.* at 41-42.

90.     In its conclusion, the Hindenburg Report elaborated on SBTech's activity in black markets, stating, in pertinent part:

> One issue with partnering with black market betting operators is that such businesses are not *just* engaged in illegal betting.  These operators almost by definition are engaged in money laundering, and often additional lines of underground business activity.

> As one former employee told us succinctly, SBTech founder Meckenzie and his affiliate entities have "sold to plenty of mobs."

> The same former employee explained that DraftKings and its SPAC sponsors must have either known the issues with SBTech's black market operations or were grossly negligent in their diligence:

>> "I would be really, really, really surprised if they didn't know.  In fact, it would be really, really amateur of them if they didn't investigate that.  Presumably they knew and . . . helped facilitate hiding it or turned a blind eye to it . . . but they must have known."

> ***DraftKings has never identified the nature of its BTi/CoreTech relationship in any of its SEC filings – not as an affiliate or subsidiary of SBTech or in any other way as relevant to DraftKings' SPAC combination with SBTech.  It also has not***

*provided transparency regarding the markets SBTech and its other "resellers" and affiliates operate in, and their respective contributions to the public company.*

*Given the importance of SBTech to DraftKings' top and bottom-line, it is virtually impossible to fathom that DraftKings was and continues to remain unaware of its ongoing relationship with BTi/CoreTech and its illicit operators.*

*Yet rather than disclose anything about these relationships, the company instead appears to have created a complex web of misinformation to conceal them.*

The 2016 New Jersey Division of Gaming Authority's director's bulletin, which serves as a key reference document for other U.S. gambling regulators, stressed the importance of "good character, honesty and integrity" of its licensees and/or prospective licensees.

*Id.* at 39-40 (first emphasis in original).

### DraftKings Has a History of Non-Compliance

91.    According to the Hindenburg Report, this is not DraftKings' first time facing questions of regulatory compliance, and appears to be part of a culture of "do whatever we think we can get away with." *Id.* at 35. In 2016, Old DraftKings settled with the New York Attorney General over allegations of extensive false and deceptive advertising to consumers. Separately, a late-2020 media article detailed how DraftKings seemed to be selectively enforcing rules against betting by proxy, when bettors in states where gambling is illegal place bets through an individual in a state where it is legal, in order to skirt the ban.

### Reputation Is Crucial for U.S. Gambling Regulators

92.    Maintaining good character and reputation is crucial for United States' gambling regulators – especially when it comes to getting or keeping a gaming license. There are myriad examples of regulators punishing gambling businesses for unsavory associations. In Nevada "state regulators determine applicants' 'suitability' to be licensed, and their regulations are intended to

prevent corruption or criminal activity in the industry."[17]  In New Jersey and Illinois, the burden is

on the applicant to show, through clear and convincing evidence, their good character and reputation.

*See* New Jersey Casino Control Act, NJS §5:12-80; 86 Ill. Adm. Code §3000.230.

93.    In March 2010, the New Jersey Casino Control Commission forced MGM Mirage to

surrender its qualification for a license as a result of the company's joint venture with Hong Kong

businesswoman Pansy Ho to develop the MGM Grand Macau hotel casino in Macau, China.[18]  Josh

Lichtblau, the Director of the New Jersey Division of Gaming Enforcement, said the integrity of

casino operators and owners is of paramount concern and such concern extends to a licensee's

associates.[19]

94.    In 2018, CG Technology was fined $2 million in exchange for keeping its Nevada

gaming license after the company committed multiple infractions including accepting bets from

outside Nevada, taking wagers after games were over, and making incorrect payouts.[20]

---

[17]  *See* Katherine Sayre, *Barry Diller's Gambling License Is Delayed by Regulator Over Investigation Into Trading*, THE WALL STREET JOURNAL (Mar. 17, 2022), https://www.wsj.com/articles/mgm-resorts-stakeholder-barry-dillers-gambling-license-is-delayed-by-regulator-11647555581.   Nevada gambling regulators put MGM Resorts International stakeholder Barry Diller's license on hold after the federal government opened insider-trading investigations into his purchases of Activision Blizzard Inc. shares.

[18]  *See Casino Control Commission Approves Settlement Under Which MGM Mirage Will Divest Interest in Borgata Hotel Casino*, THE STATE OF NEW JERSEY, DEPARTMENT OF LAW & PUBLIC SAFETY (Mar. 17, 2010), https://www.nj.gov/oag/newsreleases10/pr20100317c.html.

[19]  *Id.*  Pansy Ho is the daughter of Stanley Ho, who is allegedly associated with organized crime in Asia.  *See MGM Mirage's choice: leave Atlantic City rather than sever ties with "unsuitable" Pansy Ho*, PRACTICAL STOCK INVESTING (Mar. 19, 2010), https://practicalstockinvesting.com/2010/03/19/mgm-mirages-choice-leave-atlantic-city-rather-than-sever-ties-with-unsuitable-pansy-ho/.

[20]  *See* Philip Conneller, *CG Technology Swerves License Revocation With $2 Million Fine After Regulators Make Company Sweat*, CASINO.ORG (Nov. 19, 2018), https://www.casino.org/news/cg-technology-swerves-license-revocation-with-2-million-fine/.

95.     In 2021, the Indiana Gaming Commission sought to revoke Rod Ratcliff's gaming license after he allegedly took money from his company to use in a personal betting account and concealed financial information from the commission.[21] "The commission argue[d] that the 'mere association or inference' in such a criminal case would be enough to question whether Ratcliff could maintain a gaming license and that the burden [was] on him to prove he is still suitable to hold the license." *Id.*

96.     In 2005, a federal judge in Illinois recommended that Emerald Casino lose its gambling license for lying to regulators. *See* John Chase, *Judge: Revoke casino license*, CHICAGO TRIBUNE (Nov. 16, 2005), https://www.chicagotribune.com/news/ct-xpm-2005-11-16-0511160248-story.html. Emerald Casino officials conspired to move its casino from East Dubuque to Rosemont without informing the Gaming Board "and then lied to regulators when they found out." *Id.* Lying to regulators is in fact enough for a company to lose its license.

97.     Moreover, in the United States, it is a federal crime to participate in the illegal gambling business.[22] Indeed, federal prosecution extends beyond traditional and online casino operators: "The Department of Justice has warned that media outlets that ***accept advertising dollars*** from these illegal operators could be liable for ***aiding and abetting criminal activity***." *Id.* For example, in 2009, Microsoft, Google, and Yahoo entered into a $31.5 million settlement with the federal government for promoting illegal, offshore gambling. *Id.* And the *Sporting News*, one of oldest sporting outlets in the country, entered into a $7.2 million settlement with the Department of Justice to resolve accusations stemming from accepting advertising from offshore gaming outlets.

---

[21]     *See* Lindsey Erdody, *Gaming Commission files petition to permanently revoke Ratcliff's gaming license*, INDIANAPOLIS BUSINESS JOURNAL (Feb. 2, 2021), https://www.ibj.com/articles/gaming-commission-files-petition-to-permanently-revoke-ratcliffs-gaming-license.

[22]     *See Illegal Sports Betting*, AMERICAN GAMING ASSOCIATION (Aug. 17, 2020), https://www.americangaming.org/illegal-sports-betting/.

*Id.*  Thus, the makers of gambling software platforms for use in black-market jurisdictions face a substantial risk of prosecution.

98.    Further exemplifying the potential liability for gambling software platforms like SBTech, the New York County District Attorney charged a software maker, who licenses a program used by online casinos and bookmakers overseas, with promoting gambling in New York because his software was used by others for illegal betting in that state.  *See* Kim Zetter, *Write Gambling Software, Go to Prison*, WIRED (Jan. 3, 2013), https://www.wired.com/2013/01/coder-charged-for-gambling-software/.  The District Attorney stated, "These defendants abetted large-scale illegal gambling in the U.S. and abroad.  In doing so, they gave bettors an easy way to place illegal wagers, and created an appetite for further unlawful activity."  *Id.*

99.    Accordingly, DraftKings' ongoing illicit black-market business, conducted through BTi/Coretech, continues to expose DraftKings to the risk of losing its critically important gaming licenses – even though SBTech and/or BTi/CoreTech do not accept wagers or operate a casino or sportsbook.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

100.    The Class Period begins on December 23, 2019, when the Company issued a press release, filed with the SEC as an exhibit to a Current Report on Form 8-K and signed by Defendant Baker, announcing the Business Combination.    That press release made the following representations regarding SBTech:

**SBTech Highlights**

- SBTech is a premier global full-service B2B turnkey technology provider with omni-channel sports betting solutions, trading services, and marketing and bonus tools powering some of the world's most popular sports betting and online gaming brands.

- ***50+ partners in 20+ regulated markets and jurisdictions including Czech Republic, Denmark, Ireland, Italy, Mexico, Portugal, Spain, Sweden, and U.K. and Arkansas, Indiana, Mississippi, New Jersey, Oregon and Pennsylvania in United States.***

- Awarded exclusive contract offering mobile and retail sports betting for the Oregon state lottery with their Oregon Lottery Scoreboard brand.

"The combination of DraftKings and SBTech brings together two tech-native companies with the customer at their cores," said Gavin Isaacs, SBTech's Chairman. "SBTech will maintain its core business and continue its B2B focus. We are excited about the opportunity to join a company with a similar innovation DNA and create a unique and differentiated player in global sports betting and online gaming."

101.    The statements above in ¶100 were materially false and misleading when made because they failed to disclose that the markets and jurisdictions in which SBTech operated included numerous black markets for gambling in Asia.  Defendants knew, or recklessly disregarded, these undisclosed facts.

102.    Also on December 23, 2019, Defendants filed the BCA with the SEC.  The BCA was entered into by and among the following entities, with the respective signatories in parentheses: Old DraftKings (Robins); SBTech (Global) Limited (Richard Carter, Meckenzie, and Randolph John Anderson); the SBT Sellers' Representative (Meckenzie); DEAC (Sagansky); DEAC NV Merger Corp. (Baker); and DEAC Merger Sub Inc. (Baker).

103.    SBTech made certain representations in the BCA concerning corrupt practices, stating, in pertinent part, as follows:

Section 4.21    Corrupt Practices.

\*            \*            \*

(b)        ***Neither SBT nor any of its Subsidiaries nor, to the Knowledge of SBT, any of their Representatives, has at any time, or is presently or has agreed to become, engaged in any conduct (including by way of acquiescence or failure to perform) that violates in any material respect any ABC Laws or AML Laws that***

*are applicable to SBT or any of its Subsidiaries.[23] The books and records of SBT and its Subsidiaries are accurate and complete in compliance in all material aspects with the requirements under the ABC Laws or AML Laws that are applicable to SBT and its Subsidiaries.* Neither SBT nor any of its Subsidiaries nor, to the Knowledge of SBT, any of their current and former Representatives, has used or agreed to use proceeds from the SBT Business in a manner that violates the applicable ABC Laws.

      (c)    *Since January 1, 2016*, neither SBT nor any of its Subsidiaries is conducting or has conducted, directly or indirectly, any business (including, without limitation, sales, reselling, licensing or sub-licensing arrangements, funding, making payments, procuring, insurance or otherwise providing assistance or support in connection with operations, business or any other activity) with or for the direct or indirect benefit of or on behalf of a person or entity:

*named as a "specially designated national and blocked person" on the most current OFAC SDN List or with whom it would be prohibited for SBT or any of its Subsidiaries to engage in transactions or dealings under any of the sanctions programs of the United States administered by OFAC which would be applicable to the relevant transaction;[24] or*

*who is the subject of or otherwise targeted by, or is located or organized in any country or territory that is subject to, any such sanctions which would be applicable to the relevant transaction.*

104.    The statements above in ¶103 were materially false and misleading when made because they failed to disclose that, since January 1, 2016, SBTech had conducted business in Iran, which is a country that is subject to the sanctions program of the United States administered by OFAC, and where all forms of gambling are outlawed. Defendants knew, or recklessly disregarded, these undisclosed facts.

---

[23] "ABC Laws" means: (a) the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, 1997; (b) the Foreign Corrupt Practices Act of 1977 of the United States of America, as amended by the Foreign Corrupt Practices Act Amendments of 1988 and 1998 (the "FCPA"); (c) the Bribery Act 2010; and (d) any other applicable anti-corruption laws of any jurisdiction in which SBT and its Subsidiaries is conducting or has conducted business. "AML Laws" means: (a) the Proceeds of Crime Act 2002; (b) the Money Laundering Regulations 2007; (c) the Terrorism Act 2000; and (d) any other applicable anti-money laundering laws of any jurisdiction in which SBT and its Subsidiaries is conducting or has conducted business.

[24] "OFAC" means the Office of Foreign Assets Control of the U.S. Department of the Treasury. "SDN" means Specially Designated Nationals.

105.    SBTech made certain representations in the BCA concerning compliance with applicable gaming laws, stating, in pertinent part, as follows:

Except for operations conducted by SBT, its Subsidiaries and the Clients in any jurisdiction that is a Grey Market or was a Grey Market at the relevant time(s) and with respect to which at the relevant time(s): (i) to the Knowledge of SBT, SBT, its Subsidiaries and, in so far as relating to the SBT Software, the Clients are/were in compliance in all material respects with all Applicable Gaming Laws and Laws relating to gaming relevant to SBT, its Subsidiaries or the Clients (as applicable), and (ii) SBT, its Subsidiaries and, to the Knowledge of SBT, the Clients are/were operating in all material respects in a manner that is/was customary for businesses similar to SBT, its Subsidiaries or, in so far as relating to the SBT Software, the Clients (as applicable) in such jurisdiction, each of SBT, its Subsidiaries and, to the Knowledge of SBT and in so far as relating to the SBT Software, the Clients is [sic], and ***during the four (4) years preceding the date of this Agreement has been, in compliance in all material respects with all Applicable Gaming Laws and Laws relating to gaming relevant to SBT, its Subsidiaries or the Clients (as applicable)***.

\*        \*        \*

SBT and each of its Subsidiaries actively monitors the use of the SBT Software by the Clients, and to SBT's Knowledge (except for operations conducted by SBT, its Subsidiaries and the Clients in any jurisdiction that is a Grey Market or was a Grey Market at the relevant time(s) and with respect to which at the relevant time(s): (i) to the Knowledge of SBT, SBT, its Subsidiaries and, in so far as relating to the SBT Software, the Clients are/were in compliance in all material respects with all Applicable Gaming Laws and Laws relating to gaming relevant to SBT, its Subsidiaries or the Clients (as applicable), and (ii) SBT, its Subsidiaries and, to the Knowledge of SBT, the Clients are/were operating in all material respects in a manner that is/was customary for businesses similar to SBT, its Subsidiaries or, in so far as relating to the SBT Software, the Clients (as applicable) in such jurisdiction), ***the Clients are not using, and the Clients are not permitting the use by others, of the SBT Software in contravention of Laws related to gaming relevant to SBT, its Subsidiaries or the Clients (as applicable).  SBT and its Subsidiaries require each of the Clients to be regulated by a Gaming Regulatory Authority, and, to the Knowledge of SBT, each Client is regulated by a Gaming Regulatory Authority***.[25]

106.    The statements above in ¶105 were materially false and misleading when made because: (i) the markets and jurisdictions in which SBTech operated included markets and jurisdictions in which gambling was illegal; and (ii) certain of SBTech's clients were located in

---

[25]    The statements referenced in ¶105 are repeated in the April 15, 2020 Proxy Statement.

jurisdictions where gambling was illegal. Defendants knew, or recklessly disregarded, these undisclosed facts.

107. On January 6, 2020, the Company filed a Form S-4 with the SEC. The Form S-4 was signed by Defendants Sagansky and Baker. The Form S-4 provided a "timeline of key operational and business milestones" for SBTech, which described SBTech's entry into numerous foreign jurisdictions. Defendants also discussed numerous arrangements between DraftKings, SBTech, and foreign lotteries, as well as other business SBTech had obtained in foreign jurisdictions. Defendants also made certain statements in the Form S-4 concerning countries in which SBTech operated, stating, in pertinent part, as follows:

> SBTech has obtained licenses (and approval, as applicable) in six states in the United States and in the United Kingdom, Gibraltar, Malta and Romania. Additionally, SBTech has certified its software in Denmark, Italy, Nigeria, Portugal and Spain, and its platform and sportsbook are available in Azerbaijan, Belgium, Cyprus, Czech Republic, Greece, Mexico, Poland and Sweden under local licenses held by operators using SBTech's platform in these jurisdictions.

108. In the Form S-4, Defendants discussed the source of SBTech's revenue, stating, in pertinent part, as follows:

> SBTech records revenue net of value added tax and discounts. SBTech's key revenue drivers include the number of customers that it serves, amount of revenue generated by certain customers and geographic expansion (particularly into U.S. jurisdictions). In the nine months ended September 30, 2019, *approximately 38% and 62% of SBTech's revenue was derived from customers in Europe and other regions (primarily Asia)*. In comparison, the revenue split for the respective regions was approximately 34% and 66% in fiscal year 2018 and 48% and 52% in fiscal year 2017. Following the dot.com exit decision and entry into the United States, SBTech's management expects U.S.- and European-source revenue to continue growing relative to other regions.[26]

*      *      *

---

[26] Substantially similar statements are repeated in the April 15, 2020 Proxy Statement; Amendment No. 1 to the Form S-1 Registration Statement dated April 23, 2020; the Prospectus filed May 13, 2020; the Prospectus filed June 22, 2020; the Form S-1 Registration Statement filed October 6, 2020; and the Prospectus filed March 5, 2021.

*Revenue.* Revenue declined by €1.3 million, or 1.8%, to €68.3 million in the nine months ended September 30, 2019 from €69.6 million in the nine months ended September 30, 2018. This reflected the impact of dot.com, **which was partially offset by customers' growth, driven by SBTech's growth in Europe and Asia** and entry into U.S. jurisdictions after PASPA was struck down. Excluding the impact of dot.com, which SBTech exited as of September 1, 2018 and which had contributed €21.5 million in revenue in that period, revenue would have been €48.1 million in the nine months ended September 30, 2018, implying an organic revenue increase between periods of €20.2 million, or 42.0%. **Organic revenue growth reflected mainly additions of new customers in Asia**, as well as growth in Europe and the United States.[27]

109.    The Form S-4 included a risk disclosure concerning SBTech's international resellers, stating, in pertinent part, as follows:

> **SBT's business includes a B2B business model, primarily in international jurisdictions, which business depends on the underlying financial performance of its direct operators and its resellers. As a material part of SBT's revenue is currently generated through resellers and a few large direct operators, a decline in such resellers' or direct operators' financial performance or a termination of some or all of the agreements with such resellers or operators could have a material adverse effect on SBT's or New DraftKings' business.**
>
> SBT offers their services direct to operators in Europe and uses a reseller model in Asia. SBT's financial performance depends on the underlying financial performance of its direct operators and its resellers. An adverse decline in the underlying financial performance of key SBT operators or resellers, or a termination of some or all of the agreements with such resellers or operators, could have a material adverse effect on SBT's or New DraftKings' business. (Emphasis in original).

110.    The statements above in ¶¶107-109 were materially false and misleading when made because they failed to disclose that the markets and jurisdictions in which SBTech operated included numerous black markets for gambling in Asia. Defendants knew, or recklessly disregarded, these undisclosed facts.

111.    On April 15, 2020, DraftKings filed its 2020 Proxy Statement with the SEC (April 2020 Proxy Statement, defined above). The April 2020 Proxy Statement was signed by Defendants

---

[27]    Substantially similar statements are repeated in the Form S-4/A filed on February 13, 2020.

Robins, Meckenzie, Sagansky, and Baker.  The April 2020 Proxy Statement disclosed the following

risk factors concerning SBTech's international B2B model, stating, in pertinent part, as follows:

> ***SBT's business includes a B2B business model, primarily in international jurisdictions, which business depends on the underlying financial performance of its direct operators and its resellers.  As a material part of SBT's revenue is currently generated through resellers and direct sales to operators, a decline in such resellers' or direct operators' financial performance or a termination of some or all of the agreements with such resellers or operators could have a material adverse effect on SBT's or New DraftKings' business***.

> SBT offers their services directly to operators in Europe and uses a reseller model in Asia.  SBT's financial performance depends on the underlying financial performance of its direct operators and its resellers.  ***In particular, SBT relies primarily on one reseller for its Asia revenue.  This reseller accounted for approximately 46% of SBT's revenue in the year ended December 31, 2019***.  An adverse decline in the underlying financial performance of key SBT operators or resellers, or a termination of some or all of the agreements with such resellers or operators, could have a material adverse effect on SBT's or New DraftKings' business.  (First emphasis in original).[28]

    112.    The statements above in ¶111 were materially false and misleading when made

because they failed to: (i) disclose that the Asian markets in which the unnamed reseller operated

were black markets for gambling; and (ii) identify that the unnamed reseller was BTi/CoreTech and

disclose that BTi/CoreTech was affiliated with SBTech at that time.  Defendants knew, or recklessly

disregarded, these undisclosed facts.

    113.    The April 2020 Proxy Statement stated, in pertinent part, as follows:

### Revenue

> SBTech generates revenue by offering its services and software to customers throughout Europe, Asia and the United States. SBTech's services are delivered through its proprietary platform for sports betting and casino gaming, as well as for certain customers trading and risk management and complementary services to support reporting, customer management and regulatory reporting requirements.

---

[28]   These statements are repeated in the Prospectus dated April 23, 2020.

In 2019, SBTech generated approximately 46% of its revenue under contracts with direct customers. In 2019, approximately 37% and 63% of SBTech's revenue was derived from customers in Europe and *other regions (primarily Asia).*

114.    The April 2020 Proxy Statement further stated, in pertinent part, as follows:

Net cash provided by operating activities in 2018 increased by €12.6 million, or 69.4%, to €30.9 million from €18.3 million in 2017, due to SBTech's higher operating profit, driven by organic customer growth in Europe *as well as the addition of new customers in Asia*, as discussed above, net of non-cash costs.

115.    In the April 2020 Proxy Statement, Defendants discussed the source of SBTech's revenue, making statements similar to those described in ¶¶108-109.  Those statements were materially false and misleading when made for the reasons explained in ¶110.

116.    The April 2020 Proxy Statement also included materially false and misleading statements concerning corrupt practices identical to those quoted above in ¶103.  Those statements were false and misleading for the reasons explained in ¶104.

117.    On or about April 15, 2020, DraftKings filed a Form S-1 Registration Statement (the "April Registration Statement") with the SEC, and on or about April 27, 2020, the Prospectus, which forms part of the Registration Statement, was filed on Form 424B3 with the SEC (the "April 27, 2020 Prospectus").  The April Registration Statement was signed by Defendants Saganksy and Baker.  In the April 27, 2020 Prospectus, Defendants discussed numerous arrangements between DraftKings, SBTech, and foreign lotteries, as well as other business SBTech had obtained in foreign jurisdictions.  Defendants also made certain statements in the April 27, 2020 Prospectus concerning countries in which SBTech operated, stating, in pertinent part, as follows:

SBTech has obtained licenses (and approval, as applicable) in six states in the United States and in the United Kingdom, Gibraltar, Malta and Romania. Additionally, SBTech has certified its software in Denmark, Italy, Nigeria, Portugal and Spain, and its platform and sportsbook are available in Azerbaijan, Belgium, Cyprus, Czech Republic, Greece, Mexico, Poland and Sweden under local licenses held by operators using SBTech's platform in these jurisdictions.

118.    The statements above in ¶117 were materially false and misleading when made because the markets and jurisdictions in which SBTech operated included numerous markets and jurisdictions in which gambling was illegal.  Defendants knew, or recklessly disregarded, these undisclosed facts.

119.    On or about May 6, 2020, DraftKings filed a Form S-1 Registration Statement (the "May Registration Statement") with the SEC, and on or about May 13, 2020, the Prospectus, which forms part of the Registration Statement, was filed on Form 424B3 with the SEC (the "May 13, 2020 Prospectus").  The May Registration Statement was signed by Defendants Robins, Park, and Meckenzie.  The May 13, 2020 Prospectus contained substantially similar statements as those included in the April 27, 2020 Prospectus, referenced in ¶117.  Those statements were materially false and misleading when made for the reasons explained in ¶118.

120.    On May 15, 2020, DraftKings issued a press release announcing the Company's Q1 2020 results.  The press release stated, in pertinent part:

> Through its recent business combination, DraftKings has created the only vertically integrated sports betting company based in the United States.
>
> "We are uniquely positioned at the intersection of digital sports entertainment and gaming in a rapidly growing industry," said Jason Robins, DraftKings co-founder, CEO and Chairman of the Board. "DraftKings recorded standalone Q1 year-over-year revenue growth of 30% despite the effects of COVID-19. Additionally, the engagement we continue to see from our customers validates the connection they have with our content, their passion for our products and most importantly their loyalty to our brand."

121.    That same day, DraftKings hosted an earnings call with investors and analysts to discuss the Company's Q1 2020 results (the "Q1 2020 Earnings Call").  During the scripted portion of the Q1 2020 Earnings Call, Robins stated, in relevant part, "[t]hrough the acquisition of SBTech, we have created the only vertically integrated sports betting company in the U.S., enabling us to be

the product innovation leader for American sports, with a clear focus on the American sports fan."

Also during the scripted portion of the Q1 2020 Earnings Call, Park stated, in pertinent part:

> Starting with Old DraftKings, despite COVID, we generated $89 million of net revenue in the quarter, which was an increase of 30% versus prior year. Notably pre-COVID prior to March 11, our revenue was up 60% versus prior year. These results are due to our strategy of launching new states as well as growing revenues in existing states. In this quarter, we were live in five new states for online sports betting, versus the first quarter of 2019; Indiana, Iowa, New Hampshire, Pennsylvania, and West Virginia.

>                         *     *     *

> Now turning to SBTech. Old SBTech revenue generated EUR22.6 million, an increase of 3% versus Q1 2019. Notably, pre-COVID, prior to March 11, our revenue was up 19% versus prior year.

> Adjusted EBITDA was negative EUR851,000 versus prior year of positive EUR4.3 million. SBTech was well on track to achieve positive EBITDA for the quarter until COVID hit, and we anticipate to return a profitability once major sports resume.

122.    On or about June 16, 2020, DraftKings filed a Form S-1 Registration Statement (the "June Registration Statement") with the SEC, and on or about June 22, 2020, the Prospectus, which forms part of the Registration Statement, was filed on Form 424B4 with the SEC (the "June 22, 2020 Prospectus").    The June Registration Statement was signed by Defendants Robins, Park, and Meckenzie.    The June 22, 2020 Prospectus contained substantially similar statements as those included in the April 27, 2020 Prospectus, referenced in ¶117.    Those statements were materially false and misleading when made for the reasons explained in ¶118.

123.    On August 14, 2020, DraftKings issued a press release entitled, "DraftKings Reports Strong Q2 Revenue Despite Limited Sports Calendar."    The press release stated, in pertinent part:

> DraftKings [. . .] today reported financial results for the second quarter of 2020. For the three months ended June 30, 2020, DraftKings reported GAAP revenue of $71 million compared to $57 million during the same period in 2019. On a pro forma basis, including the effect of the Company's business combination with SBTech (Global) Limited and Diamond Eagle Acquisition Corp. as if it had been completed on January 1, 2019, revenue would have been $75 million in the second quarter of 2020, compared to $83 million during the same period in 2019. DraftKings ended the

second quarter of 2020 with over $1.2 billion in cash and no debt on its balance sheet.

124.    That same day, DraftKings hosted an earnings call with investors and analysts to discuss the Company's Q2 2020 results (the "Q2 2020 Earnings Call"). During the scripted portion of the Q2 2020 Earnings Call, Robins stated, in pertinent part:

> We had a strong second quarter given the limited sports calendar with second quarter pro forma revenue of $75 million. As sports have started to return, we saw revenue improve sequentially each month in the quarter, with June revenue increasing 20% year-over-year on a pro forma basis. The strong overall results and improvement are due to our product innovation, our entry into new jurisdictions, and pent-up demand for sports betting as Live Sports like Golf, European Soccer, NASCAR and UFC started to return.

125.    On or about October 5, 2020, DraftKings filed a Form S-1 Registration Statement (the "October Registration Statement") with the SEC, and on or about October 8, 2020, the Prospectus, which forms part of the Registration Statement, was filed on Form 424B4 with the SEC (the "October 8, 2020 Prospectus"). The October Registration Statement was signed by Defendants Robins, Park, and Meckenzie. The October 8, 2020 Prospectus contained the following statements:

> ***Market Access and Compliance Platform***.   We have developed technology, product offerings and partnerships to create a sustainable advantage in the gaming and DFS industries.   Strategic multi-year arrangements with lotteries, governments and casinos enable us to offer our products to end users.

> Additionally, we have obtained licenses in nine states, where it is required, in the United States, and internationally in the United Kingdom, Australia and Malta, to operate our DFS platform. We are also a registered DFS operator in four additional U.S. states where registration versus licensing is required to operate.

> ***Our B2B business, formerly SBTech, has obtained licenses (and approval, as applicable) in six states in the United States and in the United Kingdom, Gibraltar, Malta and Romania. Additionally, our B2B business has certified its software in various territories, including in Denmark, Italy, Nigeria, Portugal, South Africa and Spain, and its services are available in Azerbaijan, Belgium, Cyprus, Czech Republic, Greece, Mexico, Poland and Spain under local licenses held by operators using SBTech's platform in these jurisdictions***.[29]

---

[29]   The Prospectus dated June 22, 2020 contains substantially similar statements.

126.    The statements above in ¶125 were materially false and misleading when made because they failed to disclose that the markets and jurisdictions in which SBTech operated included numerous black markets for gambling in Asia.  Defendants knew, or recklessly disregarded, these undisclosed facts.

127.    On November 13, 2020, DraftKings issued a press release reporting the Company's Q3 2020 results.  The press release stated, in pertinent part:

> DraftKings [. . .] today reported its financial results for the third quarter of 2020. For the three months ended September 30, 2020, DraftKings reported revenue of $133 million, an increase of 98% compared to $67 million during the same period in 2019. After giving pro forma effect to the business combination with SBTech (Global) Limited and Diamond Eagle Acquisition Corp., as if it had occurred on January 1, 2019, revenue grew 42% compared to the three months ended September 30, 2019.

128.    That same day, DraftKings hosted an earnings call with investors and analysts to discuss the Company's Q3 2020 results (the "Q3 2020 Earnings Call").  During the scripted portion of the Q3 2020 Earnings Call, Robins stated, in pertinent part:

> DraftKings had a very productive third quarter on a number of different fronts. First, our Q3 performance confirms what we foreshadowed on our previous earnings call. The return of major sports has generated tremendous customer engagement. Third quarter revenue of $133 million was at the high end of the range we outlined in our recent S-1 and grew 42% year-over-year. In Q3, we also had more than 1 million monthly unique payers, which means the average for the month of July, August and September was greater than 1 million.

> *       *       *

> We continue to be very excited with the products and technology investments we are making as well as with our progress on the technology migration and business integration of SBTech.

> *       *       *

> As a reminder, with the acquisition of SBTech, we now have almost 1,100 engineers worldwide dedicated to creating best-in-class technology and games and experiences for our users.

129.    On February 26, 2021, DraftKings filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2020 (2020 10-K, defined above).  The 2020 10-K was signed by Defendants Robins, Park, and Meckenzie.  The 2020 10-K explained that SBTech's revenue derived mainly from one unnamed reseller in the following statement:

> SBT historically offered its services directly to operators in Europe and through a reseller model in Asia.  SBT's historical financial performance depended on the underlying financial performance of its direct operators and its resellers.  For example, ***SBT relied primarily on one reseller for approximately 52% of SBT's revenue in the year ended December 31, 2020*** (excludes SBT activity that occurred prior to the Business Combination on April 23, 2020).  An adverse decline in the underlying financial performance of key SBT operators or resellers, or a termination of some or all of the agreements with such resellers or operators, could have a material adverse effect on our business.

130.    The statements above in ¶129 were materially false and misleading when made because they failed to: (i) disclose that certain markets in which the unnamed reseller operated were black markets for gambling; and (ii) identify that the unnamed reseller was BTi/CoreTech and disclose that BTi/CoreTech was affiliated with SBTech at that time.  Defendants knew, or recklessly disregarded, these undisclosed facts.

131.    In the 2020 10-K, Defendants discussed numerous arrangements between DraftKings, SBTech, and foreign lotteries, as well as other business SBTech had obtained in foreign jurisdictions.  Defendants also made certain statements in the 2020 10-K concerning countries in which SBTech operated, stating, in pertinent part, as follows:

> Our B2B business, formerly SBTech, has obtained licenses (and approvals, as applicable) in six states in the United States and in the United Kingdom, Gibraltar, Malta and Romania. Additionally, our B2B business has certified its software in various territories, including in Denmark, Italy, Nigeria, Portugal, South Africa, Spain and Sweden, and its services are available in Azerbaijan, Belgium, Cyprus, Czech Republic, Greece, Mexico and Spain under local licenses held by operators using SBTech's products and services in these jurisdictions.

132.    The statements above in ¶131 were materially false and misleading when made because they failed to disclose that the markets and jurisdictions in which SBTech operated included numerous black markets for gambling in Asia.  Defendants knew, or recklessly disregarded, these undisclosed facts.[30]

133.    Appended to the 2020 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Robins and Park, attesting that "[t]he information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

134.    Corresponding with the 2020 10-K, on February 26, 2021, DraftKings issued a press release announcing the Company's fourth quarter and full year 2020 results.  The press release stated, in pertinent part:

> For the three months ended December 31, 2020, DraftKings reported revenue of $322 million, an increase of 146% compared to $131 million during the same period in 2019. After giving pro forma effect to the business combination with SBTech (Global) Limited ("SBTech") and Diamond Eagle Acquisition Corp. which was completed on April 23, 2020, as if it had occurred on January 1, 2019, revenue grew 98% compared to the three months ended December 31, 2019.

> "With a favorable fourth quarter sports calendar and strong marketing execution, DraftKings was able to generate tremendous customer acquisition and engagement that propelled us to $322 million in fourth quarter revenue, a 98% year over year increase," said Jason Robins, DraftKings' co-founder, CEO and Chairman of the Board. "In the fourth quarter of 2020, we saw MUPs increase 44% to 1.5 million and ARPMUP increase 55% to $65.  We are raising our revenue outlook for 2021 due to our expectation for continued growth, the outperformance of our core business and newly launched states that were not included in our previous guidance."

135.    That same day, DraftKings hosted an earnings call with investors and analysts to discuss the Company's Q4 2020 results (the "Q4 2020 Earnings Call").  During the scripted portion of the Q4 2020 Earnings Call, Robins stated, in pertinent part:

---

[30]  The 2020 10-K/A, which amended the 2020 10-K, included substantially similar misstatements as in the 2020 10-K.

Our list of accomplishments in 2020 is impressive. We completed the business combination with SBTech and became a publicly traded company in April. We are well on our way to completing the integration of the 2 companies from a team organization and business standpoint, and are progressing with the migration to our own in-house sports betting engine, which we expect will be complete by the end of the third quarter in 2021.

*       *       *

We exceeded our expectations for 2020. Pro forma revenue grew nearly 50% to $644 million versus $432 million last year. Both MUPs and ARPMUP grew 29% in 2020. We had a strong close to the year with Q4 revenue growing almost 100% year-over-year, and MUPs and ARPMUPS growing 44% and 55%, respectively, in the quarter.

Revenue for the year was almost $95 million higher than the midpoint of our guidance. These results were due to over-performance in our core business as well as multiple assumptions on external factors that broke our way, such as the sports calendar, the extension of mobile registration in Illinois and better-than-expected whole percentage in online Sportsbook.

136.    Also on February 26, 2021, DraftKings filed a Post-Effective Amendment for Registration Statement (February 26, 2021 POS AM, defined above). The February 26, 2021 POS AM was signed by Defendants Robins, Park, and Meckenzie. In the February 26, 2021 POS AM, Defendants discussed the source of SBTech's revenue, stating, in pertinent part, as follows:

> ***Our business now includes a B2B business model, primarily in international jurisdictions, which business depends on the underlying financial performance of our direct operators and its resellers. As a material part of SBT's revenue has been generated through resellers and direct sales to operators, a decline in such resellers' or direct operators' financial performance or a termination of some or all of the agreements with such resellers or operators could have a material adverse effect on our business.***
>
> SBT historically offered its services directly to operators in Europe and through a reseller model in Asia. SBT's historical financial performance depended on the underlying financial performance of its direct operators and its resellers. For example, ***SBT relied primarily on one reseller for approximately 52% of SBT's revenue in the year ended December 31, 2020*** (excluding SBT activity that occurred prior to the Business Combination). An adverse decline in the underlying financial performance of key SBT operators or resellers, or a termination of some or all of the agreements with such resellers or operators, could have a material adverse effect on our business.
>
> *       *       *

### Revenue

SBTech generates revenue by offering its services and software to customers throughout Europe, Asia and the United States. SBTech's services are delivered through its proprietary platform for sports betting and casino gaming, as well as for certain customers trading and risk management and complementary services to support reporting, customer management and regulatory reporting requirements. SBTech's direct customer contracts entitle it to earn a percentage of a customer's monthly net gaming revenue as defined under customer contracts, generated on SBTech's platform. In contrast, SBTech's reseller arrangements typically provide for a base fixed fee plus a fixed monthly fee determined based on the number of operators with which the reseller contracts to access SBTech's software.

SBTech records revenue net of value added tax and discounts. SBTech's key revenue drivers include the number of customers that it serves, amount of revenue generated by direct customers and geographic expansion (particularly into U.S. jurisdictions). In 2019, SBTech generated approximately 46% of its revenue under contracts with direct customers. *In 2019, approximately 37% and 63% of SBTech's revenue was derived from customers in Europe and other regions (primarily Asia). In comparison, the revenue split for the respective regions was approximately 34% and 66% in fiscal year 2018 and 48% and 52% in fiscal year 2017.* Following the dot.com exit decision and entry into the United States, SBTech's management expects U.S.- and European-source revenue to continue growing relative to other regions.

137. The statements above in ¶136 were materially false and misleading when made because they failed to disclose that the markets and jurisdictions in which SBTech operated included numerous black markets for gambling in Asia. Defendants knew, or recklessly disregarded, these undisclosed facts.

138. On or about March 5, 2021, the Prospectus, which forms part of the May Registration Statement (defined above), was filed on Form 424B3 with the SEC (the "March 5, 2021 Prospectus"). The May Registration Statement was signed by Defendants Robins, Park, and Meckenzie. The March 5, 2021 Prospectus explained that SBTech's revenue derived mainly from one unnamed reseller in the following statement:

*Our business now includes a B2B business model, primarily in international jurisdictions, which business depends on the underlying financial performance of our direct operators and its resellers. As a material part of SBT's revenue has been generated through resellers and direct sales to operators, a decline in such*

*resellers' or direct operators' financial performance or a termination of some or all of the agreements with such resellers or operators could have a material adverse effect on our business.*

SBT historically offered its services directly to operators in Europe and through a reseller model in Asia. SBT's historical financial performance depended on the underlying financial performance of its direct operators and its resellers. For example, ***SBT relied primarily on one reseller for approximately 52% of SBT's revenue in the year ended December 31, 2020*** (excluding SBT activity that occurred prior to the Business Combination). An adverse decline in the underlying financial performance of key SBT operators or resellers, or a termination of some or all of the agreements with such resellers or operators, could have a material adverse effect on our business. (First emphasis in original).

139. The statements above in ¶138 were materially false and misleading when made because they failed to: (i) disclose that certain markets in which the unnamed reseller operated were black markets for gambling; and (ii) identify that the unnamed reseller was BTi/CoreTech and disclose that BTi/CoreTech was affiliated with SBTech at that time. Defendants knew, or recklessly disregarded, these undisclosed facts.

140. On May 7, 2021, DraftKings issued a press release announcing the Company's Q1 2021 results. The press release stated, in pertinent part:

For the three months ended March 31, 2021, DraftKings reported revenue of $312 million, an increase of 253% compared to $89 million during the same period in 2020. After giving pro forma effect to the business combination with SBTech (Global) Limited ("SBTech") and Diamond Eagle Acquisition Corp. which was completed on April 23, 2020, as if it had occurred on January 1, 2019, revenue grew 175% compared to the three months ended March 31, 2020.

\*        \*        \*

Jason Park, DraftKings' Chief Financial Officer, added, "Our $312 million in first quarter revenue, 114% increase in MUPs and 48% growth in ARPMUP reflect solid customer acquisition and retention as well as successful launches of mobile sports betting and iGaming in new states. We are raising our revenue outlook for 2021 due to the outperformance of our core business in the first quarter and our expectation for continued healthy growth."

141. That same day, DraftKings hosted an earnings call with investors and analysts to discuss the Company's Q1 2021 results (the "Q1 2021 Earnings Call"). During the scripted portion of the Q1 2021 Earnings Call, Robins stated, in pertinent part:

> DraftKings is off to an outstanding start in 2021. Revenue for the first quarter increased 175% year-over-year to $312 million on a pro forma basis. MUPs grew 114% and ARPMUP grew 48%. These results reflect continued over performance of our core business due to strong customer acquisition and retention as well as the successful launches of mobile sports betting and iGaming in Michigan and mobile sports betting in Virginia.

142. In addition to the reasons explained above, the statements referenced in ¶¶100-141 were materially false and misleading when made because they failed to disclose the following material, adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by Defendants: (i) SBTech has a long and ongoing record of operating in black markets where online gambling is illegal; (ii) SBTech's attempts to distance itself from such illicit operations were illusory, as SBTech continued to transact with a "front" entity and other resellers operating in black markets; (iii) DraftKings' merger with SBTech exposed the Company to dealings in black market gambling; (iv) the Company's revenues were derived, in part, from operations in black markets and thus unsustainable; and (v) the foregoing increased the Company's regulatory and criminal risks with respect to these transactions.

## THE TRUTH BEGINS TO EMERGE

143. On June 15, 2021, Hindenburg published its Report alleging that the Company's merger with SBTech exposed DraftKings to dealings in black-market gambling. Following publication of the Hindenburg Report, DraftKings' stock price fell $2.11 per share, or 4.17%, to close at $48.51 per share on June 15, 2021.

144. On the same day, DraftKings issued a response to the Hindenburg Report to *Yahoo Finance*, stating:

> This report is written by someone who is short on DraftKings stock with an incentive to drive down the share price. Our business combination with SBTech was completed in 2020. **_We conducted a thorough review of their business practices and we were comfortable with the findings_**. We do not comment on speculation or allegations made by former SBTech employees.

145. DraftKings' response is telling and implies that the Report is true. Rich Duprey of

*The Motley Fool* wrote that the Company's response raises more questions than answers, stating in

pertinent part as follows:

> The allegations should not be taken lightly. While part of Hindenburg Research's thesis is that DraftKings' stock is overvalued, its allegations center around the three-way merger of DraftKings, SBTech -- a primarily Europe-based online gaming and sports betting platform -- and Diamond Eagle Acquisition, the SPAC that took the sportsbook public.

> Hindenburg charges that SBTech is deeply involved in illegal gambling activities around the world, according to former employees it spoke with, and that as much as half of SBTech's revenue comes from black-market operations. Arguably more problematic is SBTech allegedly also does business in Iran, a country in which companies are banned from operating due to the government being a state sponsor of global terrorism.

> DraftKings issued a statement saying: "This report is written by someone who is short on DraftKings stock with an incentive to drive down the share price. Our business combination with SBTech was completed in 2020. **_We conducted a thorough review of their business practices and we were comfortable with the findings_**."

> **_It's those last words that investors need to parse. Rather than a definitive denial that Hindenburg's report is true, it instead hints that DraftKings management investigated those "business practices" and doesn't believe they will materially impact its operations. That's hardly a stinging rebuke_**.

> *                *                *

> To be honest, I'd have preferred DraftKings issue a blanket denial of the allegations. **_I think the nuanced response leaves room for believing the veracity of what Hindenburg said could actually withstand scrutiny_**.

*Are the Short-Sellers Right About DraftKings?*, The Motley Fool/Nasdaq.com, June 22, 2021 (https://www.fool.com/investing/2021/06/22/should-draftkings-investors-worry-about-this-short/).

146.    On August 6, 2021, DraftKings disclosed that, on July 9, 2021, it received a subpoena from the SEC seeking documents concerning certain of the allegations raised in the Hindenburg Report.

147.    On or about November 27, 2021, Alvin Chau, a Chinese billionaire who is accused of facilitating online gambling with mainland China "where all gambling is illegal," was arrested by Chinese authorities.  On December 1, 2021, Heather Fletcher of Online Poker Report reported on Chau's arrest and his ties to SBTech, as follows:

> News emerged on Monday of Alvin Chau's arrest.  ***The Chinese billionaire is accused of facilitating online gambling within mainland China, where all gambling is illegal***.
>
> Prior to the current scandal, Chau was mainly known as a junket operator.  These junkets ferry the wealthy from mainland China to retail casinos in Macau, where they can gamble legally.
>
> ***Chau was also the CEO and chairman of Suncity Group Holdings Limited*** and Summit Ascent Holdings Limited.  He stepped down from both positions following his arrest.  Meanwhile, ***gambling insiders surfaced a 2014 press release showing SBTech entering a "multi-year deal with TGP Europe."***
>
> ***TGP Europe is a subsidiary of Suncity***.
>
> The 2014 press release says:
>
>> "*TGP Europe is owned by TGP Holding's part of the Sun City Group, the largest provider of live dealer casinos in Asia, making the deal a significant step in SBTech's progression into the European and Asian markets.*"
>
> Suncity describes itself as developing and operating "integrated resorts across Asia, including the Russia Federation, the Philippines, Vietnam and Japan, etc.  The Group also operates in the travel segment and the mall operation segment."
>
> ***As of today, the TGP Europe site still advertises the use of SBTech's platform to power its sports betting products***.
>
> According to the press release, SBTech provides TGP Europe with "a turnkey sports betting solution for the company's white label operation, including leading UK bookmaker JenningsBet."

Depending on how the story plays out, the link between SBTech and Suncity may not be helpful for DraftKings as it defends against the newly-combined class action.[31]

148.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of DraftKings' securities, Plaintiff and other Class members have suffered significant losses and damages.

## SBTECH OPERATED IN BLACK MARKETS FOR GAMBLING

149.    Numerous countries in which SBTech, through BTi/CoreTech, operated are considered black markets for gambling, as explained herein.

### Iran

150.    Gambling is illegal in Iran and has been since its formation in 1979.  According to Article 705 of the Islamic Penal Code of the Islamic Republic of Iran, Book Five, gambling by any means is forbidden and the offenders shall be sentenced to one to six months' imprisonment or up to 74 lashes; and if they commit gambling publically, they shall be sentenced to both the punishments. *See Islamic Penal Code of the Islamic Republic of Iran – Book Five*, IRAN HUMAN RIGHTS DOCUMENTATION CENTER (July 15, 2013), https://iranhrdc.org/islamic-penal-code-of-the-islamic-republic-of-iran-book-five/.  Iran is also a country that is subject to the sanctions program of the United States administered by OFAC.  *See Iran Sanctions*, *supra* at ¶54.

151.    Iran enforces its anti-gambling laws against online gaming and actively informs other countries of its policies.  In fact, in 2019, Iran blocked 61 online betting sites in two months; "[a]s per the Iranian law, designing, launching, and running betting websites are forbidden as they are

---

[31]   Heather Fletcher, *Arrested Chinese Gambling Junket Operator's Business Has An SBTech/DraftKings Connection*, ONLINE POKER REPORT (Dec. 1, 2021), https://www.onlinepokerreport.com/57252/suncity-scandal-sbtech-connection/.

considered as examples of gambling."[32]  In addition, Turkey extradited an Iranian social media influencer accused by Tehran of money-laundering and fraud in connection with online gambling.[33]

152.    As part of Iran's crackdown of online gambling, the Central Bank of Iran cut the amount of online bets and gambling transactions by 60% in the past two years.[34]  The Central Bank of Iran implemented "tougher controls and checks on online payments networks since 2019," including screening and blocking payments linked to gambling.  *Id.*

153.    Moreover, although Iran has always taken its prohibition on gambling seriously, the Iranian Parliament has been considering a new bill pursuant to Articles 705-711 of the Fifth Book of the Islamic Punishment Law which covers betting in cyberspace; under this bill, "online gambling and betting may soon be punishable by death sentence[.]"[35]  If adopted, this bill puts gambling in the same category as treason, homosexuality, and prostitution, all of which are punishable by death.  *Id.* Accordingly, Iran is a black market for gambling.

## China

154.    According to gamblingsites.org, Mainland China is strictly anti-gambling:

Mainland China is strictly anti-gambling.  Both online and offline wagering are illegal with both punishable by fines and imprisonment.  This goes for both operators

---

[32]  *61 online betting sites blocked in 2 months*, TEHRAN TIMES (Oct. 13, 2019), https://www.tehrantimes.com/news/441096/61-online-betting-sites-blocked-in-2-months.

[33]  *Turkey extradites Iranian social media influencer accused of fraud*, AHVAL NEWS (Mar. 9, 2021), https://ahvalnews.com/extradition/turkey-extradites-iranian-social-media-influencer-accused-fraud.

[34]  *See* Dominic Dudley, *Iran Struggles To Clamp Down On Illegal Online Gambling*, FORBES (Sept. 23, 2021), https://www.forbes.com/sites/dominicdudley/2021/09/23/iran-struggles-to-clamp-down-on-illegal-online-gambling/?sh=7a22c66adf9e.

[35]  *See* Jerome García, *Online Gambling May Be Punishable by Death Sentence in Iran*, GAMBLING NEWS (Dec. 29, 2020), https://www.gamblingnews.com/news/online-gambling-may-be-punishable-by-death-sentence-in-iran.

and patrons.  The country even attempts to block citizens' access to online casinos via the Great Firewall of China.

*China Online Gambling Law*, GAMBLINGSITES.ORG, https://www.gamblingsites.org/laws/china/ (last visited Apr. 5, 2022).

155.    Morgan Lewis Stamford LLC, a Singapore law firm corporation affiliated with U.S. law firm Morgan, Lewis & Bockius LLP, published "Gaming in China: Overview" on July 1, 2020. According to the Morgan Lewis guide, online gambling in China has been under strict scrutiny for years, "and the overall trend of regulation is likely to be less friendly to online gambling businesses":

> Online gambling has been under strict scrutiny in China over the years.  The authorities have issued multiple policies to regulate the market.  For example, Announcement No 105 provides that unauthorised online lottery distributions are resolutely prohibited, any illegal online lottery sales by any entity or individual shall be seriously punished. . . .
>
> The attitude of Chinese authorities towards online gambling is changing and the overall trend of regulation is likely to be less friendly to online gambling businesses.

Yap Wai-Ming and Cindy Pan, *Gambling in China: Overview*, THOMSON REUTERS PRACTICAL LAW (July 1, 2020), https://uk.practicallaw.thomsonreuters.com/5-635-9387?transitionType= Default&contextData=(sc.Default)&firstPage=true.

156.    Gambling in China is regulated by Article 303 of the Criminal Law of the People's Republic of China and the Sixth Amendment to the Criminal Law.  *Id*.  Examples of activities prohibited under Article 303 include a person who "establishes online gambling websites" or "acts as a conduit for online gambling websites, and accepts bets on behalf of online gambling websites." *Id*.  All gambling sites are illegal in China, with the exception of sites for the Welfare Lottery or the Sports Lottery.  *Id*.

157.    "Gambling activities (including online betting) are illegal in China."[36]  The Gambling Ordinance of 2002 is the specific legislation that regulates online sports betting.  *Id*.  Online

---

[36]    Muralee Das, *Fantasy sports and gambling regulation in the Asia-Pacific*, SPRINGERLINK (Aug. 21, 2021), https://link.springer.com/article/10.1007/s40318-021-00198-8.

gambling is prohibited in mainland China, as well as Hong Kong and Macau. *Id.* "Beijing views betting as a vice that fuels social unrest, and Chinese law prohibits gambling on the mainland – including online." K Oanh Ha, Jinshan Hong, and Andreo Calonzo, *The $24 Billion Online Casino Boom China Is Struggling to Halt*, BLOOMBERG (Sept. 11, 2019), https://www.bloomberg.com/news/articles/2019-09-11/the-24-billion-online-casino-boom-china-is-struggling-to-halt. People in China, however, have found ways to evade the illegality of online betting by placing bets through online gambling platforms registered oversees. *Id.*

158.    The Chinese government vigorously implements new ways to stop illegal online gambling, including enlisting help from financial groups:

> Many [online gambling] platforms also allow gamblers to use popular online payment systems from Tencent Holdings Ltd. and billionaire Jack Ma's Ant Financial Services Group. ***The payment systems have been willing to talk about how they're helping the government's effort to curb online gambling***. In recent weeks, some virtual operators have warned gamblers that Tencent's WeChat app and Ant Financial's Alipay have tightened controls. ***In a statement, Tencent said it takes measures to help identify transactional risks and act against those attempting to use its system for illegal gambling. Ant Financial says it uses an AI-powered risk engine to intercept suspicious transactions and has zero tolerance for online gambling***. When a merchant is confirmed to be engaged in gambling, Alipay limits its ability to collect payment, stops working with it, and reports the case to police.

*Id.*

159.    The Chinese government has been cracking down on gambling since at least 2004, but dramatically stepped up its enforcement in 2019. That year, Chinese authorities launched a three-year campaign against online betting codenamed "Operation Chain Break." *See How China's Crackdown on Illegal Betting Impacts Global Betting Markets*, ASIAN RACING FEDERATION (Sept. 2021), https://assets-global.website-files.com/5fbe2bde2b2ef4841cd6639c/613077d94afe 115ac35264e3_How%20China%27s%20Crackdown%20on%20Illegal%20Betting%20Impacts%20 Global%20Betting%20Markets_v2.pdf. The impetus for the government crackdown is to prevent massive capital flight out of China:

The key reason for China's crackdown on illegal betting is fear over unregulated capital flight out of China, which is theorised to be harmful to the Chinese economy because it:

> 1) reduces China's government revenues primarily through erosion of its tax base;
>
> 2) reduces domestic market liquidity, which can cause the value of assets (such as real estate) to decline, potentially resulting in social instability;
>
> 3) puts downward pressure on the yuan which, in turn, undermines Beijing's ability to control yuan exchange rates; and
>
> 4) downward pressure on the yuan in turn incentivises domestic savers to move their currency into stronger foreign currencies, creating a vicious circle of a constantly devaluing yuan.

> ***Illegal betting is not the only way unregulated capital moves out of China, but it may represent a fifth or more of total outflows. This is based on the People's Bank of China's 2019 estimate that illegal-betting related outflows are in the order of CNY 1 trillion (USD 154 billion). That would have represented 21% of China's record capital outflows, of USD 725 billion in 2016.***

> To illustrate the impact of capital outflows, the above record outflows in 2016, and after the yuan was devalued, forced the People's Bank of China to spend USD 1 trillion, or 25% of its foreign exchange reserves, to stabilise the yuan. Chinese regulators also imposed strict capital controls and foreign investment rules and within a year, such outflows had been reversed. . . .

> As well as capital flight, other reasons for the crackdown on illegal betting include social harms such as issues related to gambling, fraud and the exploitation of illegal Chinese workers in offshore illegal betting hubs.

> ***Operation Chain Break is broader in scope compared to previous anti-illegal betting campaigns, targeting overseas entities and countries, and involves various government stakeholders including the Propaganda Department, the Cyberspace Affairs Committee, the People's Bank of China, the National Immigration Administration and the Ministries of Foreign Affairs, Security, Finance and Commerce, among others***.

*Id.*

160.    In 2019, Chinese law enforcement investigated more than 7,200 illegal betting cases and arrested more than 25,000 people.  In 2020, the respective figures were more than 17,000 cases and 110,000 arrests.  *Id.*  China arrested more than 11,500 people on suspicion of cross-border

gambling in a series of raids since February 2020.  *See* Conneller, *supra* at ¶84.  "In the first nine months of 2020, police cracked down on 1,700 online gambling platforms and 1,400 underground banks involving more than 1 trillion yuan ($153 billion) of illegal transactions, data from the Ministry of Public Security showed."  *See* Yuzhe & Jia, *supra* at ¶84.

161.    According to a December 12, 2021 editorial in the *South China Morning Post*:

> Gambling beyond government-sanctioned outlets is banned in China, whether on the mainland, in Hong Kong or the world's leading gaming centre, Macau.
>
> The reasons are concerns about underage betting, links to criminal activities and addiction[.]
>
> *    *    *
>
> Chinese laws were changed a year ago making it a crime to "set up or manage casinos overseas" and "organize or solicit" Chinese to go abroad to gamble.
>
> Chinese authorities are trying to create an anti-gambling atmosphere.  Records show 255,850 people accused on operating illegal casinos were charged from 2018 to the end of September, 63,298 being prosecuted in the first nine months of this year.
>
> *    *    *
>
> Beijing claims unlawful gamblers destabilise society and the economy, hurt China's image and are prone to involvement in serious crimes; it estimates 1 trillion yuan (US$157 billion) leaves the country every year because of overseas gambling.

*Online gambling will remain a problem that must be watched*, SOUTH CHINA MORNING POST (Dec. 12, 2021), https://www.scmp.com/comment/opinion/article/3159363/online-gambling-will-remain-problem-must-be-watched?utm_source=email&utm_medium=share_widget&utm_campaign=3159363.

162.    China has also notified foreign governments that it will not tolerate solicitation of its citizens for online gambling from outside China.  In 2019 and 2020, the Chinese government pressured the Philippines and Cambodia to stop taking online bets from players in China.[37]

---

[37]  *See, e.g.*, Julie Zaugg, *Philippines casinos catering to illicit Chinese gamblers are causing kidnappings and chaos in Manila*, CNN (June 15, 2020), https://www.cnn.com/2020/06/13/tech/philippines-online-casinos-intl-hnk/index.html;  Philip Conneller, *China Finally Loses It with Philippine Online Gaming Industry, Demands Punishment of Operators*, CASINO.ORG (Aug. 8, 2019), https://www.casino.org/news/china-finally-loses-it-with-

Discussing Cambodia's ban on online gambling, China's foreign ministry spokesman Geng Shuang said in 2019, "Online gambling is a most dangerous tumor in modern society detested by people all across the world.  It is a shared hope that this problem could be effectively dealt with."  *China urges Philippines to ban online gambling*, REUTERS (Aug. 21, 2019), https://www.reuters.com/article/us-philippines-china-gambling/china-urges-philippines-to-ban-online-gambling-idUSKCN1VB16P. The foreign ministry spokesman also stated that although China welcomed the Philippines' move to stop accepting applications for online gaming licenses, "[w]e hope the Philippines will go further and ban all online gambling." *Id.*  Indeed, Chinese President Xi Jinping raised the issue directly with Philippine President Rodrigo Duterte during a meeting in August 2019.[38]  Therefore, China is a black market for gambling.

### Vietnam

163.    According to gambling.com, online gambling is banned in Vietnam:

Despite historic antipathy, the Vietnamese government has even shown signs of warming towards the rather capitalist concept of gambling - it has now issued a number of licences to casinos across the country, although these are currently only accessible by foreign citizens. ***The country is still many years away from opening itself up to the concept of online gambling, though, with its citizens forced to rely on technology to access the wealth of foreign-based gambling sites***.

---

philippine-online-gaming-industry/; Alex Weldon, *China-Facing Online Gambling Sites Running Amok In The Philippines*, ONLINE POKER REPORT (Dec. 3, 2019), https://www.scmp.com/news/asia/southeast-asia/article/3023786/beijing-urges-philippines-ban-all-online-gambling-support; *China wants Philippines to stop all online gaming*, BANGKOK POST (Aug. 21, 2019), https://www.bangkokpost.com/world/1734291/china-wants-philippines-to-stop-all-online-gaming; Sharon Singleton, *China renews pressure on Cambodia to stamp out online gambling*, ASIA GAMING BRIEF (Sept. 13, 2021), https://agbrief.com/news/cambodia/13/09/2021/china-renews-pressure-on-cambodia-to-stamp-out-online-gambling/; *China bans citizens from gambling in Cambodia*, UCANEWS (Jan. 29, 2021), https://www.ucanews.com/news/china-bans-citizens-from-gambling-in-cambodia/91190.

[38]    *See* Weldon, *supra* n.37.

**The Legal Landscape**

*Gambling is taken very seriously in Vietnam, with the practice almost entirely banned for Vietnamese citizens* - at present, only foreign tourists can use the country's opulent casino resorts. The only exception to this is the state-run lottery, which is hugely popular throughout the country. *Those who are caught operating illicit gambling dens or online casinos often receive prison sentences of up to two years*, although sentences can stretch far beyond that if there are provable connections to loan sharks or organised crime. Those caught playing are often charged with a hefty fine, but this hasn't been enough to deter the nation's gambling enthusiasts, who still bet in their droves.

Not content with controlling gambling within its borders, the Vietnamese government has also incorporated the issue into its foreign policy, taking a hard line with its more carefree neighbours. The issue has been a problem for the already uneasy relationship between Vietnam and its neighbour Cambodia, whose border is lined with casinos. 3,600 Vietnamese are thought to cross into Cambodia every day with the sole intention of visiting these casinos.

*This totalitarian approach is also used in connection with online gambling*. The authorities blocked almost 200 foreign gambling sites in the run up to Euro 2012, with citizens forced to rely on VPNs to find the best odds on their favourite teams at sites that still welcome players from Vietnam, including Mr Green. Whilst the government's attitude is showing some signs of softening towards sports betting in physical bookmakers, it seems resolved to keep online gambling at bay for as long as it can.

*Online Gambling in Vietnam*, GAMBLING.COM, https://www.gambling.com/country-overviews/vietnam (last visited Apr. 5, 2022).

164.    In July 2019, police in Vietnam arrested over 380 Chinese nationals accused of operating illegal online gambling websites in Hai Phong.[39] During the raid, police uncovered about 2,000 phones, 533 laptops, cash, and ATMs all used for illegal gambling. *Id.* A police statement described the operation as follows: "This is a criminal organisation with a new and sophisticated method of operation, implemented on cyberspace, organised under the 'cover' of foreign investment enterprises in Vietnam." *Id.*

---

[39]    *Vietnam detains nearly 400 Chinese in online gambling bust*, ALJAZEERA (July 29, 2019), https://www.aljazeera.com/news/2019/7/29/vietnam-detains-nearly-400-chinese-in-online-gambling-bust.

165.    In May 2020, Vietnamese police busted a massive online card ring with revenues estimated at $2.6 billion, "the biggest ever bust of its kind in a country where most gambling is banned but remains rampant."  *See Vietnamese cops bust $2.6bn online gambling ring*, THE JAKARTA POST (May 29, 2020), https://www.thejakartapost.com/seasia/2020/05/29/vietnamese-cops-bust-26bn-online-gambling-ring-.html.

166.    Further, the Criminal Code of Vietnam expressly prohibits gambling:

Socialist Republic of Vietnam

Independence - Freedom - Happiness

---------------

No. 100/2015/QH13 Hanoi, November 27, 2015

CRIMINAL CODE

Article 321. Illegal gambling

1. Any person who illegally gambles in any shape or form with the stakes (in cash or kind) assessed at from VND 5,000,000 to under VND 50,000,000, or with the stakes under VND 5,000,000 but previously incurred a civil penalty or has a previous conviction for the same offence or any of the offences specified in Article 322 hereof which has not been expunged, shall face a penalty of up to 03 year's community sentence or 06 - 36 months' imprisonment.

2. This offence committed in any of the following cases shall carry a penalty of 03 - 07 years' imprisonment:

a) The offence is committed in a professional manner;

b) The stake is assessed at VND ≥ 50,000,000;

c) The offence is committed using the Internet, a computer network, telecommunications network, or electronic device;

d) Dangerous recidivism.

3. The offender might also be liable to a fine of from VND 10,000,000 to VND 50,000,000.

Article 322. Organizing gambling or running gambling-dens

1. Any person who organizes gambling or runs a gambling den in any of the following cases shall carry a fine of from VND 50,000,000 to VND 300,000,000 or a penalty of 01 - 05 years' imprisonment:

a) The offender uses a place under his/her ownership or management for ≥ 10 people to gamble at the same time or for ≥ 02 gambling mats with the stakes of ≥ VND 5,000,000;

b) The total value of stakes at a time is ≥ VND 20,000,000;

c) The offender provides pawnbroker services for gamblers; installs equipment serving the gambling; appoint people to guard or serve; prepares escape in case of raid; uses equipment for assisting the gambling;

d) The offender previously incurred a civil penalty or has a previous conviction for the same offence or any of the offences specified in Article 321 hereof which has not been expunged.

2. This offence committed in any of the following cases shall carry a penalty of 05 - 10 years' imprisonment:

a) The offence is committed in a professional manner;

b) The illegal profit earned is ≥ VND 50,000,000;

c) Dangerous recidivism.

3. The offender might also be liable to a fine of from VND 20,000,000 to VND 100,000,000 or have part or all of his/her property confiscated.

*Criminal Code*, NATIONAL ASSEMBLY, SOCIALIST REPUBLIC OF VIETNAM (Nov. 17, 2015), https://www.wipo.int/edocs/lexdocs/laws/en/vn/vn086en.pdf.

167.    Thus, Vietnam actively enforces its anti-gambling laws, and as a result, is a black market for gambling.  Vietnam does not fall under the definition of grey market expressed in the BCA because it carries out its laws against gambling.

### Indonesia

168.    In Indonesia, "the country's government has gone to great lengths to ban gambling in all its forms. . . . The implementation of strict Islamic law is another driving force behind the country's unusual gambling laws, with the vast majority of gambling strictly prohibited. . . . A recent

- 65 -

report revealed that the Communications and IT ministry would be looking at the issue from a technological standpoint, aiming to block Indonesian citizens from accessing online gambling websites altogether. . . . [O]nline gambling is definitively illegal in Indonesia[.]" *Online Gambling in Indonesia*, Gambling.com, https://www.gambling.com/country-overviews/indonesia (last visited Apr. 5, 2022); *Indonesian Government to Step Up Effort to Ban Online Gambling*, Yahoo! (July 11, 2012), https://news.yahoo.com/indonesian-government-step-effort-ban-081036397.html.

169.    In 2019, two Indonesian men were flogged with bamboo rods by police officers as a punishment for gambling. Under Islamic Sharia Law, gambling is strictly forbidden, and "more than 90 percent of Indonesia's 255 million population are believed to be Muslim."[40]  Accordingly, Indonesia enforces its laws against gambling, and therefore cannot be a grey market under the definition in the BCA. In fact, Indonesia is a black market.

### Malaysia

170.    "Some forms of gambling, such as lotteries, casino games and horse racing, are legal in Malaysia, whereas all forms of sports betting (at bookmakers) and online gambling are illegal."[41] Malaysia recognizes Islamic Sharia (or syariah) courts, and "[a]ll forms of gambling are forbidden under the Sharia law." *Id.*

171.    In the first eight months of 2018, Malaysian authorities arrested 22,300 people for gambling over the course of 12,449 raids. "The sweeps were conducted on illicit gambling dens and

---

[40]  Ed Silverstein, *Indonesian Men Flogged for Alleged Gambling as Crowd Snaps Photos*, Casino.org (Oct. 21, 2019), https://www.casino.org/news/indonesian-men-flogged-for-alleged-gambling-as-crowd-snaps-photos/.

[41] Balan Rathakrishnan and Sanju George, *Gambling in Malaysia: an overview*, Cambridge Core (Dec. 2, 2020), https://www.cambridge.org/core/journals/bjpsych-international/article/gambling-in-malaysia-an-overview/EE105ABC13FAA57A743EC766D2A3F179.

lottery syndicates." *See* Silverstein, *supra* n.40.  Clearly, Malaysia enforces its anti-gambling laws and is a black market pursuant to the BCA's own definition of a grey market.[42]

### Thailand

172.    Thailand has prohibited gambling since 1935 pursuant to the Gambling Act BE 2478 and there are no legal gambling operators in the country.  *See* Das, *supra* n.36.  "Thailand follows in the footsteps of other South-East Asian nations by maintaining a complete ban on the vast majority of gambling activities.  There are only two exceptions; the State Lottery, and horse-racing, which is the only form of sports betting available within the countries' [sic] borders."  *Online Gambling in Thailand*, GAMBLING.COM, https://www.gambling.com/country-overviews/thailand (last visited Apr. 5, 2022).  "What's more, the Thailand Civil and Commercial Code (section 853 and 855) makes it clear that any form of gambling debt, whether it be to a friend or a bookmaker, is not enforceable."  *Id*.

173.    Indeed, Thailand's gambling laws "remain among the strictest on earth."[43]  The Ministry of Information and Communication Technology in Thailand has been monitoring the use of online casinos by watching local internet activity and blocking IP addresses that visit online casinos.  *Id*.  Thus, Thailand is a black market for gambling.

---

[42]    *See* Cort Smith, *22,000 Malaysians Arrested for Illegal Gambling in 2018 in Predominantly Muslim Country*, CASINO.ORG (Sept. 15, 2018), https://www.casino.org/news/22000-malaysians-involved-in-illegal-gambling-in-2018-police-say/.

[43]    *See Why gambling is flourishing in Thailand despite a strict ban*, ASEAN TODAY (Nov. 6, 2019), https://www.aseantoday.com/2019/11/why-gambling-is-flourishing-in-thailand-despite-a-strict-ban/.

**DEFENDANTS FAILED TO DISCLOSE KNOWN UNCERTAINTIES AND SIGNIFICANT RISKS CONCERNING SBTECH'S BLACK MARKET OPERATIONS PURSUANT TO ITEMS 303 AND 105**

174.    Pursuant to Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), and the SEC's related interpretive releases thereto, an issuer is required to disclose known trends, uncertainties, or risks that have had, or are reasonably likely to have, a materially adverse impact on net sales or revenues, or income from continuing operations.  Such disclosure is required by an issuer in regulatory reports.

175.    The SEC issued an interpretive release on Item 303 on or about May 18, 1989, stating:

> Required disclosure is based on *currently known trends, events, and uncertainties that are reasonably expected to have material effects*, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> *        *        *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

176.    Item 303 required DraftKings' regulatory filings to describe "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   17 C.F.R. §229.303(a)(2)(ii).  Similarly, Item 303 required DraftKings' regulatory reports to disclose events that DraftKings knew would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected."  17 C.F.R. §229.303(a)(2)(i), (ii).

177.    DraftKings was required to disclose the impact and/or potential liabilities associated with the known uncertainties and risks associated with SBTech's operations in black markets for gambling.  As alleged herein, Defendants knew that SBTech was operating in black markets for gambling.

178.    In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), requires, in the "Risk Factors" section of DraftKings' Quarterly and Annual Reports, a discussion of the most significant factors that make an investment in the Company risky or speculative, and that each risk factor adequately describe the risk.  Because the omitted material facts alleged herein were not disclosed, Defendants violated Item 105.  Indeed, rather than disclosing the risks arising from SBTech's operations in black markets for gambling, the Quarterly and Annual Reports contained boilerplate risk disclosures that were themselves materially misleading.  Defendants' discussions of risk factors did not even mention, much less adequately describe, the risks posed by SBTech's undisclosed operations in black markets, nor the likely and consequent material adverse effects on the Company's results and prospects.

## ADDITIONAL SCIENTER ALLEGATIONS

179.    As alleged herein, Defendants acted with scienter in that they knew the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and in actions intended to manipulate the market price of DraftKings securities as primary violations of the securities laws.

180.    As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding DraftKings, their control over, and/or receipt or modification of, DraftKings' allegedly materially misleading misstatements, and/or their associations

with the Company that made them privy to confidential proprietary information concerning DraftKings, participated in the fraudulent scheme alleged herein. The adverse developments at issue also impacted the Company's most important revenue streams and directly involved the Company's most senior executives, including the Individual Defendants, as detailed herein.

181.    SBTech knew, or recklessly disregarded, that BTi/CoreTech was operating in black markets for gambling because SBTech admittedly undertook "appropriate due diligence" on its clients. In the BCA, SBT represented that it "and each of its Subsidiaries undertakes appropriate due diligence on each of its Clients, and requires each of its Clients to conduct appropriate due diligence on their operators, sub-licensees and customers (as applicable) who use the SBT Software."

182.    Further, SBTech told the Oregon State Lottery that it ensures that its distributors do not operate in illegal markets, stating, in pertinent part, as follows:

> In unregulated markets, SBTech only works with operators licensed and regulated by an established gambling regulator including Malta, UK, Isle of Man, Gibraltar and the Philippines. Where SBTech contracts with distributors, it requires the distributor to only contract with operators who are properly licensed where required, and to use appropriate on-boarding processes. SBTech requests and receives information about the operators with whom the distributor contracts and is entitled by contract to terminate its relationship with the distributor or require the distributor to terminate its relationship if it is determined that a market the distributor operates is illegal. For regulated markets, SBTech checks operator licenses at least annually.

183.    Old DraftKings conducted extensive due diligence on SBTech prior to the Business Combination. In June 2019, when Sloan, the founder of DEAC, contacted Robins about a possible business combination with DraftKings, Robins revealed that he was pursuing an acquisition of SBTech. According to the Proxy Statement, "Mr. Robins told Mr. Sloan that DraftKings and its financial advisors had already performed a significant amount of due diligence on SBT, including extensive discussions with Richard Carter, the Chief Executive Officer of SBT and other members of SBT's management, and had visited SBT's primary operations in Bulgaria." Moreover, Meckenzie was a Director of Old DraftKings at that time.

184.    Further, DEAC also conducted extensive due diligence on SBTech prior to the Business Combination. In the Proxy Statement, DEAC's Board of Directors explained its decision to approve the signing of the BCA and the transactions contemplated thereby, stating, in pertinent part, as follows:

> Before reaching its decision, our board of directors reviewed the results of management's due diligence, which included:
>
> - research on industry trends, revenue projections and other industry factors;
>
> - ***extensive meetings and calls with DraftKings' and SBT's management team*** and representatives regarding operations, company services, ***major customers***, financial prospects, the pipeline of potential new builds and possible acquisitions, among other customary due diligence matters;
>
> - personal visits to DraftKings' headquarters in Boston, MA;
>
> - ***personal visits to SBT group companies' offices in Europe and Israel and an operational center in Sofia, Bulgaria***.
>
> - ***review of DraftKings' and SBT's material business contracts and certain other legal and commercial diligence including discussions with the company's major customers***;
>
> - financial and accounting diligence; and
>
> - creation of an independent financial model in conjunction with management of DraftKings and SBT, which was generally consistent with the financial model prepared by each respective company.
>
> *        *        *
>
> Although DEAC's board of directors did not seek a third-party valuation, and did not receive any report, valuation or opinion from any third party in connection with the Business Combination, ***the board of directors relied on the following sources (i) due diligence on DraftKings' and SBT's business operations, (ii) channel checks with SBT's customer base***, (iii) extensive research reports and data related to the online and retail sports gaming industries in the United States and internationally and (iv) DEAC management's collective experience in public markets transactions in constructing and evaluating financial models/projections and conducting valuations of businesses. The $2.7 billion valuation is on a pre-money basis. The board of directors concluded that this is fair and reasonable, given the growth prospects, potential industry consolidation and other compelling aspects of the transaction.

- 71 -

185.    In addition, Defendants were motivated to engage in a fraudulent course of conduct in order to allow certain Company insiders to collectively sell more than 33 million shares of their personally held DraftKings stock during the Class Period for gross proceeds of approximately $1.5 billion.    The following chart reflects sales made by DraftKings' executive officers and directors:

| Filer Name | Transaction Date | Direct Indirect | Price | Shares Sold | Proceeds | % of Shares Sold | Net Profits |
|---|---|---|---|---|---|---|---|
| Dodge (Robert Stanton) | 06/23/2020 | D | $38.80 | 399,416 | $15,497,341 | | |
| *Chief Legal Officer* | 05/13/2021 | D | $41.36 | 19,553 | $808,712 | | |
| | 05/13/2021 | D | $42.50 | 8,766 | $372,555 | | |
| | 05/13/2021 | D | $43.31 | 13,704 | $593,520 | | |
| | 05/13/2021 | D | $40.67 | 8,565 | $348,339 | | |
| | 05/26/2021 | D | $49.61 | 13,304 | $660,011 | | |
| | 05/26/2021 | D | $49.12 | 37,284 | $1,831,390 | | |
| | 06/11/2021 | D | $54.26 | 9,110 | $494,309 | | |
| | 06/11/2021 | D | $53.56 | 41,478 | $2,221,562 | | |
| | | | | **551,180** | **$22,827,738** | **13.17%** | **$21,466,128** |
| Kalish (Matthew) | 06/23/2020 | D | $38.80 | 329,782 | $12,795,542 | | |
| *Co-founder,* | 06/23/2020 | I | $38.80 | 381,681 | $14,809,223 | | |
| *Director, President* | 05/14/2021 | D | $44.20 | 22,011 | $972,886 | | |
| *of DK No. America* | 05/14/2021 | D | $42.05 | 6,334 | $266,345 | | |
| | 05/14/2021 | D | $44.80 | 23,953 | $1,073,094 | | |
| | 05/14/2021 | D | $42.70 | 5,395 | $230,367 | | |
| | 05/28/2021 | D | $50.38 | 35,245 | $1,775,643 | | |
| | 05/28/2021 | D | $51.24 | 22,073 | $1,131,021 | | |
| | 05/28/2021 | D | $51.83 | 374 | $19,384 | | |
| | 06/11/2021 | D | $53.56 | 47,680 | $2,553,741 | | |
| | 06/11/2021 | D | $54.27 | 10,012 | $543,351 | | |
| | | | | **884,540** | **$36,170,596** | **12.22%** | **$35,811,052** |
| Levin (Woodrow) | 06/23/2020 | D | $38.80 | 50,000 | $1,940,000 | | |
| *Director* | 06/23/2020 | I | $38.80 | 3,112 | $120,746 | | |
| | | | | **53,112** | **$2,060,746** | **11.91%** | **$2,060,746** |
| Liberman (Paul) | 06/23/2020 | I | $38.80 | 796,348 | $30,898,302 | | |
| *Co-founder,* | 05/13/2021 | D | $40.78 | 45,287 | $1,846,804 | | |
| *Director, President* | 05/13/2021 | D | $43.39 | 37,096 | $1,609,595 | | |
| *of Global Tech. &* | 05/13/2021 | D | $42.69 | 34,453 | $1,470,799 | | |
| *Product* | 05/13/2021 | D | $41.51 | 53,164 | $2,206,838 | | |

| Filer Name | Transaction Date | Direct Indirect | Price | Shares Sold | Proceeds | % of Shares Sold | Net Profits |
|---|---|---|---|---|---|---|---|
| | 05/27/2021 | D | $49.28 | 39,486 | $1,945,870 | | |
| | 05/27/2021 | D | $49.97 | 45,514 | $2,274,335 | | |
| | 06/10/2021 | D | $53.42 | 75,663 | $4,041,917 | | |
| | 06/10/2021 | D | $54.22 | 9,337 | $506,252 | | |
| | | | | **1,136,348** | **$46,800,712** | **14.05%** | **$46,538,036** |
| Meckenzie (Shalom) | 06/23/2020 | D | $38.80 | 4,680,136 | $181,589,277 | | |
| *SBTech Founder,* | 10/9/2020 | D | $50.83 | 6,949,088 | $353,222,143 | | |
| *Director* | 05/27/2021 | D | $50.00 | 660,000 | $33,000,000 | | |
| | 06/14/2021 | D | $51.84 | 449,083 | $23,280,463 | | |
| | 06/14/2021 | D | $52.66 | 10,792 | $568,307 | | |
| | 06/14/2021 | D | $50.86 | 200,125 | $10,178,358 | | |
| | | | | **12,949,224** | **$601,838,547** | **36.65%** | **$601,838,547** |
| Moore (Ryan R) | 06/23/2020 | I | $38.80 | 1,000,000 | $38,800,000 | | |
| *Director* | 10/9/2020 | I | $50.83 | 1,000,000 | $50,830,000 | | |
| | | | | **2,000,000** | **$89,630,000** | **18.95%** | **$89,630,000** |
| Murray (Steven Joseph) | 06/23/2020 | I | $38.80 | 1,040,992 | $40,390,490 | | |
| *Director* | 10/9/2020 | I | $50.83 | 1,545,924 | $78,579,317 | | |
| | | | | **2,586,916** | **$118,969,807** | **32.95%** | **$118,969,807** |
| Nada (Hany M) | 06/23/2020 | I | $38.80 | 966,411 | $37,496,747 | | |
| *Director* | 10/9/2020 | I | $50.83 | 946,712 | $48,121,371 | | |
| | | | | **1,913,123** | **$85,618,118** | **26.24%** | **$85,618,118** |
| Park (Jason) | 06/23/2020 | D | $38.80 | 76,128 | $2,953,766 | | |
| *CFO* | 05/21/2021 | D | $45.78 | 9,513 | $435,505 | | |
| | 05/21/2021 | D | $45.05 | 43,837 | $1,974,857 | | |
| | | | | **129,478** | **$5,364,128** | **11.42%** | **$4,755,582** |
| Robins (Jason) | 06/18/2020 | D | $38.80 | 548,862 | $21,295,846 | | |
| *CEO,* | 06/18/2020 | I | $38.80 | 1,256,118 | $48,737,378 | | |
| *Board Chairman* | 05/14/2021 | I | $44.81 | 137,200 | $6,147,932 | | |
| | 05/14/2021 | I | $42.78 | 24,300 | $1,039,554 | | |
| | 05/14/2021 | I | $44.20 | 128,896 | $5,697,203 | | |
| | 05/14/2021 | I | $42.10 | 42,937 | $1,807,648 | | |
| | | | | **2,138,313** | **$84,725,561** | **11.40%** | **$81,477,356** |
| Rosenblatt (Richard M) | 06/23/2020 | D | $38.80 | 23,691 | $919,211 | | |
| *Director* | | | | **23,691** | **$919,211** | **9.81%** | **$849,322** |
| Salter (John S.) | 06/23/2020 | I | $38.80 | 3,347,203 | $129,871,476 | | |
| *Director* | 10/9/2020 | I | $50.83 | 4,972,572 | $252,755,835 | | |
| | | | | **8,319,775** | **$382,627,311** | **32.98%** | **$382,627,311** |
| Sloan (Harry Evans) | 06/23/2020 | D | $38.80 | 558,706 | $21,677,793 | | |
| *DEAC founder, Vice Board Chairman* | | | | **558,706** | **$21,677,793** | **16.93%** | **$21,677,793** |
| **Grand Total** | | | | **33,244,406** | **$1,499,230,268** | | **$1,493,319,796** |

186.    Further, on May 26, 2021, Meckenzie transferred more than 19 million DraftKings shares to a trust for his spouse and children, paving the way for them to dispose of approximately $1 billion in stock without the same reporting requirements that he would be subject to.

187.    The aforementioned Company insiders did not trade any DraftKings shares prior to the Class Period.

188.    To the extent any of the Individual Defendants sold shares during the Class Period pursuant to a 10b5-1 plan, the plan was entered into during the Class Period.

189.    The vast majority of shares sold by Company insiders were sold into securities offerings on or about June 23, 2020 and October 9, 2020, when insiders were first able to sell large amounts of shares.  Thus, on information and belief, these insiders unloaded massive amounts of their DraftKings shares as soon as they could, rather than try to time the peak price of DraftKings stock during the Class Period.  Further, Meckenzie sold more than $34 million in DraftKings stock the day before the Hindenburg Report was published.

## LOSS CAUSATION/ECONOMIC LOSS

190.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of DraftKings securities and operated as a fraud or deceit on Class Period purchasers of DraftKings securities by failing to disclose and misrepresenting the adverse facts detailed herein.  As detailed above, when the truth about DraftKings' misconduct was revealed over time, through corrective disclosures and/or the materialization of the concealed risk, the value of the Company's securities declined precipitously as the prior artificial inflation no longer propped up the common stock's prices.  The declines in the prices of DraftKings securities were the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price declines

negate any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's securities and the subsequent significant decline in the value of the Company's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

191.   At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of DraftKings' business, operations, and financial condition, as alleged herein.  Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the prices of DraftKings securities to be artificially inflated.  Plaintiff and other Class members purchased DraftKings securities at those artificially inflated prices, causing them to suffer damages as complained of herein.

## NO SAFE HARBOR

192.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein,

Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and the forward-looking statement was authorized and approved by an executive officer of DraftKings who knew that those statements were false when made.

## APPLICATION OF PRESUMPTION OF RELIANCE

193.    Plaintiff is entitled to a presumption of reliance under the fraud-on-the market doctrine, because the market for DraftKings' publicly traded securities was open, well-developed, and efficient at all times during the Class Period.  As a result of the materially false and misleading statements alleged herein, DraftKings securities traded at artificially inflated prices during the Class Period.  Further, Plaintiff and other members of the Class purchased DraftKings securities in reliance on the integrity of the market price of the securities and the market information relating to DraftKings, and were damaged thereby.

194.    At all relevant times, the market for DraftKings securities was an efficient market for the following reasons, among others:

(a)    DraftKings securities met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient, electronic stock market;

(b)    as a regulated issuer, DraftKings filed periodic public reports with the SEC and the Nasdaq;

(c)    DraftKings regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    DraftKings was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their

respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

195.    As a result of the foregoing, the market for DraftKings securities promptly digested current information regarding DraftKings from all publicly available sources and reflected such information in the price of the securities.  Under these circumstances, all purchasers of DraftKings securities during the Class Period suffered similar injury through their purchase of DraftKings securities at artificially inflated prices and a presumption of reliance applies.

196.    Plaintiff is also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon omissions of material fact for which there was a duty to disclose.  Specifically, Plaintiff is entitled to a presumption of reliance throughout the Class Period because, as more fully alleged above, Defendants failed to disclose material information regarding the Company's business, operations, and financial condition.

## CLASS ACTION ALLEGATIONS

197.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a class, consisting of all those who purchased or otherwise acquired DraftKings securities during the Class Period and were damaged thereby (the "Class").

198.    Excluded from the Class are Defendants, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

199.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, DraftKings securities were actively traded on the

Nasdaq. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by DraftKings or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

200.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

201.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

202.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of DraftKings;

(c)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(d)    whether the prices of DraftKings securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(e)        whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

203.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

204.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

205.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

206.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of DraftKings securities; and (iii) cause Plaintiff and other members of the Class to purchase or

otherwise acquire DraftKings securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

207.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the Quarterly and Annual Reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for DraftKings securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about DraftKings' operations, finances, and business prospects.

208.    By virtue of their positions at DraftKings, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

209.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of DraftKings, the Individual Defendants had knowledge of the details of DraftKings' internal affairs.

210.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of DraftKings.  As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to DraftKings' business, operations, future financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of DraftKings securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning DraftKings' business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired DraftKings securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

211.    During the Class Period, DraftKings securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of DraftKings securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of DraftKings securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of DraftKings securities declined

sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

212.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

213.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

214.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

215.    During the Class Period, the Individual Defendants participated in the operation and management of DraftKings, and conducted and participated, directly and indirectly, in the conduct of DraftKings' business affairs.  Because of their senior positions, they knew the adverse non-public information about DraftKings' misstatement of income and expenses and false financial statements.

216.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to DraftKings' financial condition and results of operations, and to correct promptly any public statements issued by DraftKings which had become materially false or misleading.

217.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which DraftKings disseminated in the marketplace during the Class Period concerning DraftKings' results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause DraftKings to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of DraftKings within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of DraftKings securities.

218.    Each of the Individual Defendants, therefore, acted as a controlling person of DraftKings.  By reason of their senior management positions and/or directorship of DraftKings, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, DraftKings to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of DraftKings and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

219.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by DraftKings.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class Representative and Plaintiff's counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED:  April 5, 2022                    ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                         SAMUEL H. RUDMAN
                                         ALAN I. ELLMAN
                                         NATALIE C. BONO


                                         */s/ Samuel H. Rudman*
                                         SAMUEL H. RUDMAN

                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)
                                         srudman@rgrdlaw.com
                                         aellman@rgrdlaw.com
                                         nbono@rgrdlaw.com

                                         *Lead Counsel for Lead Plaintiff*

- 84 -

<u>CERTIFICATE OF SERVICE</u>

I, Samuel H. Rudman, hereby certify that on April 5, 2022, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.



*/s/ Samuel H. Rudman*
SAMUEL H. RUDMAN