UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE DRAFTKINGS INC. SECURITIES LITIGATION

*This Document Relates to All Actions*

21 Civ. 5739 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion to dismiss a putative securities class action brought

against the fantasy sports, sports entertainment, and sports betting company DraftKings, Inc.,

formerly known as Diamond Eagle Acquisition Corp. ("DraftKings"), and affiliated persons

(together with DraftKings, "defendants").  The putative class consists of purchasers of

DraftKings securities between December 23, 2019, and June 15, 2021, inclusive (the "class

period").

Plaintiffs' Second Amended Complaint ("SAC") centrally alleges that a company that

DraftKings had acquired in the course of going public, SBTech (Global) Limited ("SBTech"),

had secretly operated in "black-market" jurisdictions—that is, ones in which gambling was

illegal.  Dkt. 62.  The SAC alleges that SBTech's having done so, and its continuing practice of

doing so, exposed DraftKings to regulatory and criminal risks and made some of its revenue the

fruit of illegal conduct.  It alleges that DraftKings made materially false and misleading

statements about, and failed to disclose, SBTech's violations of foreign law and their potential

consequences.  As a result, it argues, DraftKings's shares traded at artificially inflated prices

until June 15, 2021, when a short seller, Hindenburg Research ("Hindenburg"), published a

report, *see* SAC, Ex. A (the "Report"), that revealed SBTech's ostensible operations in black-

market jurisdictions and the risks to which the merger with SBTech allegedly exposed DraftKings. That day—the final day of the class period—DraftKings's shares fell 4.17%.

The SAC brings claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), *codified at* 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, as to all defendants, and violations of Section 20(a) of the Exchange Act, *codified at* 15 U.S.C. § 78t(a), as to the individual defendants. Pending now is defendants' motion to dismiss the SAC for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b), and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b). Dkt. 64. For the reasons that follow, the Court grants in full the motion to dismiss, and dismisses the SAC with prejudice.

## I.    Background

### A.    Factual Background[1]

#### 1.    DraftKings and the Business Combination Including SBTech

DraftKings is a U.S.-based digital sports entertainment and gaming company incorporated in Nevada. SAC ¶¶ 2–3. Through its business-to-consumer ("B2C") segment,

---

[1] The summary is drawn from the SAC. Dkt. 62. For the purposes of resolving the motion to dismiss, the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

The Court also considers the documents attached to the SAC and to the declaration of Brian T. Frawley in support of the motion to dismiss, Dkt. 66, as described herein. These include DraftKings's Form 10-K annual report for 2020; its proxy statement; its December 23, 2019 press release; various of its Form 4 statements and a chart summarizing them; its April 2020 prospectus; the Business Combination Agreement ("BCA"); and an undated Securities and Exchange Commission ("SEC") Investor Bulletin. "It is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 (2d Cir. 2022) (alterations omitted) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)); *see also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 390 (S.D.N.Y. 2020) (considering "(1)

DraftKings provides users with daily sports, sports betting, and iGaming opportunities. *Id.* ¶ 2. Through its business-to-business ("B2B") segment, DraftKings designs, develops, and licenses its sports-betting and casino-gaming platform software for online and retail sportsbook and casino gaming products. *Id.* DraftKings distributes its offerings through websites, direct app downloads, and direct-to-consumer digital platforms. *Id.* DraftKings's common stock trades on the NASDAQ under the ticker symbol "DKNG." *Id.* ¶ 16.

DraftKings became a public company in April 2020, as a result of a three-way business combination brought about between Diamond Eagle Acquisition Company ("DEAC"), a special purpose acquisition company, or "SPAC."[2] *Id.* ¶ 3. On May 14, 2019, DEAC had consummated its initial public offering ("IPO"). *Id.* ¶ 34. Shortly thereafter, DEAC identified two target companies: (1) DraftKings, Inc., a privately held daily fantasy sports operator founded in 2011 and incorporated in Delaware, *id.* ¶¶ 3, 38 ("Old DK"), which had experienced rapid recent growth, *see* Dkt. 66, Ex. 2, at 188–92 ("Proxy Statement"), and (2) SBTech, a designer and developer of sports-betting and casino-gaming platform software for online and retail sportsbook

---

documents attached to or incorporated by reference in the complaint, (2) documents integral to and relied upon in the complaint, even if not attached or incorporated by reference, [and] (3) public disclosure documents required by law to be, and that have been, filed with the SEC").

[2] As described in the SAC, a SPAC is a publicly traded company created to complete a merger or business combination with an existing company, within a specified timeframe. SAC ¶¶ 26, 28. A SPAC cannot identify a target company to acquire until the SPAC's own initial public offering has been completed. *Id.* ¶ 28. SPAC founders take on significant risk: a successful business combination within the timeframe can yield large profits for founders, who typically own approximately 20% of the company, but failure to consummate a combination within that period automatically dissolves the SPAC, returns funds to investors, and may leave the SPAC's founders and management team uncompensated for years' worth of work and start-up costs. *Id.* ¶¶ 28, 30. According to the SAC, SPAC founders thus are "highly incentivized to get a qualifying transaction approved within the operating deadline." *Id.* ¶ 30; *see id.* ¶ 32 (quoting Securities and Exchange Commission ("SEC") Chairman Gary Gensler, stating SPACs confer less investor protection than traditional IPOs).

and casino gaming products, which had been founded in 2007 and was headquartered in the Isle of Man, SAC ¶ 39.  *Id.* ¶ 37.  On December 22, 2019, the three-way Business Combination Agreement (the "BCA") was entered into between DEAC, Old DK, and SBTech.  *Id.* ¶ 3.  The BCA was publicly announced on December 23, 2019, *id.* ¶ 100, and amended on April 7, 2020, *id.* ¶ 3.

On April 23, 2020, the BCA was consummated, *id.*, after DEAC's shareholders approved it by vote at a special meeting, *id.* ¶ 41.  Upon that approval, DEAC and Old DK merged— becoming the public company, DraftKings, that is the subject of this lawsuit—and simultaneously acquired all issued and outstanding shares of SBTech (the "Business Combination").  *Id.* ¶¶ 3, 40–41.  Old DK and SBTech became wholly owned subsidiaries of DraftKings, which became "a vertically[] integrated powerhouse" for sports betting.  *Id.* ¶ 44 & n.7 (citing *DraftKings to Become Public Company, Creating the Only Vertically-Integrated U.S.- based Sports Betting and Online Gaming Company*, Businesswire (published Dec. 23, 2019), https://www.businesswire.com/news/home/20191223005130/en/DraftKings-to-Become-Public- Company-Creating-the-Only-Vertically-Integrated-U.S.-based-Sports-Betting-and-Online- Gaming-Company).

Going into the Business Combination, SBTech had accounted for 25% of the combined company's revenue, was the only positive contributor of operating income, helped stabilize the offering for the market, and provided DraftKings's "technological and financial backbone." SAC ¶ 42.  As described in the Proxy Statement, SBTech itself does not accept wagers, or operate a casino or sportsbook.  Rather, it provides a "proprietary platform [that] allows leading mobile sportsbook and casino gaming operators to deliver products under their own brands."  *See* Proxy Statement at 243; SAC ¶ 99.

As also described in the Proxy Statement, SBTech offers its services directly to operators in Europe and via a reseller business model in Asia.  Proxy Statement at 75.  In the direct model, SBTech licenses operators who directly use its product in exchange for a share of operators' revenues.  *See id.* at 200 (comparing direct and reseller models).  In its reseller model, SBTech "licenses its products and services to resellers (through a fixed-fee model) who" then "sublicense[] to operators."  *Id.* at 204; *see also id.* at 200.  *But see* SAC ¶ 52 (alleging, without distinguishing among models, that SBTech partners with clients through revenue-sharing agreements and that, based on "former employees Hindenburg spoke with," SBTech charged clients in black-market jurisdictions more).  SBTech's agreements with resellers "typically provide for a base fee plus a fixed monthly fee determined by the number of operators with which the reseller contracts."  Proxy Statement at 200.

Defendants include, in addition to DraftKings, five executives of either pre- or post-BCA entities: (1) and (2) Jeff Sagansky and Eli Baker, who were executives of DEAC between its incorporation on March 27, 2019, and the consummation of the BCA, SAC ¶¶ 20–21, 33; (3) Jason D. Robins, DraftKings's chief executive officer ("CEO") and board chairman, *id.* ¶ 17; (4) Jason K. Park, DraftKings's chief financial officer, *id.* ¶ 18; and (5) Shalom Meckenzie, SBTech's founder and principal owner before the Business Combination, a director of Old DK from December 2013 through April 2020, and a director of DraftKings since the Business Combination, *id.* ¶¶ 19, 39.

### 2.    Pre-Class Period Events

The SAC relies upon the Hindenburg Report, a short-seller report about DraftKings that issued on June 15, 2021, for almost all of its factual allegations relating to SBTech's business

practices, as set out in this section.  *See* Report[3]; *see also infra* Section I.A.4 (describing aftermath of the Report).  Specifically, the SAC alleges the following.

Unbeknownst to investors, the Business Combination exposed DraftKings to civil and criminality liability based on SBTech's historical exposure to "black-market gaming, money laundering and organized crime," SAC ¶ 50; Report at 1, and "ongoing record of operating in black markets where online gambling is illegal," SAC ¶ 8.  The SAC defines "black markets" as jurisdictions in which "government authorities have taken affirmative, concrete actions to actively enforce laws that prohibit online gaming, or have issued unequivocal official pronouncements that online gaming is not legal in the jurisdiction."  *Id.* ¶ 45.  And, drawing on a definition in the BCA, it defines "grey markets" as jurisdictions in which (1) no law specifically prohibited or permitted internet gaming and/or sports betting, or (2) such laws existed, but were not affirmatively enforced and/or the government had not made an unequivocal, official pronouncement that internet gaming and/or internet sports betting was illegal.  *Id.* ¶ 48; Dkt. 66, Ex. 5, at 105.

<div style="text-align:center">

a.    *Pre-2018: SBTech's Involvement in Black Markets*

</div>

After its 2007 founding as a sports-betting technology provider, SBTech struggled to compete.  SAC ¶ 53.  According to former employees cited in the Hindenburg Report, as early as 2014, SBTech decided to "seek business where others were unwilling to operate" and expand into "major Asian markets" where gambling was illegal.  *Id.*  During this period, SBTech began advertising on its website that it accepted payment for its software in currencies—such as the Vietnamese dong and the Indonesian rupee—used in countries where certain types of gambling was illegal.  *Id.* (quoting Report at 7–8); *see also id.* ¶¶ 163–67 (Vietnam); *id.* ¶¶ 168–69

---

[3] For the Report and other attached exhibits, the Court cites the documents' internal page numbers, where present, and, otherwise, the Bates-stamped numbers on those exhibits.

(Indonesia).  Unidentified former employees quoted in the Report also stated that SBTech operated in Vietnam, as well as in Thailand and Malaysia, where some forms of gambling are also illegal.  *Id.* ¶ 54; *id.* ¶¶ 172–73 (Thailand); *id.* ¶¶ 170–71 (Malaysia).  An unidentified former employee quoted in the Report estimated that SBTech had done business in Iran for four or five years, but "dispensed with the business around early 2019."  *Id.* ¶ 87 (quoting Report at 34–35).  Iran also has certain laws prohibiting gambling.  *See id.* ¶¶ 150–53.  SBTech's head of international business development, Tom Light or Tom John Or-Paz ("Light"), ran its Asia-facing business and was Meckenzie's "right hand man."  *Id.* ¶¶ 55–56.

Also in 2014, a press release referenced in the Report indicated that "SBTech enter[ed] a 'multi-year deal with TGP Europe,'" a subsidiary of Suncity Group Holdings Limited.  *Id.* ¶ 147.[4]

### b.    *2018–2019: SBTech Restructures to Facilitate its Entry into the U.S. Market*

In June 2017, the Supreme Court granted certiorari to review the constitutionality of the Professional and Amateur Sports Protection Act ("PASPA"), which had restricted all but a handful of U.S. states from legalizing sports gambling.  *Id.* ¶ 57.  SBTech thereafter began taking steps to facilitate its entry into U.S. sports gambling markets by "conceal[ing] its activity in

---

[4] The SAC quotes an *Online Poker Report* article, published December 1, 2021, to suggest that the SBTech-TGP Europe deal evidences SBTech's black-market operations.  *See generally* SAC ¶ 147 & n.31.  The link to the article is no longer live.  *Id.*  The SAC alleges the article reported that Alvin Chau, a Chinese billionaire, was CEO and chairman of Suncity Group Holdings Limited—the parent company for TGP Europe—and that, on November 27, 2021, Chinese authorities arrested Chau and accused him of "facilitating online gambling with mainland China" as "a junket operator" who "ferr[ied] the wealthy from mainland China to retail casinos in Macau, where they can gamble legally."  *Id.*  The SAC alleges that, even after Chau's arrest, "TGP Europe still advertises the use of SBTech's platform to power its sports betting products."  *Id.*

Asian countries where gambling is illegal." *Id.* ¶ 5.  In 2017, SBTech removed the portion of its website that advertised its acceptance of "Asian solutions." *Id.* ¶ 58.

In 2018, the Supreme Court invalidated PASPA and opened the door to legalized sports gambling in the United States, *see Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018).  SBTech then transferred its gambling activity to a "front" company called BTi and later renamed CoreTech ("CoreTech"). *Id.* ¶ 5.  According to an unidentified former employee quoted in the Report, CoreTech "acted as a customer of SBTech, which invoiced [CoreTech], in an apparent effort to put a layer of legal separation between SBTech and its black market end customers." *Id.* ¶ 60.  Unidentified employees quoted in the Report stated that "[a]ll CoreTech business comes from [SBTech]," and that "the two companies are very financially close." *Id.* ¶ 73.  The Report, however, also quotes other unidentified former employees as stating that "CoreTech is not part of [SBTech]," and that, although "full separation [took a] few months," it was completely "handled in less than 3 months." *Id.* (quoting Report at 22–23).

The SAC alleges that the formal separation between SBTech and CoreTech was "illusory." *Id.* ¶ 8.  Light ran CoreTech. *Id.* ¶ 60 (citing Report at 11–13).  CoreTech's offices were 4.5 miles from SBTech's in Sofia, Bulgaria. *Id.*  Bulgarian employment records show that 47 employees left SBTech in July 2018, that CoreTech hired 50 new employees in the same month, *id.* ¶ 67 (citing Report at 17–18), and that the companies were integrated to a degree that "many CoreTech employees seemed to be under the impression that they worked for SBTech"— including CoreTech's CEO who, shortly after the formation of CoreTech, announced on LinkedIn that he was hiring employees for SBTech, *id.* ¶¶ 6, 69–70 (citing Report at 18–19). One unidentified "Asian white label provider" quoted in the Report stated that CoreTech had

been founded in 2007 (SBTech's founding date); another betting review website "used [CoreTech] and SBTech interchangeably." *See id.* ¶ 71 (citing Report at 20).

CoreTech had multiple black-market clients. *Id.* ¶¶ 50 (citing Report at 1–2), 76–79 (citing Report at 24–29). For example, it provided software to "an Asia-focused site tied to a tried kingpin at the center of a Swiss money laundering investigation." *Id.* ¶¶ 50 (citing Report at 1–2), 77 (citing Report at 25). CoreTech's software was also linked to a "massive illegal online sports betting ring" in Vietnam. *Id.* ¶¶ 50, 78 (citing Report at 28–29). CoreTech's sportsbook was advertised through a site linked to a recent raid on an alleged illegal gambling operator in Thailand. *See id.* ¶ 76 (citing Report at 24).

   c. *Spring 2019: SBTech's Representations to the Oregon State Lottery*

SBTech's first major contract in the U.S. was to provide its sportsbook to Oregon's Lottery Commission in 2019. *Id.* ¶ 79. That the Oregon Lottery had appeared to vet SBTech in connection with awarding that contract, the SAC alleges, likely reassured investors as to the lawfulness of SBTech's operations. *Id.* ¶ 85; *see also* Report at 34.

As reflected in a report of the Oregon State Police Gaming Enforcement Division that it cites, *see* Dkt. 67 ("Pl. Opp."), Ex. A ("Or. R."), SBTech made several representations to the Oregon Lottery in connection with that due diligence. SBTech stated that in "unregulated markets, SBTech only works with operators licensed and regulated by an established gambling regulator including Malta, UK, Isle of Man, Gibraltar and the Philippines" and that, where it contracts with distributors, SBTech "requires the distributor to only contract with operators who are properly licensed where required, and to use appropriate on-boarding processes." SAC ¶ 182; Or. R. at 9–10. SBTech also stated that it "requests and receives information about the operators with whom the distributor contracts" and, in the event of misconduct, it "is entitled by

contract to terminate its relationship with the distributor or require the distributor to terminate its relationship with the specific operator."  SAC ¶ 182; Or. R. at 10.  "SBTech will act to end a business relationship if it is determined that the market the distributor operates in is illegal."  SAC ¶ 182; Or. R. at 10.

SBTech also told the Oregon Lottery that, in early spring 2018, it had become aware that one of its contracted "B2B" distributors had accepted wagers from an end-use operator in Iran.  *See* SAC ¶ 86 (quoting Report at 34); Or. R. at 9.  SBTech stated that it had taken "immediate action and caused the distributor to terminate business with the end use operator."  SAC ¶ 86; Or. R. at 9; *see also* Report at 34.  The SAC, citing the Report, alleges that these statements to the Oregon Lottery mischaracterized SBTech's dealings in Iran.  *See, e.g.*, SAC ¶¶ 86–87 (citing Report at 34–35).  In fact, according to an unidentified former employee quoted in the Report, SBTech had been operating in Iran for five years, with founder Meckenzie's knowledge and approval, and had abandoned its Iranian business only after it began to face heightened scrutiny due to the Oregon Lottery's investigation.  *Id.* ¶ 87 (quoting Report at 34–35).

The Oregon Lottery also inquired into SBTech's relationship with 10Bet, a company "that seemed to operate in China."  *Id.* ¶ 79.  At the time, China was classified as a "grey" market because it did not enforce its prohibitions against gambling, *id.* ¶ 84, although the SAC alleges that, since the Oregon Report, China began to do so, *see id.*; *id.* ¶¶ 154–62.  SBTech's founder, Meckenzie, had also founded 10Bet.  *Id.* ¶ 83.  In 2018, Meckenzie left 10Bet and transferred it to Water Tree Limited, an entity solely owned by his brother.  *Id.*  This transfer was "another legal fig leaf meant to separate SBTech from some of its prior operations in order to enter U.S. markets, while still keeping control of the entity in the family" and "for SBTech to pass their due diligence with DraftKings."  *Id.* (quoting Report at 32–33).  Although SBTech assured the

Oregon Lottery that, in 2019, 10Bet "does not derive revenues from China using SBTech's software," *id.* ¶¶ 80, 82, the SAC alleges that, in fact, SBTech retained a "massive China operation," according to an unidentified "former SBTech employee familiar with the Oregon contract" quoted in the Report, *id.* ¶ 80 (quoting Report at 31).  To this end, the Report stated that there were multiple Chinese-facing 10Bet sites where "backend web infrastructure demonstrates SBTech's involvement."  *Id.* ¶ 79.

On April 18, 2019, an Oregon newspaper, the *Statesman Journal*, published an article on the Oregon Lottery's diligence into SBTech.  *Id.* ¶ 85; *see also* Report at 33.  It stated that "businesses that use SBTech technology reach out to online customers in Iran and Turkey, where gaming is restricted or illegal" but there is "unregulated black market activity."  SAC ¶ 85.[5]  In response, the article states, SBTech "categorically denied operating in Iran," and stated that its "[c]ustomers are contractually banned from operating in forbidden territories, . . . SBTech takes action to stop any activities found in restricted areas."  *Id.* (quoting Report at 34); *supra* note 5.

### 3.    DraftKings's Allegedly Actionable Statements and Omissions

The SAC alleges that, during the class period, DraftKings made public statements to the effect that SBTech, its subsidiaries, and its clients complied with applicable gaming laws and did not violate certain anti-corruption and anti-bribery laws, or relevant United States sanctions. Based on the factual allegations contained in the Hindenburg Report, the SAC alleges that these statements were materially false or misleading.  The SAC relatedly alleges that DraftKings's public statements omitted material facts necessary to make them non-misleading, in that the

---

[5] *See also* Report at 33 (citing Ben Botkin, *Oregon Lottery's Foray into Sports Betting Finds International Intrigue*, Statesman J. (published Apr. 18, 2019), https://www.statesmanjournal.com/story/news/politics/2019/04/18/oregon-lottery-sports-betting-illegal-gaming-international/3453739002).

company failed to disclose SBTech's black-market dealings as alleged in the Report.  *Id.* ¶¶ 100–42.  The SAC identifies the following statements as actionable.

>        *a.       The December 23, 2019 Press Release*

On December 23, 2019, DraftKings issued a press release announcing the BCA, *id.* ¶ 100; Dkt. 66, Ex. 3 ("the 2019 Press Release"), and attached it to a Form 8-K significant event disclosure, signed by defendant Baker, that it filed with the SEC.  SAC ¶ 100.  It stated that SBTech had "50+ partners in 20+ regulated markets and jurisdictions"; it listed "Czech Republic, Denmark, Ireland, Italy, Mexico, Portugal, Spain, Sweden, and U.K" as examples of foreign jurisdictions.  *Id.*  The SAC alleges that this statement was materially false and misleading because DraftKings "failed to disclose that the markets and jurisdictions in which SBTech operated included numerous black markets for gambling in Asia," and that DraftKings "knew, or recklessly disregarded, these undisclosed facts."  *Id.* ¶ 101.

>        *b.       The December 23, 2019 Filing of the BCA*

The same day, DraftKings publicly filed the BCA.  *Id.* ¶ 102.  The SAC alleges that two sets of representations in the BCA were materially false or misleading.

First, SBTech made representations in the BCA denying engaging in certain "corrupt practices," in particular, that:

> (b) [n]either SBT[ech] nor any of its Subsidiaries nor, to the Knowledge of SBT[ech], any of their Representatives, has at any time, or is presently or has agreed to become, engaged in any conduct . . . *that violates in any material respect any ABC laws or AML laws that are applicable to SBT[ECH]or any of its Subsidiaries*.  The books and records of SBT[ech] and its Subsidiaries are *accurate and complete in compliance* in all material aspects with the requirements under the ABC Laws or AMC Laws that are applicable to SBT[ech] and its Subsidiaries.
>
> (c) *Since January 1, 2016*, neither SBT[ech] nor any of its Subsidiaries is conducting or has conducted, directly or indirectly, any business . . . with or for the direct or indirect benefit of or on behalf of a person or entity: *Named as a "specially designated national and blocked person" on the most current OFAC SDN List or with whom it would be prohibited for SBT[ech] or any of its Subsidiaries to engage*

> *in transactions or dealings under any of the sanctions programs of the United States administered by OFAC . . . [or] who is the subject of or otherwise targeted by, or is located or organized in any country or territory that is subject to, any such sanctions . . . .*

*Id.* ¶ 103 (emphasis added and in original).  The ABC Laws include a variety of anti-bribery measures, *id.* ¶ 103 n.23; the AMC laws prohibit forms of money laundering, *id.*; and "OFAC" refers to the Office of Foreign Assets Control of the U.S. Department of the Treasury, *id.* ¶ 103 n.24.  The SAC alleges that these statements were materially false and misleading because they failed to disclose that, "since January 1, 2016, SBTech had conducted business in Iran," which is subject to United States sanctions administered by OFAC and "where all forms of gambling are outlawed."  *Id.* ¶ 104.

Second, SBTech made representations in the BCA concerning its compliance with gaming laws:

> Except for operations conducted by SB[Tech] . . . in any jurisdiction that is a Grey Market or was a Grey Market at the relevant time(s): (i) to the Knowledge of SBT[ech] . . . in so far as relating to the SBT[ech] Software, the Clients are/were in compliance with all material respects with all Applicable Gaming Laws and Laws relating to gaming relevant to SBT[ech[, its Subsidiaries or the Clients . . . and (ii) SBT[ech]. . . to the Knowledge of SBT[ech], the Clients are/were operating in all material respects in a manner that is/was customary for businesses similar to SBT[ech] . . . in such jurisdiction . . . and to the Knowledge of SBT[ech] and *in so far as relating to the SBT[ech] Software, the Clients is [sic] and during the four (4) years preceding the date of this Agreement has been, in compliance in all material respects with all Applicable Gaming Laws and Laws relating to gaming relevant to SBT, its Subsidiaries, or the Clients*.
>
> . . . SBT[ech] and each of its Subsidiaries actively monitors the use of the SBT[ECH]Software by the Clients, and to SBT[ech]'s Knowledge (except for operations conducted by SBT[ech], its Subsidiaries, and the Clients in any jurisdiction that is a Grey Market[)] . . . *the Clients are not using, and the Clients are not permitting the use by others, of SBT[ech] Software in contravention of Laws relating to gaming relevant to SBT[ech] . . . or the Clients.  SBT[ech] and its Subsidiaries require each of the Clients to be regulated by a Gaming Regulatory Authority, and, to the Knowledge of SBT[ech], each Client is regulated by a Gaming Regulatory Authority.*

*Id.* ¶ 105 (emphasis added).  The SAC alleges that these statements were materially false

or misleading because SBTech operated in markets in which gambling was illegal, and

because certain SBTech clients were located in such jurisdictions.  *Id.* ¶ 106.

> c.      *The January 6, 2020 Form S-4*

On January 6, 2020, DraftKings publicly filed a Form S-4, signed by defendants

Sagansky and Baker.  *Id.* ¶ 107 ("Form S-4").  It included a "timeline of [SBTech's] key

operational and business milestones," including its entry into numerous foreign jurisdictions,

arrangements between DraftKings, SBTech, and foreign lotteries, and SBTech's other foreign

dealings.  *Id.*  The Form S-4 stated that:

> SBTech has obtained licenses (and approval, as applicable) in six states in the
> United States and in the United Kingdom, Gibraltar, Malta and Romania.
> Additionally, SBTech has certified its software in Denmark, Italy, Nigeria,
> Portugal, and Spain, and its platform and sportsbook are available in Azerbaijan,
> Belgium, Cyprus, Czech Republic, Greece, Mexico, Poland[,] and Sweden under
> local licenses held by operators using SBTech's platform in these jurisdictions.

*Id.*

The Form S-4 also stated that, in the first nine months of 2019, "approximately 38% and

62% of SBTech's revenue was derived from customers in Europe and other regions (primarily

Asia)," while the "revenue split for the respective regions was approximately 34% and 66% in

fiscal year 2018 and 48% and 52% in fiscal year 2017."[6]  *Id.* ¶ 108 (emphasis omitted).  It also

stated that "revenue declined . . . in the nine months ended September 30, 2019," but "was

partially offset by customers' growth, driven by SBTech's growth in Europe and Asia," and that

---

[6] Substantially similar statements were made in the: (1) April 15, 2020 Proxy Statement,
(2) April 23, 2020 Form S-1 Registration Statement, (3) May 13, 2020 Prospectus, (4) June 22,
2020 Prospectus, (5) October 6, 2020 Form S-1 Registration Statement, and (6) March 5, 2021
Prospectus.  *See* SAC ¶ 108 n.26.

this "[o]rganic revenue growth reflected mainly additions of new customers in Asia."[7]  *Id.*

(emphasis omitted).  Finally, the Form S-4 included a risk disclosure that stated that SBTech's

B2B model operated "primarily in international jurisdictions," and that a "material part of [its]

revenue is currently generated through resellers and a few large direct operators," such that a

decline in their financial performance could "have a material adverse effect on SBT[ech]'s or

[DraftKings's] business."  *Id.* ¶ 109 (emphases omitted).

The SAC alleges that these statements were materially false and misleading because they

"failed to disclose that the markets and jurisdictions in which SBTech operated included

numerous black markets for gambling in Asia."  *Id.* ¶ 110.

### d.  The April 15, 2020 Proxy Statement

On April 15, 2020, in advance of investors' vote on the Business Combination,

DraftKings publicly filed its 2020 Proxy Statement, signed by defendants Robins, Meckenzie,

Sagansky, and Baker.  *Id.* ¶ 111.  It repeated the BCA's assurances that SBTech's clients

complied with the applicable gaming laws, had done so for the preceding four years, and were

regulated by a Gaming Regulatory Authority.  *See id.* ¶ 105 n.25.  It also reiterated the Form S-

4's representations that SBTech "relies primarily on one reseller for [SBTech's] Asia revenue . . .

[that] accounted for approximately 46% of [its] revenue in the year ended December 31, 2019"

and identified, as a risk factor, "a decline in such resellers' or direct operators' financial

performance or a termination of" licensing agreements.  *Id.* ¶ 111.  The Proxy Statement did not

identify the reseller.  *Id.* ¶ 112.  Its discussion of SBTech's revenues from customers in "other

regions (primarily Asia)," *id.* ¶ 113, and of the addition of "new customers in Asia," *id.* ¶ 114,

did not reference CoreTech or any of the alleged black-market operations, *id.* ¶ 115.

---

[7] The Form S-4 filed on February 13, 2020 contained substantially similar statements.  *See* SAC
¶ 108 n.27.

> e.     *The April 15, 2020 Form S-1 Registration Statement and*
> *Prospectus*

Also on April 15, 2020, DraftKings publicly filed a Form S-1 Registration Statement, signed by Sagansky and Baker. *Id.* ¶ 117 ("April Registration Statement"). On April 27, 2020, DraftKings filed a prospectus. *Id.* (the "April 2020 Prospectus"). The April 2020 Prospectus "discussed numerous arrangements between DraftKings, SBTech, and foreign lotteries, as well as other business SBTech had obtained in foreign jurisdictions," and reiterated the statement in the Form S-4 as to the places in which SBTech had "obtained licenses" or "certified its software," or where "its platform and sportsbook are available . . . under local licenses held by operators using SBTech's platform." *Id.*; *see also id.* ¶ 107.

The SAC alleges that the April 2020 Prospectus, like the Form S-4, is materially false and misleading because it did not reference SBTech's alleged black-market dealings or identify those markets. *Id.* ¶ 118.

> f.     *The May 6, 2020 Form S-1 Registration Statement and Prospectus*

On May 6, 2020, DraftKings filed a Form S-1 Registration Statement, signed by Robins, Park, and Meckenzie. *Id.* ¶ 119. On May 13, 2020, DraftKings filed the related prospectus, (the "May 2020 Prospectus"), which contained substantially similar statements to the April 2020 Prospectus. *Id.*

> g.     *The May 15, 2020 Press Release and Q1 Earnings Call*

On May 15, 2020, DraftKings issued a press release announcing its results for the first quarter of 2020. *Id.* ¶ 120. DraftKings stated that "[t]hrough its recent business combination, DraftKings has created the only vertically integrated sports betting company based in the United States," and that DraftKings had "recorded standalone Q1 year-over-year revenue growth of 30% despite the effects of COVID-19." *Id.*

The same day, DraftKings hosted an earning call (the "Q1 2020 Earnings Call") with investors and analysts. *Id.* ¶ 121.  During the scripted portion of the call, Robins reiterated that "through the acquisition of SBTech, [DraftKings] ha[s] created the only vertically integrated sports betting company in the U.S." *Id.*  Park stated:

> Starting with [Old DK], despite COVID, [DraftKings] generated $89 million of net revenue in the quarter, which was an increase of 30% versus prior year.  Notably pre-COVID prior to March 11, our revenue was up to 60% versus prior year.  These results are due to our strategy of launching new states as well as growing our revenues in existing states.  In this quarter, we were live in five new states for online sports betting. . . .

*Id.*  Park also stated that "[o]ld SBTech Revenue generated EUR22.6 million, an increase of 3% versus Q1 2019," and that "pre-COVID, prior to March 11, [DraftKings's] revenue was up 19% versus prior year." *Id.*  Finally, Park stated that "[a]djusted EBITDA was negative EUR851,000 versus prior year of positive EUR4.3 million," and that "SBTech was well on track to achieve positive EBITDA for the quarter until COVID hit, and we anticipate a return to profitability once major sports resume." *Id.*

### h.    The June 16, 2020 Form S-1 Registration Statement and Prospectus

On June 16, 2020, DraftKings publicly filed a Form S-1 Registration Statement, signed by Robins, Park, and Meckenzie.  *Id.* ¶ 122.  On or about June 22, 2020, DraftKings filed an accompanying prospectus that contained substantially similar statements to the April 2020 Prospectus.  *Id.* (the "June 2020 Prospectus").

### i.    The August 14, 2020 Press Release and Q2 Earnings Call

On August 14, 2020, DraftKings issued a press release regarding its Q2 earnings.  *Id.* ¶ 123.  The press release stated that "[f]or the three months ended June 30, 2020, DraftKings reported GAAP revenue of $71 million compared to $51 million during the same period in 2019." *Id.*  "Including the effect of the [DraftKings] business combination with SBTech [and

DEAC] as if it had been completed on January 1, 2019," it continued, would have placed the

second quarter revenue at "$75 million . . . compared to $83 million during the same period in

2019." *Id.* The press release stated that "DraftKings ended the second quarter of 2020 with over

$1.2 billion in cash and no debt on its balance sheet." *Id.*

The same day, DraftKings hosted its Q2 earning call with investors and analysts. *Id.*

¶ 124 (the "Q2 2020 Earnings Call"). During the call, Robins stated:

> We had a strong second quarter given the limited sports calendar with second
> quarter pro forma revenue of $75 million. As sports have started to return, we saw
> revenue improve sequentially each month in the quarter, with June revenue
> increasing 20% year-over-year on a pro forma basis. The strong overall results and
> improvement are due to our product innovation, our entry into new jurisdictions,
> and pent-up demand for sports betting as Live Sports like Golf, European Soccer,
> NASCAR and UFC started to return.

*Id.*

> j.    *The October 5, 2020 Form S-1 Registration Statement and October
>       Prospectus*

On approximately October 5, 2020, DraftKings filed a Form S-1 Registration statement

(the "October Registration Statement") signed by Robins, Park, and Meckenzie, and, a week

later, the related prospectus, (the "October 2020 Prospectus"). *Id.* ¶ 125. The October 2020

Prospectus stated:

> *Our B2B business, formerly SBTech*, has obtained licenses (and approval, as
> applicable) in six states in the United States and in the United Kingdom, Gibraltar,
> Malta and Romania. Additionally, our B2B business has certified its software in
> *various territories*, including Denmark, Italy, Nigeria, Portugal, *South Africa,* and
> Spain, and its *services* are available in Azerbaijan, Belgium, Cyprus, Czech
> Republic, Greece, Mexico, Poland[,] and Spain under local licenses held by
> operators using SBTech's platform in these jurisdictions.

*Id.* (emphases added[8]).  The SAC again alleges that this statement was materially false or misleading because it "failed to disclose that the markets and jurisdictions in which SBTech operated included numerous black markets for gambling in Asia."  *Id.* ¶ 126.

> k.     *The November 13, 2020 Press Release and Q3 Earnings Call*

On November 13, 2020, DraftKings issued a press release concerning its Q3 results.  *Id.* ¶ 127.  It stated:

> DraftKings [. . .] today reported its financial results for the third quarter of 2020.
> For the three months ended September 30, 2020, DraftKings reported revenue of
> $133 million, an increase of 98% compared to $67 million during the same period
> in 2019.  After giving pro forma effect to the business combination with [SBTech
> and DEAC] as if it had occurred on January 1, 2019, revenue grew 42% compared
> to the three months ended September 30, 2019.

*Id.* (ellipses in original).

Later that day, DraftKings hosted its Q3 earnings call (the "Q3 2020 Earnings Call") with investors and analysts.  *Id.* ¶ 128.  During the scripted portion of the call, Robins stated:

> DraftKings had a very productive third quarter. . . .  The return of major sports has
> generated tremendous customer engagement.  Third quarter revenue of $133
> million was at the high end of the range we outlined in our recent S-1 and grew
> 42% year-over-year.  In Q3, we also had more than 1 million monthly unique
> payers, which means the average for the month of July, August, and September was
> greater than 1 million. . . .  We continue to be excited with the products and
> technology investments we are making as well as with our progress on the
> technology migration and business integration of SBTech. . . .  As a reminder, with
> the acquisition of SBTech, we now have almost 1,100 engineers worldwide
> dedicated to creating best-in-class technology and games and experiences for our
> users.

*Id.*

---

[8] The italicizations highlight changes between the Form S-4 and the October 2020 Prospectus.
*Compare* SAC ¶ 107, *with id.* ¶ 125.

> l.      *The February 26, 2021 Statements*

On February 26, 2021, DraftKings made four public statements.  First, it publicly filed a

Form 10-K Annual Report, *see* Dkt. 66, Ex. 1 ("Form 10-K"), reporting its financial and

operating results for the quarter and year ended December 31, 2020.  SAC ¶ 129.  Robins, Park,

and Meckenzie had signed the Form 10-K, *id.*, Robins and Park attached signed certifications

that "[t]he information contained in the [Form 10-K] fairly presents, in all material respects, the

financial condition and results of operations of [DraftKings]," *id.* ¶ 133.

The Form 10-K stated that "SBT[ech] historically offered its services directly to

operators in Europe and through a reseller model in Asia," and that it "relied primarily on one

reseller for approximately 52% of SBT[ech]'s revenue in the year ended December 31, 2020,"

excluding SBTech activity that occurred prior to the Business Combination on April 23, 2020.

*Id.* ¶ 129.  The Form 10-K did not identify the reseller or the jurisdiction in which it operated.

*Id.* ¶ 130.  The Form 10-K included a statement similar to that in the October 2020 Prospectus as

to the jurisdictions in which its "B2B business, formerly SBTech, has obtained licenses (and

approvals, as applicable)" and "certified its software," and where "its services are available."  *Id.*

¶ 131.  The SAC alleges, again, that this statement was materially false and misleading because it

did not "disclose that the markets and jurisdictions in which SBTech operated included

numerous black markets for gambling in Asia."  *Id.* ¶¶ 131–32.

Also on February 26, 2021, DraftKings issued a press release announcing its Q4 and full-

year 2020 results.  *Id.* ¶ 134 (the "Q4 2020 Press Release").  It reported "revenue of $322

million, an increase of 146% compared to $131 million during the same period in 2019," and that

"[a]fter giving pro forma effect to the business combination . . . which was completed on April

23, 2020, as if it had occurred on January 1, 2019, revenue grew 98% compared to the three

months ended December 31, 2019."  *Id.*  "DraftKings was able to generate tremendous customer

acquisition and engagement," it continued, and in the fourth quarter of 2020 had seen "MUPs increase 44% to 1.5 million and ARPMUP increase 55% to $65." *Id.* The Q4 2020 Press Release stated that DraftKings was "raising [its] revenue outlook for 2021 due to [its] expectation for continued growth, the outperformance of [its] core business and newly launched states that were not included in [its] previous guidance." *Id.*

The same day, DraftKings hosted its Q4 2020 earnings call (the "Q4 2020 Earnings Call") with investors and analysis. *Id.* ¶ 135. During the scripted portion of the call, Robins stated:

> Our list of accomplishments in 2020 is impressive. We completed the business combination with SBTech and became a publicly traded company in April. We are well on our way to completing the integration of the 2 companies from a team organization and business standpoint, and are progressing with the migration to our own in-house sports betting engine, which we expect will be complete by the end of the third quarter in 2021. . . . Pro forma revenue grew nearly 50% to $644 million versus $432 million last year. Both MUPS and ARPMUP grew 29% in 2020. We had a strong close to the year with Q4 revenue growing almost 100% year-over-year, and MUPs and ARPMUPS growing 44% and 55%, respectively, in the quarter.
>
> Revenue for the year was almost $95 million higher than the midpoint of our guidance. These results were due to over-performance in our core business as well as multiple assumptions on external factors that broke our way, such as the sports calendar, the extension of mobile registration in Illinois, and better-than-expected whole percentage in online Sportsbook.

*Id.*

Finally on February 26, 2021, DraftKings filed a Post-Effective Amendment for Registration Statement, signed by Robins, Park, and Meckenzie. *Id.* ¶ 136. It repeated the Form 10-K's representation that "SBT[ech] relied primarily on one reseller for approximately 52% of [its] revenue in the year ended December 31, 2020," excluding "some SBT[ech] activity that occurred prior to the Business Combination," and that a certain percentage of revenue had come from "other regions (primarily Asia)." *Id.*

None of the February 26, 2021 statements discussed SBTech's black-market operations in Asia. This, the SAC alleges, made them materially false and misleading. *Id.* ¶¶ 130, 132, 137.

> m. *The March 5, 2021 Prospectus*

On March 5, 2021, DraftKings filed another prospectus, supplementing the May 2020 Prospectus that Robins, Park, and Meckenzie had signed (the "March 2021 Prospectus"). *Id.* ¶ 138. The March 2021 Prospectus made substantially identical representations regarding SBTech's reliance on a single reseller as had the Proxy Statement, Form 10-K, and Amendment. *See id.* It again did not identify the reseller or discuss CoreTech. *Id.* ¶ 139.

> n. *The May 7, 2021 Press Release and Q1 Earnings Call*

On May 7, 2021, DraftKings issued a press release announcing its Q1 2021 results ("the Q1 2021 Press Release"). *Id.* ¶ 140. It stated:

> For the three months ended March 31, 2021, DraftKings reported revenue of $312 million, an increase of 253% compared to $89 million during the same period in 2020. After giving pro forma effect to the [Business Combination], as if it had occurred on January 1, 2019, revenue grew 175% compared to the three months ended March 31, 2020. . . .

*Id.* The Q1 2021 Press Release quoted Park as stating that DraftKings's "$312 million in first quarter revenue, 114% increase in MUPs and 48% growth in ARPMUP reflect solid customer acquisition and retention as well as successful launches of mobile sports betting and iGaming in new states," and that DraftKings was "raising [its] revenue outlook for 2021 due to [its] outperformance of [its] core business" and its "expectation for continued healthy growth." *Id.*

Also on May 7, 2021, DraftKings hosted its Q1 2021 earnings call with investors and analysts (the "Q1 2021 Earnings Call"). *Id.* ¶ 141. During the scripted portion of the call, Robins stated that DraftKings was "off to an outstanding start to 2021." *Id.* "Revenue for the first quarter increased 175% year-over-year to $13 million on a pro forma basis," and "MUPs

22

grew 114% and ARPMUP grew 48%." *Id.* "These results reflect continued over performance of our core business due to strong customer acquisition and retention," Robins stated, "as well as the successful launches of mobile sports betting and iGaming in Michigan and mobile sports betting in Virginia." *Id.*

The SAC alleges that these statements—and those before them —were materially false or misleading because they did not disclose SBTech's alleged history of black-market dealings, its continued black-market operations, that the Business Combination exposed DraftKings to black-market gambling, or that, as a result, DraftKings faced financial, regulatory, and criminal risks. *Id.* ¶ 142.

### o.   Items 303 and 105

DraftKings did not disclose any black-market operations—or their potential impact or liabilities—in its regulatory reports pursuant to Item 303 of SEC Regulation S-K ("Item 303"), 17 C.F.R. § 299.303(A)(2)(i), (ii).  SAC ¶¶ 174–77.  DraftKings also did not reference any black-market dealings, or its legal or regulatory exposure arising from these dealings, in any disclosures pursuant to Item 105 of SEC Regulation S-K ("Item 105"), 17 C.F.R. § 299.105. SAC ¶ 178.  The SAC alleges that such information was required to be disclosed by Items 303 and 105, and that its absence was an actionable material omission.  *See generally id.* ¶¶ 174–78.

### 4.   The Hindenburg Report and Its Aftermath

On June 15, 2021, Hindenburg published a short-seller report, *see id.* ¶¶ 50 & n.11, 143– 44.  Its central claim was that SBTech had a "long and ongoing record of operating in black markets where online gambling is illegal." *Id.* ¶ 50.  The Report attributed this determination to conversations with unidentified former employees and a review of documents.  *Id.*  The Report claimed that in 2020, when shareholders had voted on the Business Combination, "roughly 50% of SBTech's revenue continue[d] to come from markets where gambling [was] banned." *Id.* ¶

50; *see also id.* ¶ 60 ("Despite the small legal market in Asia, DraftKings states in its SEC filings that an unnamed customer focused on Asian markets accounted for 46% of SBTech's 2019 revenue and 52% of SBTech's 2020 revenue.").  The Report also claimed that DraftKings's SEC filings reveal that SBTech has an ongoing relationship with Water Tree Limited, the company to which Meckenzie transferred "the rights and everything related to the 10Bet brand." *Id.* ¶ 83.

As discussed more fully below, counsel for plaintiffs in this case represented that they attempted to confirm employee statements quoted in the Report by contacting Hindenburg's founder, but were unable to speak with him or to confirm the statements in the Report attributed to unidentified former employees.  *See id.* ¶ 51 n.13.

The day the Report was published, DraftKings's stock price fell $2.11 per share, or 4.15%, to close to $48.51 per share.  *Id.* ¶ 143.

Later the same day, DraftKings responded.  *Id.* ¶ 144.  It stated that the Report had been "written by someone who is short on DraftKings stock with an incentive to drive down the share price." *Id.*  It also stated that the company had "conducted a thorough review of [SBTech's] business practices and [was] comfortable with the findings" as to these at the time of the Business Combination.  *Id.*  DraftKings declined to "comment on speculation or allegations made by former SBTech employees." *Id.*[9]

The SAC alleges that the putative class suffered economic losses as a result of the Report's revelation of defendants' "fraudulent scheme" to conceal from the market SBTech's

---

[9] Commenting on the company's statement, Rich Duprey of *The Motley Fool* noted that DraftKings had not issued a "definitive denial"; he interpreted the company's statement as "hint[ing]" that DraftKings's "management investigated [SBTech's] 'business practices' and d[idn't] believe they w[ould] materially impact its operations."  SAC ¶ 145.

black-market operations, which had had the effect, until the Report, of fraudulently inflating the price of DraftKings's stock.  *Id.* ¶ 190; *see also id.* ¶ 148.

### 5.    Allegations as to Defendants' Scienter

The SAC alleges that defendants were motivated to conceal SBTech's history of doing business in black-market jurisdictions.  That is because, it alleges, at the time of the Business Combination, it was well known that, to preserve gaming licenses, a company needed to "maintain[] good character and reputation," and these would not have been harmed had DraftKings revealed SBTech's ties to—and having aided and abetted—illegal gambling.  *See, e.g.*, *id.* ¶¶ 92–94, 96–99.  Defendants were also aware of SBTech's black-market operations, the SAC alleges, because Old DK had conducted "extensive due diligence on SBTech prior to the Business Combination," *id.* ¶ 183, as had DEAC, *id.* ¶ 184.  Further, "extensive meetings and calls" occurred among DEAC's board and the management teams of DraftKings and SBTech. *Id.* ¶ 184.  Among the subjects discussed in these meetings and calls were major customers and financial prospects.  The participants also made personal visits to SBTech companies' offices in Europe, Israel, and Bulgaria, and reviewed DraftKings's and SBTech's "material business contracts . . . and discussions with [their] major customers."  *Id.*

Individual defendants also were motivated to conceal SBTech's black-market operations, the SAC alleges, as such enabled them to "collectively sell more than 33 million shares of their personally held DraftKings stock . . . for gross proceeds of approximately $1.5 billion."  *Id.* ¶ 185 (chart showing sales).  The "vast majority" of these sales were made on approximately June 23, 2020 and October 9, 2020, when DraftKings's "insiders were first able to sell large amounts of shares"; company insiders "unloaded massive amounts of their DraftKings shares as soon as they could."  *Id.* ¶ 189.  SEC filings reflect that, of trades made by individual defendants,

the majority were made pursuant to section 10b5-1 predetermined trading plans or agreements in connection with the underwriting process. *See* Dkt. 66, Exs. 6–9.

###### B. Procedural History

This case commenced with the filing of parallel complaints bringing putative class actions against DraftKings and affiliated executives. The first was filed on July 2, 2021 by Kent J. Rodriguez, Dkt. 1; the second, on July 30, 2021, by Michiel Ten Hoorn, *see* No. 21 Civ. 6497 at Dkt. 1. Both complaints alleged, in substance, that DraftKings had made false and misleading statements and failed to disclose material adverse facts about SBTech's business practices, which had caused the market to excessively price DraftKings's securities during a period ending with the June 15, 2021 publication of the Hindenburg Report. The plaintiffs each alleged violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78a, *et seq.*, and Rule 10b-5.

On August 31, 2021, six individual investors moved to consolidate the two cases and for their appointment as lead plaintiff in the consolidated action. Dkts. 9, 12, 15, 17–18, 24. After the Court set a schedule for responses, Dkt. 28, three investors, on September 15, 2021, filed statements of non-opposition, Dkts. 29–31, and the other three contested the others' motions for appointment, Dkts. 32–33, 35. On November 11, 2021, the Court consolidated the two actions, and appointed Walter Marino lead plaintiff and Robbins Geller Rudman & Dowd LLP lead counsel. Dkt. 45.

On November 22, 2021, the Court, substantially adopting counsels' joint proposal, Dkt. 48, set a schedule for the filing of a consolidated amended complaint, and notified plaintiffs that, if following a motion to dismiss, they chose to amend the complaint rather than oppose a motion to dismiss, no further opportunities to amend would ordinarily be granted. Dkt. 49. On January 11, 2022, plaintiffs filed the First Amended Complaint. Dkt. 52 ("FAC").

On February 22, 2022, defendants moved to dismiss the FAC and filed a supporting memorandum of law and declaration. Dkts. 59–61. On April 5, 2022, plaintiffs filed the SAC, Dkt. 62, attaching the Hindenburg Report as an exhibit, *see* Report. As noted, the SAC alleges that defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by knowingly or recklessly making false statements regarding SBTech's business practices to inflate the market price of DraftKings's securities, causing lead plaintiff and the putative class to buy DraftKings's securities at artificially inflated prices, and causing plaintiffs to be injured when the stock's price dropped upon publication of the Report. SAC ¶ 206; *see also id.* ¶¶ 204–13. The SAC also seeks to hold the individual defendants liable under Section 20 of the Exchange Act. *Id.* ¶¶ 215–16.

On April 26, 2022, defendants filed the operative motion here, to dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6), Dkt. 64, and an accompanying memorandum of law, Dkt. 65 ("Motion"), declaration, and exhibits, Dkt. 66. On May 10, 2022, plaintiffs opposed the motion. Pl. Opp. On May 17, 2022, defendants replied. Dkt. 68 ("Reply").

## II.   Legal Standards

### A.   Standards Governing the Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court

must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145. That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007).

First, a complaint alleging securities fraud must meet the requirements of Federal Rule of Civil Procedure 9(b). *See ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI*, 493 F.3d at 99.

Second, such a complaint must comply with the pleading requirements of the PSLRA, 15 U.S.C. § 78u-4(b). *See Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 393–94 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018). In particular, where a plaintiff's claims depend upon allegations that the defendant has made an untrue statement of material fact or that the defendant omitted a material fact necessary to make a statement not misleading, the plaintiff "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Thus, in order to plead a claim of securities fraud, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*,

355 F.3d 164, 174 (2d Cir. 2004).  In addition, the plaintiff "shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

### B.      Elements of the SAC's Claims Under Exchange Act Sections 10(b) and 20(a)

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  The SEC's implementing rule, Rule 10b-5, provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.  To state a claim under § 10(b), a complaint must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (internal quotation marks and citation omitted).

To state a claim under § 20(a) of the Exchange Act, a complaint must plead "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI*, 493 F.3d at 108) (internal quotation marks omitted).  If a complaint has not adequately alleged a primary violation—that is, a viable claim under another provision of the Exchange Act—then the § 20(a) claims must be dismissed. *See id.*; *see also Gregory*, 297 F. Supp. 3d at 394.

### 1.      Material Misstatements or Omissions

Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 23 (S.D.N.Y. 2016) (quoting *Matrixx Initiatives*, 563 U.S. at 44); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). "Disclosure of . . . information is not required . . . simply because it may be relevant or of interest to a reasonable investor." *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002). An omission of information not affirmatively required to be disclosed is, instead, actionable only when disclosure of such information is necessary "to make the statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives*, 563 U.S. at 37 (quoting 17 C.F.R. § 240.10b-5(b)); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016) ("Pure omissions" of information, absent a duty to disclose, are not actionable. Half-truths, however, "statements that are misleading . . . by virtue of what they omit to disclose," are).

As for the materiality requirement, it "is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives*, 563 U.S. at 38 (internal quotation marks omitted) (quoting *Basic*, 485 U.S. at 231–32). As the Supreme Court has explained, a lower standard—such as defining a "material fact" as any "fact which a reasonable shareholder might consider important"—would lead corporations to "bury the shareholders in an avalanche of trivial information[,] a result that is hardly conducive to informed decisionmaking." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976). The "materiality hurdle" is, therefore, "a meaningful pleading obstacle." *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013). However, because of the fact-intensive nature of the materiality inquiry, the Court may not dismiss a complaint "on the ground that the alleged

misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA*, 553 F.3d at 197.

### 2.   Scienter

As noted, Rule 9(b) and the PSLRA require plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged,'" and "the court must take into account plausible opposing inferences." *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324) (alteration and emphasis in original).  The requisite mental state is one "embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (internal quotation marks and citation omitted).

A complaint "may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99.  And where a complaint does not sufficiently allege that defendants had a motive to defraud the public, it "must produce a stronger inference of recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001).

Recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (citation and emphasis omitted).  To qualify as reckless, defendants' conduct must have been "highly unreasonable" and "an extreme departure from the standards of ordinary care." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon*

*& Co.*, 570 F.2d 38, 47 (2d Cir. 1978)) (internal quotation marks omitted).  An alleged "refusal to see the obvious, or to investigate the doubtful," must be "egregious" to be actionable.  *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (citation omitted).

A complaint can plead recklessness by adequately alleging that "defendants knew facts or had access to non-public information contradicting their public statements" and therefore "knew or should have known they were misrepresenting material facts."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (citing *Novak*, 216 F.3d at 308).  However, "an inference of scienter does not follow from the mere fact of non-disclosure of relevant information."  *See Gregory*, 297 F. Supp. 3d at 395; *In re Sanofi Sec. Litig.* ("*Sanofi I*"), 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015), *aff'd sub nom.*, *Tongue v. Sanofi* ("*Sanofi II*"), 816 F.3d 199 (2d Cir. 2016). "Instead, to adequately plead scienter, plaintiffs must also provide sufficient factual allegations to indicate that defendants understood that their public statements were inaccurate, or were 'highly unreasonable' in failing to appreciate that possibility."  *Sanofi I*, 87 F. Supp. 3d at 534 (quoting *Novak*, 216 F.3d at 308).  "The key, of course, is the honest belief of the management in the truth of information issued to the public."  *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 470 (S.D.N.Y. 2008), *aff'd sub nom. State Univ. Ret. Sys. of Ill. v. Astrazeneca PLC*, 334 F. App'x 404 (2d Cir. 2009) (summary order).

### 3.    Loss Causation

"To state a claim for securities fraud under § 10(b) and Rule 10b-5, plaintiffs must also adequately plead loss causation."  *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 792 (S.D.N.Y. 2020) (citing *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157, (2008)).  "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 304 (S.D.N.Y. 2011) (internal quotation marks omitted).  "To make out loss causation, 'a

plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Id.* (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)).  A complaint may establish loss causation by demonstrating either "(1) a corrective disclosure or (2) a materialization of a concealed risk." *Id.*

"[P]laintiffs need not allege that their entire loss was caused by the misstatements and omissions complained of." *Id.* at 305.  "To plead loss causation, the complaint must allege facts that support an inference that [the defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of . . . that loss absent the fraud." *Id.* (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005)).  "Nor are plaintiffs required to allege that the particular misstatements and omissions directly caused the alleged losses. . . . [M]isstatements or omissions that conceal a risk, the materialization of which causes all or part of the plaintiffs' loss, . . . suffice." *Id.*

### 4.   Items 105 and 303 of SEC Regulation S-K

Item 105 requires that offering documents provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky," and discourages "[t]he presentation of risks that could apply generically to any registrant or any offering."  17 C.F.R. § 229.105(a).  "To state a claim under Item 105, an issuer must know, at the time of the IPO, about an undisclosed risk factor that could seriously affect its present or future business." *Wandel v. Gao*, No. 20 Civ. 3259 (PAC), 2022 WL 768975, at *11 (S.D.N.Y. Mar. 14, 2022). "When the omitted information concerns a contingent or speculative event, the materiality of those events depends on a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 554 (S.D.N.Y. 2021).

As relevant here, Item 303 compels disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(i). The provision creates a duty to disclose that can support a Section 10(b) claim. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 101, 107–08 (2d Cir. 2015). Under Item 303, a complaint must allege that "a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011); *see also Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012); *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, No. 7 Civ. 10528 (RWS), 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010). "[G]eneric cautionary language" that is "spread out over several different filings" and "often unconnected to the [defendant's] financial position" does not satisfy Item 303. *Stratte-McClure*, 776 F.3d at 105 (quoting *Panther Partners*, 681 F.3d at 122) (holding that plaintiffs adequately alleged violation of disclosure duty under Item 303 where "market watchers, including [the defendant's] analysts, reported a downward trend in the real estate and subprime mortgage markets" prior to the class period, and defendant "had significant exposure to a sharp downturn in the subprime market," but dismissing for failure to plead scienter).

## III.   Discussion

The SAC's claims—whether brought under § 10(b) against DraftKings, or under § 20(a) against the individual defendants, and whether sounding in materially false representations of fact or in omissions of fact necessary to make the company's statements non-misleading—turn on a single factual proposition: that SBTech operated in black-market gambling jurisdictions and derived revenue from illegal gambling in such venues. On the premise that SBTech did so (and

did not disclose it), the SAC centrally alleges that DraftKings's representations about SBTech's business practices and their legality were false and misleading.  The market, it alleges, was thus deceived about DraftKings's lack of exposure to adverse regulatory or criminal action.  As a result, it alleges, when the Hindenburg Report in June 2021 reported SBTech's ostensible black-market business activity, DraftKings's stock price dropped, damaging persons who had bought stock during the preceding 18 months and continued to hold it.  In moving to dismiss, defendants dispute that the SAC plausibly pleads an actionable statement or omission to this effect.  They also argue that the SAC does not plausibly plead scienter or loss causation.  And, because the SAC fails to plead a primary § 10(b) violation, defendants argue, its claims based on § 20(a) necessarily fail as well.

The Court below analyzes each of the SAC's claims of material misstatements or omissions by DraftKings regarding SBTech's business practices.  The actionable statements, the SAC alleges, included representations to the effect that SBTech was in compliance with the gaming laws of six "black market" foreign countries (Malaysia, Vietnam, Indonesia, Thailand, Iran, and China), with United States sanctions regimes, and with various anti-corruption and anti-money-laundering laws and nondisclosures relating to the same; the SAC alleges that these misstatements and omissions were made with scienter.  In fact, the SAC claims, contrary to statements made in the BCA, the Proxy Statement, other public filings, and press releases, SBTech—itself and through CoreTech, as an "undisclosed subsidiary" or "front" company—had secretly operated in those jurisdictions before and during the class period.  *See, e.g.*, SAC ¶¶ 8, 50, 142; Pl. Opp. at 7.

However, at the threshold, it is important to note a global deficiency spanning the SAC's theories of fraud.  The SAC's claims as to SBTech's business practices are virtually entirely

based on the Hindenburg Report, which in turn was largely based on unsourced or anonymously sourced allegations.  *See* SAC ¶¶ 50–54, 60–65, 67–91 (citing or quoting Report).  The SAC's threadbare sourcing and the conclusory quality of these factual allegations and attributions are ultimately fatal to all of its § 10(b) or § 20(a) claims, whether based on DraftKings's statements about its compliance with law or its failure to disclose SBTech's ostensible black-market activity and revenues.

That is because, to satisfy the PSLRA, a complaint must specify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  *ATSI*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(1)).  And "[w]hen a securities fraud claim is premised on the defendant's predicate violations of law . . . the facts of that underlying violation must be pled with particularity."  *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021); *see, e.g.*, *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 463 (2d Cir. 2019) (to plead securities fraud, plaintiffs required to provide particularized facts about the underlying conspiracy).  "Until and unless [the underlying violation is alleged with particularity], appellants' complaint [will] not met the burden of explaining what rendered the statements materially false or misleading."  *Gamm*, 944 F.3d at 463.

Here, the source on which the SAC essentially entirely relies to satisfy these pleading obligations has two features that are problematic, in compounding ways.

First, the Hindenburg Report is a report by short seller.  As the assembled case law reflects, to the extent that open-market securities fraud complaints use as the source for adverse factual allegations about a public issuer a report by a short seller—an entity with an economic

interest in driving down the company's stock price—these allegations must be considered with caution.  *See, e.g.*, *Long Miao*, 442 F. Supp. 3d at 801 (collecting cases to this effect, and noting that short sellers "have an obvious motive to exaggerate the infirmities of the securities in which they speculate").  Accordingly, as this Court has canvassed, courts "critically analyze[]" "factual attributions to short-seller reports."  *See In re Hebron Tech. Co., Ltd. Sec. Litig.*, No. 20 Civ. 4420 (PAE), 2021 WL 4341500, at *13 (S.D.N.Y. Sept. 22, 2021) (citing *Long Miao*, 442 F. Supp. 3d at 801).

Second, the Hindenburg Report, rather than being based on identifiable and/or verifiable sources, is based on "confidential"—that is, unidentified and unspecified—sources.  As the case law again reflects, although a confidential source need not be identified for his or her statements to be credited on a motion to dismiss, such a source must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting *Novak*, 216 F.3d at 314).  As this Court has previously distilled, in evaluating facts attributed to unidentified sources, courts have coalesced around certain inquiries: (1) whether the source is described with specificity so as to make clear that he or she was in position to know the facts attributed to them; (2) whether the confidential source "situate[d] in time relevant occurrences," for otherwise, such occurrences may not "establish that the [issuer's] challenged statements were knowingly false when made"; (3) whether the confidential source's factual allegations are pled with sufficient particularity; and (4) whether the facts attributed to the confidential source are corroborated, as otherwise, such statements are apt to be disregarded.  *See Long Miao*, 442 F. Supp. 3d at 799–800.

As the case law further reflects, where these two problematic features coincide—when a complaint's factual attributions to unidentified sources derive not from interviews by plaintiffs' counsel, but from a short-seller report's attributions to such sources—there is still greater need for care.  The author of such a report is economically motivated to drive the issuer's stock price down.  He or she is not an attorney with professional obligations to the Court, such as that under Federal Rule of Civil Procedure 11(b) to certify that a pleading's factual averments were the product of an inquiry reasonable under the circumstances.  *See id.* at 801 (noting "particular need for close scrutiny where a short-seller report relied upon by a securities plaintiff itself relies on 'confidential' or anonymous sources, without corroboration"); Fed. R. Civ. P. 11(b).  To be sure, where "well-pled independent and particularized facts corroborate those attributed to anonymous sources in short-seller reports, courts have sustained such complaints."  *Long Miao*, 442 F. Supp. 3d at 801.  But when plaintiffs' counsel has not interacted with the unidentified source—and does not even know the source's name, position, or other attributes tending to bear on the source's credibility—and instead extracted and pled as true statements from a report by a short seller attributing adverse facts to unidentified persons, these aspects of the complaint, if not corroborated, are fairly discounted or put aside altogether as ill-pled.  *Id.* at 800.

Such is the case here.  The following is a representative sample of the statements, drawn from the Hindenburg Report and attributed to unidentified former employees, on which the SAC relies for its claim that SBTech engaged in black-market operations:

- "According to former employees, SBTech's offering struggled to compete," which "pushed SBTech to seek business in markets where others were unwilling to operate."  SAC ¶ 53 (quoting Report at 7–8).

- "[O]ne former employee told [Hindenburg that] SBTech founder Meckenzie and his affiliate entities have 'sold to plenty of mobs.'"  *Id.* ¶ 90 (quoting Report at 39–40).

- "Hindenburg also spoke with former employees who said that SBTech operated in Vietnam, Thailand, and Malaysia." *Id.* ¶ 54.

- "SBTech operated in Iran for years, according to multiple former employees," *id.* ¶ 85 (quoting Report at 33–34), and a "former employee estimated that SBTech had done business in Iran for 4–5 years," *id.* ¶ 87 (quoting Report at 34–35).

- "A former employee told [Hindenburg] SBTech had extensive operations in Iran, violating local laws in a market subject to heavy U.S. sanctions." *Id.* ¶ 50 (quoting Report at 1–2).

These attributions contain all the methodological shortcomings identified by the case law. They suffer from all the indicia of unreliability that have led courts often not to credit attributions to unnamed sources in short-seller reports. They describe "former employees" only generally. They do not specify these employees' positions, length of employment, location of employment, or their respective roles or sources of knowledge. *Compare* SAC, *with Blanford*, 794 F.3d at 307 ("[T]he Complaint specifies each witness's position, length of employment, and job responsibilities."), *and In re Blue Apron Holdings, Inc. Sec. Litig.*, No. 17 Civ. 4846 (WFK), 2020 WL 1950783, at *7 (E.D.N.Y. Apr. 22, 2020) (same). And the statements attributed to the unnamed sources are general in nature; they are devoid of details lending themselves to corroboration. *Compare* SAC, *with Blanford*, 794 F.3d at 307 (multiple witnesses described buildup of expiring inventory in specific terms, and specific orders where inventory was temporarily loaded onto trucks before audits). These former employee statements quoted in the SAC are also strikingly non-particular. *Long Miao*, 442 F. Supp. 3d at 800. They lack details, for example, as to where, when, and how SBTech operated in each jurisdiction at issue. *See, e.g.*, *id.* at 800 n.21 (collecting cases); *Schiro v. Cemez, S.A.B. de. C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019) (confidential witnesses' allegations too vague, speculative, and conclusory to be credited); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007)

(discounting confidential witness's statements, even where role specified, where witness "merely parrots the conclusory allegations contained in the complaint").

And plaintiffs' counsel, by its own account, has not confirmed *any* of the attributions to unnamed sources in the Hindenburg Report. As the SAC (to counsel's credit) discloses, counsel "attempted to confirm the statements of these former employees by reaching out to Hindenburg's founder," but was unable to do so. SAC ¶ 51 n.13[10]; *see Long Miao,* 442 F. Supp. 3d at 803–04 (refusing to credit uncorroborated secondhand accounts); *see also In re Lehman Bros. Sec. and Erisa Litig.*, Nos. 10 Civ. 6637, 09 Md. 2017 (LAK), 2013 WL 3989066, at *4 (S.D.N.Y. July 13, 2013) ("Allowing counsel to rely on confidential witness statements recounted" in a separate document "would provide the Court little assurance that the factual contentions have any evidentiary support."). Plaintiffs' attempt to distinguish the secondhand allegations from those disregarded in *Long Miao* on the grounds that counsel here made an attempt to corroborate those statements, *see* Pl. Opp. at 11 n.8 (noting that counsel's failure to confirm former employees' statements was not "for lack of effort"), does not salvage these statements so as to accord with the standards of the PSLRA.

The SAC's central factual premise is thus subject to an overarching methodological deficiency. That frames the Court's assessment—which now follows—of each of the categories of allegedly actionable statements and omissions cited by the SAC.

[10] Plaintiffs' counsel's statement that it "confirmed the well-sourced facts in the Report," Pl. Opp. at 11 n.7, does not fill this void, both because it is conclusory, and because, by its terms, it does not appear to address the *un-sourced* facts on which the Report dominantly relies. *Compare* SAC, *with In re Longwei Petroleum*, No. 13 Civ. 214 (HB), 2014 WL 285103, at *2 (S.D.N.Y. Jan. 27, 2014) ("Plaintiffs' investigators independently corroborated these reports through similar interviews, photographs, and visits.").

### A. Statements Relating to Compliance

#### 1. Statements Regarding Compliance with Various Gaming Laws

##### a. Allegations Relating to Malaysia

As to Malaysia, the SAC's theory of falsity is straightforward, but its allegations are threadbare. The SAC alleges that, contrary to DraftKings's representations, SBTech operated directly in Malaysia. SAC ¶ 54. It alleges, in turn, that Malaysia is a black-market jurisdiction because it prohibits "all forms of sports betting (at bookmakers) and online gambling," although it allows "some forms of lotteries, casino games and horse racing." *Id.* ¶ 170. As proof of this, the SAC alleges that "[i]n the first eight months of 2018, Malaysian authorities arrested 22,300 people for gambling over the course of 12,449 raids" on "illicit gambling dens and lottery syndicates." *Id.* ¶ 171.

For multiple reasons, these sparse allegations fall far short. "When a securities fraud claim is premised on the defendant's predicate violations of law[,] . . . the facts of that underlying violation must be pled with particularity." *See Plumber & Steamfitters*, 11 F.4th at 99; *see also In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014). Here, beyond the anonymous former employee statement in the Hindenburg Report that the SAC reprises and that is not properly credited, the SAC is devoid of any allegation that SBTech conducted business in Malaysia, *see* SAC ¶ 54. The SAC also does not identify any law or unequivocal official pronouncement prohibiting internet gaming in Malaysia. *See id.* ¶ 48 (defining grey markets); Motion at 13 & n.5 (SAC fails to plead black-market jurisdiction). And the SAC does not allege that the 2018 arrests for what it terms "gambling" and "lottery" offenses were for online gambling or internet gaming, or state whether these were based on violations of categorical bans, as opposed to violations of licensure and permitting requirements, *see id.* ¶ 170 n.41 (citing Balan Rathakrishnan and Sanju George, *Gambling in Malaysia: An Overview*,

Cambridge Core (published Dec. 2, 2020), https://www.cambridge.org/core/journals/bjpsych-international/article/gambling-in-malaysia-an-overview/EE105ABC13FAA57A743EC766D2A3F179) (discussing gambling licensing, stating that "[m]any forms of gambling are legal and popular in Malaysia," and discussing popularity of online gambling, despite illegality). The SAC does not identify what laws SBTech, its subsidiaries, or its clients allegedly violated; how, if at all, those laws applied to foreign software providers such as SBTech; how concretely SBTech's conduct violated those laws; or whether those laws are in fact enforced. These lapses are fatal to the SAC's claims as to Malaysia. *See Plumber & Steamfitters*, 11 F.4th at 99 (claim not stated where complaint did not "specify *what* law or standard the defendant violated and *how* the violation occurred" (emphasis in original)).

### b.   Allegations Relating to Vietnam

As to Vietnam, Indonesia, and Thailand, the SAC's factual allegations and legal theories overlap significantly. The SAC alleges that SBTech operated in these jurisdictions (1) directly, based on websites associated with SBTech that accepted local currencies or were available in local languages, *see, e.g.*, SAC ¶ 53 (citing Report at 7–8); *id.* ¶ 89 (citing Report at 41–42), and (2) indirectly, through its "undisclosed subsidiary," CoreTech, *see, e.g., id* ¶¶ 68–73 (section heading); *id.* ¶¶ 76, 78 (CoreTech's conduct in Thailand and Vietnam). As to each jurisdiction, the SAC's allegations are insufficiently particular. But because the SAC pleads different facts as to the regulatory climates in these countries, the Court addresses these jurisdictions separately, beginning with Vietnam.

The SAC's basis for alleging that Vietnam is a black-market jurisdiction are general quotes from gambling.com that gambling is "almost entirely banned for Vietnamese citizens." *See id.* ¶ 163. But as the SAC acknowledges, Vietnam does not prohibit all gambling. Casinos

are "accessible by foreign citizens," and Vietnamese citizens routinely use technology to access foreign-based gambling sites. *Id.* As to online gambling specifically, the SAC cites Article 321 of the Criminal Code of Vietnam, as of 2015, which prohibits "any person" from participating in or organizing online gambling. *Id.* ¶ 166. But these allegations do not address what, if any, online gambling laws applied between 2014 and 2017—and if so, how—to foreign software providers like SBTech, its subsidiaries, or its (unidentified) reseller clients. *See also* Dkt. 66, Ex. 5, at 33 (BCA defining "clients" as persons who have "at any time licensed SBT[ech] software directly from SBT[ech] or any of its subsidiaries"). As to enforcement, the SAC states that Vietnamese authorities blocked almost 200 foreign gambling sites before 2012 (although, it notes, citizens still accessed sites through Virtual Private Networks or "VPNs"), SAC ¶ 163; "shut down an illegal gaming ring tied to 12Bet," a site "tied to a triad gang kingpin," in 2015, *id.* ¶ 77; arrested 22 individuals in an "online sports betting ring," *id.* ¶ 78, and "over 380 Chinese nationals accused of operating illegal online gambling websites in Hai Phong," in 2019, *id.* ¶ 164; and "busted a massive online card ring," in 2020, *id.* ¶ 165. But these allegations of disparate enforcement measures leave unstated what the overall Vietnamese enforcement regime was as relevant to DraftKings and its affiliates, including how Vietnam's laws applied to the businesses of these entities. The SAC thus leaves to unacceptable conjecture its claim that SBTech violated Vietnamese laws that are affirmatively enforced, and that DraftKings's statements about its legal compliance were materially false when made. *See generally Uni-World Cap. L.P. v. Preferred Fragrance*, No. 13 Civ. 7204 (PAE), 2014 WL 3900565, at *7 (S.D.N.Y. Aug. 8, 2014) (to state a § 10(b) and Rule 10b-5 claim, complaint must plead, among other things, an untrue statement or misrepresentation).

Further, although the SAC's allegations of material falsehoods center on SBTech's activities, its factual allegations about SBTech are far too loose, general, and hazy to plead that DraftKings's representations about its compliance were misleading. *See id.*; *Schiro v. Cemez, S.A.B. v. C.V.*, 438 F. Supp. 3d 194, 198 (S.D.N.Y. 2020) (to plead with particularity underlying illegal act, complaint must allege "who, what, when, where, and how" of improper transaction). The SAC's allegations appear to embody two theories as to how conduct in Vietnam was attributable to SBTech.

The SAC first posits that SBTech itself operated directly in Vietnam. In support, it cites the Report, which states, without citation, that "Hindenburg . . . spoke with former employees who said that SBTech operated in Vietnam." SAC ¶ 54. These unsourced and secondhand allegations in a short-seller's report cannot, without more, be credited on a motion to dismiss, for the reasons reviewed above.

The SAC also cites a screenshot of a website graphic indicating that beginning in 2014, SBTech's website accepted payment in the form of the Vietnamese dong and the Indonesian rupee.[11] *Id.* ¶ 53 (citing Report at 7–8). But even crediting that website as a reliable source, that SBTech accepted a currency would fail to tie SBTech to business (let alone unlawful business) in Vietnam, so as to make DraftKings's claims of material compliance with applicable gaming laws materially false.

---

[11] Insofar as the SAC states that SBTech "removed its advertisement for Asian solutions sometime in 2017," *see* SAC ¶ 58, neither the SAC nor the Report, *see* Report at 10, defines "Asian solutions." However, the web archive link cited in the Report reflects the most recent "capture" of SBTech website on January 15, 2017, showing the same multi-currency symbol replicated in the Report. *See* SAC ¶ 53 (citing https://web.archive.org/web/20170115202334/http://www.sbtech.com/solutions-asian-agent-networks.html).

The SAC, quoting the Report, next states that, "[e]arly on in [its] investigation," Hindenburg found domains for sports betting sites "linked to over 25 operators who appear to be targeting black market clientele, based on the languages supported," which included Vietnamese, and some of which had "source code that shared the same labeling system as SBTech's," *id.* ¶ 89 (citing Report at 41–42). For this proposition, the SAC cites a chart from the Report's appendix—apparently created by Hindenburg, but lacking any attribution or dates. The chart contains errors, albeit minor ones. *See, e.g.,* Report at 41–42 (repeatedly calling "Indonesia" a supported language); *cf. Long Miao*, 442 F. Supp. 3d at 804 (errors in short-seller report raised doubt as to its reliability). And the chart's subdomain hostnames lack any evident connection to SBTech; neither the SAC nor the Report specifies or explains how, as alleged, the hostnames reflect "the same labeling system as SBTech's." SAC ¶ 89; Report at 41. The Report, although stating that it began collecting the information in the chart "early in [Hindenburg's] investigation," does not sync that information to dates or times, let alone reveal any unlawful activity by SBTech. Report at 40. Again, even treating the chart as a reliable source, the mere fact that third-party operator websites, whose connection to SBTech is unspecified, were available in Vietnamese does not permit a court to infer plausibly that DraftKings's statements about its compliance with Vietnamese law were false when made. *See id.*; *In re Lululemon*, 14 F. Supp. 3d at 571 ("A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false *at the time it was made.*" (emphasis in original)).

The SAC's second theory is that, before and after the BCA, SBTech operated in Vietnam (among other assertedly black-market jurisdictions) indirectly through CoreTech. The SAC labels CoreTech an "undisclosed affiliate or subsidiary of SBTech," *see, e.g.*, SAC ¶¶ 68–73

(section heading).  These allegations are again too general and unreliable to support a claim that DraftKings's statements about its (and SBTech's) compliance with Vietnamese law were false.  *See* Motion at 7–8, 12–13.  According to the Oregon Lottery's Report, SBTech had a *contractual* relationship with CoreTech.  Or. R. at 10 (contract with BTI).  The SAC advances a different theory: that in fact "SBT[ech]and [CoreTech] are one and the same," Pl. Opp. at 5; *see, e.g.*, SAC ¶ 26 (describing SBTech as "SBTech/BTi/CoreTech"); *id.* ¶ 77 (attributing conduct to "SBTech and [CoreTech]," but only discussing CoreTech's sportsbook).  But it lacks any particularized allegations supporting the corporate unity of the two entities, or even, as the SAC elsewhere offers, that CoreTech was a direct affiliate as opposed to a contractual client of SBTech.[12]  *See, e.g.*, *id.* ¶ 70.

---

[12] The SAC does not appear to allege that—insofar as CoreTech was a client, but not an affiliate, of SBTech—DraftKings's compliance representations about SBTech's clients were false in that client CoreTech violated foreign laws.  Nor does plaintiffs' memorandum of law in opposition to dismissal articulate such a theory.  *See* Pl. Opp. at 20 (citing SBTech-BTI contract, but only to discuss DraftKings's revenue sources).

Even if plaintiffs had pursued this theory, the SAC's allegations as to CoreTech's conduct would be insufficient to plead a § 10(b) violation, with respect to any country.  DraftKings's operative representation was that SBTech's clients were not "permitting the use by others, of the SBT[ech] Software in contravention of Laws related to gaming relevant to SBT[ech], its Subsidiaries, or the Clients (as applicable)" and that "to the knowledge of SBT[ech], each Client is regulated by a Gaming Regulatory Authority."  *See* SAC ¶ 105; Dkt. 66, Ex. 5, at 32.  As to the representation about clients' compliance with laws, the SAC does not plead what laws applied to foreign distributors like CoreTech, to whom SBTech appears to have directly licensed its product.  *See* Dkt. 66, Ex. 5, at 33 (defining "client").  Nor does it plead the manner in which CoreTech violated these laws.  *See id.* at 32 (representing compliance with laws relevant to SBTech and its clients, but not making representations about third parties).  The SAC does not allege that CoreTech, as a client, ever permitted third parties to use *SBTech's* software impermissibly in Vietnam, *see* SAC ¶¶ 77–78 (only discussing use of CoreTech's platform), Thailand, *see id.* ¶ 76 (same), or China, which, in any event, the SAC's allegations fail to plead was a black market, *see infra* Section III.A.1.f.

As to the representation about Gaming Regulatory Authorities, the SAC also does not develop any facts as to these.  It does not address what the Gaming Regulatory Authorities were in the

In support of its theory that—contrary to the Report—CoreTech was a concealed

subsidiary of SBTech, the SAC primarily relies on anonymous statements attributed by the

Report to former employees.  With one exception that does not support the SAC's theory,[13] the

cited statements lack indicia of reliability.  These include statements from: (1) "one former

employee who served in a product development role," who stated that CoreTech was a "front"

entity for SBTech, *see id.* ¶ 60; (2) a former employee of "both SBTech and CoreTech," who

stated that "[a]ll CoreTech business comes from SBT[ech]," *id.* ¶ 73; and (3) "another employee"

who worked for both companies, who stated that "the two companies are very financially close,"

*id.*  The Report and the SAC do not identify the positions, job responsibilities, or source of

knowledge of any these witnesses, let alone do so with sufficient particularity "to indicate a high

likelihood that they actually knew the facts underlying their allegations."  *Long Miao*, 42 F.

Supp. 3d at 803 (declining to credit statements from confidential witnesses described as

---

jurisdictions where it alleges CoreTech operated—all of which, critically, as pled, did not
categorically forbid all gambling.  It does not allege whether CoreTech was "regulated by a
Gaming Regulatory Authority."  *Compare* SAC ¶ 105 (DraftKings's statement), *with id.* ¶¶ 163
(Vietnam, some types of gambling permitted), 170 (Malaysia, same), 172 (Thailand, same), 168
(Indonesia, stating only "the vast majority of gambling" is prohibited), 161 (China, discussing
efforts to stop gambling "beyond government-sanctioned outlets").

Finally, even if the SAC had adequately pled unlawful activity by CoreTech in violation of
Vietnamese or other foreign laws, the SAC does not non-speculatively allege DraftKings's
scienter—or knowledge—as to CoreTech's compliance.  *See, e.g.*, SAC ¶¶ 76–78; *In re PXRE
Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (plaintiff must specify
"allegations that [1] *specific* contradictory information was available to the defendants [2] *at the
same time* they made their misleading statements.").

[13] One former employee stated that CoreTech "acted as a customer of SBTech."  SAC ¶ 60.
Although anonymously sourced, this statement is corroborated by the Oregon Report, which
states that SBTech had a contract with CoreTech, *see* Or. R. at 10.  But that, as explained above,
is not the SAC's theory.  *See supra* note 12.

occupying "a financial role").  The statements are also unmoored in time, unconfirmed by

counsel, and uncorroborated by other allegations.[14]

These statements aside, the SAC contains the thinnest of allegations suggesting that

CoreTech was an SBTech affiliate so as to support attributing CoreTech's violations of law to

SBTech and to undermine DraftKings's representation that SBTech and its subsidiaries had

complied with all relevant gaming laws in the four years preceding the BCA.  *See* SAC ¶ 105.

The SAC alleges that the separation between the companies was "illusory" because Meckenzie's

former "right hand man," Tom Light, left SBTech to start CoreTech, *id.* ¶¶ 55, 60 (citing Report

at 11–13), and because CoreTech and SBTech's offices were 4.5 miles apart in Sofia, Bulgaria,

*id.* ¶ 60.  These allegations fall far short of pleading a corporate affiliation between two entities.

*See Rombach*, 355 F.3d at 174 (complaint "must demonstrate with specificity why and how [a

statement is false]").  That SBTech lost 47 employees and CoreTech hired 50 employees in July

2018, *id.* ¶ 67, similarly, does not support that the two entities were affiliates, as opposed to

occupying a sufficient similar business space to make it plausible that CoreTech, which was

founded in 2018, *id.* ¶ 60, recruited these persons.[15]

---

[14] These statements are also contradicted by statements the SAC attributes to other anonymous
former employees.  *See, e.g.*, SAC ¶ 73 ("One [CoreTech] manager told us: '[CoreTech] is not
part of SBT[ech] group.'"); *id.* ("[A] different former colleague" stated that, although the "full
separation [took] a few months," and during that time "SBTech supported [CoreTech]," the
"split was handled in less than three months.").

[15] That a handful of employees posted online resumes reflecting that they worked at both
companies in overlapping time periods, Report at 19–20; SAC ¶¶ 69–70 (LinkedIn profiles),
does not establish an affiliate relationship between SBTech and CoreTech.  The employees
could, for example, have worked at both companies pursuant to the SBTech-CoreTech
contractual relationship.  *See* Or. R. at 10.  Also nonprobative, without more, is the allegation
that three third-party websites confused SBTech and CoreTech, *see* SAC ¶¶ 71–72 (citing Report
at 20–21).  The SAC does not allege whether their confusion occurred during the period when
CoreTech allegedly engaged in black-market dealings in Thailand or Vietnam, *see* Report at 24

The SAC thus does not allege actionable misstatements to the extent that its theory of falsity turns on the activities of CoreTech as an ostensible affiliate of SBTech.  This pleading deficiency undermines the SAC's reliance on CoreTech's business activities in any venue in which the SAC references CoreTech:  Vietnam, Malaysia, Indonesia, Thailand, or China.

In sum, the SAC does not plausibly allege any misstatement by DraftKings with respect to violations of law in Vietnam.

### c.    Allegations Relating to Indonesia

As to its claim that SBTech directly operated in Indonesia, the SAC's factual basis for so claiming is substantially the same as the factual basis, which the Court has found inadequate, for so claiming as to Vietnam.  It consists of the same generalized statement of an unnamed former employee, SAC ¶ 54, the claim that SBTech's website accepted the Indonesian rupee between 2014 and 2017, *id.* ¶ 53, and the claim that some third-party operator websites were available in Indonesian, according to the Hindenburg Report's chart, *see id.* ¶ 89 (citing Report at 41–42); *see also id.* (same, as to CoreTech).

As to its claim that SBTech indirectly operated in Indonesia through CoreTech, the SAC reiterates its *ipse dixit* that SBTech and CoreTech were a single entity, *see, e.g.*, *id.* ¶¶ 68–73; *see supra* Section III.A.1.b.  And its allegations as to CoreTech's having had operations in Indonesia are, if anything, more general than those as to Vietnam.  *Compare* SAC ¶¶ 77–78 (alleging raids

(Thailand: no date on Betway site screenshots); *id.* at 26, 29 (Vietnam: no date on 12Bet or Fun88 site screenshots), what the basis was for the third parties' confusion, and whether any of these entities had a business relationship with SBTech, including using its software, *id.*; SAC ¶ 71 (discussing only CoreTech's platform).  The Report contains a screenshot of a CoreTech employee's tweet from December 27, 2018, which shows that the employee received a gift basket from Fun88, a company linked to an illegal online sports-betting ring in Vietnam, along with a card that read: "Happy Holidays!"  *See* Report at 28–29; SAC ¶ 78.  The exchange of a gift basket does not link Fun88 to SBTech's software (or support an affiliate relationship between CoreTech and SBTech).

in Vietnam linked to CoreTech), *with, e.g.*, *id.* ¶ 60 (alleging generally that CoreTech operates in

black-market jurisdictions in "Asia" on SBTech's behalf (quoting Report at 11–13)); *see also id.*

¶ 89 (linking CoreTech to 25 operators whose websites were available in Indonesian).  The

SAC's claim that DraftKings made misleading representations that its affiliates complied with

Indonesian law thus is unsupported by concrete, non-conclusory factual allegations.

As to its claim that Indonesia is a black-market country, the SAC, quoting gambling.com,

states that Indonesia's government "has gone to great lengths to ban gambling in all its forms"

and that "the vast majority of gambling is strictly prohibited."  *Id.* ¶ 168.  It states that "[o]nline

gambling is definitively illegal in Indonesia" and that a recent report "revealed that the

Communications and IT ministry would be looking at the issue from a technological standpoint,

aiming to block Indonesian citizens from accessing online gambling websites altogether."  *Id.*

But these elusive formulations stop short of pleading that gambling activities are categorically

illegal; the SAC does not identify laws that so provide.  It identifies a single instance of

enforcement: a 2019 incident in which local authorities flogged two "Indonesian men . . . with

bamboo rods as a punishment for gambling."  *Id.* ¶ 169 (quoting Ed Silverstein, *Indonesian Men

Flogged for Alleged Gambling as Crowd Snaps Photos*, Casino.org (published Oct. 21, 2019),

https://www.casino.org/news/indonesian-men-flogged-for-alleged-gambling-as-crowd-snaps-

photos) (internal quotation marks omitted).  That incident does not speak to whether the

ostensibly direct business activities of SBTech, or the business activities of its alleged affiliate

CoreTech, breached Indonesian law.[16]

---

[16] According to the article the SAC cites, the flogging occurred in Indonesia's Banda Aceh
province.  SAC ¶ 169 (quoting Silverstein, *supra*).  Although this province adopted Sharia law
"after getting its autonomy in 2001," other parts of Indonesia have not—and the enforcement by
"local authorities'" reported in the article does not purport to be of a national-level law.  *Id.*
("Other parts of Indonesia would also like to adopt Sharia law.").

As to the legality in Indonesia of SBTech's alleged direct operations, the SAC does not identify any law prohibiting such, let alone any laws applicable to foreign gaming platforms like SBTech, its subsidiaries, or clients.  Nor does it explain how SBTech's ostensible acceptance of the Indonesian rupee or the availability of third-party operator sites in Indonesian would have breached Indonesia law.  And its general allegations about enforcement efforts do not bespeak an "unequivocal official pronouncement" categorically prohibiting internet gambling or an "affirmative concrete [governmental] action" tantamount to the same.  *See id.* ¶ 45 (defining black-market jurisdictions); *see also* Dkt. 66, Ex. 5 at 105 (defining "grey markets").  As noted, the enforcement action the SAC cites, as pled, occurred in a province that, unlike others in Indonesia, adopted Sharia law "after getting its autonomy in 2001."  SAC ¶ 169 (quoting Silverstein, *supra*).  Nor do the SAC's observations about religious demographics—that "Islamic Sharia law . . . strictly forbid[s]" gambling [and] more than 90 percent of Indonesia's . . . population are believed to be Muslim"—substitute for concretely pled facts indicative of a nationwide prohibition on online gaming.  "Allegations that are conclusory or unsupported by factual assertions are insufficient."  *ATSI*, 493 F.3d at 99.  Such is the case here.

> d.      *Allegations Relating to Thailand*

The SAC's theories of illegal operations attributable to SBTech in Thailand track those for Vietnam and Indonesia.  It alleges that Thailand is a black-market jurisdiction and that, contrary to DraftKings's claim of compliance, SBTech operated there both directly and (through CoreTech) indirectly, in violation of Thai law.  *See, e.g.*, SAC ¶¶ 89 (SBTech), 76 (CoreTech).  The SAC, however, does not adduce concrete facts in support of several components of this theory.

As to the claim that Thailand is a black-market jurisdiction, the SAC alleges that—with the exceptions of the State Lottery and horse racing—it has "prohibited gambling since 1935 pursuant to the Gambling Act BE 2478," and that its Civil and Commercial Code make gambling debts non-enforceable. *See id.* ¶ 172 (citing sections 853 and 855). But the SAC also alleges that, notwithstanding these laws, gambling is widely permitted. It cites, for example, an article that, in turn, states that "[o]nline [g]ambling is highly popular in Thailand despite the prohibition in the country," and that "the Thai Ministry of Information and Communication Technology has recently started monitoring the situation" by "watching local internet activity and blocking IP addresses found visiting any online casinos." *Id.* ¶ 173 (quoting *Why Gambling is Flourishing in Thailand Despite a Strict Ban*, ASEAN Today (published Nov. 6, 2019), https://www.aseantoday.com/2019/11/why-gambling-is-flourishing-in-thailand-despite-a-strict-ban).

As to the claim that SBTech had direct operations in Thailand, these, too, lack well-pled factual support. The SAC relies on the same unnamed former employee addressed in connection with the jurisdictions above, *see id.* ¶ 54; and on the claim—again based on the Hindenburg Report's unsubstantiated chart—that certain third-party operator sites were available in Thai, *see id.* ¶ 89 (citing Report at 41–42). These attributions are problematic, for the reasons covered, and too slender a reed to support this allegation.

As to the claim that Thai law barred SBTech or its affiliates—or, for that matter, its clients—from providing software used in gaming websites, the SAC does not cite any law applicable to this conduct, or explain why a gaming website's availability in Thailand would have breached Thai law. And as to Thai enforcement practices, the SAC references only online

casinos generally.  *See id.* ¶ 173.  It is silent as to enforcement efforts directed at online sports betting, foreign software providers, or products similar to SBTech's, in particular.

The SAC thus does not adequately allege that DraftKings's representations about its affiliates' compliance with Thai law were false (or materially so).

### e.      Allegations Relating to Iran

The SAC claims that, contrary to DraftKings's public representations, SBTech, for years, operated illegally in Iran, a black-market jurisdiction.  *See, e.g.*, *id.* ¶¶ 50, 85–97.

In support of its claim of unlawful business operations, the SAC cites: (1) the Report's statement that unidentified employees had stated that SBTech for years had operated in Iran and "violat[ed] local laws," *see, e.g.*, *id.* ¶¶ 50, 85, 87 (citing Report at 34–35), and (2) SBTech's acknowledgment to the Oregon State Lottery that "in early Spring of 2018, [it] became aware one of [its] contracted B2B distributors accepted wagers from one of the said distributor's end use operators in Iran," *id.* ¶ 86 (citing Report at 34); *see also* Or. R. at 9.  In support of the claim that Iran is a black-market jurisdiction, the SAC cites Article 705 of the Islamic Penal Code of the Islamic Republic of Iran, which prohibits "gambling by any means" and provides that "offenders shall be sentenced to one to six months imprisonment or up to 74 lashes; and if they commit gambling publically [sic] they shall be sentenced to both the punishments."  SAC ¶ 150.  The SAC alleges that Iran applies these laws to "online gaming."  *Id.* ¶ 151.  It alleges that in 2019, Iran "blocked 61 online betting sites in two months," *id.*, and that, over the past two years, Iran's Central Bank has reduced the number of online bets and gambling transactions by 60% by screening and blocking payments linked to gambling, *id.* ¶ 152.  The SAC also alleges that the Iranian Parliament is contemplating a "new bill . . . which covers betting in cyberspace."  *Id.* ¶ 153.  And, in an allegation particular to Iran, the SAC alleges that SBTech has stated that Iran

is "considered to be a black-market jurisdiction." *Id.* ¶ 86; *see* Or. R. at 9 (describing Iran as a market SBTech "has chosen not to enter").

The SAC adequately pleads that Iran is a black-market jurisdiction. But its conclusory claim that SBTech operated there in breach of local law—making DraftKings's representations false or misleading—is unsupported by concrete factual allegations. The Court again puts aside the unsourced secondhand generalizations from the short-seller report. That leaves SBTech's statement to the Oregon lottery that in spring 2018, it had become aware of an incident in which one of its contracted distributors had accepted wagers from an "end use operator" in Iran. That incident is fairly considered. But, standing alone, it is insufficient to support the SAC's thesis that SBTech operated in Iran. On its face, the incident concerned the acts not of SBTech, but of a single contractual distributor. And, as the Oregon Report—the SAC's source for this allegation—states, SBTech "immediate[ly]" resolved this issue by compelling the distributor to "terminate business with that end use operator." *See* Or. R. at 9; SAC ¶ 86 (quoting Report at 34). This instance of a contracted distributor acting in contravention of SBTech policy does not support the SAC's sweeping "estimat[ion] that SBTech had done business in Iran for 4–5 years," SAC ¶ 87. It also does not, as pled, support the SAC's thesis that, in the BCA, DraftKings misrepresented SBTech's and its clients' compliance with "Applicable Gaming Laws" for the preceding four years, *id.* ¶ 105, or that SBTech's clients did not use or permit third parties to use SBTech's software in contravention of such laws, *id.*; *see In re Lululemon*, 14 F. Supp. 3d at 571 ("[W]ithout *contemporaneous* falsity, there can be no fraud." (emphasis in original)). The SAC does not explain how a sub-licensee's acceptance of wagers from an end-use operator in Iran, unbeknownst to SBTech, violated a "material respect of the relevant Applicable Gaming Laws" applicable to *SBTech*. And it does not explain how SBTech's client—the distributor to whom

SBTech licensed its product directly, *see* Dkt. 66, Ex. 5 at 33 (defining "client" for the purposes of Section 4.6)—breached local laws.  It does not plead where the distributor was located, what Iranian laws applied to it, or how those laws were violated.  *See Gray v. Alpha and Omega Semiconductor Ltd.*, No. 20 Civ. 2414 (RA), 2021 WL 4429499, at *8 (S.D.N.Y. Sept. 27, 2021) (collecting cases) (when falsity related to violations of export control regulations, underlying violations had to be pled with particularity); *see also Mucha v. Winterkorn*, No. 21-1511, 2022 WL 774877, at *2 (2d Cir. 2022) (same as to underlying violations).

### f.      Allegations Relating to China

Finally, as to China, the SAC posits that SBTech operated there both directly and indirectly through CoreTech.  *See, e.g.*, SAC ¶¶ 50, 73.

The SAC's claims of actionable statements and omissions as to China, however, falter at the threshold.  That is because the SAC admits that China began as a grey-market jurisdiction, consistent with the Oregon Report's 2019 description of China as such in its Report.  *See* Or. R. at 10–11; SAC ¶ 84.  And, conclusory statements aside, *see, e.g.*, SAC ¶ 79 (terming China as a "major black market" where "online gambling . . . has been illegal for years"), the SAC does not plead concrete facts establishing that such gambling thereafter and during the class period became categorically prohibited, as the SAC's theory of § 10(b) liability presupposes.

The SAC states—in tension with the Oregon Report's characterization of China—that "[g]ambling activities (including online betting) are illegal in China" under the Gambling Ordinance of 2002, *id.* ¶ 157, and Article 303 of the Criminal Law of the People's Republic of China and the Sixth Amendment to the Criminal Law, *id.* ¶ 156 (applying to "a person who 'establishes online gaming websites' or 'acts as a conduit for online gaming websites, and accepts bets on behalf of online gambling websites'" (citation omitted)).  But its ensuing

allegations make clear that its basis for terming China a black-market jurisdiction are recent intensified enforcement efforts.  It states that "popular online payment systems . . . [have been] helping the government's effort to curb online gambling" by intercepting transactions linked to illegal online casinos, *id.* ¶ 158 (quoting K Oanh Ha, Jinshan, Hong, and Andreo Calonzo, *The $24 Billion Online Casino Boom China Is Struggling to Halt*, Bloomberg (published Sept. 11, 2019), https://www.bloomberg.com/news/articles/2019-09-11/the-24-billion-online-casino-boom-china-is-struggling-to-halt?leadSource=uverify%20wall).  It describes a "three-year campaign against online betting codenamed 'Operation Chain Break.'"  *Id.* ¶ 159.  And, in a formulation that implies that online gambling is not categorically prohibited, but merely subject to regulation and intensified enforcement efforts, it states that "authorities have issued multiple policies to regulate the [online gambling] market" and notes that "sites for the Welfare Lottery or Sports Lottery" are legal.  *Id.* ¶¶ 155–56; *see also id.* ¶ 156 ("[T]he overall trend of regulation is likely to be less friendly to online gambling businesses." (citation omitted)).  The SAC also cites China's efforts in 2019 and 2020 to "pressure the Philippines and Cambodia to stop taking online bets from players in China," *id.* ¶ 162, a foreign ministry spokesman's statements that "[o]nline gambling is a most dangerous tumor in modern society," *id.*, and a December 12, 2021 editorial discussing enforcement efforts directed to illegal casinos, *id.* ¶ 161 (quoting *Online Gambling Will Remain a Problem that Must Be Watched*, South China Morning Post (published Dec. 12, 2021), https://www.scmp.com/comment/opinion/article/3159363/online-gambling-will-remain-problem-must-be-watched).

This mash-up of disparate allegations does not adequately plead that during the class period, China was a black-market jurisdiction—that is, one in which SBTech's operations would necessarily have been unlawful.  Some of these allegations address extraneous forms of

gambling; none clearly elucidates the boundaries of what, during the class period, was permitted and what was prohibited with respect to online gaming in general or, as specifically relevant to SBTech's business model, the licensing of gaming software.  That "[s]ince [the Oregon Report], China has arrested over 11,500 people for gaming offenses," *id.* ¶ 84 (quoting Hindenburg Report at 44), does not clarify the operative legal rules.  Nor do the allegations as to "Operation Chain Break."  As support for its Operation Chain Break allegation, the SAC quotes a report by the Asian Racing Federation, "whose purpose is to foster and enhance international cooperation among horse racing operators, regulators, intergovernmental organisations and government agencies," but the report does not speak to whether or how Chinese laws, as written and enforced, would apply SBTech's business.  *See id.* ¶¶ 159–60 (quoting *How China's Crackdown on Illegal Betting Impacts Global Betting Markets*, Asian Racing Fed'n (Sept. 2021) https://assets-global.website-files.com/5fbe2bde2b2ef4841cd6639c/613077d94afe115ac35264e3_How%20China%27s%20Crackdown%20on%20Illegal%20Betting%20Impacts%20Global%20Betting%20Markets_v2.pdf).  China's enforcement efforts directed to in-person, *id.* ¶ 161, or online casinos, *id.* ¶ 158, generally also do not speak to whether those casinos offered foreign gaming software like SBTech's, and, as a result, do not bear on how that country's gambling laws and enforcement practices applied to SBTech.

The SAC also cites some enforcement efforts that post-date, or appear to post-date, the conduct described in DraftKings's compliance statements.  The December 2019 BCA and the April 2020 Proxy Statement represented that SBTech, its subsidiaries, and its clients had complied with "Applicable Gaming Laws" for the preceding four years "*[e]xcept for* operations conducted . . . in any jurisdiction that is a Grey Market or was a Grey Market *at the relevant*

*time(s)*." *Id.* ¶ 105 & n.25 (emphasis added); *see id.* ¶ 48 (BCA defining "grey markets"). By definition, enforcement activity directed to later conduct cannot demonstrate that these representations were false, because "the pertinent moment is the date of the [conduct] described in the [SEC] filings, not the date of the filings themselves." *In re Hebron Tech. Co., Ltd. Sec. Litig.*, 2021 WL 4341500, at *13.

In any event, putting aside its hazy portrait in general of the operative prohibitions, the SAC does not identify any specific "applicable gaming law" that SBTech's alleged direct operations in China, or its alleged indirect operations via CoreTech, breached.[17] Relying on the Hindenburg Report, the SAC (1) cites an undated screenshot purportedly showing "source code that appears tied to SBTech's CoreTech [that was] pulled from Chinese betting sites," SAC ¶ 81 (citing Report at 31–32), and (2) claims that SBTech operates in China through resellers such as "10Bet, W88, and Gameplay," *id.* ¶ 60 (quoting Report at 11–13). *But see* Or. R. at 11 ("10Bet does not derive revenues from China using SBTech's software."). But its allegations about China's "strictly anti-gambling" posture, SAC ¶ 154, prohibitions on "a person" from establishing online gaming sites or acting as a conduit for online gaming, *id.* ¶ 156 (Article 303), and "regulat[ion of] online sports betting," *id.* ¶ 157 (Gaming Ordinance of 2002), do not make at all clear that, or how, these laws would apply to the "Chinese betting sites" at issue, *see id.* ¶ 79 (10Bet); Report at 31–32 (five "apparent Chinese mirror sites"). Nor does the SAC elucidate whether these laws would run to an international software licenser like SBTech, let alone that they would make SBTech's conduct (that is, the licensure of its gaming software)

---

[17] For the same reasons addressed in connection with Vietnam, the SAC's allegations to the effect that SBTech was identical to, or affiliated with, CoreTech, or that CoreTech violated Chinese law, *see, e.g.*, SAC ¶ 89 (citing Report at 41–42), are inadequately pled. The SAC does not anywhere allege that CoreTech was located in China. *See id.* ¶ 60 (CoreTech office in Bulgaria); Or. R. at 10 (CoreTech not located in China).

illegal.  *See* SAC ¶ 87 (citing Report at 41) ("China facing sites" contain source code indicating they are running SBTech software).  Indeed, the SAC, which otherwise draws upon the Oregon Report, does not identify any change in Chinese law since that report stated that the legal analysis of SBTech's lawyers and that of "many other licensed European operators" was that Chinese laws prohibiting gambling do *not* apply to services originating from outside China's territorial borders.  Or. R. at 10.

For these reasons, the SAC does not plausibly allege an actionable misstatement or omission by DraftKings concerning SBTech's or its affiliates' compliance with the laws of China—or of any of the other five jurisdictions discussed above.

### 2.     Statements Regarding Compliance with Sanctions

The SAC next alleges that DraftKings's statement that "[s]ince January 1, 2016, neither SBTech nor any of its subsidiaries is conducting or has conducted, directly or indirectly, any business" with an entity subject to sanctions "applicable to the relevant transaction" was materially false or misleading, because an unidentified sub-licensee accepted wagers in Iran in 2018.  SAC ¶¶ 103–04.

This theory of liability is quickly put aside as conclusory.  The SAC contains only vague allegations about the applicable sanctions regime.  It states that Iran "has regularly been subject to U.S. sanctions," *id.* ¶ 54, is "subject to the sanctions program of the United States," *id.* ¶ 104, and is "a market subject to heavy U.S. sanctions," *id.* ¶ 50.   It does not, however, plead who the sublicensee was that accepted wagers in Iran in 2018; what sanctions, if any, were "applicable to the relevant transaction" with respect to the sub-licensee or SBTech, *see* Motion at 12 (SBTech

had no connection to United States at the time); or how the transaction violated those sanctions.[18]

*See, e.g.*, *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016)

(dismissing for failure to plead with particularity where complaint did not identify details of

transaction that allegedly violated sanctions); *see also Gray*, 2021 WL 4429499, at *9 (without

analysis of applicable regulation or why sales violated them, claim that American corporation's

sales to regulated Chinese entity were "necessarily illegal" was conclusory).

### 3. Statements Regarding Compliance with Anti-Corruption and Anti-Money Laundering Laws

The SAC next alleges that DraftKings's statement that neither SBTech nor its

subsidiaries "engaged in any conduct . . . that violates in any material respect any ABC Laws or

AML Laws that are applicable to [them]" was materially false.  SAC ¶ 103.  The SAC defines

"ABC Laws" and "AML Laws" to include five United States statutes, one international anti-

corruption instrument, and two residual categories encompassing "any other applicable" anti-

corruption or anti-money laundering laws of jurisdictions in which SBTech did business.[19]  *See*

*id.* ¶ 103 n.23.

---

[18]  The SAC cites to the Department of State website to support that Iran is subject to sanctions.
SAC ¶ 54 (citing *Iran Sanctions*, U.S. Department of State, https://www.state.gov/iran-sanctions
(last visited Apr. 5, 2022)).  But the linked information is generally put and arguably contradicts
the SAC's suggestion that sanctions apply to all commercial activity in Iran.  It states:

> The United States has imposed restrictions on activities with Iran under various
> legal authorities since 1979, following the seizure of the U.S. Embassy in Tehran.
> The Department of State's Office of Economic Sanctions Policy and
> Implementation is responsible for enforcing and implementing a number of U.S.
> sanctions programs that restrict access to the United States for companies that
> engage in *certain* commercial activities in Iran.

*Id.* (emphasis added).

[19]  In full, the SAC alleges:

These allegations, like those relating to Iranian sanctions, are conclusory and general.

The SAC does not specify what law SBTech or its subsidiaries violated, which entity did so, how

that entity did so, or in what jurisdiction.  And because the premise of the SAC's allegation of

this category of false statements is that there was an underlying violation of an ABC or AML law

that DraftKings denies or conceals, these claims therefore are fatally deficient.  *See, e.g.*, *In re*

*China Mobile Games & Ent. Grp., Ltd. Sec. Litig*, No. 14 Civ. 4471 (KMW), 2016 WL 922711,

at *4 (S.D.N.Y. Mar. 7, 2016) ("Plaintiffs' inability to allege that any bribery occurred during the

Class Period is fatal to their required showing of contemporaneous falsity" and they, therefore,

"cannot allege actionable misstatements or omissions . . . .").

## B.    Failures to Disclose

In a separate but related category of claims, the SAC alleges that DraftKings actionably

failed to disclose its alleged black-market operations or its revenue from the same, and that this

made other of its statements materially misleading.  *See* Pl. Opp. at 17–20.  In moving to dismiss,

DraftKings argues that the SAC does not adequately allege actionable omissions and thus does

not state a § 10(b) claim.  *See* Motion at 10–17; Reply at 2–8.  DraftKings is correct.

Two background principles frame the Court's assessment of these allegations.

---

"ABC Laws" means: (a) the OECD Convention on Combating Bribery of Foreign
Public Officials in International Business Transactions, 1997; (b) the Foreign
Corrupt Practices Act of 1977 of the United States of America, as amended by the
Foreign Corrupt Practices Act Amendments of 1988 and 1998 (the "FCPA");
(c) the Bribery Act 2010; and (d) any other applicable anti-corruption laws of any
jurisdiction in which SBT and its Subsidiaries is conducting or has conducted
business.  "AML Laws" means: (a) the Proceeds of Crime Act 2002; (b) the Money
Laundering Regulations 2007; (c) the Terrorism Act 2000; and (d) any other
applicable anti-money laundering laws of any jurisdiction in which SBT and its
Subsidiaries is conducting or has conducted business.

SAC ¶ 103 n.23.

First, DraftKings did not have a freestanding legal duty to disclose any alleged black- or grey-market dealings, no matter how significant those dealings might have been to the market. *See In re Braskem S.A. Sec. Litig.,* 246 F. Supp. 3d 731, 752 (S.D.N.Y. 2017) (collecting cases). The securities laws do not create a general duty to disclose uncharged criminal conduct. *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006); *see Lopez,* 173 F. Supp. 3d at 23 ("Disclosure of . . . information is not required . . . simply because it may be relevant or of interest to a reasonable investor." (quoting *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002)).  Rather, disclosure is required—and the failure to do so is actionable— only where disclosure "was necessary to prevent the corporation's *other* statements from being misleading." *In re Braskem*, 246 F. Supp. 3d at 752 (emphasis in original); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016) ("'Pure omissions' of information, absent a duty to disclose, are not actionable.  Half-truths, however, 'statements that are misleading . . . by virtue of what they omit to disclose,'" are.).  Of course, a disclosure obligation may alternatively arise from a separate statute or regulation.  *See In re Marsh*, 501 F. Supp. 2d at 469.  Here, however, the SAC does not identify any statute or regulation that obliged DraftKings to disclose black- or grey-market operations.  *See, e.g.*, *In re Braskem*, 246 F. Supp. 3d at 753.

Second, as to the materiality requirement, it "is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *JP Morgan*, 553 F.3d at 197 (quoting *Basic*, 485 U.S. at 231–32).  "[T]he concepts of materiality and duty to disclose are different."  *Glazer v. Formica Corp.*, 964 F. 2d 149, 156 (2d Cir. 1992) (citations omitted).  "Material facts are those that may affect the desire of investors to buy, sell,

or hold securities."  *In re Lululemon*, 14 F. Supp. 3d at 572 (quoting *Castellano v. Young &*

*Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001)), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

### 1.     Failures to Disclose Operations in Black-Market Jurisdictions

The SAC alleges that, when listing the jurisdictions of its operations in public filings,

DraftKings omitted countries where SBTech had black-market operations, and that these were

material omissions.  The SAC points to the December 2019 press release announcing the BCA,

which stated that SBTech has "50+ partners in 20+ regulated markets and jurisdictions including

Czech Republic, Denmark, Ireland, Italy, Mexico, Portugal, Spain, Sweden, and U.K. and

Arkansas, Indiana, Mississippi, New Jersey, Oregon, and Pennsylvania."  *See* SAC ¶ 100; Dkt.

66, Ex. 3, at 2.  It also points to SBTech's inclusion in various SEC filings of this text:

> SBTech has obtained licenses (and approval, as applicable), in six states in the United
> States and in the United Kingdom, Gibraltar, Malta and Romania.  Additionally, SBTech
> has certified its software in Denmark, Italy, Nigeria, Portugal, and Spain, and its platform
> and sportsbook are available in Azerbaijan, Belgium, Cyprus, Czech Republic, Greece,
> Mexico, Poland and Sweden under local licenses held by operators using SBTech's
> platform in these jurisdictions.

SAC ¶¶ 107 (2020 Form S-4), 117 (April 2020 Prospectus); *see also id.* ¶¶ 125 (October

Registration Statement) (largely the same, but discussing DraftKings's "B2B business, formerly

SBTech"), 125 n.29 (June Prospectus), 131 (Form 10-K); Dkt. 66, Ex. 2, at 214 (BCA).

For several independent reasons, the SAC does not plead an actionable material omission.

First, these statements, read in context, do not purport to list the "countries in which

SBTech operated."  SAC ¶ 107; *see, e.g.*, Pl. Opp. at 17.  Rather, the statements purport only to

list some of the "regulated markets" in which SBTech operates, SAC ¶ 100 (emphasis added), or

jurisdictions where "SBTech has obtained licenses (and approval, as applicable)" or "has

certified its software."  *See, e.g.*, *id.* ¶ 117.  And the SAC does not plead, let alone with the

requisite specificity,[20] that the omission from this list of black-market jurisdictions in which
SBTech operated—assuming that the fact of operations in such jurisdictions were well-pled—
rendered false or misleading DraftKings's disclosure of the jurisdictions in which SBTech's
software *was* licensed.[21]  "Simply put, [operations in black-market, unlicensed, and licensed
jurisdictions] are different concepts." *Lopez*, 173 F. Supp. 3d at 32 (dismissing for failure to
plead omission in public statements regarding voluntary turnover rates, even where sufficiently
pled that sizeable number of female employees involuntarily left company accused of hiding
hostile work environment for women).  That elsewhere in these same filings DraftKings
referenced operations in grey-markets, stating that these were excepted from its compliance
representations, *see, e.g.*, SAC ¶ 105, and in jurisdictions other than those listed in the at-issue
statements reinforces that these statements did not purport to describe SBTech's jurisdictions of
operations, let alone exhaustively, *see, e.g.*, *id.* ¶ 109 (2020 Form S-4) ("SBT[ech] offers their
services direct to operators in Europe and uses a reseller model in Asia."); *id.* ¶ 108 (discussing
revenue generated from customers in Asia); *id.* ¶ 108 n.26 (same, in six other SEC filings);
Proxy Statement (same); *see also, e.g.*, *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 770

---

[20] "[P]laintiffs who assert claims rooted in a failure to disclose misconduct—as Plaintiffs do
here—must plead with sufficient specificity how the alleged omissions are sufficiently connected
to Defendants' existing disclosures to make those public statements misleading."  *Marcu v.
Cheetah Mobile Inc.*, No. 18 Civ. 11184 (JMF), 2020 WL 4016645, at *3–4 (S.D.N.Y. July 16,
2020) (internal alterations, quotation marks, and citation omitted) (omissions not actionable
where allegedly misleading statements described topics "unrelated to a scheme to fraudulently
garner referral bonuses from advertisers").  *See generally Matrixx Initiatives*, 563 U.S. at 37
(omission of information not affirmatively required to be disclosed is only actionable "when
disclosure of such information is necessary to make statements made, *in the light of the
circumstances under which they were made*, not misleading." (emphasis added)).

[21] Insofar as the statements focus on jurisdictions in which SBTech had obtained formal
regulatory approval, listing operations in (alleged) black-market jurisdictions would have been
nonsensical.

(S.D.N.Y. 2019) (declining to consider statements "in a vacuum" and looking, instead, to

"remarks surrounding the purportedly false or misleading statements").

Second, the SAC alleges only conclusorily—not with particularity—the fact of illegal

black-market dealings by SBTech in Malaysia, Thailand, Vietnam, and Indonesia[22] or that China

was a black-market jurisdiction.  And the existence of such dealings is the premise of its

material-omission theory.[23]  *See* Pl. Opp. at 17; *see, e.g.*, *In re Axis Cap. Holdings Ltd. Sec.*

---

[22] In opposing dismissal, plaintiffs argue that specificity is "unnecessary" because the SAC "does not—and need not—allege that SB[Tech] engaged in illegal conduct" but only that "[d]efendants failed to disclose their business activities in black markets."  Pl. Opp. at 16.  But even assuming that the SAC satisfactorily pled that the countries above were black-market jurisdictions, and that SBTech (or a subsidiary or client) operated in them, the fact of lawful business conduct by these entities in such lands would not make the challenged statements materially false or misleading.  These statements address compliance with laws applicable to SBTech, its subsidiaries, and its clients, *see* SAC ¶ 105, or sanctions applicable to the relevant transactions, *see id.* ¶ 103.  They do not purport to list countries where SBTech, an affiliate, or client had some presence.  "Disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing," *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 164 (S.D.N.Y. 2018) (internal quotation marks omitted), let alone conduct not pled as unlawful but merely, in plaintiffs' casting, unseemly.  *See, e.g. In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006) ("[T]he federal securities laws do not require a company to accuse itself of wrongdoing."); *In re Yukos Oil Sec. Litig.*, No. 04 Civ. 5243 (WHP), 2006 WL 3026024, at *16 (S.D.N.Y. Oct. 25, 2006) ("[Defendant] can hardly have been expected to disclose the speculative possibility that it might be found guilty of tax evasion in the event that [a Russian tax ministry decision] was called into question," and, regardless, "[d]efendants did disclose the risks attendant to Russian tax legislation and enforcement.").

[23] In a separate argument aimed at eliminating one set of challenged statements, defendants contend that statements made in the BCA—a contract among business entities, not a disclosure to the market—are not actionable.  *See* Pl. Opp. at 14–15; Reply at 2–3.  That argument is questionable, because DraftKings publicly filed the BCA, including the representations therein by the parties to it, and once a corporation has elected to speak, as DraftKings did by filing the BCA with the SEC, it is obliged to "speak truthfully about material issues," *Caiola v. Citibank, N.A. N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002).  For this reason, SEC guidance is that "[w]hen an issuer makes a public disclosure of information—via filing a proxy statement or otherwise"—it must evaluate whether additional disclosure is necessary to contextualize its disclosure and "cannot avoid this disclosure obligation simply because the information published was contained in an agreement or other document not prepared as a disclosure document."  *See* SEC Release

*Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) ("If the complaint fails to allege facts which would establish such an illegal scheme, then the securities law claims premised on the *nondisclosure* of the alleged scheme are fatally flawed." (emphasis in original)).  As reviewed above, as to Malaysia, Vietnam, Indonesia, and Thailand, the SAC does not plead with the required specificity the fact of black-market operations.  And as to China, it does not plead with particularity that China was a black-market jurisdiction during the class period or that SBTech, its subsidiaries, or its clients violated applicable Chinese laws.  *See* SAC ¶ 105 (excepting grey-market jurisdictions); *id.* ¶ 84 (quoting Hindenburg Report statement that, at the time of the Oregon Report, China was classified as a grey market).

Third, insofar as the SAC seizes on the fact that, in 2018, a single, SBTech sub-licensee accepted wagers from an end-use operator in Iran, DraftKings's non-disclosure of this, or of its ostensible operations in Iran, this allegation is also not actionable.  *See* Or. R. at 9.  The statements at issue do not purport to catalog the jurisdictions in which SBTech operated historically.  *See id.*  Rather, they list SBTech's then-current partners, SAC ¶ 100 (using present tense), and licensures, *see, e.g.*, *id.* ¶ 117 (listing jurisdictions where SBTech "has obtained" licensures).  *See Gagnon*, 368 F. Supp. 3d at 768 ("[J]udges in this district routinely decline to impose liability for statements where the subject matter of the statements is not sufficiently connected to the undisclosed corporate misconduct.").  And, as reviewed above, DraftKings's statements about its licensees were not rendered false or misleading by not mentioning an incident of misconduct by a sub-licensee in a market in which the pleadings do not demonstrate

---

No. 51283, 2005 WL 1074830, at *2 (Mar. 1, 2005).  In the end, however, the Court need not resolve this claim, because DraftKings's challenged statements—in the BCA and elsewhere—were not misleading, including as to the existence of black-market operations by a BCA signatory or affiliate, and thus additional disclosure was not required.

business activity by SBTech (and in which the Oregon Report states that SBTech had "chosen not to enter)." Or. R. at 9. Simply put, DraftKings's statements addressed concepts distinct and afield from the fact omitted.[24]

### 2. Failures to Disclose Black-Market Revenue Sources

For several reasons, the SAC's claim—whether cast as alleging a material omission, a misleading statement, or half-truth—that DraftKings failed to disclose its revenue from black-market jurisdictions does not state a § 10(b) claim. *In re Vivendi*, 838 F.3d at 239–40 (distinguishing non-actionable "pure omissions" from misleading, and actionable, "half-truths"). The SAC faults DraftKings's statements disclosing its revenue for not disclosing that the jurisdictions in which SBTech operated "included black markets for gambling," or "that the unnamed reseller was [CoreTech] and . . . that [CoreTech] was affiliated with SBTech at that time." *See, e.g.*, *id.* ¶¶ 110, 115, 30, 137, 139, 142.

To begin, as reviewed above, the SAC does not allege with anything close to sufficient particularity either that SBTech operated in black-market jurisdictions during the class period, such that it could have generated revenue from any such operations, or that CoreTech was an undisclosed affiliate of SBTech. That failing, alone, sinks the SAC's non-disclosure theory. *See*

---

[24] In any event, the SAC does not plead that the undisclosed fact of a sub-licensee's dealings with an Iranian end-use operator was material. "Courts have generally held that failure to disclose anecdotal incidents of improper [] tactics or other isolated . . . misconduct is not material," and that "[i]nstead, the alleged improper activity must be widespread or otherwise of sufficient magnitude as to be capable of affecting a reasonable investor's decision to buy or sell the company's stock." *See In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 527 & n.19 (S.D.N.Y. Aug. 18, 2020) (collecting cases). That is all the more so here given that this incident occurred a year before SBTech's challenged representations and that, as reflected in the Oregon Report on which the SAC relies for this incident, SBTech terminated its relationship with the licensee upon learning of the sub-licensee's dealings with Iran. *See* SAC ¶ 86. The SAC does not explain why this detail, if disclosed, would have "affect[ed] the desire of investors to buy, sell, or hold securities," *In re Lululemon*, 14 F. Supp. 3d at 572, or "significantly altered the 'total mix' of information made available," *JP Morgan Chase*, 553 F.3d at 197 (internal quotation marks omitted).

*In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 632 (S.D.N.Y. 2005) (no material omissions where charge that bank's officers violated certain laws "lack[ed] support in the factual allegations").

In any event, that DraftKings's high-level statements reporting the fact of SBTech's operations "in Asia"[25] did not identify its alleged operations in black-market jurisdictions, or identify the principal reseller in Asia as CoreTech, *see, e.g.*, SAC ¶¶ 129 (Form 10-K), 136 (Amendment), 138 (Prospectus), does not render these statements actionable. That is because, whatever interest there might have been in such information, DraftKings had no duty to disclose it. "No such duty [to disclose] arises 'merely because a reasonable investor would very much like to know' [certain] information." *In re Vivendi, S.A.* 838 F.3d at 239. And DraftKings's high-level statements disclosing the fact of operations in Asia "'did nothing more than' accurately 'characterize statistical facts.'" *Marcu*, 2020 WL 4016645, at *5 (quoting *In re Sanofi*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016)) (ellipses omitted). DraftKings disclosed, for example, the percentage of SBTech's revenue derived from "other regions (primarily Asia)," SAC ¶ 113, noting the "addition of new customers in Asia," *id.* ¶ 114, and the percentage of SBTech's revenue derived from an individual reseller. These did not oblige it to address different subjects: the particular jurisdictions in which that revenue was earned, or the allocation of that revenue to non-black-market, versus black-market, jurisdictions. *See Marcu*, 2020 WL 4016645, at *5 (statements that certain apps have "some very large contributions to revenues" or

---

[25] These statements fall into two categories: (1) statements regarding the percentage of SBTech's revenue "derived from customers in Europe and other regions (primarily Asia)," SAC ¶¶ 108 & n.27 (Form S-4 and Form S-4/A), 113 (Proxy Statement), 136 (Amendment); and (2) statements regarding the growth of SBTech's customer base "in Asia," *id.* ¶¶ 108, 114 (Proxy Statement). *See also id.* ¶¶ 119 (May 2020 Prospectus contained substantially similar statements), 122 (same, for the June 2020 Prospectus).

"have achieved critical mass" are "not misleading in the slightest"). *Contra* Pl. Opp. at 19–20.

These statements did not, "for instance, tout[] some legitimate competitive advantage or

specifically deny[] wrongdoing"; instead, they merely "reported the facts that some of the

reported revenue and income came from" certain regions or resellers. *Marcu*, 2020 WL

4016645, at *5 (quotation marks omitted). Nor does the SAC allege that these statements are

inaccurate. *See Plumber & Steamfitters*, 11 F. 4th at 98–99 ("[A]ccurately reported financial

statements do not automatically become misleading by virtue of the company's nondisclosure of

suspected misconduct that may have contributed to the financial results."); *In re Marsh*, 501 F.

Supp. 2d at 469–70 (no actionable omission where financial reporting was accurate, even where

it did not disclose revenue sources relating to uncharged criminal conduct).[26]

### C.    Scienter

Independently, the SAC's claims must be dismissed because they do not adequately plead

scienter.  "[A] plaintiff can establish scienter for purposes of a securities-fraud claim by alleging

---

[26] Of the statements the SAC challenges, those made on certain earnings calls come closest to the mark.  These statements include that "results are due to [DraftKings's] strategy of launching new states as well as growing revenues in existing states," SAC ¶ 121 (Q1 2020 Earnings Call), that "[t]he strong overall results and improvement are due to our product innovation, our entry into new jurisdictions, and pent-up demand for sports betting as Live Sports . . . return," *id.* ¶ 124 (Q2 2020 Earnings Call), and that higher-than-predicted revenue "results were due to over-performance in our core business as well as multiple assumptions on external factors that broke our way, such as the sports calendar, the extension of mobile registration in Illinois, and better-than-expected whole percentage in online Sportsbook," *id.* ¶ 135 (Q4 2020 Earnings Call).  But even assuming the SAC sufficiently alleged black-market operations, these statements would not be misleading for failure to break out the geographic sources of the DraftKings's revenue.  And insofar as the SAC alleges that SBTech operated directly in the at-issue jurisdictions, it either fails to allege specific dates or alleges that such conduct occurred prior to the BCA that gave rise to DraftKings. *See, e.g., id.* ¶ 89 (25 operators, undated), 86 (Iran, 2018), 53, 58 (Vietnam and Indonesia, 2014–2017).  Such conduct, as pled, could not have contributed to a not-yet-extant company's revenue.  As such, these statements cannot serve as the basis for a § 10(b) claim against DraftKings for a material omission or misrepresentation. *Cf. In re Sanofi*, 155 F. Supp. 3d at 403–04 (alleged omission must be "sufficiently connected to defendants' existing disclosures" to make those public statements misleading).

facts showing 'either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness.'" *Marcu*, 2020 WL 4016645, at *7 (quoting *JP Morgan Chase Co.*, 553 F.3d at 198). "To qualify as 'strong,' an 'inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (quoting *Tellabs*, 551 U.S. at 308). "Securities-fraud claims based on recklessness, however, must 'specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements.'" *Id.* (quoting *Novak*, 216 F.3d at 308).

### 1.    Motive and Opportunity

"To raise a strong inference of scienter through 'motive and opportunity,' a plaintiff must allege that the defendant corporation or its officers 'benefitted in some concrete and personal way from the purported fraud.'" *Koplyay v. Cirrus Logic, Inc.*, No. 13 Civ. 790 (CM), 2013 WL 6233908, at *5 (S.D.N.Y. Dec. 2, 2013) (quoting *Novak*, 216 F.2d at 307–08). Generally, "this can be established with allegations that a defendant made unusual insider sales at a time when he withheld material information from the investing public." *Id.* (internal quotation marks omitted) (quoting *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 275 (S.D.N.Y. 2008)).

The SAC pursues one theory of an improper motive. It alleges that individual defendants aimed to enrich themselves through securities transactions, timed to "unload massive amounts of DraftKings shares as soon as they could," before, presumably, the public learned of SBTech's alleged black-market activity. SAC ¶¶ 185, 189. Specifically, the SAC alleges that on various dates during the 18-month class period, three of the six individual defendants (Meckenzie, Robin, and Park) engaged in total of 15 stock sales. *See id.* ¶ 185. Below are excerpts from SAC's chart alleging these trades:

| Filer Name | Transaction Date | Direct Indirect | Price | Shares Sold | Proceeds | % of Shares Sold | Net Profits |
|---|---|---|---|---|---|---|---|
| Park (Jason) | 06/23/2020 | D | $38.80 | 76,128 | $2,953,766 | | |
| *CFO* | 05/21/2021 | D | $45.78 | 9,513 | $435,505 | | |
| | 05/21/2021 | D | $45.05 | 43,837 | $1,974,857 | | |
| | | | | **129,478** | **$5,364,128** | **11.42%** | **$4,755,582** |
| Robins (Jason) | 06/18/2020 | D | $38.80 | 548,862 | $21,295,846 | | |
| *CEO,* | 06/18/2020 | I | $38.80 | 1,256,118 | $48,737,378 | | |
| *Board* | 05/14/2021 | I | $44.81 | 137,200 | $6,147,932 | | |
| *Chairman* | | | | | | | |
| | 05/14/2021 | I | $42.78 | 24,300 | $1,039,554 | | |
| | 05/14/2021 | I | $44.20 | 128,896 | $5,697,203 | | |
| | 05/14/2021 | I | $42.10 | 42,937 | $1,807,648 | | |
| | | | | **2,138,313** | **$84,725,561** | **11.40%** | **$81,477,356** |
| Meckenzie (Shalom) | 06/23/2020 | D | $38.80 | 4,680,136 | $181,589,277 | | |
| *SBTech* | 10/9/2020 | D | $50.83 | 6,949,088 | $353,222,143 | | |
| *Founder,* | | | | | | | |
| *Director* | 05/27/2021 | D | $50.00 | 660,000 | $33,000,000 | | |
| | 06/14/2021 | D | $51.84 | 449,083 | $23,280,463 | | |
| | 06/14/2021 | D | $52.66 | 10,792 | $568,307 | | |
| | 06/14/2021 | D | $50.86 | 200,125 | $10,178,358 | | |
| | | | | **12,949,224** | **$601,838,547** | **36.65%** | **$601,838,547** |

The Form 4s attached to defendants' motion reflect that, of these, Park's two May 21, 2021 trades were made pursuant to a 10b-5 trading plan adopted on March 19, 2021. Dkt. 66, Ex. 66 at 21, n.1. Robins's four May 14, 2021 trades, which were of stock held indirectly by the Robins September 2020 Grantor Retained Annuity Trust ("GRAT"),[27] were made pursuant to a 10b-5 trading plan last amended on December 11, 2020. *Id.*, Ex. 8, at 32 n.1. Meckenzie's May 27, 2021 sale and three June 14, 2021 sales were also made pursuant to 10b-5 trading plans,

---

[27] Faisal Hasan, as to whom there are no allegations in the SAC, is listed as the reporting person on each selling defendant's Form 4. *See* Dkt. 66, Exs. 6–9. Hasan was the trustee of the Robins September 2020 GRAT. *See id.*, Ex. 8 at 32 n.1.

although his Form 4s do not reflect the dates on which these plans were adopted.  *See id.*, Ex. 6 at 16 n.1, 17 n.1.[28]

For multiple reasons, the facts pled do not raise a strong inference of scienter.[29]

First, viewed in context, the individual defendants' sales do not present as suspicious so as to support inferring scienter.  "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling."  *City of Omaha Police and Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 419 (S.D.N.Y. 2020).  Here, although the profits from the identified sales were significant, the selling defendants all retained more shares than they sold.  *See* Dkt. 66, Exs. 6–8; *see, e.g.*, *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 763 (S.D.N.Y. 2018) ("[T]he decisive question in assessing

---

[28] However, the Report cites to a Schedule 13D on the SEC's website states that Meckenzie's May 27, 2021 sale was made pursuant to a 10b-5 trading plan adopted on March 19, 2021.  *See* Report at 6 (citing https://www.sec.gov/Archives/edgar/data/1772757/000134100421000198/sc13d-a3.htm)

[29] The SAC also alleges sales made by seven non-party insiders of DraftKings.  SAC ¶ 185.  But beyond alleging the roles of these persons and the percentage of their shares sold, the SAC offers no allegations regarding them or the circumstances of these sales whatsoever.  *Id.*  It does not allege that they knew the at-issue statements were materially false or misleading, whether these individuals acquired any shares during the class period, or that their sales had any connection to the alleged misstatements or omissions.  Even if the conduct of these seven persons could somehow bear on the state of mind of DraftKings or an individual defendant, the SAC is devoid of information that would shed light on whether the alleged trades were suspicious—as to these non-party persons and the three individual defendants.  For example: the circumstances of the alleged trades (that is, whether they were made pursuant to 10b-5 trading plans); whether the listed individuals acquired stock during the class period (*e.g.*, through purchase or vesting of certain rights); and whether the "% of shares sold" figure cited in the SAC reflects the proportion of the shares with which the individual began the class period that were sold, or the proportion of all shares an individual had *or acquired* during the class period that were sold—that is, the percentage of all shares an individual "*could have* sold."  *In re Aratana*, 315 F. Supp. 3d at 763 (emphasis in original).  Although defendants provided the Form 4s for the selling defendants, therefore providing such clarifying data, *see* Dkt. 66, Exs. 6–9; *id.*, Ex. 10 (explaining Form 4 codes), the SAC did not attach the Form 4s or summarize this data for the non-party insiders.

whether an insider's sales are indicative of scienter is how many shares the insider sold during the class period relative to the total number of shares that he or she *could have* sold.  Such a number appropriately captures not only the fact of sales, but also the extent to which the insider availed himself or herself of, or forwent, the opportunity to turn a profit before disclosure of concealed bad news." (emphasis in original)).  Indeed, the shareholdings of two of the sellers, Robins and Park, *increased* during the class period, *see* Dkt. 66, Exs. 7–8; *Evoqua Water Techs.*, 450 F. Supp. 3d at 420; Sagansky and Baker are not alleged to have sold any stock during the class period, further undermining any such inference, *see* Reply at 8 (undisputed that defendants Sagansky and Baker sold no stock).[30]  Both of these facts weigh against inferring scienter.  *See, e.g., San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) ("In the context of this case, we conclude that the sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent; the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive."); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 291 (S.D.N.Y. 2006) ("[T]he dispositive factor is that other insiders, including the other two individual defendants, did not sell during the putative class period," where two defendants had sold less than twenty percent of their individual holdings.); *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 570 (no motive where only one individual defendant sold 20% of stock);

---

[30] Sagansky and Baker were officers of DEAC through the Business Combination on April 23, 2020.  *See* SAC ¶¶ 20–21.  The SAC alleges that the two signed certain documents filed with the SEC before that date, *see, e.g., id.* ¶¶ 107 (Form S-4), 111 (Proxy Statement), but it is devoid of factual allegations about them, their ownership, sale, or acquisition of DraftKings stock, or their respective roles with DraftKings, if any, later in the class period.  The SAC thus supplies no basis to infer scienter on the part of these defendant officers.  *See, e.g., Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 464, 481 n.170 (S.D.N.Y. 2010); *see also* Reply at 8 (no dispute that two individual defendants sold no stock).

*Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 481 n.170 (S.D.N.Y. 2010) (no motive where two defendants did not sell any stock during class period, and one purchased stock).

Second, on the SAC's spare allegations, the timing and circumstances of the 15 transactions themselves were not suspicious.[31]  *See* SAC ¶ 185.  Critically, none was discretionary as of the date of the sale.  Ten of the 15 were pursuant to binding Rule 10b5-1 plans, which irrevocably committed the executives to sales on specified future dates.  *Compare id.*, *with* Dkt. 66, Ex. 6 (four transactions by Meckenzie); *and id.*, Ex. 7 at 21 n.1 (two transactions by Park); *and id.*, Ex. 8 at 31–32 (four transactions by Robins).  *See* Motion at 21; Dkt. 66, Ex. 9 (summarizing transactions).  The remaining five were pursuant to underwriting agreements entered into in connection with (and therefore preceding) DraftKings's public offerings, which provided for sales immediately following the "lock-up" period in the BCA, Dkt. 66, Ex. 2 at 35, that had prohibited insider stock sales for six months.  *See id.*, Ex. 6 at 5 n.1, 8

---

[31] Independent of the 15 sales, the SAC alleges that, on May 26, 2021, Meckenzie transferred 19 million shares to a trust for his spouse and children.  *See* SAC ¶ 186; *see also id*. ¶ 185 (summary chart of sales, not including the transfer).  The transfer was reported on DraftKings's publicly filed Form 4s.  *Compare* SAC, *with* Dkt. 66, Ex. 6, at 9; *id.*, Ex. 9 (reflecting transfer of 1,235,298 shares to a "trust for benefit of certain former optionholders of SBTech" on November 27, 2020).  The SAC does not allege any facts to support the claim that an intra-family transfer, unaccompanied by a sale, would be indicative of scienter.  *Cf. Gregory*, 297 F. Supp. 3d at 416 (declining to infer scienter from claims unsupported by concrete factual allegations).

n.1 (two transactions, Meckenzie); *id.*, Ex. 7 at 6 (one transaction, Park); *id.*, Ex. 8 at 11 n.1

(three[32] transactions, Robins).[33]

"[S]ales conducted pursuant to a 10b5-1 trading plan" or "executed for procedural

purposes . . . could not be timed suspiciously," *Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 355–56,

and, as a general matter, "do not give rise to a strong inference of scienter." *In re Lululemon*, 14

F. Supp. 3d at 585. "It is true . . . that the mere existence of a trading plan will not defeat an

otherwise strong inference of scienter where, as here, the plans were entered into during the class

period." *In re Aratana*, 315 F. Supp. 3d at 764. But the SAC does not plead facts giving rise to

an inference that the plans themselves were suspect. It does not plead any facts about the trading

plans. *See, e.g.*, *In re Lululemon*, 14 F. Supp. 3d at 585 (no inference of scienter where

complaint "pleads no facts that even remotely suggest that [defendant] entered into the Plan

[during the class period] 'strategically' so as to capitalize on insider knowledge"); *cf. In re*

*Aratana*, 315 F. Supp. 3d at 764 (no inference of scienter where complaint alleges only generally

that trading plans can be abused).[34]  And although not dispositive, the fact that the remaining

---

[32] The SAC appears to combine, as a single transaction, two transactions dated June 18, 2020 in
the form of indirect sales of shares held by the Robins Grantor Retained Annuity Trust of 2020
and Robins Family LLC. *Compare* SAC, *with* Dkt. 66, Ex. 8 at 10 (548,862 + 707,256 =
1,256,118), *with* SAC ¶ 185 (listing an indirect sale of 1,256,118 shares on 6/18/20). The
applicable Form 4 states that these sales were pursuant to the Underwriting Agreement. *See* Dkt.
66, Ex. 8 at 11 n.1.

[33] DraftKings's public filings reflected that two individual defendants made additional, periodic
sales to fund tax payments. *See* Dkt. 66, Ex. 8 at 32 n.1 (six transactions by Robins); Dkt. 66,
Ex. 7 (five transactions by Park). The SAC does not contend that these sales were indicative of
scienter.

[34] Plaintiff broadly contends that trading plans entered into during a class period "provide no
defense to scienter allegations." Pl. Opp. at 24 n.37. That claim mischaracterizes the bench
decision on which it relies: *Plumbers and Pipefitters National Pension Fund v. Tableau*
*Software, Inc.*, No. 17 Civ. 5753 (JGK), 2019 WL 2360942, at *6 (S.D.N.Y. Mar. 4, 2019). In

identified sales were in connection with public offerings also "cuts against an inference of scienter, because it suggests a motive that is 'generally possessed by most corporate directors and officers.'" *Evoqua Water Techs. Corp.*, 450 F. Supp. 3d at 420.

### 2.   Circumstantial Evidence of Misbehavior or Recklessness

Where a complaint lacks well-pled allegations of motive, it bears a "correspondingly greater burden in alleging conscious misbehavior or recklessness." *In re Aratana*, 315 F. Supp. 3d at 765 (quoting *ECA*, 553 F.3d at 198–99) (internal quotation marks omitted). It can plead conscious misbehavior or recklessness by adequately alleging that defendants "knew facts or had access to information suggesting that their public statements were not accurate," *Novak*, 216 F.3d at 311, but "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information," *id.* at 309. For example, "[w]ith respect to sales data and reports, pleadings are sufficiently specific where the plaintiffs have alleged who prepared the reports, how frequently they were prepared, and who reviewed them." *Koplyay*, 2013 WL 6233908, at *7.

In attempting to establish the individual defendants' knowledge of publicly undisclosed facts—to wit, that SBTech had black-market operations—plaintiffs point to six categories of allegations that ostensibly support inferring this knowledge. These are: (1) anonymous employee statements about such operations, *see* Pl. Opp. at 22–23; (2) that Meckenzie was the

---

fact, the authorities cited in *Tableau Software* either state that a trading plan provides no defense where they were conceived during the class period *and* "the Complaint sufficiently alleges that the purpose of the plan was to take advantage of an inflated stock price," *Blanford*, 794 F.3d at 309, or emphasize that the defendant's direct knowledge was already well-plead, *see generally Tableau Software*, 2019 WL 2360942, at *6 (citing *Blanford* and *Freudenberg*, 712 F. Supp. 2d at 200–01). In any event, the Second Circuit has rejected plaintiffs' contention. *See Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 356 n.4 (trading plans were a defense against scienter, even when entered into during the class period, where the complaint failed to "sufficiently allege that the purpose of the plan was to take advantage of an inflated stock price").

principal owner of SBTech before the BCA and, during the period sports betting was becoming

legal in the United States, formed "front entities"—that is, CoreTech and Water Tree Limited—

under the control of his "trusted confidant," Light, and his brother, *see* Pl. Opp. at 21; (3) that

Meckenzie was on Old DK's board of directors since 2013 and Robins and Park, as then-

directors of Old DK, knew what Meckenzie knew, Pl. Opp. at 23; SAC ¶¶ 19, 37; (4) that

Sagansky and Baker knew of SBTech's black-market dealings based on their due diligence, Pl.

Opp. 22 & n.34, 23; SAC ¶¶ 35, 184; (5) statements in the Oregon Report, *see* Pl. Opp. at 21–22

(citing Or. R. at 9); and (6) that, in responding to the Hindenburg Report, DraftKings did not

explicitly deny that SBTech had operated in black-market jurisdictions, *see* Pl. Opp. at 23; SAC

¶ 145.

      Considered as a whole, these allegations do not plead the individual defendants' scienter.

Nor do they plead corporate scienter by other means, for example, by supporting "a strong

inference either (1) that someone whose intent could be imputed to the corporation acted with the

requisite scienter or (2) that the [allegedly false or misleading statements identified in the SAC]

would have been approved by corporate officials sufficiently knowledgeable about the company

to know that those statements were misleading." *See Town of Davie Police Officers Ret. Sys. v.

City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan*, 2021 WL 5142702, at *3 (2d

Cir. Nov. 5, 2021) (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d

160, 177 (2d Cir. 2015) (citations and internal quotation marks omitted)).  Most salient, the

SAC—unsurprisingly given its failure to plead black-market operations adequately—makes only

conclusory allegations that defendants knew of such operations.  It does not "specifically identify

the reports or statements containing this information" that were accessible to individual

defendants.  *Novak*, 216 F.3d at 311, 309; *see also Teamsters Loc. 445*, 531 F.3d at 196 (no

inference of scienter proper based on defendants' knowledge of facts, or failure to monitor information, where complaint did not "specifically identif[y] any reports or statements" that existed); *Long Miao*, 442 F. Supp. 3d at 807 (same, where complaint did not allege specific contrary information known to individual defendants at the time they signed and certified Form 20-F containing allegedly false statements); *In re Sanofi*, 155 F. Supp. 3d at 406–07 (same, where complaint alleged defendants had knowledge to contrary facts, but did not identify the reports or statements containing that information).

And the categories of evidence on which plaintiff relies do not support an inference of scienter. As to the first category, the SAC relies on the same uncorroborated and unconfirmed statements from anonymous employees quoted in the Hindenburg Report that, under the case law, must be put aside. As to the second and third categories, it is "well established that a defendant's position does not, without more, support a conclusion that the defendant had access to information contradicting an alleged misrepresentation." *Marcu*, 2020 WL4016645, at *7; *see, e.g.*, *Lipow v. Net1UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) ("[T]o establish an inference of scienter, Plaintiff must do more than allege that the Individual Defendants had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions."). And the claim that Meckenzie, based on his personal relationships with Light and his brother, knew of CoreTech or Water Tree Limited's internal operations is wholly conclusory and conjectural. *See In re Aratana*, 315 F. Supp. 3d at 765 (no inference of scienter where complaint lacked non-conclusory allegations and did not cite specific documents); SAC ¶ 83 (Water Tree Limited operates the 10Bet brand, which operates in China).

As to the fourth category, to the effect that DEAC conducted "extensive due diligence on SBTech prior to the Business Combination," *see* SAC ¶ 184, "conditional allegations of the sort that [a defendant] 'would' have learned the truth about a company's fraud" through due diligence are, without more, "generally insufficient" to plead scienter. *Town of Davie Police Officers*, 2021 WL 5142702, at *2 (quoting *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 646 (2d Cir. 2015) (alterations in original) (citations and internal quotation marks omitted)).  And the SAC does not identify any specific documents, reports, or information in the due diligence that would have revealed SBTech's ostensible black-market operations. *See Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (dismissing claims where complaint failed to "specifically identif[y] any reports or statements that would have come to light in a reasonable investigation and that would have demonstrated the falsity of the allegedly misleading statements" (internal quotation marks and citation omitted)); *id.* (a "broad reference to raw data" did not "raise[] an inference of scienter based on knowledge of or access to information demonstrating the inaccuracy of [defendant's] public statements").

As to the fifth category, the Oregon Report—the sole report that the SAC identifies with particularity—suggests the *absence* of fraudulent intent. *See* Reply at 9.  Far from stating that any executive knew of black-market dealings, the Oregon Report states that SBTech "sought and obtained legal advice regarding the legal status of on-line gambling in China."  Or. R. at 10.  That SBTech voluntarily hired lawyers to independently assure compliance with the law is, without more, in tension with premise of executive knowledge that SBTech was doing prohibited business. *Cf. In re Aratana*, 315 F. Supp. 3d at 765–66 (no fraudulent intent where defendants voluntarily hired sales team and spent millions of dollars developing inventory, which they were ultimately unable to sell by the predicted release date).  That SBTech's legal advice aligned with

the understanding of "many other licensed European operators" "that the Chinese laws prohibiting gambling" did not bar the provision of "online gambling services originating from outside China's territorial borders," and that China was a grey-market jurisdiction, as the Oregon Report further reported, *see* Or. R. at 10, also undermine the inference that company executives acted with the requisite intent.  And, as noted, the 2018 conduct of an SBTech sub-licensee in Iran—which, as pled, breached SBTech's policies, and was promptly terminated after it came to light, *see* SAC ¶ 86—does not mean that SBTech or its client broke the law, let alone that it tolerated any violation in real time or acted with the intent to defraud.  *See Gray*, 2021 WL 4429499, at *11 (no scienter where plaintiff relied on mere fact that defendants continued indirect sales to company that had been placed on a Department of Justice list, but failed to establish that these sales violated the law).

As to the sixth category, defendants were not under any obligation to respond at all to the Hindenburg Report.  And plaintiff does not cite any authority that a denial of accusations, if less than categorical, supports inferring scienter.  DraftKings's statement was that it had "conducted a thorough review of [SBTech's] business practices and [was] comfortable with the findings" and refused to "comment on speculation or allegations made by former SBTech employees."  SAC ¶¶ 144–45.  This response cannot coherently be read to admit any violation of law.  In any event, even if it had, DraftKings's response says nothing about the state of mind of the company or its officers much earlier in the class period, when the allegedly actionable corporate statements were made.  *See In re Sierra Wireless,* 482 F. Supp. 2d at 378 ("In order for a statement to be false or misleading, a plaintiff must allege that the speaker was aware of adverse information at the time he spoke.").

The SAC therefore fails to state a claim for the independent reason that it fails to plead facts giving rise to a strong inference of scienter.

### D.     Loss Causation

In light of its holdings that the SAC fails to adequately allege either (1) an actionable misstatement or omission or (2) scienter, the Court does not have occasion to reach defendants' alternative argument that the SAC inadequately pleads loss causation.  *See, e.g.*, *Taylor v. Westor Cap. Grp.*, 943 F. Supp. 2d 397, 402 (S.D.N.Y. 2013) (declining to reach loss causation issue under similar circumstances); *Ok. Firefighters Pension & Ret. Sys. Xerox Corp.*, 300 F. Supp. 3d 551, 581 (S.D.N.Y. 2018) (same).

### E.     Item 105 and Item 303 of SEC Regulation S-K

In a distinct but related category of allegations, the SAC alleges that DraftKings violated § 10(b) by failing to disclose "the impact and/or potential liabilities associated with . . . SBTech's operations in black markets for gambling" as, the SAC claims, Items 105, 17 C.F.R. § 229.105, and 303, *id.* § 229.303, of SEC Regulation S–K independently required.  *See* SAC ¶¶ 174–78.  Item 303 "imposes a disclosure duty where a trend, demand, commitment, event or uncertainty is both (1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations."  *Rubinstein v. Credit Suisse Grp. AG*, 457 F. Supp. 3d 289, 300 (S.D.N.Y. 2020) (quoting *Panther Partners Inc.*, 681 F.3d at 120) (internal quotation marks omitted); *see* 17 C.F.R. § 229.303(a)(1).  The failure to make a required Item 303 disclosure is "an omission that can serve as the basis for a Section 10(b) securities fraud claim . . . only if it satisfies the materiality requirements outlined in *Basic Inc v. Levinson*, 485 U.S. 224 (1988), *and* if all the other requirements to sustain an action under Section 10(b) are fulfilled."  *Stratte-McClure*, 776 F.3d at 100 (emphasis added) (affirming dismissal where complaint failed to plead scienter).  Item 105, "formerly item 503,

requires disclosure of the 'most significant risk factors' associated with the security."

*Rubinstein*, 457 F. Supp. 3d at 300 (citing 17 C.F.R. § 229.105).  Courts have also treated the

failure to make a required Item 105 disclosure as the basis for a § 10(b) claim.  *See, e.g.*, *Lau v.*

*Opera Ltd.*, 527 F. Supp. 3d 537, 556 (S.D.N.Y. 2021) (where complaint failed to allege Item

105 violation, it also failed to allege § 10(b) violation as to those documents).

Substantially for the reasons reviewed above, the SAC does not viably allege breaches of

DraftKings's disclosure obligations under Items 105 and 303.  That claim turns on the same ill-

pled factual premise as the claims of material misrepresentations and omissions found wanting

above:  that, directly and through CoreTech, SBTech operated in black-market jurisdictions.  *See*

SAC ¶¶ 174–78; Pl. Opp. at 20–21; *see also* Motion at 18; *Schaffer v. Horizon Pharma PLC*, No.

16 Civ. 1763 (JMF), 2018 WL 481883, at *14 (S.D.N.Y. Jan 18, 2018) (dismissing claims of

violations under Items 303 and 503 where these were "largely redundant" of deficient claims

under the Exchange Act and the Securities Act"); *Garnett v. RLX Tech. Inc.*, No. 21 Civ. 5125

(PAE), 2022 WL 4632323, at *26 (S.D.N.Y. Sept. 30, 2022) (same); *Gutman v. Lizhi Inc.*, No.

21 Civ. 317 (LDH) (PK), 2022 WL 4646471, at *5 (E.D.N.Y. Oct. 1, 2022) (Item 105 requires

the presence of a significant risk).  Because the SAC does not adequately allege the fact of

operations in black-market countries during the class period, it necessarily does not plead a

failure to disclose the risks therefrom.  And the SAC does not allege a different basis for its

claim of noncompliance with these Items: for example, that an anticipated regulatory or

legislative change posed a reasonably likely and significant effect on DraftKings's financial

condition or operations.  *See, e.g.*, *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, No.

21-2524, 2022 WL 17815767, at *1–3 (2d Cir. Dec. 20, 2022) (complaint pled Item 303

violation where defendants knew that proposed regulation promulgated by United Nations set to

go into effect in 2020, even though some market experts believed the regulation would be revised or its effective date extended, would significantly affect issuer's business).

Unsurprisingly, too, the SAC does not plead the requisite state of mind: that DraftKings knew of a material risk or uncertainty presented by SBTech's purported black-market operations. *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) ("The plain language of Item 303 confirms our previous assumption that it requires the registrant's actual knowledge of the relevant trend or uncertainty."); *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, No. 08 Civ. 9203 (RJS), 2010 WL 1372709, at *6 (S.D.N.Y. Mar. 31, 2010) ("Knowledge of a trend is an essential element triggering disclosure under Item 303.").[35]  The SAC makes only the general allegation that "[d]efendants knew that SBTech was operating in black markets for gambling," SAC ¶ 177, but this allegation fails to plead "*actual* knowledge of an existing trend, event, or risk," as required to allege violations of Section 303 and 105.  *Rubinstein*, 457 F. Supp. 3d at 300–01 (collecting cases) (emphasis in original) (rejecting allegations of violations under Items 105 and 303 where plaintiffs alleged that defendant could be "presumed to have known" of a risk); *see In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 302 (S.D.N.Y. 2021) (same).

F.     **Section 20 Claims**

---

[35] *See also Rubinstein*, 457 F. Supp. 3d at 300 ("Plaintiffs must demonstrate *actual* knowledge of an existing trend, event, or risk to allege violations of Section 303 and 105." (emphasis in original)); *Wandel v. Gao*, 590 F. Supp. 3d 630, 646 (S.D.N.Y. 2022) (same); *Lematta v. Casper Sleep, Inc.*, No. 20 Civ. 2744 (MKB), 2022 WL 4637795, at *13 (E.D.N.Y. Sept. 30, 2022) ("To state a claim under Item 105, an issuer must know . . . about an undisclosed risk factor that could seriously affect its present or future business."); *see also Jaroslawivz v. M&T Bank Corp.*, 962 F.3d 701, 713 (3d Cir. 2020) ("[T]he text of Item 105 . . . naturally requires an allegation that a *known* risk factor existed at the time of the offering." (emphasis added)), *cert. denied*, 141 S. Ct. 1284 (2021).  *But see Gutman*, 2022 WL 4646471, at *5 ("Item 105 does not require a plaintiff to plead actual knowledge, [but] it does require the presence of a significant risk.").

The SAC also alleges claims against the individual defendants under § 20(a) of the Exchange Act.  See SAC ¶¶ 214–19.  To state a claim under § 20(a), a complaint must adequately allege "a primary violation by the controlled person."  *Carpenter Pension Tr. Fund*, 750 F.3d at 236 (quoting *ATSI,* 493 F.3d at 108).  Because the SAC has not so pled, its § 20(a) claims necessarily must also be dismissed.  *See, e.g.*, *Gregory*, 297 F. Supp. 3d at 418 (dismissing § 20(a) claim based on failure to adequately allege primary violation); *Lopez*, 173 F. Supp. 3d at 42–43 (same); *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 24 (S.D.N.Y. 2016) (same).

### G.     Leave to Replead

Plaintiffs seek, in the event of dismissal, leave to file another amended complaint under Federal Rule of Civil Procedure 15(a).  Pl. Opp. at 25 n.41.  The Court denies such leave.  On November 22, 2021, the Court advised plaintiffs that, if they chose to amend the complaint rather than oppose a motion to dismiss, no further opportunities to amend would ordinarily be granted. Dkt. 49.  Plaintiffs have already amended the complaint twice—once before and once after a motion to dismiss.  And plaintiffs have not identified additional factual allegations—for example, a solid factual basis on which to allege black-market operations by SBTech—that would cure the deficiencies noted in the motion to dismiss, explained how further investigation or diligence would rectify the SAC's deficiencies, or otherwise offered any reason for the Court to disregard its earlier warning.  *See* Dkts. 52, 62.

"Where the problems with a claim are 'substantive' rather than the result of an 'inadequately or inartfully pleaded' complaint, an opportunity to replead would be 'futile' and 'should be denied.'"  *Long Miao*, 442 F. Supp. 3d at 808 (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).  Here, for the reasons reviewed in this decision, the deficiencies of the

SAC's claims are substantive.  And in light of plaintiffs' multiple opportunities to amend, and the fact that plaintiffs' counsel purports to have investigated the allegations in the Hindenburg Report on which the SAC relies, *see* SAC ¶ 51 n.13 (unable to confirm employee statements); Pl. Opp. at 11 n.7 (able to confirm other factual allegations in Report), further amendment would be futile.  The Court thus denies the request to amend.  *See, e.g.*, *Garnett*, 2022 WL 4632323, at 29 n.26 (collecting cases).

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss, pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the PSLRA.  The dismissal is with prejudice.

The Clerk of the Court is respectfully directed to terminate all pending motions and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: January 10, 2023
       New York, New York